UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

United States of America,
*Plaintiff-Appellee*,

v.

Sixth Circuit No. 23-3840

Alexander Sittenfeld a/k/a "P.G. Sittenfeld,"
*Defendant-Appellant*.

———————————————————————

United States' Response in Opposition to
Defendant's Motion for Release Pending Appeal

———————————————————————

The United States opposes Defendant-Appellant Alexander Sittenfeld's motion for release pending appeal. Sittenfeld has not raised a substantial issue sufficient to rebut the statutory presumption of detention pending appeal under 18 U.S.C. § 3143(b). The motion should be denied.

Factual Background

Sittenfeld is a former Cincinnati City Council member. Following a broader FBI investigation into corruption at City Hall, the grand jury charged Sittenfeld with two counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (Counts 1 and 2); two counts of federal funds bribery, in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 3 and 5); and two counts of attempted extortion under color of official right, in violation of 18 U.S.C. § 1951(a), (b)(2) (Counts 4 and 6). The jury convicted Sittenfeld on one count of federal funds bribery and one count of

attempted extortion. These counts related to his agreement to "deliver the votes" for a project needing City Council approval in exchange for $20,000 in bribe payments.

The testimony at trial established that Chinedum Ndukwe, a real estate developer, had been trying to develop a real estate project in downtown Cincinnati called 435 Elm St. To do so, Ndukwe would need the Cincinnati City Council's formal approval.  Approval required a majority of the nine members of Council voting in favor of a development agreement; six votes would prevent the mayor from vetoing the agreement.  But Ndukwe's efforts to secure City approval had stalled.

Ndukwe was friends with Sittenfeld, a City Council member with ambitions to run for mayor. In September 2018, Sittenfeld solicited a $10,000 campaign donation from Ndukwe, knowing that Ndukwe was seeking the City's approval for the project. (R. 266, 6242–44.) In a recorded call, Ndukwe told Sittenfeld his project "was starting to heat up," and they discussed Sittenfeld meeting with two investors of the project who could support Sittenfeld financially. (USA Ex. 12B.) Unbeknownst to Sittenfeld, the two investors were undercover FBI agents.

In an October 30, 2018 recorded phone call, Ndukwe and Sittenfeld discussed having a meeting with Ndukwe's investors. Ndukwe explained that he was encountering resistance from the City's then-mayor regarding the project. As a result, he was trying to keep his name off political contributions. After Ndukwe discussed raising funds for Sittenfeld—and not contributing in Ndukwe's own

name—Sittenfeld warned Ndukwe: "You don't want me to be like, sorry, Chin, love you but can't." (USA Ex. 13B at 2–3.) Ndukwe testified that he understood Sittenfeld to be conditioning his support for the 435 Elm St. project on his receipt of donations. (R. 266, 6247.) The jury heard evidence that this type of activity was part of Sittenfeld's fundraising strategy—he told a campaign staffer he "would look more favorably upon those who contributed to him and only him," (R. 267, 6448); and he warned a lobbyist that if another Cincinnati lobbyist "hedges on my campaign, I'm going to hedge on his clients as mayor," (R. 266, 6369).

In a November 2, 2018 recorded call, Ndukwe offered Sittenfeld an express *quid pro quo*: the investor (undercover agent "Rob") would pay Sittenfeld $20,000 total, and $10,000 during a meeting with Sittenfeld the very next week, but the investor was going to want a "yes vote . . . , without a doubt" on 435 Elm St. when they met. (USA Ex. 14B). Sittenfeld responded, "nothing can be illegal . . . nothing can be a [ ] quid pro quo." In the very next breath, however, he stated that he was "super pro-development" especially regarding the "revitalization of . . . our urban core." (The jury heard that 435 Elm St. was a development project to revitalize the urban core.) Sittenfeld then stated, "we can discuss that more *in person*," and proceeded to set up the meeting with Rob, the investor who he now knew wanted to make a clearly corrupt offer, so Sittenfeld could give that corrupt businessman "the confidence and the comfort" he was investing in a "winning endeavor."

