No. 23-3840

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

UNITED STATES,

*Appellee,*

v.

ALEXANDER SITTENFELD,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Ohio (Western Division) (Cole, J.)
District Court Case No. 1:20-cr-00142

_____

## OPENING BRIEF OF APPELLANT
## ALEXANDER (P.G.) SITTENFELD

_____

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., NW
Suite 300
Washington, DC 20006
(602) 501-5469
james@kingstlegal.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(202) 326-3939
amaugeri@jonesday.com

Yaakov M. Roth
Harry S. Graver
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-7658
yroth@jonesday.com

Justin E. Herdman
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7113
jherdman@jonesday.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT .................................................... 3

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ............................................................ 3

    A.    Alexander "P.G." Sittenfeld. ............................................ 4

    B.    The Sting ................................................................................ 4

    C.    The Recorded Conversations ......................................... 6

    D.    The Indictment .................................................................. 14

    E.    The Trial and Split Verdict ............................................ 15

    F.    The Post-Trial Proceedings .......................................... 16

SUMMARY OF ARGUMENT ......................................................... 17

STANDARD OF REVIEW ............................................................... 19

ARGUMENT ....................................................................................... 19

I.    THE GOVERNMENT DID NOT PROVE AN "EXPLICIT" *QUID PRO QUO* ............ 19

    A.    *McCormick* Requires Unambiguous Evidence of Corruption Before Treating a Campaign Contribution as a Bribe ............................ 19

    B.    The Evidence Here Fails to Satisfy *McCormick* ........................................ 27

    C.    Punting Ambiguity to the Jury Would Eviscerate *McCormick* ................. 37

II.    THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT ............ 41

    A.    The Government Exceeded the Indictment's "To Wit" Clause ............ 42

    B.    Exceeding a "To Wit" Clause Effects a Constructive Amendment ...... 44

    C.    The District Court's Conduit Theory Cannot Save the Verdict ............ 47

CONCLUSION ..................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................ 39

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984) ..................................................................... 39, 40

*Buckley v. Valeo,*
424 U.S. 1 (1976) ........................................................................ 19, 20

*Citizens United v. FEC,*
558 U.S. 310 (2010) ............................................................... 20, 32, 34

*Crawford-El v. Britton,*
523 U.S. 574 (1998) ........................................................................ 40

*Evans v. United States,*
504 U.S. 255 (1992) ........................................................................ 20

*FEC v. Cruz,*
596 U.S. 289 (2022) ..................................................................... 19, 34

*FEC v. Wis. Right to Life, Inc.,*
551 U.S. 449 (2007) ........................................................................ 40

*McConnell v. FEC,*
540 U.S. 93 (2003) ......................................................................... 34

*McCormick v. United States,*
500 U.S. 257 (1991) .................................................................... *passim*

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ........................................................................ 19

*McDonnell v. United States,*
579 U.S. 550 (2016) ..................................................................... 20, 26

# TABLE OF AUTHORITIES

**Page(s)**

*NAACP v. Alabama*,
357 U.S. 449 (1958) ............................................................. 33

*NAACP v. Button*,
371 U.S. 415 (1963) ............................................................. 20

*United States v. Benjamin*
2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ......................... 25, 36, 37, 40

*United States v. Blagojevich*,
794 F.3d 729 (7th Cir. 2015) ............................................... 25, 40

*United States v. Blandford*,
33 F.3d 685 (6th Cir. 1994) ................................................. 23, 41

*United States v. Brewbaker*,
2023 WL 8286490 (4th Cir. Dec. 1, 2023) ............................ 45

*United States v. Carmichael*
232 F.3d 510 (6th Cir. 2000) ............................................... 24

*United States v. Carpenter*,
961 F.2d 824 (9th Cir. 1992) ............................................... 25, 37

*United States v. Chambers*,
408 F.3d 237 (5th Cir. 2005) ............................................... 45

*United States v. Combs*,
369 F.3d 925 (6th Cir. 2004) ............................................... 41

*United States v. Cusmano*
659 F.2d 714 (6th Cir. 1981) ............................................... 45, 46

*United States v. Davis*,
854 F.3d 601 (9th Cir. 2017) ............................................... 45

iii

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Farley*
2 F.3d 645 (6th Cir. 1993) ........................................................... 24

*United States v. Farr,*
536 F.3d 1174 (10th Cir. 2008) .................................................. 46

*United States v. Inzunza,*
638 F.3d 1006 (9th Cir. 2011) ............................................... 26, 37

*United States v. Kuehne,*
547 F.3d 667 (6th Cir. 2008) ................................................. 19, 41

*United States v. McAuliffe,*
490 F.3d 526 (6th Cir. 2007) ....................................................... 44

*United States v. McCormick,*
896 F.2d 61 (4th Cir. 1990) ............................................. 22, 36, 38

*United States v. Menendez*
291 F. Supp. 3d 606 (D.N.J. 2015) ....................................... 26, 37

*United States v. Pawlowski,*
27 F.4th 897 (3d Cir. 2022) .................................................. 25, 40

*United States v. Siegelman,*
640 F.3d 1159 (11th Cir. 2011) ................................................... 25

*United States v. Terry*
707 F.3d 607 (6th Cir. 2013) ....................................................... 24

*United States v. Thompson,*
515 F.3d 556 (6th Cir. 2008) ....................................................... 44

*United States v. Weissman,*
899 F.2d 1111 (11th Cir. 1990) ................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Willoughby*,
  27 F.3d 263 (7th Cir. 1994)...........................................................................45

*United States v. Woods*,
  14 F.4th 544 (6th Cir. 2021) ........................................................................19

*Stirone v. United States*
  361 U.S. 212 (1960) ................................................................................46, 48

**STATUTORY AUTHORITIES**

28 U.S.C. § 1291 ...........................................................................................3

**OTHER AUTHORITIES**

*Black's Law Dictionary* (11th ed. 2019) ......................................................44

*The New Oxford American Dictionary* (2001) ..............................................44

*Oxford English Dictionary* (3d ed. 2020) .....................................................44

## STATEMENT REGARDING ORAL ARGUMENT

P.G. Sittenfeld requests oral argument.  This appeal raises important questions relating to the interaction of the First Amendment and federal bribery laws.  This appeal also involves important questions about the interpretation of language in a criminal indictment.  Oral argument will assist the Court in analyzing and deciding the legal and factual issues contested by the parties.

## INTRODUCTION

Politicians cannot sell their official powers—not for bags of cash, not for Rolexes or luxury travel, and not even for campaign contributions. But identifying a campaign contribution as a bribe is uniquely fraught, because such contributions are *always* based on expectations of what the candidate will do in office. Candidates, likewise, know their policies, promises, and pledges will affect their ability to raise funds. All that is not only lawful; it is constitutionally protected. The result is an incredibly fine line: Donating or soliciting *based on* policy commitments is First Amendment activity, while donating or soliciting *in exchange for* policy commitments threatens a prison sentence. Articulating that distinction is hard enough; distinguishing the two in practice is even harder. That, in turn, casts a pall of prosecution over our entire political system and deprives officials and citizens alike of fair notice about what conduct is criminal.

Enter the Supreme Court. In *McCormick v. United States*, 500 U.S. 257 (1991), the Court addressed that problem by holding that the Government must hurdle a distinctly high evidentiary bar when it premises a bribery charge on a campaign donation. In cases involving ordinary, constitutionally insignificant benefits, prosecutors must prove a *quid pro quo*: that the parties traded benefits for official action. But in the context of campaign contributions, the Government must show the *quid pro quo* was "explicit"— an *unambiguous* corrupt bargain. Anything less, the Court warned, would leave every campaign donation the fodder of a bribery charge, and every official at the mercy of a lay jury asked to infer corruption from money in politics.

This case exceeds *McCormick*'s worst nightmares. Alexander "P.G." Sittenfeld was a rising star on Cincinnati's City Council, and favorite to become the next mayor. He was known for his pro-development platform, backing every project that came across his desk over ten years in office. The Government engineered a sting to see if he would accept a campaign donation in exchange for supporting a local development project. To maximize the sting's chances of success, the FBI approached Sittenfeld through one of his longtime *existing* donors, in connection with a project Sittenfeld had *already agreed* to support. Yet despite that choreography, Sittenfeld never bit. Over the course of a year-long prosecutorial Truman Show, Sittenfeld *rejected* the only express *quid pro quo* his friend offered, cautioned him on the legal limits around donations, turned away contributions that did not comport with obscure campaign-finance rules, and even invited two undercover agents to a dinner party with *the U.S. Attorney*.

The jury acquitted Sittenfeld on most counts, but (inconsistently) convicted on two. Even the district court acknowledged the Government's evidence was at most "ambiguous," and could be easily seen as ordinary politics. But the court reasoned that the jury was free to string together some vague phrases and pull an "explicit" exchange out of a hat. Every other court to address this issue, however, has required *clear and unambiguous* proof of corruption; none has upheld a conviction on a record so thin and ambivalent. Indeed, if this evidence suffices, *McCormick* has no meaning; prosecutors would be free to conjure a bribery charge against every politician, ushering in a First Amendment Ice Age.

The Government's failure to satisfy *McCormick* is the most fundamental legal error. But at minimum this Court should order a new trial, because the Government constructively amended the indictment. It explicitly charged Sittenfeld with bribery based on a donation from one of the undercover agents ("Rob"). But at trial, the Government told the jury it could convict if Sittenfeld engaged in bribery with *either* Rob *or* Sittenfeld's friend, and the jury instructions (over objection) authorized that expansion. Under this Court's precedent, that shift compels a new trial.

## JURISDICTIONAL STATEMENT

The district court entered final judgment on October 10, 2023. R.300. Sittenfeld noticed an appeal on October 17, 2023. R.303. 28 U.S.C. § 1291 confers jurisdiction.

## STATEMENT OF THE ISSUES

**1.** Whether objectively ambiguous evidence can prove an "explicit" *quid pro quo*, and whether the concededly ambiguous evidence here sufficed to do so.

**2.** Whether the Government constructively amended the indictment by relying on a "bribe" different from the one specified in the indictment's "to wit" clause.

