No. 23-3840

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

UNITED STATES,

*Appellee,*

v.

ALEXANDER SITTENFELD,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Ohio (Western Division) (Cole, J.)
District Court Case No. 1:20-cr-00142

_____

## BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF THE APPELLANT AND REVERSAL OF THE DISTRICT COURT

L. Bradfield Hughes (OH 0070997)
Matthew F. Stowe (TN 029994)
PORTER, WRIGHT, MORRIS &
ARTHUR, LLP
41 South High Street
Suites 2800-3200
Columbus, Ohio 43215
(614) 227-2000
bhughes@porterwright.com
mstowe@porterwright.com

Daniel J. Hemel
NEW YORK UNIVERSITY SCHOOL
OF LAW
40 Washington Square South
Vanderbilt Hall
Room 325
New York, NY 10012
(212) 998-6354
Daniel.Hemel@nyu.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST OF AMICI ................................................ 1

INTRODUCTION.......................................................................... 4

LEGAL AND FACTUAL BACKGROUND............................................. 7

SUMMARY OF THE ARGUMENT ................................................... 13

ARGUMENT .............................................................................. 14

    I.    A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign Contribution Cases Is Necessary To Protect Core Political Speech and Conduct ................................................... 14

    II.   A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign-Contribution Cases Is Necessary To Guard Against the Risk of Prosecutorial Bias ................................................... 20

    III.  A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign-Contribution Cases Is Essential To Federalism and the Separation of Powers........................................................... 23

CONCLUSION ........................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................... 28

CERTIFICATE OF SERVICE .......................................................... 29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Brown v. Hartlage,*
   456 U.S. 45 (1982) ................................................................................ 14

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................................... 13

*Davis v. FEC,*
   554 U.S. 724 (2008) .............................................................................. 15

*Evans v. United States,*
   504 U.S. 255 (1992) .......................................................................*passim*

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ......................................................................... 22, 23

*McCormick v. United States,*
   500 U.S. 257 (1991) .......................................................................*passim*

*McCutcheon v. FEC,*
   572 U.S. 185 (2014) .............................................................................. 15

*McDonnell v. United States,*
   579 U.S. 550 (2016) .............................................................................. 23

*McNally v. United States,*
   483 U.S. 350 (1987) .............................................................................. 24

*Monitor Patriot Co. v. Roy,*
   401 U.S. 265 (1971) .............................................................................. 13

*New State Ice Co. v. Liebmann,*
   285 U.S. 262 (1932) .............................................................................. 24

*Printz v. United States,*
   521 U.S. 898 (1997) .............................................................................. 23

*United States v. Abbey,*
   560 F.3d 513 (6th Cir. 2009) ........................................................................ 8

*United States v. Allen,*
   10 F.3d 405 (7th Cir. 1993).......................................................................... 12

*United States v. Benjamin,*
   No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022)...................... 8

*United States v. Blandford,*
   33 F.3d 685 (6th Cir. 1994).......................................................................... 8

*United States v. Carpenter,*
   961 F.2d 824 (9th Cir. 1992) ........................................................................ 8

*United States v. Ganim,*
   510 F.3d 134 (2d Cir. 2007) ......................................................................... 7

*United States v. Inman,*
   39 F.4th 357 (6th Cir. 2022) ................................................................... 9, 12

*United States v. Kincaid-Chauncey,*
   556 F.3d 923 (9th Cir. 2009) ........................................................................ 7

*United States v. Margiotta,*
   688 F.2d 108 (2d Cir. 1982) ................................................................... 19, 21

*United States v. Siegelman,*
   561 F.3d 1215 (11th Cir. 2009) ..................................................................... 7

*United States v. Terry,*
   707 F.3d 607 (6th Cir. 2013) ....................................................................... 12

*Welsh v. United States,*
   398 U.S. 333 (1970) .................................................................................... 5

**Statutes**

Or. Rev. Stat. § 162.005(1) ........................................................................... 24

Tex. Penal Code § 36.02(a)(4) ........................................................................ 23

**Other Authorities**

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
(3rd ed. 1992) ................................................................................. 3, 4

BLACK'S LAW DICTIONARY (6th ed. 1990) ......................................... 8

*The Federalist No. 51 (Madison), in* THE FEDERALIST PAPERS 263 (Ian
Shapiro ed., Yale Univ. Press 2009) ............................................ 22

*The Federalist No. 57 (Madison), in* THE FEDERALIST PAPERS 290 (Ian
Shapiro ed., Yale Univ. Press 2009) ............................................ 16

Brent Ferguson, *Congressional Disclosure of Time Spent Fundraising*, 23
CORNELL J. L. & PUB. POL'Y 1 (2013) ............................................ 14

Ilissa B. Gold, Note, *Explicit, Express, and Everything in Between: The Quid
Pro Quo Requirement for Bribery and Hobbs Act Prosecutions in the 2000s*, 36
WASH. U. J. L. & POL'Y 261 (2011) ................................................. 7

Sanford C. Gordon, *Assessing Partisan Bias in Federal Public Corruption
Prosecutions*, 103 AM. POL. SCI. REV. 534 (2009)........................... 20, 21