Sittenfeld then met Ndukwe and Rob a few days later. The meeting was recorded. The jury heard evidence that the 435 Elm St. project was complicated, and professionals in the City's Economic Development Department did not support the development agreement sought by Ndukwe. (R. 262, 5575–76; 5585; 5591.) But when Sittenfeld met with Rob and Ndukwe on November 7, 2018—knowing Rob intended to offer money for a "yes vote" *at that very meeting*—Sittenfeld agreed to "shepherd the votes" *within minutes* of discussing the proposal. (USA Ex. 15C.)

The meeting continued with Sittenfeld and Rob in a private condominium. This interaction was video-recorded and the jury watched the video multiple times. Rob stated he needed to guarantee enough votes for the development agreement on Council to override a veto by the current mayor. He offered Sittenfeld $20,000 to "to get that deal." In response, Sittenfeld agreed to "deliver the votes." (USA Ex. 15C.) They then discussed how to pay the $20,000 (the *quid*) to Sittenfeld in a way that would keep the undercovers' names off public filings, and Sittenfeld later reaffirmed, "we're gonna make [the development agreement] happen" (the *quo*).

Following these interactions, Sittenfeld continued to cultivate a relationship with the undercovers and reaffirmed in meetings in which he received checks that he would ensure the agreement passed through Council. (USA Ex. 20D (Sittenfeld: "I'm ready to shepherd the votes" in November 28 meeting); Ex. 21G (Sittenfeld: "I can always get a vote to my left or to my right" in December 17 meeting).)

4

Sittenfeld also discussed ways the "investors" could make payments without disclosing their names. (USA Ex. 18D (Sittenfeld: "nothing about [the PAC] in any way will ever be connected to me and no one will, you know, no one's going to be poking around for it to find your names on it."); Ex. 20D (Sittenfeld: (after receiving checks) "my name is not connected to [the PAC] in any way. . . . No one will ever know this").)

After entering the agreement and receiving the checks, Sittenfeld attempted to fulfill his end of the corrupt bargain through discussions with the mayor and the Economic Development Department. (USA Ex. 22G, 23C.) He also encouraged Rob to take the agreement straight to Council for a direct vote to get around opposition to the project. (USA Ex. 25B (Sittenfeld: "Let's do it."); 26D (Sittenfeld: "Go the council route. . . . I offered.").) Sittenfeld had not helped advance 435 Elm prior to his calls with Ndukwe in late October 2018. (R. 266, 6251–52). He ultimately voted to approve the transfer of 435 Elm to the Port Authority but not without first discussing the transfer with Ndukwe and Rob. (USA Ex. 26B, 27C.)

Sittenfeld testified in his own defense at trial. For each of the recorded calls and interactions described above, Sittenfeld offered his own interpretation of what his words meant and what he intended. Sittenfeld testified that he never took part in any quid pro quo arrangement and never intended to act illegally. During closing

argument, defense counsel told the jury: "Everything in this case comes down to intent. Everything comes down to what P.G. intended." (R. 251, 5040.)

The jury determined Sittenfeld's intent when it convicted him of federal funds bribery and attempted extortion. Both counts required the jury to find that Sittenfeld had entered an explicit quid pro quo involving the 435 Elm St. project.

Sittenfeld sought to overturn the verdict in a motion for acquittal, arguing that the government did not prove the existence of a quid pro quo. Sittenfeld argued—as he does now—that so long as a politician's statements and conduct are even "susceptible to an innocuous explanation," they cannot provide the basis for criminal liability. (R. 270, 6875–90.) The district court disagreed because matters of intent are for the jury to decide. Relying on *United States v. Terry*, 707 F.3d 607, 614 (6th Cir. 2013), the court emphasized that "'[t]he trier of fact is 'quite capable of deciding the intent with which words are spoken or actions taken as well as the reasonable construction given to them by the official and the payor." (R. 283, 7140.) Citing the "hours of recordings and testimony," the court easily concluded, "a rational jury could have found that an explicit quid pro quo existed." (*Id*. at 7140–43.)