## STATEMENT OF THE CASE

This case arises from a federal sting targeting Sittenfeld. Every aspect was scripted; every moment recorded. At its core, the case turns on whether Sittenfeld agreed to an "explicit" bribe during any of these interactions—all of which the Court can read and hear for itself.

### A.    Alexander "P.G." Sittenfeld.

Sittenfeld was once a rising star.  A son of Cincinnati, Sittenfeld was first elected to the City Council in 2011, the youngest person to ever hold the job.  He was reelected twice, both times receiving the most votes of anyone running.  App.68.  In 2020, Sittenfeld announced he would run to replace the term-limited mayor.  At the time, Sittenfeld was widely seen as the frontrunner.  App.37, 70.

The defining trait of Sittenfeld's political identity was economic development.  It is undisputed Sittenfeld voted for *every* economic development deal put in front of him while on the Council.  App.47; R.269.PageID.6785-86.

### B.    The Sting.

Chinedum Ndukwe was a real-estate developer in Cincinnati.  Despite a generally good reputation (R.238.PageID.4310-11), he was caught skirting campaign-finance laws (R.264.PageID.5805).  In March 2018, Ndukwe entered a proffer agreement with the Government where he admitted to giving "money orders and cashier's checks to local politicians in other individuals' names."  R.264.PageID.5888; App.116-19.  Under this agreement, Ndukwe agreed to help investigate episodes of potential political corruption in Cincinnati.  App.117.

The Government had been investigating local corruption in Cincinnati since early 2017, including with the use of undercover agents.  But so far with little success.  By October 2018, the Government had not indicted any local officials.

When Ndukwe first started cooperating, he provided a list of local officials the FBI might want to investigate. That list did *not* include Sittenfeld. R.264.PageID.5898. Months later, however, Ndukwe floated the idea. The impetus was a September 2018 call where Sittenfeld solicited Ndukwe for a $10,000 contribution to his upcoming mayoral campaign, to match other local developers. R.266.PageID.6245. Nothing about this was out of the ordinary: Sittenfeld and Ndukwe had been friends for years, and Ndukwe had regularly donated to and raised thousands of dollars for Sittenfeld's campaigns. R.269.PageID.6718-20. And nothing about this was unlawful either. Even so, Ndukwe relayed Sittenfeld's request to the FBI and claimed he felt pressured to donate to keep up with his developer peers. R.266.PageID.6244-45.

The Government promptly developed a sting. R.263.PageID.5687, 5690. Agents directed Ndukwe to approach Sittenfeld about 435 Elm Street—an actual development project to revive a blighted downtown property. This project was already pending, albeit largely stalled. R.264.PageID.5911-12; R.266.PageID.6227, 6232-33. Ndukwe would offer to connect Sittenfeld with investors in 435 Elm, who were actually undercover agents. R.263.PageID.5695-97; R.264.PageID.5913. Eventually, they would proposition Sittenfeld with a corrupt deal: If you agree to back 435 Elm, the investors will donate to your campaign. R.263.PageID.5700, 5709.

Maximizing the sting's odds, the FBI selected a project *involving Ndukwe* that Sittenfeld had *already agreed* to support, dating back to 2017. R.269.PageID.6730-35; App.115. As with every other development project to come across his desk, Sittenfeld

had seen redeveloping 435 Elm as a "no brainer," because the building was both "across the street from the Convention Center," and in a "blighted" condition "costly to the taxpayers."  R.269.PageID.6734-35.

### C.    The Recorded Conversations.

Once the sting began, every relevant interaction was recorded, with all the principal evidence on tape.  There were four key exchanges, set forth below.

October 26, 2018.  The first recorded call between Sittenfeld and Ndukwe mostly consisted of informal personal conversation.  Ndukwe eventually steered the discussion to 435 Elm, and claimed he had two investors—"Rob" and "Brian" (FBI agents)—who were "all in on Cincinnati," and wanted to meet Sittenfeld when in town.  App.38-39.  Ndukwe added that these investors controlled numerous LLCs that could potentially donate to his campaign.  App.38.  Sittenfeld responded positively, and asked Ndukwe if they could contribute before November 6, when a local law limiting LLC donations was set to kick in.  App.39.  Ndukwe did not know, and they left it there.  *Id.*

October 30, 2018.  Sittenfeld and Ndukwe spoke again a few days later.  Ndukwe expressed that he wanted to contribute to Sittenfeld, but was fearful because the then-mayor was "trying to fuck me left and [right], because I supported [one of his rivals]."  App.41.  Ndukwe thus wanted to "keep [his] name off" donations to avoid potential blowback.  *Id.*  Sittenfeld replied that he understood, "love[d] what [Ndukwe was doing] as someone revitalizing our city," and was "fond of [him] as a friend."  *Id.*  But, he went on to say, there were "things I need to do to be a successful candidate"—*i.e.*,

fundraise—and so he discussed with Ndukwe possibly bundling donations from others (a lawful and common practice), rather than making the contributions himself. *Id.*

At trial, the prosecution focused on one part of this exchange—a passage the district court later branded the Government's "best" evidence. R.283.PageID.7140-41. Amidst talking about bundling, and using a nickname for Ndukwe, Sittenfeld said:

> Sittenfeld:  So, but what that means is I don't really get like, if you say look I don't want to support you in the name of Chinedum Ndukwe, but some guy I've never met from Columbus is going to use a coup, you know, you know you're going to a, round up to a bunch of LLC checks.  Like that's great.  I actually don't care.  But I mean the one thing I will say is like, you know I mean, you don't want me to be like **'hey Chin like love you but can't'** you know like, you know, I mean like, you know like.  I, I, I want people to support me, that's like…
>
> Ndukwe:  Absolutely.
>
> Sittenfeld:  … if a candidate doesn't want people to support them, they're a shitty dumb candidate …
>
> Ndukwe:  Yeah, right, yeah, right.
>
> Sittenfeld:  … and you know I've been … a lot of people have come through in a really big way that's been awesome so far and I would love, I would love for you to be one of those people too.
>
> Ndukwe:  I hear ya.  I hear ya.  So we'll, we'll figure, we'll, we'll make sure, trust me, we'll, we'll, we'll make something happen sooner than later too.

App.41-42 (emphasis added).

The Government characterized the bolded comment as a threat: Contribute to my campaign, or when you need help, I will say "love you but can't." Sittenfeld would explain, however, that he was just awkwardly asking a friend for money, by pointing out that he would not be in a position to help Ndukwe if *he was not elected mayor* (which he could not do without financial support). R.269.PageID.6745-46.

November 2, 2018. The FBI did not kick down the doors after hearing "love you but can't." In fact, they had Ndukwe lay it on thicker three days later by offering a clear *quid pro quo*. Again, here is the relevant portion of the transcript in full:

> Ndukwe:  But, but good news is I'll probably be able to get you close to twenty thousand over the next couple. Uhm you know, and, and these guys that are doing that deal on 435 Elm, uh, you know, they're, they're, very, you know, they don't really fuck around. They're very specific. They're like, you know … so I, you know, for me just want my experience of this whole Cranley bullshit with Yvette. Like I'm…
>
> Sittenfeld:  Yeah, yeah, no, I get it.
>
> Ndukwe:  … not trying to you know what I mean. I'm not trying to put anything on my name at all and …
>
> Sittenfeld:  Totally understand. I totally understand. Look if you can—
>
> Ndukwe:  … But, but—
>
> Sittenfeld:  Here, here, it it's my … as I told you before it's my job as a candidate to put myself in the strongest position as possible and you know, I've done a pretty good, I've done a pretty good job with that. At the end of the day, if you can, you know, rather than delivering 5K in LLC checks by next Tuesday, can help raise twenty over the next couple years. Like you know I will be incredibly grateful.

Ndukwe:  No I mean, I think it's like over the next couple of weeks.  I mean, so…

Sittenfeld:  No shit.  No, due that's … yeah.

Ndukwe: … so and then for, and then for this meeting with Rob next week, I'm pretty sure he can get you ten this week. **You know the biggest thing is, you know, if we do ten, I mean, they're gonna want to know that when it comes time to vote on 435 Elm,** like whenever that, I don't know if it's next year, two years, three years, **that it's gonna be a yes vote, you know, without, without a doubt.**  I've shared that with them, that hey known PG for years, all this stuff, but they're like all right we'll get his attention.

Sittenfeld:  I mean, obv-, as you know, obviously nothing can be illegal like … illegally **nothing can be a quid, quid pro quo.  And I know that's not what you're saying either.  But what I …**

Ndukwe:  Yeah.

Sittenfeld:  **can say is that I'm always super pro-development** and revitalization of especially our urban core.

Ndukwe:  Okay, no, I hear ya.  And so they're, he'll probably come out—

Sittenfeld:  And we can, we, we, we can discuss that more in person.

Ndukwe:  Okay, okay.  My guy, perfect, perfect.

Sittenfeld:  But I'm not, I'm not sure, I'm not they're, I, **in seven years I have voted in favor of every single development deal that's ever been put in front of me so**.

App.46-47 (emphases added).

November 7, 2018.  Five days later, Sittenfeld, Ndukwe, and Rob met for lunch.

After some small talk, Ndukwe and Rob pivoted to 435 Elm, and began to tell Sittenfeld

how well the project was doing—they had hired an elite architect, received key funding, and secured large tenants. App.54-56. *All of this was a lie.* R.240.PageID.4664-65; R.269.PageID6735-38. The Government was trying to make 435 Elm sound too good for Sittenfeld *not* to support. And before anyone spoke a syllable about contributions, Sittenfeld announced: "[I]t's got my support … and you know [I] can certainly shepherd the votes too." App.57.