Daniel H. Lowenstein, *When Is a Campaign Contribution a Bribe?*, *in*
PRIVATE AND PUBLIC CORRUPTION 127 (William C. Heffernan &
John Kleinig eds., 2004) ..................................................... 3, 20, 24

Alexei V. Ovtchinniko & Philip Valta, *Self-Funding of Political Campaigns*,
69 MGMT. SCI. 2425 (2023)............................................................. 15

Daniel Richman, *Political Control of Federal Prosecutions: Looking Back and
Looking Forward*, 58 DUKE L.J. 2087 (2009) ............................... 21

Christopher Robertson et al., *The Appearance and Reality of* Quid Pro Quo
*Corruption: An Empirical Investigation*, 9 J. LEGAL ANAL. 375 (2016) .............. 16-19, 23

## STATEMENT OF INTEREST OF AMICI

*Amici* are law professors whose research addresses issues implicated by the present appeal. The interest of *amici* in this case is to ensure that the federal bribery and extortion statutes are not construed in a manner that threatens constitutionally protected political activity and undermines essential institutions of American democracy.[1]

**Nancy Gertner** is a former United States District Judge for the District of Massachusetts, where she served for seventeen years. She is currently a Senior Lecturer on Law at Harvard Law School. She has written, taught, and spoken extensively on a wide variety of criminal law issues, including issues of white collar crime and sentencing. She is the co-author of THE LAW OF JURIES (11th ed., Thomson Reuters 2020) and the author of IN DEFENSE OF WOMEN: MEMOIRS OF AN UNREPENTANT ADVOCATE (Beacon Press 2011) and INCOMPLETE SENTENCES (Beacon Press, forthcoming).

**Gregory Gilchrist** is a Professor of Law at the University of Toledo College of Law. A scholar of criminal law and criminal procedure, he is a co-author of

---

[1] Institutional affiliations are provided for identification purposes only. This brief reflects the views of the *amici* only and does not purport to present the views of any institution. No party or counsel other than the *amici* and counsel of record authored or made any monetary contribution to the preparation and submission of this brief. All parties consented to the filing of this brief. Fed. R. App. 29(a)(2).

WHITE COLLAR CRIME IN A NUTSHELL (6th ed., West Academic 2022) and a co-author of the casebook WHITE COLLAR CRIME: LAW AND PRACTICE (5th ed., West Academic, 2022).

**Daniel Hemel** is a Professor of Law at New York University School of Law. His research and writing addresses—among other topics—free speech and the application of federal criminal law to elected officials. He is the author of *Economic Perspectives on Free Speech*, *in* THE OXFORD HANDBOOK OF FREE SPEECH (Adrienne Stone and Frederick Schauer eds., Oxford University Press 2021) and co-author of *Presidential Obstruction of Justice*, 106 CALIFORNIA LAW REVIEW 1277 (2018) (with Eric A. Posner).

**Ellen S. Podgor** is the Gary R. Trombley Family White-Collar Crime Research Professor and Professor of Law at Stetson University College of Law.  She is the lead author of the co-authored HORNBOOK ON WHITE COLLAR CRIME (2nd ed., West Academic 2018) and WHITE COLLAR CRIME IN A NUTSHELL (6th ed., West Academic 2021) and co-author of the casebook WHITE COLLAR CRIME: LAW AND PRACTICE (5th ed., West Academic 2022).

**Stephen F. Smith** is the Diane and M.O. Miller II Research Professor of Law at Notre Dame Law School. He previously served as the John V. Ray Research

2

Professor at University of Virginia School of Law. A scholar of criminal law and criminal procedure, his publications include CRIMINAL PROCEDURE AFTER REHNQUIST, in THE CONSTITUTIONAL LEGACY OF WILLIAM H. REHNQUIST (Bradford P. Wilson ed., West 2015) as well as articles in the American Criminal Law Review, Texas Law Review, and Virginia Law Review, among other journals.

## INTRODUCTION

Every day, candidates and elected officials across the country ask potential donors for campaign contributions. Often in the course of fundraising, candidates reiterate their core policy commitments. And often, citizens contribute to campaigns because they believe that candidates will make good on those policy commitments. For all but the wealthiest candidates (who are capable of financing their own campaigns), soliciting potential donors is a virtual requirement of office-seeking. And not only are these interactions inevitable, but they are constitutionally protected.

To be sure, politicians cannot sell their official powers for campaign contributions—that would be bribery and extortion under federal law. But just as surely, candidates can lawfully accept a campaign contribution with the understanding that the donor has an interest—ideological or economic—in the candidate taking a particular action while in office. Or at least, that *was* the law under *McCormick v. United States*, 500 U.S. 257, 273 (1991), in which the Supreme Court held that the receipt of a campaign contribution does not amount to a federal crime unless the contribution is part of an "explicit" *quid pro quo*. By all indications, the *McCormick* Court meant for "explicit" to carry its ordinary meaning: "entirely clear and unambiguous." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 645 (3rd ed. 1992).