Sittenfeld also filed a Rule 33 motion in which he argued that the government unconstitutionally deviated from the Indictment by charging him with soliciting a bribe from Rob but arguing the statement to Ndukwe—"You don't want me to be like love you but can't"—amounted to corrupt solicitation. (R. 271, 6902.) The court

found that this argument "fail[ed] both on the law and the facts," citing law in this circuit and others, along with the allegations in the Indictment. (R. 283, 7151.)

Sittenfeld then filed a motion for release pending appeal in which he raised these same arguments. The district court denied the motion at the sentencing hearing. In denying the motion, the court cited the applicable standard and relied on the reasons set forth its prior written Opinion denying post-trial motions. (R. 302, 7505–07.) The court also clarified that, although the constructive amendment issue was "a closer call" relative to the other claim, it failed to meet the § 3143 standard. (*Id*. at 7507.) In this motion, Sittenfeld renews the same arguments that were presented to—and rejected by—the district court.

The United States does not assert that Sittenfeld poses a flight risk or a risk of danger to others. However, the Government maintains that Sittenfeld has not presented a substantial question of law or fact that is likely to result in one of the favorable outcomes as required by 18 U.S.C. § 3143(b)(1)(B).

## Standard

The Bail Reform Act creates a presumption that a convicted defendant shall be incarcerated. *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). Under the Act, a person found guilty and sentenced to imprisonment, and who files an appeal, shall be detained, unless the defendant demonstrates: (1) he is not likely to flee or pose a danger to others; and (2) the appeal is not for purposes of delay and

"raises a substantial question of law or fact likely to result in reversal [or] an order for a new trial . . . ." 18 U.S.C. § 3143(b). An appeal raises a substantial question when it "presents a 'close question or one that could go either way'" and when the question is "'so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor.'" *United States v. Pollard,* 778 F.2d 1177, 1182 (6th Cir. 1985).

<u>Argument</u>

Sittenfeld fails to present a substantial issue of fact or law. As he did below, Sittenfeld attempts to hide the true nature of his sufficiency challenge by labelling it a "*McCormick* question." As a result, he never confronts the demanding standard of review that this Court applies to sufficiency of evidence claims. That standard is one defendants rarely meet. And Sittenfeld is no exception. Because the jury rationally found an explicit quid pro quo based on all the evidence, including Sittenfeld's recorded statements and testimony at trial, his sufficiency claim clearly fails.

His constructive amendment claim also lacks merit. Aside from the fact this argument "fail[s] both on the law and the facts" as the district court found, any constructive amendment to the corrupt "solicitation" element in Count 3 would not affect the jury's verdict as to Count 4. In other words, even if he were successful as to this claim, it would not result in the relief required to succeed on a motion for release pending appeal. For these reasons, set forth fully below, his motion fails.

# I. Sittenfeld's "*McCormick*" challenge does not raise a substantial issue.

## A. Sittenfeld does not challenge the explicit *quid pro quo* instructions.

As an initial matter, the district court properly instructed the jury on the law governing campaign contribution bribery under 18 U.S.C. § 666 (Count 3) and § 1951(Count 4)—and Sittenfeld does not argue otherwise.

For both Counts 3 and 4, the district court's instructions required that the jury find an explicit *quid pro quo*. (*See* R. 202, 3221–25 (§ 666 instructions), 3226–32 (§ 1951 instructions)). The court made clear that this standard required the government prove "the contours of the proposed exchange were *clearly understood* by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms." (*Id*. at 3231 (§ 1951), 3224 (§ 666).) Sittenfeld did not—and does not—contest the instructions. And for good reason: they come straight from governing law. *See McCormick v. United States*, 500 U.S. 257, 273 (1991); *Evans v. United States*, 504 U.S. 255, 258 (1992); *Terry*, 707 F.3d at 613; *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018).