The talk then moved to various other topics, including Sittenfeld's lament that the City had gotten in the way of other good projects. App.63-64. Sittenfeld also tried to pitch Rob on Cincinnati as a place to find a wife. App.65-66. Only later—11 transcript pages after expressing support for the project—did Sittenfeld raise the subject of fundraising, first carefully demarcating it as "political stuff" unlike the conversation that preceded. App.68. And he did not treat anything as a done deal, as if the parties had already reached some *quid pro quo*. He instead brought out *PowerPoint slides*, all as part of an effort to convince Rob his campaign merited support:

> Sittenfeld: Chin can I show Rob some uh data on the, you mind if I, is that appropriate?
>
> Ndukwe: No no yes definitely.
>
> Sittenfeld: This this is this is political stuff.
>
> Ndukwe: Yeah yeah.
>
> Sittenfeld: But it is, in the event that um Chinedum is successful in twisting your arm to be supportive of someone, I want you to know that I think it's a you like making good bets and good investments. This is just three quick slides

but give you some landscape here, give you some con-context rather. So Chin's seen these.

App.68.

After a discussion of granular political data and a set of one-word answers from

Rob, the agent tried to direct the conversation back to 435 Elm:

> <u>UC Rob:</u>  Um, you know obviously we're very concerned with knowing and being in a good relationship with the next Mayor, uh so and that's huge for us.  The part that really concerns me for Chin is, you know, he said it, like Cranley's got a hard-on for him like … you know, and so we wanna try to set 435 up being veto-proof you know.  And that that's kind of what's I'm 'cause this deal is gonna happen, long before that.

> <u>Sittenfeld:</u>  Yeah.

> <u>UC Rob:</u>  So that that's kind of when our strategically that's how what what we're trying to figure out too so.

> <u>Sittenfeld:</u>  So so two things, two reactions to that.  One, you know like, I don't have a machine, but we just got 6 people together to pass my budget…

> <u>UC Rob:</u>  Right.

> <u>Sittenfeld:</u>  … over [Mayor Cranley].  I think I c-, at this point, I can say I control, not control, that's the wrong word.

> <u>Ndukwe:</u>  Right right right right.

> <u>Sittenfeld:</u>  But like I can move more votes than any single other person.  Including the Mayor or, he had 3 votes on his budget, I had 6.

App.70-71.

11

After lunch ended, Rob and Sittenfeld continued the meeting at Rob's staged condo across the street. Once there, Rob tried to proposition Sittenfeld directly. But he fudged the solicitation, and the two ended up talking past one another:

> UC Rob: Um, but at the same time, like we want to help, we want to make sure, we want to really get this thing, Cranley, I would feel comfortable tellin' my guys like hey we're in…
>
> Sittenfeld: Right.
>
> UC Rob: … this deal with Chin if I know we're Cranley-proof.
>
> Sittenfeld: Yeah.
>
> UC Rob: **Um and so with that like Chin told me like hey you know I want to try to get uh P.G. 20,000** …
>
> Sittenfeld: Right.
>
> UC Rob: … **and I'm like, hey man I I'm I'm if if if we can get this deal done, like fuckin' let's do it.**
>
> Sittenfeld: Yeah.
>
> UC Rob: You know and so.
>
> Sittenfeld: **Do you guys?**
>
> UC Rob: **What is the best way, what's the best way for us to get that to you, to get that deal? You know what I mean, like…**
>
> Sittenfeld: **Yeah yeah yeah. I'm just, do you guys know that he's gonna try and veto it?**
>
> UC Rob: **No, we don't know that. I'm just saying like I want it, I just want to be comfortable that …**
>
> Sittenfeld: Yeah no I get it I get what you're…

12

> <u>UC Rob:</u> I mean obviously like I think, I don't think he will. Like we've had a lot of just meetings with him you know. We've we've done some things to kind of massage, we just wanna you know, he's been pretty good like, he he straight up told us, we had a meeting with him in his office, and he's like, look, like it'll get, I'm fine with it I just don't want Chin to be the face of it. I just don't want Chin to be the one walking in and we're like cool we're fine with that.

> <u>Sittenfeld:</u> Honestly I can I can deliv-… **I can sit here and say I can deliver the votes.**

App.77-78 (emphases added).

As even *Rob* later admitted at trial, Sittenfeld thought he was talking about his "*development* deal," not some *bribery* deal. R.265.PageID.6157. Of course, the Mayor was not going to "veto" a bribe; Sittenfeld understood the "deal" to be the 435 Elm project. R.269.PageID.6751-52.

The rest of the conversation continued in much the same way. As Rob mused about a potential veto, Sittenfeld repeated (as he said at lunch) that he could "deliver the votes." App.78. Sittenfeld added that the Mayor "loves guys like you … who choose to invest here … so I can get I can get [the deal] done." *Id.* At that point, Rob steered the conversation toward donating, and suggested different ways of contributing in a low-profile manner (for the same stated reasons as Ndukwe). App.78-81.

<u>December 17, 2018.</u> Over a month later, Sittenfeld eventually accepted a $20,000 donation to his PAC via Rob. App.78-83; R.265.PageID.5974. Why the delay? Because Sittenfeld kept *rejecting* Rob's attempts to donate in illegal ways—including through money orders, corporate checks, or cash. App.80-82, 88-89, 98.

Sittenfeld was so punctilious that, on one occasion, he turned back an improper check even when the Government (as Rob would later testify) was trying its best to get him a lawful donation.  App.98; R.265.PageID.5976-77.  All told, Sittenfeld explained to Rob he wanted to be "thorough" and to make sure everything about the contribution was "right," to "protect" both Rob and Ndukwe.  App.88-89.

In the lead-up to December 17, Sittenfeld continued to voice support for 435 Elm.  And he did so as part of conversations where Rob also discussed donating.  But there was never any explicit link between the two, and the Government did not try to argue otherwise.  *See* R.251.PageID.5010-12.  For instance, on November 28, Sittenfeld repeated to "Brian" (another agent) that he was "ready to shepherd the votes as soon as it gets to us"; but the men only discussed donating multiple breaks in the transcript later, where Sittenfeld walked Brian through the logistics of contributing to his PAC.  App.92, 93-94; *see also* App.103 (Sittenfeld saying he could "always get a vote to my left or a vote to my right").

### D.    The Indictment.

Apparently unsatisfied, the Government kept investigating Sittenfeld for another full year.  Its agents never offered Sittenfeld another *quid pro quo*, however, nor did Sittenfeld solicit a single donation from them.  *See* R.251.PageID.5027-30.  Instead, he spent this period rebuffing the agents' repeated attempts to ply him with personal benefits.  He declined invitations for trips to Miami, Las Vegas, and Nashville; rejected open-ended offers for anything Rob could "help out with" (R.265.PageID.5992-93);

and always paid or offered to pay for meals with the "investors" (R.269.PageID.6836-37). The only personal benefit Sittenfeld accepted from government agents was a bottle of scotch (which Sittenfeld does not drink) and a box of cigars (which Sittenfeld does not smoke), gifted on the birth of his son. R.269.PageID.6830-32.

While being secretly tracked, Sittenfeld also took a number of acts that would be astonishing for a politician in the market for bribes. For instance, as part of introducing Rob and Brian to civic leaders, Sittenfeld invited the two to join him for dinner at his house with the U.S. Attorney. R.269.PageID.6730. He even stopped Rob from making more donations, since he had been "generous enough" already. R.265.PageID.6167.

The Government's investigation ended around December 2019. *See* App.111. But it took another year for the indictment. R.3. In it, Sittenfeld was charged with three bribery offenses in connection with the facts discussed above: honest-services fraud (Count 1), federal-programs bribery (Count 3), and Hobbs Act extortion (Count 4). He was also charged with a parallel set of three counts involving an alleged sports-betting scheme on which he was ultimately acquitted (Counts 2, 5, and 6).

### E.    The Trial and Split Verdict.

The Government's case-in-chief rested principally on the recordings above. But it also tried to shade the evidence with other routine political behavior. For instance, the Government stressed how Sittenfeld was eager to help Ndukwe and Rob (at their request) assist in fundraising without contributing directly in their own names. R.251.PageID.5017-18, 5083. Likewise, the Government highlighted how Sittenfeld

told a local lobbyist that if his clients "hedged" on their donations for mayor, he would "hedge" on the access they received to his office.  R.251.PageID.5084.

The Government also reinvented an elemental part of its case.  The indictment used "to wit" clauses to specify that *Rob* was the bribe-giver (R.3 ¶¶ 42, 44); at trial, the Government instead told the jury could convict Sittenfeld based on a  bribe from *either* Rob *or* Ndukwe (R.251.PageID.4997-98, 5001, 5035).  It did so to frame the October 30 call, and Sittenfeld's "love you but can't" comment, as independently sufficient to convict.  R.251.PageID.5035.

The jury acquitted on all charges deriving from the alleged sports-betting scheme.  And it acquitted on the 435 Elm honest-services count.  But it convicted on the other two counts, even though they turned on the same evidence.  R.207-1.

### F.    The Post-Trial Proceedings.

Sittenfeld moved for post-trial relief.  R.270; R.271.  He argued that the evidence was insufficient to prove an "explicit" *quid pro quo*.  The district court acknowledged that the evidence was at most "ambiguous."  R.283.PageID.7142.  But it thought the jury could nevertheless divine an "explicit" exchange from this concededly ambiguous record.  R.283.PageID.7148.

The court also rejected Sittenfeld's claim that the Government had constructively amended the indictment.  R.283.PageID.7149-52.  The court held that "to wit" clauses are merely illustrative, not definitional.  R.283.PageID.7151.  And in the alternative—offering a theory never briefed by the Government—the district court said the evidence

could support a finding that Ndukwe acted as a conduit to Rob, thus equating a bribe from the former with one from the latter.  R.283.PageID.7151-52.

The court sentenced Sittenfeld to 16 months' imprisonment (R.300.PageID.7381) and denied release pending appeal (R.302.PageID.7505-08).  A motions panel of this Court also declined to award that relief.  ECF 21.

## SUMMARY OF ARGUMENT

**I.**    Given the realities of our political system—in which politicians must raise campaign funds from citizens who support their political agendas—the Government must shoulder a distinct evidentiary burden if it wishes to recharacterize an otherwise constitutionally protected campaign donation as a bribe.  In most bribery cases, any *quid pro quo* will do; when campaign contributions are at issue, an "explicit" *quid pro quo* is necessary.  *McCormick*, 500 U.S. at 271.  That means an *unambiguous* corrupt bargain; an exchange that involves no squinting to see, and conduct that *cannot* be explained as ordinary politics.  Anything less, the Supreme Court cautioned, will allow the usual give-and-take of lawful politics to become the fodder of criminal prosecution.