Yet in the decades since that decision, some federal appeals courts have watered down *McCormick*'s "explicit" *quid pro quo* standard so much that in those circuits, the requirement is "all water." Daniel H. Lowenstein, *When Is a Campaign Contribution a*

*Bribe?*, *in* PRIVATE AND PUBLIC CORRUPTION 127, 155 (William C. Heffernan & John Kleinig eds., 2004). And while Sixth Circuit case law on the subject remains unsettled, the district court in this case adopted the wateriest version of the *quid pro quo* requirement, holding that the *quid pro quo* in a campaign contribution case "must be 'explicit' but need not be express." R.283.PageID.7139. Since "explicit" and "express" are synonyms, *see* AMERICAN HERITAGE DICTIONARY, *supra*, at 645, the district court's explicit-but-not-express standard amounts to no standard at all.

The present case illustrates the dangers of dispensing with *McCormick*'s "explicit" *quid pro quo* requirement. Alexander P.G. Sittenfeld, a two-term Cincinnati City Council member and candidate for mayor, was well-known for supporting the economic development of his city's downtown. Indeed, he voted for every development project put before the City Council during his tenure. In 2018, the Federal Bureau of Investigation—as part of a broader public corruption probe into Cincinnati's municipal government—orchestrated a sting in which an undercover operative offered to contribute to Sittenfeld's campaign if the candidate promised to support a project to develop a blighted property in the city's urban core. Sittenfeld refused, stating— correctly—that the FBI operative's proposal would be "illegal" and that "nothing can be a quid pro quo." All that Sittenfeld would allow was that he was "always super pro-development" and had "voted in favor of every single development deal that's ever been put in front of me." R.265.PageID.6012. Now, Sittenfeld faces 16 months in prison for a *quid pro quo* that he explicitly—and expressly—rejected.

If "explicit" does not mean "express" and rejecting a *quid pro quo* means accepting it, then we are in "an Alice-in-Wonderland world where words have no meaning." *Welsh v. United States*, 398 U.S. 333, 354 (1970) (Harlan, J., concurring in the result). And in that scenario, it is not only the English language—but also American democracy—that suffers. The democratic danger is three-fold. First, when routine interactions between donors and candidates can be prosecuted as bribery and extortion—as they can under the district court's holding—then the Constitution's protections for core political activity will be compromised. Second, when the "explicit" *quid pro quo* requirement is whittled down to nonexistence, then federal law enforcement authorities will have wide latitude to pick and choose their prosecutorial targets based on partisan bias and other improper motives. And third, when every elected official across the 50 states—or at least, every elected official who lacks the personal resources to self-finance a campaign—lies exposed to federal bribery and extortion charges, then the federal executive branch will have the ability to determine not only the winners of state and local elections but also the structure of state and local governments. *McCormick* sought to prevent precisely those outcomes. By giving full effect to *McCormick*—by reading its words for what they mean—this Court can ensure that the "forbidden zone" delineated by that decision does not swallow up the everyday activity of electoral competition.

## LEGAL AND FACTUAL BACKGROUND

In *McCormick v. United States*, the Supreme Court held that a public official's receipt of an otherwise-legal campaign contribution can constitute extortion under the Hobbs Act only if the government proves the existence of an "explicit" *quid pro quo*. *McCormick*, 500 U.S. at 273.  "To hold otherwise," according to the *McCormick* Court, "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id.* at 272. Only by requiring an "explicit" *quid pro quo* would the "forbidden zone of conduct" be defined "with sufficient clarity" to protect the "everyday business of a legislator" from criminalization. *Id.* at 272-73.

The clarity provided by *McCormick* did not last long. The following year, in *Evans v. United States*, 504 U.S. 255 (1992), the Supreme Court considered a legal issue separate and apart from the one in *McCormick*: whether a public official commits extortion under the Hobbs Act when he accepts—but does not demand—a cash bribe. There was no dispute in that case about the explicitness of the *quid pro quo*; the question before the Court was whether the petitioner could be convicted of extortion even though he "did not initiate the transaction." *Id.* at 257. The Court answered "yes" to that question—a conclusion entirely consistent with *McCormick*—and the *Evans* majority never indicated that it intended to modify *McCormick*'s explicitness requirement. But in a non-controlling concurrence, Justice Kennedy observed that under the Hobbs Act, "[t]he

official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Id.* at 274 (Kennedy, J., concurring).[2]

Some courts have tried to merge *McCormick*'s "explicit" *quid pro quo* requirement with Justice Kennedy's non-precedential statement that a *quid pro quo* need not be "express." They have made mincemeat of the English lexicon in the process. For example, the Eleventh Circuit—in a case involving an otherwise-legal campaign contribution—held that "an explicit agreement may be implied from the official's words and actions." *United States v. Siegelman*, 561 F.3d 1215, 1226 (11th Cir. 2009) (alterations and internal quotation marks omitted)), *vacated and remanded on other grounds*, 561 U.S. 1040 (2010). Under that formulation, "the word 'explicit,' as applied to the quid pro quo agreement in *McCormick*, can actually mean the exact opposite, 'implicit.'" Ilissa B. Gold, Note, *Explicit, Express, and Everything in Between: The Quid Pro Quo Requirement for Bribery and Hobbs Act Prosecutions in the 2000s*, 36 WASH. U. J. L. & POL'Y 261, 263 (2011).