Although these instructions were sufficient on their own, the court gave an additional instruction titled, "Campaign Contributions as Bribes/Defendant Not Charged With Campaign Finance Law Violations." This instruction cautioned the jury that PAC contributions are protected by the First Amendment and highlighted examples of what the court deemed *lawful* campaign-related activity, including:

- "acceptance by an elected official of a campaign contribution, by itself, does not constitute bribery, even if the person making the contribution has business pending before the official";

- "a candidate merely discussing his positions regarding an issue with a campaign contributor, including on the same occasion as the candidate accepts a contribution or discusses campaign contributions";

- "soliciting contributions from individuals or entities who have business pending before a political body on which the candidate serves or may serve."

(R. 202, 3233–36.) This additional instruction also restated that, for "PAC contributions to qualify as bribe payments, they must be part of an explicit promise or understanding by the public official." (*Id*. at 3233.)

## B. Sittenfeld's sufficiency challenge clearly fails.

Sittenfeld argues that the evidence was insufficient to prove the existence of an explicit quid pro quo. In doing so, he deliberately ignores the proper standard of review for jury verdicts. That "demanding" standard dooms his claim. *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019).

This Court reviews a sufficiency challenge under the same standard as the district court. It must uphold the verdict if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The sufficiency standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* This Court

will "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). And the evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004). Under this standard, Sittenfeld's argument fails because, as the district court held, the jury rationally "found that an explicit quid pro quo existed here." (R. 283, 7141–43.)

Start with what Sittenfeld said to Ndukwe while the two were discussing Ndukwe donating to Sittenfeld: "You don't want me to be like . . . love you but can't." A rational jury could have concluded—as Ndukwe did—that Sittenfeld was conditioning his support for the 435 Elm St. project on his receipt of donations. (*Id.*)

Next, consider Sittenfeld's series of interactions with Rob. Ndukwe told Sittenfeld that Rob wanted to offer him an express quid pro quo at an upcoming meeting: Rob would provide $20,000, with "ten [thousand] next week," in exchange for Sittenfeld's "yes vote" on the 435 Elm project. Sittenfeld immediately recognized the illegal nature of the offer. But instead of distancing himself from an individual he now knew was corrupt, he asked to meet the investor who wanted to bribe him "in person." Sittenfeld stated he wanted to meet so he could give the investor "confidence and comfort" that, by donating to Sittenfeld, he was "invest[ing] in a winning endeavor." Put differently, when Sittenfeld heard that an investor wanted to bribe him, he set up an in-person meeting with that investor.

During that "in-person" meeting on November 7, Sittenfeld represented that he would support the complicated development project in Council—the *quo* in the preceding phone call—after mere minutes. The project Sittenfeld was so quick to support was one that City development professionals disfavored. Later, Sittenfeld responded to an "*express* offer to guarantee official action in exchange for $20,000 in campaign contributions" (R. 53, 524 (Opinion))—money for votes—by agreeing to "deliver the votes" for the money. *Evans*, 504 U.S. at 268 (bribery includes receiving money "knowing that the payment was made in return for official acts").

Last but not least, Sittenfeld assured the bribe-paying investors that their payments would not be publicly disclosed. (*See, e.g.*, USA Ex. 20D (Sittenfeld: "No one will ever know this").) And, after receiving the money, he worked on the investors' behalf to fulfill his end of the quid pro quo agreement and communicated his efforts to them.

Sittenfeld testified that he did not intend to enter a quid pro quo agreement and provided his own interpretations of what the jury saw and heard on the recordings. But the jury rejected his testimony. Applying the court's instructions—which Sittenfeld does not challenge—the jury assessed Sittenfeld's "words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences" and found him guilty. *Terry*, 707 F.3d at 614.