This case typifies what *McCormick* was meant to prevent; it is the furthest that prosecutors have pushed the envelope in this sensitive area.  As even the district court recognized, the Government's evidence against Sittenfeld—despite a year-plus sting—was at most ambiguous, and could readily (indeed, most naturally) be explained as routine fundraising.  That should have been the end of the case.  As other federal courts have held, *ambiguous* evidence cannot—by definition—prove an *unambiguous* corrupt

deal.  Conversely, an "explicit" exchange does not betray any legitimate explanation.  So where the evidence at trial is actually—not just theoretically—susceptible to one, it is insufficient as a matter of law.  Put another way, a jury cannot divine explicitness from objectively ambiguous interactions.  That is the *entire point* of the doctrine.

Doctrine aside, the defects in the Government's case are confirmed by a simple side-by-side of the evidence here and in *McCormick* itself.  Whatever *McCormick* requires, it must be more than the evidence that fell short there.  And here, the evidence is markedly *weaker*.  Both convictions must therefore be reversed.

**II.**     At minimum, Sittenfeld is entitled to a new trial.  The Government stated clearly in the indictment that both counts were premised on an alleged bribe from "Rob"—and *only* an alleged bribe from Rob.  But at trial, the Government pivoted, and told the jury it could also convict on these two counts if they thought Sittenfeld engaged *Ndukwe* in a bribe.  That is a textbook constructive amendment.

The district court held otherwise, primarily on the ground that the charge specified in the indictment was illustrative; but that contradicts both the indictment's own words and this Court's precedent.  The court also reasoned in the alternative that Ndukwe was a conduit to Rob, such that any bribe involving the former necessarily also involved the latter.  But this *ex post* theory cannot save the verdict either: It is in the teeth of the indictment itself, unsupported by the evidence, and was never submitted to the jury.

## STANDARD OF REVIEW

This Court reviews *de novo* (i) whether sufficient evidence supports a conviction, *United States v. Woods*, 14 F.4th 544, 551 (6th Cir. 2021), and (ii) whether the indictment was constructively amended, *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008).

## ARGUMENT

### I. THE GOVERNMENT DID NOT PROVE AN "EXPLICIT" *QUID PRO QUO.*

Sittenfeld was convicted on two counts of bribery, both predicated on his receipt of a campaign donation.  Those allegations trigger *McCormick*'s heightened standard of proof—the Government must prove an "explicit" *quid pro quo*.  The evidence here does not come close, and the district court concluded otherwise only by misapprehending the legal standard.  If this proof suffices, *McCormick* is a dead letter.

### A. *McCormick* Requires Unambiguous Evidence of Corruption Before Treating a Campaign Contribution as a Bribe.

**1.** Fundraising is a pillar of American politics—so much so that it is protected by the Constitution.  The First Amendment enshrines the right to support, promote, and influence candidates through donations.  *See McCutcheon v. FEC*, 572 U.S. 185, 192 (2014).  Candidates, too, are constitutionally entitled to solicit funds.  Indeed, the "First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office."  *FEC v. Cruz*, 596 U.S. 289, 302 (2022).  A central part of this conduct—the "essential ingredient of an effective candidacy"—is the "raising of large sums of money."  *Buckley v. Valeo*, 424 U.S. 1, 26 (1976).

Of course, campaign donations and solicitations almost always hinge on what a candidate plans to *do* in office. That is obviously not corruption. As the Supreme Court has recognized, it is "well understood that a substantial and legitimate reason, if not the only reason" to contribute to a campaign "is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). So AIPAC donates to candidates who pledge to support Israel; the Chamber of Commerce to those who back business; and NARAL to those who have committed to advancing reproductive rights. Politicians, in turn, fundraise from these groups by speaking to their priorities: At a fundraiser hosted by the Chamber, for instance, a Senator might trumpet how he will vote on certain legislation in line with corporate interests. Nobody would bat an eye.

This usual give-and-take is an integral part of the "basic compact underlying [our] representative government." *McDonnell v. United States*, 579 U.S. 550, 575 (2016). The First Amendment thus requires this activity be given maximal "breathing space" to occur. *NAACP v. Button*, 371 U.S. 415, 433 (1963).

At the same time, this give-and-take cannot become a direct exchange—or as the Romans called it, a *quid pro quo*. A donation becomes a bribe when it is given "in return for" an official's agreement "to perform specific official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992). In other words, it must be a "specific attempt[]" to use a benefit to control particular "governmental action." *Buckley*, 424 U.S. at 28.

The problem is that the natural alignment between donor contributions and candidate policies makes it very hard to identify a *quid pro quo*—or, perhaps more aptly, makes it *too easy* to see one everywhere. After all, "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator." *McCormick*, 500 U.S. at 272. At the same time, "campaigns must be run and financed" by contributions "being solicited on behalf of candidates" from those very people. *Id.* As a result, it will virtually always be possible to connect the two and suggest a corrupt exchange; prosecutors will invariably be able to point to a campaign contribution (the *quid*) and brand it as the cause for some official action (the *quo*) that the official took or committed to take. This dynamic is "unavoidable so long as election campaigns are financed by private contributions." *Id.*

Without more, then, there is an inherent risk that every donation becomes fodder for a bribery charge. Every politician who takes some action that benefits a campaign donor would be at the mercy of whether twelve lay jurors infer an illicit deal. That is a big problem, because it means huge stores of constitutionally protected conduct will be punished or chilled, and citizens will lack fair notice of what constitutes a crime.

**2.** The Supreme Court identified—and solved—this problem in *McCormick*. A bribe is a bribe, but the Court held that the evidentiary burden to *prove* a bribe is different if the purported *quid* is a campaign donation. Unlike a case about a Rolex, a stack of cash, or something else that is neither constitutionally protected nor politically ubiquitous, in this context only an "explicit" exchange suffices. *Id.* at 271.

To appreciate this standard, it is necessary to understand *McCormick*'s facts. The case arose out of the prosecution of a member of the West Virginia House of Delegates. McCormick had been a supporter of a temporary program that allowed out-of-state doctors to practice in the state. Up for reelection, with the program up for renewal, he approached a lobbyist for the doctors to let them know "his campaign was expensive" and "he had not heard anything from the foreign doctors." *Id.* at 260. Soon enough, the doctors contributed (in cash) to McCormick's campaign. And McCormick soon sponsored legislation to reenact the program. After McCormick's legislation had passed into law, the doctors sent more cash his way.

McCormick was convicted of bribery under the Hobbs Act. The Fourth Circuit affirmed. It articulated a seven-factor test for juries to parse legitimate from illegitimate campaign donations, and lawful from illicit intent. *United States v. McCormick*, 896 F.2d 61, 66 (4th Cir. 1990). And it found sufficient evidence for a jury to "reasonably infer" that the donations at issue were on the wrong side of the line. *Id.* Among much else, McCormick had solicited the donation himself; acted to benefit his donors soon after receiving it; and failed to report it as part of his campaign or tax returns. *Id.* at 67.

The Supreme Court reversed. Notably, the Court agreed that all of the evidence marshaled below was "unfavorable to McCormick." 500 U.S. at 272. And it did not disagree that a rational jury could infer something foul from it. *See id.* But the Court still held this was insufficient; matters of intent were "relevant" to the analysis, but not enough. *Id.* at 271. For campaign donations, something more was required, to ensure

that conduct both "well within the law" and also "unavoidable" in American politics would not be "open to prosecution." *Id.* at 272. In this context, there needed to be unmistakable, objective evidence of a corrupt bargain.

Accordingly, the Court held that a contribution cannot be punished as a "bribe" absent evidence of an "explicit" *quid pro quo*. *Id.* at 271. Meaning, the Government had to put on evidence of a donation made "in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act," where "the official asserts," by word or by deed, "that his official conduct will be controlled by the terms of [that] promise or undertaking." *Id.* at 273 (emphasis added). If the record lacks such objective evidence, it is insufficient as a matter of law. And because the record in *McCormick*, while circumstantially powerful, did not clearly manifest a *quid pro quo*, the Court held "that a violation of the Hobbs Act" had not been "made out." *Id.* at 272.

**3.** Three decades of case law applying *McCormick* showcase what counts as an explicit exchange—and what does not. Early on, this Court defined the standard this way: An "explicit" deal is one that is "not obscure or ambiguous," and that bears "no disguised meaning or reservation." *United States v. Blandford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994). That arrangement can be conveyed expressly through words, or impliedly by actions—but either way it must be *clear and unmistakable*. If, on the other hand, the facts reasonably permit an explanation sounding in ordinary politics, the Government has not carried its burden. Until the decision below, that is how this Court and every other had understood and applied *McCormick*.

a.  Consider first the decisions finding an explicit exchange.  In *United States v. Carmichael*, a local prosecutor told the head of an illegal gambling ring his "name [was] coming up in the course of an ongoing federal investigation," and that the prosecutor had "an idea that could help"— deliver "$50,000 in cash" to the prosecutor's reelection fund.  232 F.3d 510, 514-15 (6th Cir. 2000).  In *United States v. Farley*, the defendants set up a scheme to "sell deputy sheriff commissions" for $500 in "contributions."  2 F.3d 645, 649-52 (6th Cir. 1993).  In both instances, the *quid pro quos* were "explicit"; there was no political explanation for this facially corrupt conduct.

This Court's decision in *United States v. Terry* illustrates how an "explicit" deal need not be "express," so long as the record excludes any reasonable explanation sounding in ordinary politics.  A donor called an elected judge and "straight up asked [him] to deny" two summary judgment motions, which the judge did "within hours," "[w]ithout reading the motions" or "consulting the case files."  707 F.3d 607, 614-15 (6th Cir. 2013).  The Government had no evidence of an express deal to trade cases for contributions.  But the objective facts allowed no "legitimate alternative explanation," because in no lawful world could a donor direct a case's outcome.  *Id.* at 615.