Other courts, including the Second and Ninth Circuits, have held that *McCormick*'s "explicit" *quid pro quo* standard—undiluted by *Evans*—remains the law of the land for campaign contribution cases. *See United States v. Ganim*, 510 F.3d 134, 142-43 (2d Cir. 2007) (Sotomayor, J.); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 936–37 (9th Cir. 2009). As courts in those circuits have emphasized, *McCormick* continues to

---

[2] Of course, even a non-verbal gesture such as a wink, nod, or handshake can be "explicit" in the ordinary sense. "Explicit" means "express," but it does not necessarily mean written or oral.

require an "explicit"—that is, "clear and unambiguous"—*quid pro quo* for federal bribery and extortion prosecutions involving campaign contributions. *See United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) ("[W]hat *McCormick* requires is that the *quid pro quo* be clear and unambiguous, leaving no uncertainty about the terms of the bargain."); *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *12 (S.D.N.Y. Dec. 5, 2022) ("[I]n the context of campaign contributions, there must be a *quid pro quo* that is clear and unambiguous . . . .").

In the Sixth Circuit, the status of *McCormick*'s explicitness requirement remains in limbo. Early on, the Sixth Circuit stated—in dicta in a non-campaign contribution case—that "*Evans* instructed that by 'explicit' *McCormick* did not mean 'express.'" *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994). Yet the *Blandford* Court recognized that this attempted reconciliation of *McCormick* and *Evans* raised linguistic and logical difficulties. As the *Blandford* Court noted, *Black's Law Dictionary* defines "explicit" to mean—*inter alia*—"[c]lear in understanding" and "not obscure or ambiguous," and it defines "express" to mean "[c]lear," "explicit," and "not dubious or ambiguous." *Id.* at 696 n.13 (quoting BLACK'S LAW DICTIONARY 579-580 (6th ed. 1990)). Paraphrasing those definitions, then, a *quid pro quo* that is "explicit" but not "express" would be "clear and unambiguous" but not "clear and unambiguous," or, even worse yet, "explicit" but not "explicit."

In subsequent cases, the Sixth Circuit has called *Blandford*'s dicta into doubt. In *United States v. Abbey*, 560 F.3d 513, 517-18 (6th Cir. 2009) the Court seemed to suggest

9

that a non-express *quid pro quo* could constitute bribery or extortion only "outside the campaign context." More recently, in *United States v. Inman*, 39 F.4th 357, 364-65 (6th Cir. 2022), a campaign contribution case, the Court cited *McCormick*'s explicitness requirement—but not *Evans*—in defining the elements of bribery and extortion. Yet in the decision below, the district court revived the concept that in a campaign contribution case, the relevant *quid pro quo* "must be 'explicit' but need not be express." R.283.PageID.7139. And the district court—at the urging of the government—rejected the defendant's argument that an "explicit" *quid pro quo* must be "clear and unambiguous" in order to satisfy *McCormick*'s standard. *See* R.281.PageID.7070; R.281.PageID.7097; R.283.PageID.7140.

The case at bar illustrates the consequences of a watered-down "explicit" *quid pro quo* requirement. Alexander P.G. Sittenfeld was a Cincinnati City Council member and rising star in Ohio's Democratic Party who ran for U.S. Senate in 2016 and was the odds-on favorite to be the City's next Mayor once the term-limited incumbent left office. In 2018, the FBI recruited a well-known local real estate developer and former Cincinnati Bengals player, Chinedum Ndukwe, to work as a cooperating witness in the bureau's public corruption investigations. At the time, Ndukwe—a longtime donor to Sittenfeld's campaigns—was himself facing a federal investigation into possible money laundering, identity theft, and structured bank transactions, and his cooperation was part of a proffer with federal authorities. R.266.PageID.6267.

10

In late 2018, Ndukwe—acting at the FBI's behest—approached Sittenfeld to discuss the development of a blighted property at 435 Elm Street in Cincinnati's downtown, a project that Sittenfeld already had said he would support. Indeed, Sittenfeld—who had run for City Council on a pro-development platform—had voted in favor of every development project put before the Council since he joined that body in late 2011. When Ndukwe asked for assurance that Sittenfeld would back the 435 Elm Street project, Sittenfeld interjected that "nothing can be a . . . quid pro quo," and "I know that's not what you're saying either," but "what I can say is that I'm always super pro-development" and that "in seven years I have voted in favor of every single development deal that's ever been put in front of me." App.46.

Because these statements by Sittenfeld explicitly rejected any *quid pro quo*, the prosecution focused at trial on an earlier conversation between Ndukwe and Sittenfeld in late October 2018 during which the former football player suggested that—instead of contributing directly to Sittenfeld's campaign—he could bundle contributions to Sittenfeld from multiple limited liability companies (LLCs). At the time, local law imposed a per-donor cap of $1,100 on contributions to city campaigns but counted every LLC as a separate donor, even if the LLCs were owned or controlled by the same person. Sittenfeld opposed this "LLC loophole" and had endorsed a charter amendment to close it. R.269.PageID.6690.