Sittenfeld cannot now create a substantial issue by arguing the jury's decision

is contrary to *his* interpretation of the facts. *See United States v. Bowens*, 938 F.3d 790, 794 (6th Cir. 2019) ("The defendants' [sufficiency of the evidence] arguments fail because they are at bottom jury arguments—that the evidence is circumstantial and open to multiple interpretations."); *United States v. Wallace*, 51 F.4th 177, 182–83 (6th Cir. 2022) ("It is the rare trial defendant who does not offer innocent explanations for their conduct. . . . Where the jury rejects the explanations, we generally let the jury make the call when the point is contested with admissible evidence.") (citing *Terry*, 707 F.3d at 615).

Nor can Sittenfeld create a substantial issue by repeatedly gesturing toward the "heightened standard of proof when a campaign donation is alleged to be a bribe"—the "explicit" quid pro quo *McCormick* standard. (Motion at 19, 21.) This is the *exact standard* the jury applied through the district court's jury instructions, along with additional, supplemental instructions to make sure the jury understood possible First Amendment implications. (R. 283, 7139; R. 202, 3221–36).)

To the extent Sittenfeld suggests that the *McCormick* standard requires an "unambiguously" corrupt bargain, he never sought to include "unambiguous" in the jury instructions; and he does not argue that the instructions were wrong because that word is absent. In any case, the jury instructions—consistent with this Court's precedent—required the jury to find that "the contours of the proposed exchange were *clearly understood* by both the public official and the payor, even if the

proposed exchange was not communicated between them in express terms." (*Id*. at 3231 (§ 1951), 3224 (§ 666) (emphasis added); *see United States v. Blandford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994) (relying on definition of as "explicit" as "[n]ot obscure or ambiguous. . . . *Clear in understanding*," while explaining, "by 'explicit' *McCormick* did not mean 'express'") (emphasis in original); *Terry*, 707 F.3d at 614 ("Each payment did not need to be tied to a specific official act, so long as Terry *understood* that, whenever the opportunity present[ed] itself, Terry would take specific official actions on the giver's behalf.") (emphasis added). So the jury found the corrupt agreement was *clearly understood* here.

That leaves Sittenfeld's suggestion that a jury may never "infer illicit corruption from ambiguous conduct that *could reasonably be explained* as ordinary politics." (Motion at 22 (emphasis added).) First, to restate the obvious: the jury reasonably found Sittenfeld's conduct was not "ordinary politics." Threatening to support the city business of those who contribute to him and only him is not ordinary politics; threatening a developer by warning he "can't" support a project unless he donated or raised donations is not ordinary politics; agreeing to meet a corrupt investor who he knows is prepared to offer an express quid pro quo is not ordinary politics; agreeing to "deliver the votes" after being offered $20,000 for votes on council is not ordinary politics; accepting $20,000 while agreeing to "shepherd votes" then stating "nobody will know about this" is not ordinary politics. As the

district court found, all this evidence "told a consistent, credible story that a jury could reasonably find constituted a tale of corruption." (R. 283, 7148.)

Moreover, any argument that a jury should be *precluded from inferring* corrupt intent where a defendant's conduct "could reasonably be explained as ordinary politics" is contrary to controlling law and commonsense. (Motion at 22). This Court has repeatedly recognized that the nature of bribery agreements will often require the jury to determine a defendant's intent to exchange official acts for contributions, *Terry*, 707 F.3d at 614; and it has explained that "'[m]otives and consequences, not formalities,' are the keys for determining whether a public official entered an agreement to accept a bribe." *Id.* (*quoting Evans,* 504 U.S. at 274); *United States v. Inman*, 39 F.4th 357, 365, 367–68 (6th Cir. 2022). This Court has likewise found that juries are up for the challenge. *Id.* ("[T]he trier of fact is 'quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.'")

The jury here listened to dozens of hours of recorded conversations involving Sittenfeld and the undercovers, which allowed jurors to assess "[m]otives and consequences," "the intent with which words were spoken or actions taken," and "inferences taken from what the participants say, mean and do." *Terry*, 707 F.3d at 613–14. With this context, the jury was free to reject Sittenfeld's innocent explanation that his conduct was "ordinary politics"—which is precisely what

happened.  *See id*. at 615 (affirming conviction because "the jury rejected any legitimate explanation for Russo's contributions").