Decisions from other Circuits are in accord; those upholding bribery convictions involving campaign contributions did so where the terms of the exchange were clear and there was no lawful alternative explanation.  For example, the Third Circuit found sufficient evidence of an explicit *quid pro quo* when a public official refused to "officially sign[]" a government contract until he received a sizable "campaign contribution."

24

*United States v. Pawlowski*, 27 F.4th 897, 905-07 (3d Cir. 2022). The Seventh Circuit affirmed where a governor "inform[ed]" a donor that the bill he supported "would not be signed until the money" from a "$100,000 'campaign' pledge" "arrived." *United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015). The Ninth Circuit found the standard satisfied where an official refused to discuss legislation without contributions. *United States v. Carpenter*, 961 F.2d 824, 828-29 (9th Cir. 1992). And the Eleventh Circuit did so when a governor expressly acknowledged his agreement to sell a seat on a state board for a donation. *United States v. Siegelman*, 640 F.3d 1159, 1166-67 (11th Cir. 2011).

As these examples confirm, the Government satisfies its *McCormick* burden if the evidence of an exchange is "*clear and unambiguous*, leaving no uncertainty about the terms of the bargain." *Carpenter*, 961 F.2d at 827 (emphasis added).

      **b.**    Now consider cases finding *insufficient* evidence of an explicit trade. A prime example is *United States v. Benjamin*. Prosecutors charged that the lieutenant governor of New York had directed state funds to a donor's non-profit in exchange for campaign contributions. The court dismissed the indictment for failing to satisfy *McCormick*'s "heightened legal standard for bribery." 2022 WL 17417038, at *1 (S.D.N.Y. Dec. 5, 2022) (Oetken, J.). The court readily accepted that the Government had identified a *quid* and a *quo*. *Id.* at *10. But as to *McCormick*'s critical dimension— connecting the two in "clear and unambiguous" fashion—the Government could only muster "temporal proximity, winks and nods, and vague phrases." *Id.* While that could perhaps carry the day elsewhere, it was not enough for an "explicit" exchange.

Likewise, in *United States v. Menendez*, the Government tried to satisfy *McCormick* with (in its words) evidence of "context, chronology, escalation, concealment, and a pattern of corrupt activity." 291 F. Supp. 3d 606, 623 (D.N.J. 2015). But even all that was not enough; it was not evidence of an *unambiguous* illicit deal that unmistakably "connect[ed] the *quid* and the *quo*." *Id.* at 629. Rather, the facts were equally compatible with a lawful explanation rooted in politics and friendship. *See id.* at 627-32; *see also, e.g.*, *United States v. Inzunza*, 638 F.3d 1006, 1025 (9th Cir. 2011) (affirming vacatur of bribery conviction where defendant's conduct could be seen as "innocent political act").

The results of these cases—on both sides of the line—are consistent with the concerns that animated *McCormick* in the first place. Its primary lesson, echoed in the Court's later public corruption cases, is that the federal bribery laws cannot be construed to allow "a pall of potential prosecution over" what politicians and constituents do "all the time." *McDonnell*, 579 U.S. at 575. The problem is not only the apparent risk that constitutionally protected conduct will be *criminalized*, but also that it will be *chilled* due to the blurry lines and specter of possible prosecution. *See McCormick*, 500 U.S. at 272. That implicates both the First Amendment and the Due Process Clause. The point of *McCormick* was to disperse this pall. It did so by fashioning a high standard to remove the guesswork and limit prosecution to extraordinary cases involving objectively corrupt conduct. And it did so, too, by creating a judicial backstop, where courts turn back cases if the evidence lacks an unambiguously illicit bargain.

**B.     The Evidence Here Fails to Satisfy *McCormick*.**

The case against Sittenfeld fell far short of what *McCormick* requires and far short of anything that any court has previously held sufficient. Even in its worst light, the evidence readily sounds in ordinary politics. Nowhere is there proof of an "explicit" trade; indeed, the evidence against Sittenfeld pales in comparison to the evidence *against McCormick himself.* The Government's insistence that the jury is entitled to infer an explicit exchange from ambiguity is exactly the approach *McCormick* rejected; the whole point of that decision is to shield the political process from jaundiced juries and overzealous prosecutors, by interposing a heightened legal test that *courts* enforce.

1.     The Government's basic theory was that Sittenfeld accepted $20,000 in PAC donations in exchange for backing a project he had already agreed to support. But Sittenfeld was simply a pro-development politician who touted his commitment to development while fundraising from developers. That is no more surprising, and no more sinister, than a progressive legislator pledging to enact the "Green New Deal" while raising money from Sierra Club donors, or a conservative candidate promising to restrict abortion during a fundraising dinner with Susan B. Anthony List leaders.

The Government's case-in-chief rested on two types of evidence: Foremost, the recordings of Sittenfeld, Ndukwe, and Rob; and secondarily, an array of circumstantial evidence surrounding these interactions. Because this prosecution arises entirely out of a manufactured sting, all the evidence is available for this Court to review. It speaks for itself, and none of it—alone or together—remotely betrays an "explicit" *quid pro quo.*

a.      Begin with the recordings.  Tellingly, despite months upon months of interactions singularly focused on ensnaring Sittenfeld in a bribe, the Government was never able to just press play on anything.  Nobody could listen to these recordings and identify the point where Sittenfeld "assert[ed] that his official conduct" would be "controlled" by some illicit deal.  *McCormick*, 500 U.S. at 273.  To the contrary, Sittenfeld expressed unqualified support for 435 Elm before even *asking* for campaign support.  The Government's case thus rested instead on stacking implication on implication, to conjure an exchange that was not obvious (*i.e.* explicit) from the words themselves.

"Love You But Can't."  The district court thought the "best" evidence (R.283.PageID.7140-41) was when Sittenfeld told Ndukwe:  "[Y]ou don't want me to be like 'hey Chin like love you but can't.'"  App.41-42; Gov't.Ex.13B at 2:25 (audio). The Government spun that as a threat: Contribute, or I will refuse to help you.  But even the Government recognized you need to squint between the lines to get there.  At closing, it urged the jury to use "common sense" to discern the remark's "implication." R.251.PageID.5003.  "[T]hey discussed … 435 Elm, and they discussed rounding up money," so there must have been a "corrupt solicitation."  R.251.PageID.5004.

But a jury does not need to fill in the gaps where the deal is "explicit."  And more fundamental, this tack—urging the jury to read between the lines, and layer its views of politics on its subtext—is the precise one *McCormick* sought to pretermit.  Given the stakes, campaign-contribution bribery cannot come down to twelve people's "common sense" intuitions as to a remark's "implication."  An exchange must be *unmistakable*.

28

Even on its own terms, the Government's account is barely colorable, let alone "explicit." The far more natural interpretation of this exchange was that Sittenfeld was awkwardly soliciting an old friend—a friend who had regularly donated before, and whom Sittenfeld had called to congratulate on his newborn son five days prior. R.269.PageID.6719-20; App.38. He was not suddenly *shaking down* Ndukwe. He was instead explaining he would *not be able to help* Ndukwe if he was not elected—*i.e.*, "you don't want me to be like love you, but I can't help." *See* R.269.PageID.6773-74. That is about as routine as politics get—a candidate warning that, without support, he will not be in a position to advance a donor's priorities. There is nothing unlawful about it.

"Nothing Can Be A Quid Pro Quo." Notably, the FBI did not think it caught Sittenfeld in a bribe on October 30; that is why they had Ndukwe proposition him with an express exchange a few days later. *Supra* at 8-9. But as explained, Sittenfeld rejected it *by name*, telling Ndukwe "nothing can be a quid, quid pro quo" and that he knew "that's not what you're saying either." App.47. One might think that is the ballgame under *McCormick*: It is hard to say Sittenfeld unambiguously "assert[ed] that his official conduct [would] be controlled by the terms of" a corrupt bargain, 500 U.S. at 273, when the only thing Sittenfeld "asserted" was "no."

The Government nonetheless tried to make this exchange a key part of its case. It first argued Sittenfeld did not *really* reject Ndukwe's offer: Sure, he said as much, but it was with a telephonic wink-and-nod, because he pivoted to his record ("I'm always super pro-development"). R.251.PageID.5006.

This cannot work under *McCormick*. Just tweak the facts to see why: A donor approaches a congressman and says he intends to make a large campaign contribution "but you have to vote against the assault weapon ban." The legislator responds that he cannot engage in a trade, but "I've voted against every gun control bill that's ever been put in front of me." By reverting to his record, the official makes clear his vote will *not be* "controlled by" the contribution, *McCormick*, 500 U.S. at 273; rather, the contribution will enable him to act on the policy goals he already shares with the donor. That is perfectly lawful and, indeed, the way campaign donations are supposed to work. *Id.* at 272. Contributions made "with *anticipation* of favorable future action" are routine; only those made "*in exchange for* an explicit promise of favorable future action" are crimes. *Id.* at 276 (Scalia, J., concurring) (emphases added).

The distinction is subtle because, at the end of the day, the legislator accepts the campaign funds and votes against the bill. That is what makes this dynamic so easy for prosecutors to exploit. But the point of *McCormick*'s "explicit" requirement is to stop them from doing so. Meanwhile, if assuring aggressive donors by pointing to one's record can be enough for a bribery charge, every politician should lawyer up.

Separately, the Government made much of the fact that Sittenfeld did not sever all ties with Ndukwe after he was propositioned. On the Government's telling, because Sittenfeld continued to meet with Ndukwe and his investors after Ndukwe's attempted *quid pro quo*, it was fair to see every subsequent exchange as an extension of the offer Sittenfeld had shut down. *See, e.g.*, R.251.PageID.5007.

30

This is equally untenable. The law does not require that every public official who encounters a clumsy donor race to the FBI field office. Instead, the law requires exactly what Sittenfeld did here: Reject the offer, and explain the legitimate bases for campaign contributions. At minimum, doing that is not proof of an "explicit" bribe.