During the October 2018 conversation, Sittenfeld said to the former football player: "[I]f you say, 'look I don't want to support you in the name of Chinedum

Ndukwe,' but . . . you're going to round up . . . a bunch of LLC checks. Like that's great. . . . [Y]ou don't want me to be like 'hey Chin like love you but can't.'" Sittenfeld added that only a "dumb candidate" would decline such support. App.41-42. The district court would later suggest that Sittenfeld's statement—"love you but can't"—was "perhaps the best" evidence supporting the conviction. R.283.PageID.7140.

In a vacuum, a rational factfinder certainly could arrive at multiple interpretations of Sittenfeld's statement. "You don't want me to be like '. . . love you but can't'" could be interpreted to mean that Sittenfeld's supporters would not want him to reject bundled LLC checks—despite his opposition to the LLC loophole—because only a "dumb candidate" would turn down those contributions as long as they remained legal. Or as the defendant emphasized at trial, "love you but can't" could be interpreted to mean that Sittenfeld, who was term-limited as a City Council member, would not be able to advance Ndukwe's downtown development efforts unless he raised enough money to actually *win* the mayoral election. R.269.PageID.6746. Ndukwe testified that he understood the statement to mean that "whether you donate or don't donate, that it's going to have an impact on my advocacy for you." R.266.PageID.6247. But if "explicit" is understood to mean "clear and unambiguous," then the question at this stage is *not* whether Sittenfeld's statement *could* be interpreted Ndukwe's way. The question is whether a rational factfinder could conclude—*beyond a reasonable doubt*—that "love you but can't" is a "clear and unambiguous" *quid pro quo*, notwithstanding the fact

12

that Sittenfeld clearly and unambiguously refused to enter into any *quid pro quo* agreement.

For what were at-best-ambiguous statements by a candidate engaged in core political activity—raising funds for a campaign for higher office—Sittenfeld was indicted on six counts, convicted on two (federal-funds bribery and attempted extortion under the Hobbs Act), and sentenced to 16 months in prison. In the process, federal law enforcement officials—who specifically targeted Sittenfeld with their sting—effectively ended the political career of Cincinnati's most likely next Mayor.

## SUMMARY OF THE ARGUMENT

Contrary to the decision below, the "clear and unambiguous" test supplies the appropriate standard for determining whether an alleged *quid pro quo* involving an otherwise-legal campaign contribution satisfies the explicitness requirement under *McCormick*. Although other synonymous phrasings could conceivably fulfill the same function, the "clear and unambiguous" test accomplishes what *McCormick* set out to do, and what the district court's explicit-but-not-express formulation fails to achieve: it "defines the forbidden zone of conduct with sufficient clarity" so that the federal bribery and extortion laws do not criminalize quotidian political activity.[3]

---

[3] Courts—including the Sixth Circuit—apply the same *quid pro quo* standard in bribery cases and in Hobbs Act extortion cases, since extortion under the Hobbs Act and bribery are "different sides of the same coin." *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993); *accord United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013)*; Inman*, 39 F.4th at 364-65.

Allowing bribery and extortion convictions to stand in campaign contribution cases without proof of a "clear and unambiguous" *quid pro quo* would give rise to three distinct harms. First, it would exert a chilling effect on core political speech and conduct. Second, it would exacerbate the risk of partisan and political bias in public corruption prosecutions. And third, it would undermine federalism values and the separation of powers. The heavy hand of federal criminal law enforcement would loom large over every state and local election in which candidates and officeholders engage in the constitutionally protected practice of political fundraising.

## ARGUMENT

### I.    A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign Contribution Cases Is Necessary To Protect Core Political Speech and Conduct

The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). As the Supreme Court has emphasized, "it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Buckley v. Valeo*, 424 U.S. 1, 52–53 (1976) (per curiam). For that reason, the Court has long recognized "constitutional limits on the State's power to prohibit candidates from making promises

in the course of an election campaign." *Brown v. Hartlage*, 456 U.S. 45, 55 (1982).

According to the *Brown v. Hartlage* Court:

> Candidate commitments enhance the accountability of government officials to the people whom they represent, and assist the voters in predicting the effect of their vote. The fact that some voters may find their self-interest reflected in a candidate's commitment does not place that commitment beyond the reach of the First Amendment.

*Id.* at 55–56.

Often in the course of campaigning, candidates will make promises about how they will act when in office, and often they will make these promises in campaign fundraising settings. After all, candidates for many offices spend much—maybe even a majority—of their time soliciting contributions. *See, e.g.*, Brent Ferguson, *Congressional Disclosure of Time Spent Fundraising*, 23 CORNELL J. L. & PUB. POL'Y 1, 27 (2013) ("Estimates vary, but most agree that members of Congress spend between thirty and seventy percent of their time raising money."). During that time, candidates typically talk about their plans and policy positions. For example, a pro-choice candidate may promise to codify *Roe v. Wade*, while a pro-life candidate may promise to support a ban on abortion after a certain number of weeks. And often, a candidate will know that certain single-issue donors are contributing to the candidate's campaign because those donors believe that the candidate will follow through on her promises.