Sittenfeld's position is also contrary to commonsense. Look no further than *McCormick*, which said: "It goes without saying that matters of intent are for the jury to consider." 500 U.S. at 270.  Sittenfeld's rule would take the question of intent away from the jury unless a politician blatantly spelled out his corrupt intent. As Sittenfeld sees it, so long as an official bakes plausible deniability into his illicit agreement, he should be immune from corruption charges.  Courts have consistently rejected this approach, which would allow "the law's effect [to] be frustrated by knowing winks and nods." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring); *Terry*, 707 F.3d at 613 ("[a]s most bribery agreements will be oral and informal, the question is one of inferences"); *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019) (although defendant stated, "'I'm not trying to influence you . . . I'm trying to make you think,' . . . a juror could easily have heard those words and concluded that they meant the exact opposite"); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("[The Hobbs Act] does not have a magic-words requirement. Few politicians say, on or off the record, 'I will exchange official act X for payment Y.' . . . 'Nudge, nudge, wink, wink, you know what I mean' can amount to extortion under the Hobbs Act, just as it can furnish the gist of a Monty Python sketch.").

Finally, Sittenfeld attempts to present his case as an outlier. (Motion at 20–21.) It is not. Courts routinely affirm campaign contribution bribery cases where the public official does not unambiguously state, "'I will exchange official act X for payment Y.'" *Blagojevich*, 794 F.3d at 738 (rejecting sufficiency challenge because much of the evidence came from defendant's "own mouth" and "[t]o the extent there are factual disputes, the jury was entitled to credit the prosecution's evidence"); *see, e.g., United States v. Evans*, 910 F.2d 790, 793–95 (5th Cir. 1990) *aff'd on other grounds*, 504 U.S. 255 (1992) (recordings discussed payment to help with campaign debt and vote on project, which led to meeting where official received $7,000 and $1,000 campaign check); *Terry*, 707 F.3d at 610, 614–16 (receipt of $1,200 in campaign contributions and campaign benefits in July 2017 then request for official action in July 2018); *United States v. Pawlowski*, 27 F.4th 897, 905–06 (3d Cir. 2022) (official worked to provide a contract then asked for a $2,700 campaign contribution on separate occasion).[1] In each of these cases, the evidence permitted the public official to reasonably argue that, at the time the contribution was solicited or received, the official did not enter an unambiguous agreement to perform specific

---

[1] *Pawlowski* involved "seven bribery sub-schemes," and the Third Circuit affirmed all of them after analyzing the facts for each scheme. Sittenfeld characterizes the evidence as "express." (Motion at 20 n.3.) To the contrary, as detailed in the opinion, several of the schemes involved circumstantial evidence of an explicit quid pro quo based on inferences relating to what would otherwise be "ordinary politics"—which did not involve an express quid pro quo. *See* 27 F.4th at 903–08.

official action for the payor. In each case, the jury inferred a quid pro quo based on all the evidence. In each case, the court of appeals affirmed convictions.

For all these reasons, Sittenfeld does not raise a substantial question.

## II. The Fifth Amendment challenge does not raise a substantial issue.

Sittenfeld argues here, as he did below, that the Government constructively amended the Indictment by arguing his corrupt solicitation of Ndukwe on October 30, 2018, supported the bribery charge in Count 3. Because Sittenfeld failed to object when the Government made this argument during closing, this Court will review for plain error. *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). But Sittenfeld cannot show any error—let alone plain error. The district court correctly concluded this argument "fail[ed] both on the law and the facts." (R. 283, 7151.)

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charge such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Kuehne*, 547 F.3d at 683.