Especially so here. Again, Sittenfeld and Ndukwe were longtime friends, and Ndukwe was a longtime donor. The notion that Sittenfeld would—or should—cut all ties with Ndukwe because of a single blunt proposition is fantastical. All the more so, because Sittenfeld (who obviously did not know he was being recorded) assumed that Ndukwe (who had never done this before) essentially misspoke ("I know that's not what you're saying"). To infer an "explicit" exchange from Sittenfeld's decision not to call the cops, or ghost his friend, is far too thin a reed for *McCormick*.

<u>"I Can Deliver the Votes."</u> After the above, the Government never successfully put another express bribe to Sittenfeld. As noted, Rob tried once, but botched it: He talked about donating $20,000 to "get this deal done," but Sittenfeld instead started talking about the mayor trying to "veto" the 435 Elm "deal." App.77. Even Rob thus accepted at trial Sittenfeld missed the corrupt pitch. R.265.PageID.6157.

With nothing better, the Government turned to Sittenfeld's repeated promises to support 435 Elm. *See, e.g.*, R.251.PageID.5011. Sittenfeld knew Rob had wanted to donate in exchange for support, and kept telling Rob he could "deliver the votes" to get 435 Elm across the finish line. *See, e.g.*, R.251.PageID.5012, 5014. Taken together, the Government contended, everyone knew what was really going on here.

But again, people need not squint or surmise to see something that is "explicit." And as above, this connect-the-dots strategy falls well short of what *McCormick* plainly demands. Politicians regularly solicit donors in parallel with discussing "what they intend to do" on their behalf. 500 U.S. at 272. *McCormick* emphasized it is not bribery for a politician to say he will "act for the benefit of constituents or support legislation furthering [their] interests," while "contributions are solicited and received from those beneficiaries." *Id.* Such interactions are both "well within the law" and "unavoidable" in our politics. *Id.*; *see also Citizens United*, 558 U.S. at 359.

If anything, Sittenfeld took pains to demarcate the bounds of his fundraising. At the lunch meeting, the parties discussed 435 Elm at length, and Sittenfeld repeated his categorical support—*before* any discussion of donations. With Nduke's permission, he then transitioned to "political stuff," and made a pitch for why Rob should view him as a "good bet[]" if he decided to get financially involved in the mayoral race. App.68. Sittenfeld thus did his best to keep 435 Elm *separate* from his fundraising—recognizing, of course, that a developer is not likely to contribute to an anti-development candidate.

To be sure, it is easy enough to see how twelve average jurors might brand as "corruption" any conversations that include both policy commitments and fundraising. But that is precisely why *McCormick* insisted on more—"an explicit promise or undertaking by the official to perform or not to perform an official act" in exchange for a donation. 500 U.S. at 273. There was no evidence of *that*. And *McCormick* charges this Court with enforcing that legal line.

32

**b.**    While the recordings were the heart of the case, the Government also relied on certain contextual evidence to try to paper over their ambiguities. It tried to use lawful aspects of everyday politics to color Sittenfeld's conduct. But muddying the waters cannot produce a clear *quid pro quo*.

*First*, the Government repeatedly told the jury it could infer nefarious intent from the fact that Sittenfeld tried to help Ndukwe and Rob donate *anonymously*. R.251.PageID.5017-18, 5083. Of course, the Government never charged Sittenfeld with violating campaign-finance laws. Nor could it: Everything he did was lawful. But that did not stop the Government from branding it as unseemly, and telling the lay jury it must also be corrupt. "Whether it was properly bundled is really beside the point. … [W]here the defendant took steps to hide the source of the payment, that is evidence of his intent." R.251.PageID.5017.

This is remarkable. Recall, it was *the Government's* idea for any contributions to be discreet, because Ndukwe and Rob told Sittenfeld that they feared the blowback that might come from donating—the exact reason anonymous First Amendment activity is constitutionally protected. *See NAACP v. Alabama*, 357 U.S. 449 (1958). Regardless, the attempt to paint Sittenfeld's actions here as nefarious is nonsensical. Sittenfeld repeatedly *rejected* attempts by Rob to give money in a way that did not comply with every jot-and-tittle of campaign-finance law. If Sittenfeld wanted to accept a *bribe* he surely would have not insisted on *creating* a paper trail; he would have just accepted the nontraceable cash that Rob first tried to offer him.

33

*Second*, the Government stressed that Sittenfeld pushed 435 Elm in 2019 even as others opposed it, all to say he was supporting a bad deal to hold up his side of a corrupt bargain. R.251.PageID.5019-20, 5032. This is deeply rich and deeply unfair. The reason Sittenfeld disagreed with others about 435 Elm was that Sittenfeld was operating from different facts—because *the undercover agents had lied to him* about the project (as to securing financing, high-value tenants, etc.). App.54-56; R.269.PageID.6735-38. The Government made 435 Elm sound phenomenal, and made Sittenfeld think it was yet another beneficial project about to fall victim to the bureaucracy. R.269.PageID.6737. That Sittenfeld bought something (literally) too good to be true cannot be evidence of an illicit deal.

*Third*, the Government made much of Sittenfeld allegedly telling a lobbyist once, as part of an unrelated exchange, that if his clients "hedge" on Sittenfeld, he will "hedge" on them as mayor. R.251.PageID.5002, 5004-05, 5084. But here too, it is hard to see the fire, let alone how it could spread to engulf unrelated conversations with Ndukwe and Rob. The Supreme Court has made clear donors may pay for "access" and, in turn, politicians can provide it in exchange for donations. *Cruz*, 596 U.S. at 308-09. This is a mainstay of modern politics, for better or worse. *See McConnell v. FEC*, 540 U.S. 93, 151 (2003) (national parties offered "menus of opportunities for access" where "increased prices reflect[ed] an increased level of access"). Even if tawdry, haggling access is not "corruption." *Citizens United*, 558 U.S. at 360. And this unrelated remark cannot turn ambiguous exchanges with others into "explicit" trades.

In short, while there may be close *McCormick* cases, this is not one of them. For over a year, a team of undercover agents and their cooperators had the sole objective of persuading Sittenfeld to take a bribe. They targeted a project within the heartland of his political identity, which he in fact already supported, and used a longtime friend and donor as point-person. Even still, the Government could not muster anything beyond vague phrases, parsed inferences, and circumstantial arguments—surely the realistic floor for a year-long gambit where a politician is surreptitiously recorded nonstop as trained FBI agents try to ply him with a bribe. The case against Sittenfeld legally fails under any meaningful reading of *McCormick*.

**2.** Indeed, this evidence does not begin to approach that presented in the (relatively few) cases that have found the *McCormick* standard satisfied, all of which involved express corrupt offers or conduct inexplicable as ordinary politics. *Supra* Part I.A.3. Perhaps more important, the evidence here does not surpass that in *McCormick* itself. Whatever adjectives and adverbs one uses to characterize *McCormick*'s standard, it obviously must require more than the evidence that fell short there.

As touched on above, the case against McCormick involved an apparent *quid* and *quo*: The lobbyist provided donations, and the state legislator pushed through favorable legislation. There were also coded comments: McCormick said his campaign was "expensive" and "he had not heard anything from the foreign doctors"; the lobbyist responded he would "see what he could do." Finally, circumstantial evidence suggested a corrupt deal: McCormick helped enact the legislation soon after receiving the

contributions (and then received more); pressed ahead despite pushback within the government; and failed to report any of the cash donations on his campaign reporting statements or on his own tax returns. *See McCormick*, 896 F.2d at 63-64.

Nonetheless, "*McCormick*'s point was that the *pro* itself must be clear and unambiguous—and characterized by more than temporal proximity, winks and nods, and vague phrases." *Benjamin*, 2022 WL 17417038, at *10. The Supreme Court thus held that a violation of the Hobbs Act had not been "made out." *McCormick*, 500 U.S. at 272. Yet 30 years later, the Government is running the same play. It has a *quid* (the PAC money), a *quo* (435 Elm), vague phrases ("love you but can't"), and circumstantial evidence (fundraising proximate to support); but it does not have *anything* to push this case out of the "basic structure of the exchange" from *McCormick* itself. *Benjamin*, 2022 WL 17417038, at *10. If anything, the evidence here is *weaker*. Most obviously, unlike there, Sittenfeld meticulously reported each donation, and repeatedly rejected attempts by undercover agents to skirt campaign-finance law, such as by handing him cash. App.80-82, 88-89, 98. By contrast, there is no evidence against Sittenfeld—none—that makes this case any stronger than that against McCormick.

Simply put, whatever "explicit" means, the evidence here does not qualify. If the evidence against McCormick was insufficient, the same must be true here. The same result should therefore obtain here too.

### C.      Punting Ambiguity to the Jury Would Eviscerate *McCormick*.

For its part, the district court agreed the evidence against Sittenfeld was at most ambiguous.  It admitted that Sittenfeld had "offered plausible alternative explanations for his comments," and acknowledged that the objective evidence could be understood as showing ordinary politics rather than "illegal conduct."  R.283.PageID.7148; *see also* R.283.PageID.7142.  In the face of this ambiguity, however, the district court concluded it was the jury's call.  R.283.PageID.7140.  The district court treated "intent" as the key determinant of how to construe the objectively ambiguous interactions, and concluded that divining Sittenfeld's intent presented a classic jury question.  *Id.*

That is wrong.  No reasonable jury could have found an explicit *quid pro quo* here, and in holding otherwise the court fundamentally misunderstood *McCormick*.  As every other court to address the question has understood, the *McCormick* standard demands clarity: "clear and unambiguous" evidence of a corrupt bargain.  *Carpenter*, 961 F.2d at 827.  If the record reflects "uncertainty," the standard is not met—period.  *Id.*; *see also Benjamin*, 2022 WL 17417038, at *10; *Menendez*, 291 F. Supp. 3d at 629; *Inzunza*, 638 F.3d at 1025.  The jury can resolve factual disputes and draw credibility determinations, but it cannot transform an objectively ambiguous remark into a clear one by inferring a subjective intent that is not apparent from the record.  Where, as here, the evidence is consistent with ordinary politics, it is thus insufficient as a matter of law.  And where, as here, a jury finds bribery on such a record anyway, it is not *applying* the standard from *McCormick*, but *relaxing* it—at which point, the courts must fix the error.