A watered-down version of *McCormick*'s explicitness requirement—one that allows for a conviction in the absence of a clear and unambiguous *quid pro quo*—will exert a chilling effect on this routine political activity. As more than 100 former State

Attorneys General have warned, such a standard "subjects public officials to the unreasonable burden of having to reject campaign contributions if there is any reason to believe that such contributions were made by donors desiring that the officials take certain actions." Brief *Amici Curiae* of Former Attorneys General in Support of Petitioner 34, *Siegelman v. United States*, No. 11-955 (U.S. filed Mar. 1, 2012). Moreover, "if public officials choose to actually accept campaign contributions with that same belief, they now must take pains to not do what the donors desire or else face the threat of criminal recriminations." *Id.* And because the same standard applies both to bribery and extortion—and thus to donors as well as public officials—the chill will extend to citizens who are exercising their fundamental right to participate in the democratic process through campaign contributions. *Cf. McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion) (stating that "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders," and among the "variety of ways" that "[c]itizens can exercise that right" is by "contribut[ing] to a candidate's campaign").

Importantly, this chilling effect will not affect all candidates equally: self-funded candidates, who need not rely on campaign contributions, would be insulated. Wealthy candidates are, of course, constitutionally entitled to self-fund their campaigns, *see Davis v. FEC*, 554 U.S. 724, 738 (2008), and self-funding has become a widespread phenomenon in American democracy. *See* Alexei V. Ovtchinniko & Philip Valta, *Self-Funding of Political Campaigns*, 69 Mgmt. Sci. 2425, 2430 tbl.1 (2023) (finding that 60

percent of House and Senate campaigns from 1983 through 2018 were self-funded in part or in whole, and that among those campaigns, own-source contributions accounted for 34 percent of all funds). But a system in which everyone except the wealthiest candidates must fundraise and campaign under the pall of potential prosecution would look more like an oligarchy than a democracy. It would contravene the principle—"at the very root of republican government"—that "[n]o qualification of wealth" should be "permitted to fetter the judgment or disappoint the inclination of the people." *The Federalist No. 57 (James Madison), in* THE FEDERALIST PAPERS 290, 291 (Ian Shapiro ed., Yale Univ. Press 2009).

A careful study published in the peer-reviewed *Journal of Legal Analysis* underscores the democratic dangers of an amorphous *quid pro quo* standard. *See* Christopher Robertson et al., *The Appearance and Reality of* Quid Pro Quo *Corruption: An Empirical Investigation*, 8 J. LEGAL ANAL. 375 (2016). In the first part of that study, Professor Christopher Robertson and coauthors conducted a three-hour simulation in which they asked a diverse group of 45 adults to act as mock grand jurors. In the simulation, a Congressman expressed support for a legislative rider after a company that would benefit from the provision contributed $50,000 to an outside group that backed the Congressman. The witnesses in the simulation testified that they were not aware of "any agreement to exchange one thing for another," and "the facts of the case were designed to mimic ubiquitous behavior that virtually any of the 535 Members of Congress engage in every day." *Id.* at 380, 396.

17

At the end of the simulation, 33 out of the 45 participants (72 percent) voted to indict both the Congressman and the company's CEO on charges of bribery. *See id.* at 398. In a follow-up experiment, the authors asked a separate group of 1,271 U.S. adults—balanced to be representative of the U.S. population along lines of gender, age, and political affiliation—whether they would *convict* the Congressman or CEO based on similar facts. Most of the participants—even after receiving jury instructions that matched those used in federal court—said that they would. *See id.* at 406 fig.3. Indeed, even when participants were told that the Congressman and the CEO "simply had background knowledge about the reciprocal interests of each other, and acted in accordance, without any direct or indirect contact between the parties," nearly half of participants voted to convict. *Id.* at 405.

Simulation-based experiments provide only suggestive evidence as to how individuals will behave in real-world settings such as a jury room. With that caveat in mind, the authors interpreted their results to "suggest[] that, under the Federal bribery statutes, grand jurors applying the probable cause standard, and even petit jurors applying the beyond a reasonable doubt standard, may actually pose a real risk of jeopardy for politicians and benefactors." *Id.* at 416. The authors added:

> Frankly, we have provided a very soft test of this phenomenon, one that likely underestimates the risk of jeopardy. In a real case, Federal prosecutors would buttress their case by offering immunity to favorable witnesses and withholding it from unfavorable witnesses . . . . With such a deal, the prosecutors might find witnesses willing to say that there was a much more explicit agreement than the two witnesses in our grand jury experiment, who we scripted to insist that they were unaware of any bribery agreement.

*Id.* at 417. Indeed, just as Professor Robertson and his coauthors anticipated, the star witness at Sittenfeld's trial – who also happened to be a well-known former player for the local NFL team – had entered into a proffer with prosecutors in hopes of leniency in his own case.

While it is tempting to wish that well-crafted jury instructions might mitigate the risk that donors and public officials will be convicted under the bribery and extortion statutes for conduct that falls outside *McCormick*'s "forbidden zone," Professor Robertson and his coauthors found no statistically significant difference in conviction rates based on whether guilt-phase jurors were given instructions that matched *McCormick* or *Evans*. *See id.* at 408. Thus, the authors concluded that the best defense against criminalization of routine fundraising activity is for courts to apply the sufficiency-of-the-evidence standard with rigor. Although "criminal jury convictions are almost never overturned on questions of the sufficiency of the evidence," the authors noted, "it is possible that appellate courts will give a more scrutinizing review" in the "speech sensitive area" of campaign finance. *Id.* at 416.