There was no constructive amendment here because Sittenfeld's corrupt solicitation of Ndukwe was charged in the Indictment under a section titled "**2018 Solicitations**," incorporated into Count 3 expressly, and inextricably intertwined with the agreement and payments made by Rob. (R. 277, 6995–98; R. 3, 28–30, 41–

42 (¶¶ 9–13, 41–42) (Indictment).)  Where, as here, allegations are incorporated into the paragraph containing "to wit" language, there is no constructive amendment because the defendant is on notice the conduct is part of the offense.  (R. 283, 7151 (citing *United States v. Bradley*, 917 F.3d 493, 503 (6th Cir. 2019); *United States v. Agrawal*, 726 F.3d 235, 260–61 (2d Cir. 2013)); *see also United States v. Bastian*, 770 F.3d 212, 220 (2d Cir.2014); *Robinson v. Harry*, 562 F. App'x 440, 444–47 (6th Cir.2014); *United States v. Berger*, 224 F.3d 107, 117–18 (2d Cir. 2000). The authority cited by Sittenfeld is inapposite because they did not involve allegations expressly incorporated into the charged count as they are here. *Cf. Bradley*, 917 F.3d at 503; *United States v. Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021).

The district court also correctly found Sittenfeld's claim contrary to the facts in the Indictment and trial because "Rob and Ndukwe were the same when it came to the real estate development project—and the alleged bribe—at issue."  (R. 283, 7151–52.)  The October 2018 phone calls in the Indictment and trial made clear that Ndukwe's investors on 435 Elm would be making payments to Sittenfeld.  (R. 3, 29–32 (¶¶ 12–15).) Sittenfeld's corrupt solicitation of Ndukwe on October 30th led directly to the corrupt agreement on November 7th and, ultimately, the PAC checks. Because the PAC payments were first solicited and discussed in conversations between Sittenfeld and Ndukwe, they were "within the charged core of criminality" and intrinsic to the charge.  *Khalupsky*, 5 F.4th at 293–94; *Bastian*, 770 F.3d at 220.

But even if there was a constructive amendment as to one count of conviction—and there was not—Sittenfeld has not explained how that is likely to result in reversal or a new trial on *both* counts of conviction. (Motion at 26.) Sittenfeld's silence on this score is particularly telling because the government raised this argument in response to the same claim below. (*See* R. 277, 6998.)

The statement in closing challenged by Sittenfeld related only to "solicitation" under Count 3, the § 666 count. (R. 251, 5035; Motion at 127 (A.92).) Unlike Count 3, the jury instructions for Count 4 did not include solicitation as an element. (R. 202, 3226 (instructing for § 1951 that defendant must have "obtained, accepted, agreed to accept, or received" property in exchange for specific official action).) Because Sittenfeld's conviction on Count 4 remains, he cannot meet the standard for release pending appeal. *See Morison v. United States*, 486 U.S. 1306, 1306–07 (1988) (denying motion for release under § 3143(b) because the appeal not was "likely to result in reversal with respect to all the counts"); *accord United States v. Randell*, 761 F.2d 122, 125 (2nd Cir. 1985); *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985) *United States v. Miller*, 753 F.2d 19, 24 (3rd Cir. 1985); *United States v. Krilich*, 178 F.3d 859, 860 (7th Cir. 1999); *United States v. Terry*, No. 1:10CR390, 2011 WL 5008415, at *5 (N.D. Ohio Oct. 19, 2011).

## Conclusion

The Court should deny the motion for release pending appeal.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/Matthew Singer
MATTHEW SINGER
EMILY N. GLATFELTER
MEGAN GAFFNEY PAINTER
Assistant United States Attorneys
221 East Fourth St., Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
matthew.singer@usdoj.gov
emily.glatfelter@usdoj.gov
megan.painter@usdoj.gov

Certificate of Service

I certify that the foregoing Response complies with the 5,200 word limitation

provided in Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure. This

response was filed with the Court's CM/ECF system this 1st day of November 2023

and served electronically on all parties of record.

s/Matthew Singer
MATTHEW SINGER
Assistant United States Attorney