1.    The most glaring problem with the district court's contrary position is that it welcomes quite literally what *McCormick* rejected.  The Court adopted a heightened standard, to ensure that "unavoidable" conduct "that has long been thought to be well within the law" would not be "open to prosecution."  500 U.S. at 272.  But as even the district court seemed to accept, if ambiguous conduct translates into a jury question on intent, "no politician can accept money from anybody who is going to have business coming before them [without] leaving it up to twelve of their peers to decide whether … an inference could be drawn that there was some illicit deal."  R.281.PageID.7105.  One of these has to give, and it is not *McCormick*.

Indeed, if the district court were right about what is sufficient to prove campaign-contribution bribery, it is impossible to see how *McCormick* came out the way it did.  In that case, there was no doubt that the evidence against McCormick was ambiguous; and there was no doubt that a jury could "infer" corrupt intent from it.  896 F.2d at 66.  On the district court's logic, that would be the end of the matter.  But, of course, it was not.  The Government had every piece of evidence possible against McCormick *besides* what mattered—*objective proof* of an "explicit" exchange.  And so the Court could not "agree that a violation of the Hobbs Act" was "made out."  500 U.S. at 272.

Simply put, under the district court's approach of sending any ambiguous record to a jury to decide "intent," it is hard to see what independent function *McCormick* retains, and easy to see how the exact evils *McCormick* sought to prevent would run amok.  Those are flashing signs that the district court got it wrong.

**2.**    The district court did get it wrong, because it misunderstood the judiciary's role in enforcing *McCormick*.  Of course the jury must be instructed on the "explicit" requirement.  But the court must also ensure the evidence is legally sufficient to support a verdict, and that inquiry must incorporate *McCormick*'s special standard.  *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (explaining that if "First Amendment mandates a 'clear and convincing' standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude … that the plaintiff had shown actual malice with convincing clarity").  Accordingly, the sufficiency inquiry in a *McCormick* case is whether a reasonable jury could find an "explicit" *quid pro quo*.  And if the record is ambiguous, the answer is *no*—by definition, a reasonable jury cannot find an "explicit" trade if the facts are readily understandable as routine politics rather than manifest corruption.

The judiciary's obligation to ensure sufficient evidence is more critical—and its review more searching—"in cases raising First Amendment issues," lest the judgment "constitute a forbidden intrusion on the field of free expression."  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).  So in *Bose*, for instance, the Court held that it had "an obligation to make an independent examination of the whole record" to assure itself the evidence revealed "actual malice."  *Id.* at 510-11.  So too here.  Just as with actual malice, "independent appellate review" is needed to ensure that the evidence establishes an "explicit" *quid pro quo*, lest campaign expenditures protected by the First Amendment become grist for the bribery mill.  *Id.* at 510.

39

A court cannot escape that obligation, as the district court tried to do, by citing the jury's role in determining intent. Subjective intent is "'easy to allege and hard to disprove.'" *Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998). Using an "intent-based test" to distinguish First Amendment activity from criminal conduct would therefore "chill core political speech" by failing to provide sufficient "breathing space." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468-69 (2007) (opinion of Roberts, C.J.). It would also run afoul of Due Process fair warning principles. That is why *McCormick* required more. While "matters of intent" are of course "relevant," intent cannot be the whole analysis, as in ordinary bribery cases. 500 U.S. at 270-72. There must be independent assessment of whether the record contains *objective evidence* from which a jury could find an *explicit* bribe. If the record only reveals "temporal proximity, winks and nods, and vague phrases," that is insufficient. *Benjamin*, 2022 WL 17417038, at *10.

To be clear, none of this relegates juries to the sidelines. Resolving disputes of fact and making credibility determinations remain their principal province. *See Bose*, 466 U.S. at 500. The record is thus not necessarily "ambiguous" simply because there are competing accounts of events; *McCormick* is not a safe harbor for any official who denies wrongdoing. If the Government puts on testimony that an official refused to sign a contract until receiving a donation, *see Pawlowski*, 27 F.4th at 905-07, or that a governor threatened to withhold his signature on a bill until money arrived, *see Blagojevich*, 794 F.3d at 734, that is objective proof of an "explicit" trade, and a jury would be entitled to credit it even over a defendant's denial. *McCormick*, 500 U.S. at 273.

But this case is different. Again, *everything* here was part of a sting, and *everything* was recorded. Figuring out what happened does not involve credibility determinations, or factual findings. It is all on tape for the Court to hear, just as the jury did. The only question is whether the recorded conversations reveal an "explicit" *quid pro quo*. *Id.* And it is plain from any serious review that they do not. Sittenfeld never asserted "that his official conduct [would] be controlled by the terms" of an "explicit promise or undertaking," traded for a campaign donation. *Id.* Just the opposite. There is no way a reasonable jury could discern anything beyond, at worst, an "obscure or ambiguous" exchange laden with "disguised meaning." *Blandford*, 33 F.3d at 696 n.13. The record thus lacks what *McCormick* legally requires. Both convictions must be reversed.

## II. THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT.

The Fifth Amendment protects defendants from facing trial on something other than what the grand jury indicted. Accordingly, the "charging terms of the indictment" may not be amended at trial, either literally or constructively, "after the grand jury has last passed on them." *United States v. Combs*, 369 F.3d 925, 935 (6th Cir. 2004). And those terms are constructively amended when "the presentation of evidence and jury instructions" in effect modifies "essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Kuehne*, 547 F.3d at 682-83. A constructive amendment is *per se* prejudicial and therefore compels vacatur for a new trial. *Id.* at 683.

For Counts 3 and 4, the indictment against Sittenfeld used a "to wit" clause to specify that each charge was premised on a *PAC* contribution from *"Rob."* But at trial, the Government urged the jury to convict Sittenfeld based on a *direct* contribution from *Ndukwe.* That is a textbook constructive amendment. The district court held that "to wit" clauses are illustrative, not definitional; but that argument is foreclosed by both text and precedent. As a backup, the court reasoned that any payment from Ndukwe could be viewed as coming from Rob; but that *ex post* theory cannot square with the indictment or the evidence, and regardless, was never put to the jury. For these reasons, a new trial is warranted as to both counts at minimum.

### A.    The Government Exceeded the Indictment's "To Wit" Clause.

Counts 3 and 4 charged a *specific* bribe from a *specific* person. After incorporating the relevant factual allegations, and citing the general offense elements, the indictment stated that, "to wit," Sittenfeld "corruptly solicited and demanded, and accepted and agreed to accept, *payments to his PAC* for his benefit *from UCE-1* [*i.e.*, 'Rob']." R.3 ¶ 42 (emphases added); *see also id.* at R.3 ¶ 44 (similar for Count 4).

At trial, the Government changed course. Prosecutors repeatedly told the jury Sittenfeld had corruptly solicited *Ndukwe* when telling him "love you but can't" on their October 30 call. R.263.PageID.5698-700; R.266.PageID.6247; R.269.PageID6773; R.251.PageID.5002-04, 5083. In closing, the Government told the jury this was enough to convict. R.251.PageID.5035. And, over objection, the instructions did not expressly link Counts 3 or 4 to "Rob." R.107.PageID.1187; R.202.PageID.3221, 3226.

During post-conviction proceedings, the Government suggested that this constructive amendment affected only Count 3 (which spoke to whether Sittenfeld had *solicited* a bribe), but not Count 4 (which spoke to whether he *agreed to accept* one). R.277.PageID.6998. But that after-the-fact splicing is plainly wrong. As Judge Cole himself explained, the October 30 exchange between Sittenfeld and Ndukwe was "the best example" of "an explicit deal" for *both* counts. R.283.PageID.7140-41. Indeed, the Government itself cited that comment elsewhere in its post-trial briefing as evidence for *both* counts. R.276.PageID.6975-84. The reason why is simple: If the jury believed Sittenfeld's comment was a corrupt solicitation, it could easily have found that Sittenfeld "agreed to accept" the solicited bribe (R.202.PageID.3226) based on Ndukwe's reply that he would "go to work on" collecting contributions. App.42.

And of course, the split verdict confirms the jury convicted on this impermissible basis for both counts. Recall, Count 1 (wire fraud) charged the *same* corrupt agreement with Rob that Counts 3 and 4 did (R.3 ¶¶ 39-40); but both the Government's closing and the jury instructions specifically tied Count 1 to Rob, because the jury had to find that a particular phone call with Rob (the use of the wires) was in furtherance of the corrupt deal (R.202.PageID.3212; R.251.PageID.5012). The jury, however, *acquitted* as to Count 1. R.207-1.PageID.5300. In other words, when properly limited to the terms of the indictment, the Government could not convict.

43

**B.      Exceeding a "To Wit" Clause Effects a Constructive Amendment.**

It is plain the Government went beyond the bribe it specified in the indictment; for Counts 3 and 4, the indictment only named a PAC donation from Rob, while much of the trial focused on a direct contribution from Ndukwe.  But the district court thought a "to wit" clause is simply an illustration that does not restrain the Government.  R.283.PageID.7151.  That was legal error.

**1.**      Like all legal texts, indictments should be given a "plain reading."  *United States v. Thompson*, 515 F.3d 556, 566 (6th Cir. 2008).  The plain meaning of "to wit" is "namely" or "[t]hat is to say."  *To Wit, Black's Law Dictionary* (11th ed. 2019).  It is used to make "more specific something already said or referred to."  *To Wit*, *The New Oxford American Dictionary* (2001); *see also To Wit*, *Oxford English Dictionary* (3d ed. 2020).

Viewed "as a whole," *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007), it is clear the indictment used "to wit" in its ordinary way.  For both Counts 3 and 4, the operative paragraphs—those that actually state the offense—are broken into two parts.  The first half of each paragraph states the timeframe and the general elements of each offense; and then the second half of each paragraph, marked by "to wit" clauses, specifies the exact way they were allegedly violated.  R.3 ¶¶ 42, 44.  If someone told a friend—Maddie was hired by a bank, to wit, Goldman Sachs—nobody would think she could be working for Chase.  So too here.  The indictment alleged that Sittenfeld committed two offenses, to wit, by taking a PAC donation from Rob.  And *that* is therefore what the Government needed to prove at trial.