The present case illustrates that the "risk of jeopardy" identified by Professor Robertson and his coauthors is a real one. The supposedly criminal conduct at the heart of the government's case is core political activity: a politician stating his policy commitments and trumpeting his track record in conversations with donors. And if this conduct can be criminalized, then—as Professor Robertson and his coauthors

concluded from their study—"[f]ederal prosecutors can target just about any contemporary politician"—except for a self-funded one—"with a plausible chance of exacting a conviction (by plea or trial)." Robertson et al., *supra*, at 418.

## II.    A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign-Contribution Cases Is Necessary To Guard Against the Risk of Prosecutorial Bias

Of course, even if federal prosecutors *can* target "just about any contemporary politician" who engages in routine fundraising activity, federal prosecutors won't target all of them. The "real danger," as Judge Winter warned in a similar case involving the mail fraud conviction of a local party official, is "prosecutorial abuse for partisan political purposes." *United States v. Margiotta*, 688 F.2d 108, 139 (2d Cir. 1982) (Winter, J., concurring in part and dissenting in part). As Judge Winter elaborated:

> I am not predicting the imminent arrival of the totalitarian night or the wholesale indictment of candidates, public officials and party leaders. To the contrary, what profoundly troubles me is the potential for abuse through selective prosecution and the degree of raw political power the freeswinging club of mail fraud affords federal prosecutors.

*Id.* at 143. What Judge Winter said about mail fraud will apply equally to the federal bribery and extortion statutes if convictions like this one in campaign contribution cases are allowed to stand without the government proving a "clear and unambiguous" *quid pro quo*. As a leading scholar of the law of bribery and extortion has warned, criminalizing "practices in which politicians are nearly forced to engage routinely" would "give discretion to prosecutors to decide de facto what practices will be punished

and, in the worst case, to abuse their positions by engaging in partisan or other improperly motivated selection of cases." Lowenstein, *supra*, at 158.

Rigorous empirical research bears out these concerns regarding partisan bias in public corruption prosecutions. In an article published in the *American Political Science Review*, the premier peer-reviewed academic journal in the field, Professor Sanford Gordon of New York University found that the ratio of Democratic-affiliated defendants to Republican-affiliated defendants in federal public corruption prosecutions was more than twice as high under President George W. Bush as under President Bill Clinton—or, to put the same point in reverse terms, the ratio of Republican-affiliated defendants to Democratic-affiliated defendants was more than twice as high under Clinton as under Bush. Sanford C. Gordon, *Assessing Partisan Bias in Federal Public Corruption Prosecutions*, 103 AM. POL. SCI. REV. 534, 543 tbl.1 (2009). Moreover, the weakest public corruption cases—the cases resulting in short prison sentences, probation, or acquittal—tended to be brought against defendants who were members of the opposite party from the President. *See id.* at 544 tbl.2. In other words, the Justice Department appears to be prosecuting egregious acts of corruption regardless of the defendant's party but bringing feeble cases primarily against members of the out-of-power party.

Since baseline rates of corruption among members of each party are unobservable, Professor Gordon's findings do not reveal whether Clinton administration prosecutors were biased against Republican defendants, Bush

administration prosecutors were biased against Democratic defendants, or both. But overall, Professor Gordon's results provide "strong evidence of aggregate partisan bias" in the enforcement of federal public corruption laws. *See id.* at 549. These empirical results align with the anecdotal observations of former federal prosecutors themselves. *See, e.g.*, Daniel Richman, *Political Control of Federal Prosecutions: Looking Back and Looking Forward*, 58 DUKE L.J. 2087, 2122 (2009) (former federal prosecutor warning that "[t]he risk that partisan prosecutors with allegiance to the president's party will target local political opponents—either at the behest of the White House or on their own—is real").

Even when federal prosecutors' motives are pure, the potential for abuse can itself distort the democratic process. *See Evans*, 504 U.S. at 296-97 (Thomas, J., dissenting) ("The potential for abuse, of course, is particularly grave in the inherently political context of public corruption prosecutions."). Prospective candidates may be more reluctant to seek public office when their views clash with the presidential administration that controls federal prosecutions, and citizens may be more reluctant to contribute funds to candidates who refuse to toe the presidential party line. The upshot—as Judge Winter put it—is "a danger of corruption to the democratic system greater than anything [the defendant] is alleged to have done." *Margiotta*, 688 F.2d at 144 (Winter, J., concurring in part and dissenting in part).

### III.    A "Clear and Unambiguous" Standard for Bribery and Extortion in Campaign-Contribution Cases Is Essential To Federalism and the Separation of Powers

That "danger of corruption to the democratic system" is especially acute when, as here, federal prosecutors wield the "freeswinging club" of the federal bribery and extortion statutes against state and local officeholders like Sittenfeld. The threat to federalism values in those cases is two-fold. First, state and local governments are less likely to serve as effective checks on federal power when their elected officials are vulnerable to retaliatory prosecution under amorphous federal criminal laws. Second, states and localities will be unable to set their own ground rules for citizen-officeholder interactions when donors and candidates who abide by state and local campaign finance laws run the risk of federal indictment and imprisonment.