2.     This Court's cases—along with those of most others—confirm "to wit" clauses should be read naturally, and are thus definitional.  More, the same courts have also confirmed that when such clauses are breached, a constructive amendment follows.

Begin with this Court.  In *United States v. Cusmano*, the indictment charged the defendant with interfering with interstate commerce "by extortion, to-wit: by threats of economic loss."  659 F.2d 714, 715 (6th Cir. 1981).  Relying on this clause, this Court held "[i]t is clear that the indictment alleges only one means of extortion: threats of economic loss." *Id.*  And because the Government went *beyond* this one means at trial— presenting evidence of extortion by way of "physical violence," *id.* at 717—this Court reversed the conviction.  This because the "events at Cusmano's trial effectively altered the charging terms of the indictment," and thus required a new trial.  *Id.* at 719.

*Cusmano* controls.  Here as there, the indictment used a "to wit" clause to specify the "means" of the relevant crime.  Here as there, the Government went past those means during trial.  And here as there, a new trial is necessary.

Most federal appellate courts read "to wit" clauses the same way.  These courts regularly find constructive amendments where the Government exceeded such clauses' limits.  *See, e.g.*, *United States v. Davis*, 854 F.3d 601, 604-05 (9th Cir. 2017); *United States v. Chambers*, 408 F.3d 237, 241-47 (5th Cir. 2005); *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994); *United States v. Weissman*, 899 F.2d 1111, 1115 (11th Cir. 1990); *cf. United States v. Brewbaker*, 2023 WL 8286490, at *4 (4th Cir. Dec. 1, 2023) (reversing denial of motion to dismiss indictment where only charged theory was legally deficient).

Supreme Court decisions point in the same direction.  In *Stirone v. United States*, the Court analyzed an indictment that identified the "commodity" in a Hobbs Act charge as "supplies and materials (sand)."  361 U.S. 212, 213 (1960).  Like a "to wit" clause, the parenthetical specified the particular commodity involved in the crime.  And adopting this reading, the Court held that the "grand jury … was satisfied to charge" only "interstate importation of sand," and that a constructive amendment followed from a trial that was focused in meaningful part on the importation of *steel* shipments as well.  *Id.* at 217-219.

The basic point is where "an indictment charges particulars," the Government's case "must comport with those particulars."  *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008) (Gorsuch, J.).  And a "to wit" clause charges particulars.

**3.**    The district court barely engaged with this.  It reasoned that because the indictment as a whole "put Sittenfeld on notice that conduct potentially outside that expressly mentioned in the 'to wit' clauses in Counts 3 and 4 may form part of those charges," this was "enough."  R.283.PageID.7151.  But the court never tried to square this view with the plain meaning of "to wit."  Nor this Court's decision in *Cusmano*.

Instead, the district court relied on a decision from the Second Circuit for the proposition that "to wit" clauses are "properly understood to be illustrative rather than definitional."  R.283.PageID.7151 (quoting *United States v. Agarwal*, 726 F.3d 235 (2d Cir. 2013)).  But out-of-circuit precedent cannot displace in-circuit precedent. Especially where wrong.  The Government knows how to use illustrative phrases when

46

it wants to—"*e.g.*," "for instance," and "such as" are easy enough to say. But a "to wit" clause has a distinct meaning, and brings with it distinct limits. The Government must live within those limits at trial.

### C.    The District Court's Conduit Theory Cannot Save the Verdict.

Perhaps aware of the weaknesses with its primary ruling, the district court offered an alternative basis for salvaging the convictions: Ndukwe was really a conduit to Rob, so "soliciting from Ndukwe was indistinguishable from soliciting from Rob." R.283.PageID.7152. This theory is flawed at every turn, and cannot save the verdict.

*First*, the conduit theory *itself* cannot square with the indictment. The indictment is clear the October 30 call concerned *direct* contributions to Sittenfeld's campaign— not separate contributions to his *PAC*—because the focus of the conversation was about Ndukwe securing certain LLC donations before a law limiting their donations to campaigns (not to PACs) was scheduled to take effect in November. R.3 ¶¶ 11, 13, 16. The indictment is also clear that in this call, Sittenfeld solicited contributions from "others" *besides* Rob, because Ndukwe had specifically advised that Rob *could not meet (or donate)* until after the November LLC law went into effect. R.3 ¶ 13. So to the extent Ndukwe was acting as a go-between among Sittenfeld and "others" on this call, it was to facilitate donations from individuals who were *not* Rob. *Id.*

*Second*, no rational jury could convict on the conduit theory. The transcript of the October 30 call tracks what was alleged in the indictment; so the points above apply in full here too. More, the transcript shows Ndukwe describes the "others" from whom

he could get donations as his "friends up in Columbus." App.41. But while Sittenfeld did not know much about Rob, he did know Rob was from North Carolina. App.52. So again, to the extent Ndukwe was a conduit to anyone on October 30, it was not Rob. At minimum, "it cannot be said with certainty" that the jury convicted on this basis, and that is enough to require a new trial. *Stirone*, 361 U.S. at 217.

*Third*, and most fundamental, the conduit theory was never submitted to the jury. The district court instead surmised it as a possible way to save the verdict in light of the evidence. But that is marked error. Courts may sustain a conviction only on the "legal and factual grounds" actually "submitted to the jury." *McCormick*, 500 U.S. at 269. And here, the Government *never once* argued to the jury the "love you but can't" conversation was somehow an indirect solicitation of Rob. Instead, the Government presented the remark as a solicitation of Ndukwe, and Ndukwe alone. For a sampling:

- In its opening, the Government argued that Sittenfeld "told Chin that Chin needed to financially support him." R.262.PageID.5457. It never suggested this financial support was really supposed to come from Rob.

- Agent Holbrook testified that he understood the October 30 call to "mean that Mr. Sittenfeld was trying to raise funds from Mr. Ndukwe." R.265.PageID.6010. He continued that Sittenfeld "wanted Mr. Ndukwe to provide multiple LLC checks before the Issue 13 was voted on." *Id.* At no point did Agent Holbrook even hint this was some way to get to Rob.

- Ndukwe himself testified that he understood Sittenfeld to be telling him that he "needed to go out and get people to put money into LLCs." R.266.PageID.6247. But he never identified Rob as one of these people, and again, the LLC donations were intended for the campaign, not the PAC.

48

- In closing, the Government argued that the October 30 call was a threat to Ndukwe that *Ndukwe* had to "support" Sittenfeld if he wanted support once Sittenfeld became mayor.  R.251.PageID.5003.  Nowhere did the Government indicate this "support" would come from Rob.

Put together, there is no way the district court's post-trial conduit theory can save the verdict.  The indictment premised Counts 3 and 4 on PAC contributions from Rob; but the October 30 call had nothing to do with PAC donations, and nothing to do with Rob.  In making Sittenfeld's "love you but can't" conversation with Ndukwe the heart of its case at trial, the Government constructively amended the indictment, urging the jury to convict for conduct not charged.  A new trial is warranted.

## CONCLUSION

The Court should grant acquittal or, at minimum, a new trial on both counts.


December 11, 2023

Respectfully submitted,

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., NW
Suite 300
Washington, DC 20006
(602) 501-5469
james@kingstlegal.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(202) 326-3939
amaugeri@jonesday.com

Yaakov M. Roth
Harry S. Graver
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-7658
yroth@jonesday.com

Justin E. Herdman
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7113
jherdman@jonesday.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Garamond style, 14 point font.

December 11, 2023                    */s/ Yaakov M. Roth*
                                     Yaakov M. Roth

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2023, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

I further certify that on December 8, 2023, four copies of all video and audio exhibits on which Sittenfeld relies were sent on flash drives to the Clerk of Court by United Parcel Service overnight delivery.

I further certify that on December 8, 2023, one copy of all video and audio exhibits on which Sittenfeld relies was sent on a flash drive to counsel for the United States by United Parcel Service overnight delivery.

/s/ *Yaakov M. Roth*
Yaakov M. Roth

## DESIGNATION OF DISTRICT COURT RECORD

Pursuant to Sixth Circuit Rule 30(g), Sittenfeld designates the following

documents from the lower court record as relevant to the instant appeal:

| Record Entry | Description | PageID# Range |
|---|---|---|
| 3 | Indictment | 26-45 |
| 107 | Defendant's Response to the Government's Proposed Jury Instructions | 1170-1186 |
| 202 | Jury Instructions | 3190-3256 |
| 207-1 | Verdict Form | 5300-5302 |
| 238 | Trial Transcript (Day 10) (Excerpted) | 4260-4418 |
| 240 | Trial Transcript (Day 7) (Excerpted) | 4634-4686 |
| 251 | Trial Transcript (Day 11) | 4941-5112 |
| 262 | Trial Transcript (Day 2) | 5419-5645 |
| 263 | Trial Transcript (Day 3) | 5646-5804 |
| 264 | Trial Transcript (Day 4) | 5805-5927 |
| 265 | Trial Transcript (Day 5) | 5928-6183 |
| 266 | Trial Transcript (Day 6) | 6184-6409 |
| 269 | Trial Transcript (Day 10) | 6637-6871 |
| 270 | Defendant's Motion for Acquittal | 6872-6894 |
| 271 | Defendant's Motion for a New Trial | 6995-6916 |
| 276 | Government's Response in Opposition to Defendant's Motion for Acquittal | 6970-6989 |
| 277 | Government's Response in Opposition to Defendant's Motion for a New Trial | 6990-7012 |
| 278 | Defendant's Reply in Support of Motion for Acquittal | 7013-7027 |
| 279 | Defendant's Reply in Support of Motion for a New Trial | 7028-7041 |
| 281 | Transcript of Hearing on Defendant's Post-Trial Motions | 7044-7130 |
| 283 | District Court's Opinion and Order on Defendant's Post-Trial Motions | 7137-7162 |
| 300 | Judgment | 7380-7386 |
| 302 | Sentencing Transcript | 7391-7511 |
| 303 | Notice of Appeal | 7512-7513 |