In "the compound republic of America," where power is divided horizontally among the branches of government and vertically between the federal government and the states, "a double security arises to the rights of the people." *The Federalist No. 51 (Madison)*, *in* THE FEDERALIST PAPERS 263, 265 (Ian Shapiro ed., Yale Univ. Press 2009). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). An overly expansive interpretation of the federal bribery and extortion laws would upend that "healthy balance." Without clear limits on their reach, the federal

bribery and extortion statutes will be a "sword of Damocles" hanging over the heads of state and local officials. Robertson et al., *supra*, at 421. The threat of federal prosecution will generate "an implicit incentive for state officials to play nicely" rather than "to robustly challenge prerogatives of the Federal executive." *Id.*

The risk that state and local officials might be deterred from challenging the power of the federal executive is not the only way in which an expansive interpretation of the federal bribery and extortion laws would undermine federalism values. The "great innovation" of the Framers' federalist design is "that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other," and "each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *Printz v. United States*, 521 U.S. 898, 920 (1997) (internal quotation marks omitted). An essential component of the states' distinct capacity is "the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell v. United States*, 579 U.S. 550, 576 (2016).

States have exercised that prerogative in different ways. Under Texas law, for example, a campaign contribution can constitute a bribe only if it was "offered, conferred, solicited, accepted, or agreed to pursuant to an *express agreement*," and only if that "express agreement" is substantiated by "direct evidence." Tex. Penal Code § 36.02(a)(4). Texas thus has decided to provide more breathing room for core political speech and conduct than the district court's standard here would allow. *Cf.*

R.283.PageID.7139 (*quid pro quo* "need not be express"). "In Illinois, the judiciary has read several statutes together to reach a special rule for campaign contributions similar to the Texas rule." Lowenstein, *supra*, at 141. Oregon, for its part, excludes all properly reported campaign contributions from its bribery laws. Or. Rev. Stat. § 162.005(1).

By devising different definitions of bribery and extortion, states act as "laboratories of democracy" in the purest sense: they experiment with different ways to balance anti-corruption goals with free speech—and thus, different ways to structure a polity. *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., concurring) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). But of course, it is impossible for state and local governments to "try novel . . . experiments" when federal prosecutors may charge into the laboratory at any moment. To preserve that freedom of experimentation, the Supreme Court has declined to construe criminal laws "in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 (1987). The Court's wisdom in *McNally* applies with full force here.

## CONCLUSION

The stakes of Sittenfeld's case reach well beyond the fate of a single elected official in a single city. For this Court to uphold Sittenfeld's conviction would—and should—send a chill down the spine of donors and candidates engaged in everyday politics, particularly when they fall out of favor with federal law enforcement authorities in their area. And by exposing elected officeholders across all levels of government to the risk of retaliatory federal prosecution, the Court would discourage state and local officials from fulfilling the checking-and-balancing function assigned to them in the Framers' grand plan.

By holding the government to the "clear and unambiguous" *quid pro quo* standard in campaign contribution cases—a standard that tracks the dictionary definition of "explicit" as used in *McCormick*—this Court can constrain the federal bribery and extortion laws so that they do not become a "freeswinging club" that places constitutional values in peril. It can give assurance to law-abiding donors and candidates that routine campaign contributions and fundraising appeals will not land them in federal prison. And it can shield states and localities from the federal executive branch's intrusion into the conduct of their elections and the structure of their governments. It can, in sum, accomplish what the *McCormick* Court set out to do before *McCormick*'s words were construed to mean nearly their exact opposite.

For all these reasons, *amici* urge the Court to reverse the district court's judgment and grant acquittal on both counts.

Respectfully Submitted,

/s/ *L. Bradfield Hughes*
L. Bradfield Hughes (OH 0070997)
Matthew F. Stowe (TN 029994)
PORTER, WRIGHT, MORRIS & ARTHUR, LLP
41 South High Street
Suites 2800-3200
Columbus, Ohio  43215
(614) 227-2000
bhughes@porterwright.com
mstowe@porterwright.com

Daniel J. Hemel
NEW YORK UNIVERSITY SCHOOL OF LAW
40 Washington Square South
Vanderbilt Hall, Room 325
New York, NY 10012
(212) 998-6354
Daniel.Hemel@nyu.edu

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(a)(7)(B), 29(a)(5) and Sixth Circuit Rule 32(b)(1), I hereby certify that the foregoing brief contains 6,442 words, as counted by a word processing system, including headings, footnotes, quotations, and citations in the court, but excluding certificates and other items properly excludable under Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), and therefore is within the word limit set by the Court.

The brief complies with the typeface requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure as it was prepared using the Microsoft Word 2010 word processing program in 14-point Garamond font.

*/s/ L. Bradfield Hughes*
L. Bradfield Hughes
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Brief of *Amici Curiae* was served on

December 18, 2023, via CM/ECF upon counsel of record.

/s/ *L. Bradfield Hughes*
L. Bradfield Hughes
*Counsel for Amici Curiae*