**No. 23-3840**

In the
# United States Court of Appeals for the Sixth Circuit

♦

UNITED STATES,

*Appellee,*

v.

ALEXANDER SITTENFELD,

*Defendant-Appellant.*

♦

On Appeal from the United States District Court for
the Southern District of Ohio (Western Division)
The Honorable Douglas R. Cole
Case No. 1:20-cr-00142

♦

## BRIEF OF THE INSTITUTE FOR FREE SPEECH AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

♦

Joseph O. Masterman
COOPER LAW PARTNERS
1717 Pennsylvania Ave. N.W., Suite 1025
Washington, D.C. 20006
Telephone: (202) 866-0171
joe@cooperlawpartners.com

*Counsel for Amicus Curiae
Institute for Free Speech*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3840                    Case Name: United States v. Sittenfeld

Name of counsel: Joseph O. Masterman

Pursuant to 6th Cir. R. 26.1, the Institute for Free Speech, as Amicus Curiae,
*Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

The Institute for Free Speech is not a subsidiary or affiliate of any publicly owned corporation. The Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

The Institute for Free Speech is unaware of any such corporation.

CERTIFICATE OF SERVICE

I certify that on _____ December 18, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joseph O. Masterman

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                                    Page 1 of 2

**TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................ ii

IDENTITY AND INTERESTS OF AMICUS CURIAE ...........................................1

INTRODUCTION ......................................................................................1

ARGUMENT ...........................................................................................4

    I.     *McCormick* Requires Clear and Unambiguous Proof of a Bribe. ...............4

    II.    Requiring Anything Less than Clear and Unambiguous Proof of a Bribe Would Raise Serious Constitutional Concerns. .........................................9

         A. First Amendment ...............................................................10

         B. Due Process ....................................................................15

         C. Federalism ......................................................................19

CONCLUSION ......................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..................................................................................10, 13

*Evans v. United States*,
    504 U.S. 255 (1992)..............................................................................5, 19, 20

*F.E.C. v. Cruz*,
    596 U.S. 289 (2022)..................................................................................2, 11

*F.E.C. v. Nat'l Conservative Pol. Action Comm.*,
    470 U.S. 480 (1985)......................................................................................13

*F.E.C. v. Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007)......................................................................................11

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)......................................................................................10

*Johnson v. United States*,
    576 U.S. 591 (2015)..........................................................................15, 16, 17

*McBoyle v. United States*,
    283 U.S. 25 (1931)........................................................................................15

*McCormick v. United States*,
    500 U.S. 257 (1991).............................................. 3, 4, 5, 7, 9, 10, 11, 14, 18

*McCutcheon v. F.E.C.*,
    572 U.S. 185 (2014)..............................................................7, 11, 13, 14, 16

*McDonnell v. United States*,
    579 U.S. 550 (2016)..........................................................11, 12, 13, 17, 19

*Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*,
    544 U.S. 1301 (2005)....................................................................................14

*Raygor v. Regents of Univ. of Minn.*,
    534 U.S. 533 (2002)......................................................................................20

*United States v. Allen*,
    10 F.3d 405 (7th Cir. 1993) ...........................................................................6

*United States v. Benjamin*,
    No. 21-CR-706, 2022 WL 17417038
    (S.D.N.Y. Dec. 5, 2022) .......................................................3, 5, 6, 7, 8, 9, 19

*United States v. Blandford*,
33 F.3d 685 (6th Cir. 1994) ....................................................................3, 5, 9

*United States v. Carpenter*,
961 F.2d 824 (9th Cir. 1992) ....................................................................6

*United States v. Davis*,
841 F. App'x 375 (3d Cir. 2021) ....................................................................6

*United States v. Donagher*,
520 F. Supp. 3d 1034 (N.D. Ill. 2021)....................................................5, 6

*United States v. Giles*,
246 F.3d 966 (7th Cir. 2001) ....................................................................14

*United States v. Kincaid-Chauncey*,
556 F.3d 923 (9th Cir. 2009) ....................................................................6, 7

*United States v. Lanier*,
520 U.S. 259 (1997)....................................................................15, 16, 18, 19

*United States v. McGregor*,
879 F. Supp. 2d 1308 (M.D. Ala. 2012)....................................................8, 9

*United States v. Sun-Diamond Growers of Cal.*,
526 U.S. 398 (1999)....................................................................6, 13, 17

## <u>Statute</u>

18 U.S.C.
§ 1951(a)....................................................................4
§ 1951(b)(2) ....................................................................4

## <u>Other Authorities</u>

Charles F.C. Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy*, 65 GEO. L. J. 1171 (1977)...............2, 19

*Explicit*, MERRIAM-WEBSTER,
https://bit.ly/41l8Ah2 (last visited Dec. 17, 2023) ....................................................................6

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The Institute for Free Speech is a nonprofit organization dedicated to advancing First Amendment rights, in particular political speech rights, through litigation, communication, education, and related activities. The issues presented in this appeal—specifically regarding the type of evidence needed to show that a campaign contribution constituted an unlawful bribe—are of vital concern to the Institute. Campaign contributions are core political speech. The threat of a bribery prosecution chills this core political speech. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), and with the consent of all parties, the Institute respectfully submits this brief as Amicus Curiae to set forth why the constitutional protections for ordinary political conduct mandate that proof of nothing less than a clear and unambiguous quid pro quo is necessary to support criminal charges based on campaign contributions.[1]

## INTRODUCTION

Agents of the Federal Government tried doggedly to cause Alexander "P.G." Sittenfeld to commit a federal crime. For the reasons Sittenfeld described in his

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus states that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than Amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

1

opening brief, the efforts failed. But they did succeed in showing, once again, the constitutional dangers inherent in federal efforts to criminalize ordinary politics.

Sittenfeld, a Cincinnati City Councilmember, mounted a bid for the mayor's seat. That process involves an activity at the heart of our political system: campaigning, which itself involves gathering funds from the constituents whom the candidate promises to serve. This activity enjoys constitutional protection. Indeed, "[t]he First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office." *F.E.C. v. Cruz*, 596 U.S. 289, 302 (2022) (internal quotation marks omitted). Constituents express political positions by contributing to campaigns, which in turn provide information that constituents need to determine who should represent them. Imposing criminal sanctions on the mere basis of a campaign contribution, as the Government endeavored to do here, chills this fundamental First Amendment activity.

It also creates serious problems under the Due Process Clause, and, in the case of state and local politics, principles of federalism. The federal "prosecution of local officials for acts of public corruption" has in fact long been recognized as "perhaps the most sensitive area of potential federal-state conflict." Charles F.C. Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy*, 65 GEO. L. J. 1171, 1172 (1977) ("Ruff").

2

The Supreme Court has attempted to head off these problems, while leaving room for legitimate bribery prosecutions, on multiple occasions. Most pertinent here is the Court's construction of the Hobbs Act in *McCormick v. United States*, 500 U.S. 257 (1991). Under *McCormick* and related cases, there is no debate that the Government was required to prove an "explicit" quid pro quo—*i.e.*, a campaign donation in exchange for a favor from a public official—between Sittenfeld and a purported donor. *Id*. at 273. To be sure, there has been some debate as to what exactly the *McCormick* Court meant by "explicit." But as far as this case is concerned, that issue is resolved. As all courts to address the question, including this one, have correctly concluded, an "explicit" quid pro quo is "clear and unambiguous": there will be a "direct connection" between the quid (the campaign contribution) and the quo (the promised official favor), and that connection will be so clearly conveyed in word or deed that the exchange cannot be interpreted as anything other than a bribe. *United States v. Benjamin*, No. 21-CR-706, 2022 WL 17417038, at *10 (S.D.N.Y. Dec. 5, 2022); *accord, e.g.*, *United States v. Blandford*, 33 F.3d 685, 696 & n.13 (6th Cir. 1994).

This statement of the *McCormick* standard is not only correct according to *McCormick* itself. It is also compelled by the constitutional concerns that are inherently present in federal prosecutions of local officials for soliciting and/or accepting campaign contributions. This everyday political activity simply cannot, by

itself, suffice to sustain convictions against Sittenfeld either for extortion under the Hobbs Act, 18 U.S.C. § 1951(a) & (b)(2), or for federal-program bribery under 18 U.S.C. § 666(a)(1)(B).

This amicus brief first sets forth the proper understanding of the *McCormick* requirement, namely, that the Government must prove a clear and unambiguous quid pro quo to sustain any bribery charge based on a campaign contribution. The brief then shows why several constitutional principles compel that requirement.

## ARGUMENT

### I.   *McCormick* Requires Clear and Unambiguous Proof of a Bribe.

In *McCormick*, the Court held that campaign contributions can become illegal bribes "only if," as relevant here, "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." 500 U.S. at 273. The Court framed this holding as a matter of statutory interpretation. Like Sittenfeld, McCormick had been charged under the Hobbs Act, which prohibits "the obtaining of property from another, with his consent, . . . under color of official right." 18 U.S.C. § 1951(b)(2). As the Court explained,

> to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right."

4

*McCormick*, 500 U.S. at 272. Thus, the Court emphasized in its following Term, "the requirement that the payment must be given in return for official acts"—that is, the requirement of an explicit quid pro quo—"is derived from the statutory language 'under color of official right,' which has a well-recognized common-law heritage that distinguished between payments for private services and payments for public services." *Evans v. United States*, 504 U.S. 255, 268 n.20 (1992). Courts likewise enforce this requirement as an "implicit element" of federal-program bribery, the other criminal prohibition at issue here, when campaign contributions are involved. *Benjamin*, 2022 WL 17417038, at *13; *see also United States v. Donagher*, 520 F. Supp. 3d 1034, 1042–45 (N.D. Ill. 2021) (explaining that *McCormick* establishes a rule for interpreting criminal statutes not limited to the Hobbs Act).

Although *McCormick* did not define the term "explicit," its relevant parameters are readily apparent. This Court has held that "by 'explicit' *McCormick* did not mean 'express,'" *i.e.*, "[d]eclared in terms," "set forth in words," or "[d]irectly and distinctly stated." *Blandford*, 33 F.3d at 696 & n.13 (quoting BLACK'S LAW DICTIONARY 580 (6th ed. 1990)) (internal italics omitted). Even so, as this Court also explained, an "explicit" agreement is "[n]ot obscure *or ambiguous*"; even if such an agreement is not expressly stated, it must be "*[c]lear in understanding*." *Id*. at 626 n.13 (quoting BLACK'S LAW DICTIONARY 579) (first emphasis added).

This definition of "explicit" as "clear and unambiguous" has cross-circuit consensus. *See, e.g.*, *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992); *United States v. Davis*, 841 F. App'x 375, 379 (3d Cir. 2021); *Donagher*, 520 F. Supp. 3d at 1045; *Benjamin*, 2022 WL 17417038, at **9–10; *accord United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993). And for good reason. This definition follows not only from the ordinary meaning of "explicit," as evident from the above-cited *Black's Law Dictionary* entries and from similar entries in lay dictionaries. *See, e.g.*, *Explicit*, MERRIAM-WEBSTER, https://bit.ly/41l8Ah2 (last visited Dec. 17, 2023) (defining "explicit" as "fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent"). It also follows from *McCormick*'s quid-pro-quo requirement itself.

A quid pro quo is "a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999) (emphasis in original). To prove a quid pro quo, therefore, the Government must establish more than a general intent to give or receive something of value. The Government must establish "a link between the item of value received and an understanding that the public official receiving it is to perform official acts on behalf of the payor when called upon." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009). That link—the specific intent to buy an official act with a campaign contribution—is what "distinguish[es] between an

6

elected official responding to legitimate lobbying," which does not violate federal anti-corruption law, "and a corrupt politician selling his votes to the highest bidder," which does. *Id*.

If *McCormick* only required some form of proof of this intent, however, there would be no need for its additional explicitness requirement. That cannot be what the Court meant. The Court has imposed quid-pro-quo requirements in other contexts. *See, e.g.*, *McCutcheon v. F.E.C.*, 572 U.S. 185, 192 (2014). But in this specific context, the quid pro quo must be "explicit."

This additional requirement establishes how the requisite specific intent must manifest, and thus the type of evidence that the Government needs to support a conviction. Under *McCormick*, each element of a corrupt bargain—the quid, the pro, and the quo—must be clearly established. In *McCormick* itself, the alleged quid and the quo were clear: a state legislator received campaign contributions from a group of doctors and later sponsored legislation favorable to the doctors. *See* 500 U.S. at 260. That evidence alone could not establish a quid pro quo, however, because "*McCormick*'s point was that the *pro* itself," the agreement to exchange a campaign contribution *for* an official action, "must be clear and unambiguous," too. *Benjamin*, 2022 WL 17417038, at *10 (emphasis in original). That means the agreement must be "characterized by more than temporal proximity" between the quid and the quo, or by "winks and nods," or by "vague phrases like 'let me see what I can do.'" *Id*.

7

That sort of evidence might suggest an *implicit* agreement interpretable as a quid pro quo. But implicit is, obviously, the antonym of "explicit."

*McCormick*'s exacting liability requirement thus entails an exacting standard of proof. Whether the Government seeks to prove a quid pro quo through express statements or through conduct, under *McCormick* the evidence may leave no doubt that a campaign contribution was made and accepted as an exchange for an official act and not for any other purpose. That is what it takes to prove, beyond a reasonable doubt, a specific *and explicit* intent to engage in a corrupt bargain.

Such a showing may be relatively simple in cases of express agreements. An official cannot invoke *McCormick* if, for example, he promises a businessowner that he will award the business a public contract in exchange for a campaign donation, the businessowner says "Great," and a check in the agreed-upon amount arrives the next day. Where the Government lacks such express evidence, however, the agreement must be no less clear. The official might still be liable if the above deal were sealed with a handshake rather than verbal assent. But the federal bribery statutes do not broadly prevent officials from meeting with constituents, discussing how the official might be able to serve them, and accepting campaign contributions from them thereafter. Liability thus does not attach if the official promises merely general support, or if the promise is not clearly connected to contribution offer, even if a contribution were to follow. If a quid pro quo could be found in such an

8

exchange, it is at best an ambiguous one, discernible only by implication. *See id*. at *11 (describing scenarios on either side of the *McCormick* line); *accord United States v. McGregor*, 879 F. Supp. 2d 1308, 1317 (M.D. Ala. 2012).

In short, only proof of a clear and unambiguous bribe can establish the "explicit" quid pro quo that *McCormick* requires. This Court correctly interpreted that term in *Blandford*, 33 F.3d at 696 n.13. And that alone suffices for reversal here: *McCormick* and *Blandford* are controlling, and, as shown in Sittenfeld's opening brief, the supposedly corrupt exchange at issue was anything but clear and unambiguous. But if any doubts remained as to the strict standard of proof needed to satisfy *McCormick*, they are definitively resolved by the need to avoid the serious constitutional problems that a more lenient standard would create.

## II. Requiring Anything Less than Clear and Unambiguous Proof of a Bribe Would Raise Serious Constitutional Concerns.

*McCormick*'s interpretation of the Hobbs Act was driven by constitutional concerns of the most fundamental sort. Congress could not have meant to define as "extortion" any official action taken for a constituent "shortly before or after campaign contributions are solicited and received from" that constituent because, the Court explained,

> [t]o hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.

9

500 U.S. at 272. This concern relates to the nature of our representative democracy— and thus is literally "constitutional." And though not expressly invoked in *McCormick*, several provisions of the written Constitution address just this concern: in particular, the First Amendment, Due Process Clause, and, in cases involving state and local officials, principles of federalism.

An interpretation of federal bribery laws that allows for the prosecution of local officials over anything less than a clear and unambiguous quid pro quo would violate these protections and should be avoided. *See Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Even were such an interpretation available after *McCormick*, the Constitution would foreclose it.

### A. First Amendment

Our representative democracy is built on political campaigns—and on the freedom to fund them. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976). The ability of those candidates to inform the citizenry of their positions is equally essential. And it requires funds. The *McCormick* Court had this dynamic clearly in mind:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run

on platforms and who claim support on the basis of their views and what they intend to do or have done.

500 U.S. at 272. This give-and-take serves both informational and expressive functions. Constituents learn from campaigns what their prospective representatives "intend to do" for them. *Id*. Meanwhile, contributing to campaigns is an exercise of the contributor's own "expressive and associational rights": to express support for and to associate with the candidate and his positions. *McCutcheon*, 572 U.S. at 204; *see also F.E.C. v. Wis. Right to Life, Inc.*, 551 U.S. 449, 486 (2007) (opinion of Scalia, J.) ("[C]ontributing money to, and spending money on behalf of, political candidates implicates core First Amendment protections."). It is for these reasons that, as the Supreme Court has repeatedly stated, "[t]he First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Cruz*, 596 U.S. at 302 (internal quotation marks omitted).

Broad constructions of anti-corruption statutes threaten these essential freedoms. Anyone who has attended a campaign event, seen a campaign ad, or received campaign mail—in short, anyone who has had any contact with a political campaign—will know the truth of *McCormick*'s observation that candidates must continually request money and that they do so to support "what they intend to do." 500 U.S. at 272. On a more retail level, "conscientious public officials arrange meetings for constituents . . . all the time." *McDonnell v. United States*, 579 U.S. 550, 575 (2016). Indeed, "[t]he basic compact underlying representative government

11

*assumes* that public officials will hear from their constituents and act appropriately on their concerns," from "the union official worried about a plant closing" to "the homeowners who wonder why it took five days to restore power to their neighborhood after a storm." *Id*. (emphasis in original). Federal anti-corruption law would "cast a pall of potential prosecution over these" common, constitutionally protected, and democratically essential "relationships" if prosecutors could fashion an illegal quid pro quo merely from an act of protected expression (a campaign contribution) and an act of constituent service. *Id*. "Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id*.

This concern is not hypothetical. Federal prosecutors have frequently tried to mount anti-corruption cases on such facts, identifying a purported "quid" and "quo" and effectively assuming the "pro"—*i.e.*, a corrupt intent to exchange one for the other. They have just as frequently been rebuffed. In *McDonnell*, "White House counsel who worked in every administration from that of President Reagan to President Obama," plus more than eighty state attorneys general from across the political spectrum, "warn[ed]" that such a "breathtaking expansion of public-corruption law would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties." *Id*. (internal

12

quotation marks omitted). The Supreme Court agreed. *See id*. at 574–77. In *Sun-Diamond*, "counsel for the United States maintained at oral argument that a group of farmers would violate [18 U.S.C.] § 201(c)(1)(A)," which prohibits gifts to certain federal officials in exchange for official acts, "by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy—so long as the Secretary had before him, or had in prospect, matters affecting the farmers." 526 U.S. at 407. The Court once again held that such facts could not establish an illegal quid pro quo. And that was true even without the unique constitutional concerns present in this case and in *McCormick*, where the alleged "quid" is an otherwise protected campaign contribution.

The lesson of these cases is that a corrupt exchange cannot simply be assumed; an alleged "quid" and "quo" do not necessarily indicate a "pro." That is only more true with campaign contributions. Given the paramount First Amendment interests involved in such cases, "[a]ny regulation" of the political process must specifically "target" a quid pro quo. *McCutcheon*, 572 U.S. at 192; *see also, e.g.*, *F.E.C. v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 498 (1985); *Buckley*, 424 U.S. at 45–47. This requirement is what separates unlawful "corruption," on the one hand, from "a central feature of democracy" on the other—namely, as discussed above, "that constituents support candidates who share their beliefs and interests, and

13

candidates who are elected can be expected to be responsive to those concerns."
*McCutcheon*, 572 U.S. at 192; *see also United States v. Giles*, 246 F.3d 966, 972
(7th Cir. 2001) ("[C]ampaign contributions often are made with the hope that the
recipient, if elected, will further interests with which the contributor agrees; there is
nothing illegal about such contributions.").

Moreover, where the regulation at issue is the *criminal sanction* of federal
bribery law, the Government may not simply target the "appearance" of a quid pro
quo, as has been allowed for other campaign-finance limits. *McCutcheon*, 572 U.S.
at 192. Rather, the Government must target an "*explicit*" quid pro quo, and only an
explicit quid pro quo. *McCormick*, 500 U.S. at 273 (emphasis added). And that must
be so because the threat of criminal prosecution "bears many of the marks of a prior
restraint," the archetypal form of an unconstitutional speech restriction, "for it may
chill protected speech much like an injunction against speech by putting that party
at an added risk of liability." *Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns
Cnty.*, 544 U.S. 1301, 1304 (2005).

The protection offered by this standard would be meaningless if the standard
were too easy to meet—in other words, if the Government could prove an explicit
quid pro quo through entirely implicit evidence. If, for example, the Government
could establish criminal bribery through a strained interpretation of disconnected
phrases in a conversation between candidate and campaign contributor, then the

14

Supreme Court's concerns, voiced throughout the above opinions, would manifest. Such conversations would be less likely to occur, at least in anything but highly guarded form, depriving citizens both of their access to their elected representatives and of their ability to exercise their First Amendment rights to support their candidates of choice on an informed basis.

Campaign contributions lose this First Amendment protection only when made in a corrupt exchange for an official act, that is, only when they cross the line from expression of policy support to purchase of a policy commitment. And only by insisting that the Government prove, clearly and unambiguously, that a campaign contribution did cross that line can courts preserve the vital First Amendment rights implicated in cases like this one.

### B. Due Process

Due process generally requires that criminal statutes provide "fair warning" of what they prohibit. *McBoyle v. United States*, 283 U.S. 25, 27 (1931). Efforts to criminalize ordinary politics inevitably run headlong into this principle, as well.

The fair-warning rule has three doctrinal "manifestations." *United States v. Lanier*, 520 U.S. 259, 266 (1997). First is the rule that a criminal statute is unenforceable if its terms are "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id*. (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). This rule against vagueness

15

also prevents "arbitrary enforcement," *i.e.*, efforts to capitalize on loose standards and prosecute chosen targets. *Johnson v. United States*, 576 U.S. 591, 595 (2015). Second is the rule that criminal statutes must be strictly construed, commonly known as the rule of lenity, thereby ensuring fair warning and foreclosing vague interpretations. *See Lanier*, 520 U.S. at 266. And third, courts may not supply missing clarity through "judicial gloss" and then apply a criminal statute "to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id*. In all cases, the "touchstone" is whether it was "reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. at 267.

The quid-pro-quo requirement exists to prevent federal anti-corruption provisions from becoming traps for the unwary. Indeed, the need for fair warning is especially acute in cases like this one. As seen, a basic *premise* of representative politics is that officials will hear from and serve their constituents, who will in turn support those officials' campaigns, as the Constitution entitles them to do. Since these sorts of exchanges happen every day, candidates need a bright line to delineate the lawful, protected exchanges on which representative democracy subsists from the types of exchanges that might subject them to criminal prosecution. That line, as the Supreme Court has held time and again, is a quid pro quo. *See, e.g.*, *McCutcheon*, 572 U.S. at 192. Allowing criminal convictions based on anything less than a quid

16

pro quo—and, in cases like this one, an *explicit* quid pro quo—would contravene all the fair-warning principles above.

The Supreme Court has been attuned to this very problem in several cases already surveyed above. In *Sun-Diamond*, the Government had asserted that it did not need to prove a "connection" between an alleged gift and "a specific official act" and, instead, could establish the necessary quid pro quo merely by characterizing the gift as an "effort to buy favor or generalized goodwill from an official who" may "be *in a position to act* favorably to the giver's interests." 526 U.S. at 405 (emphasis in original; internal quotation marks omitted). As the Court noted, that interpretation would produce a host of "peculiar results"; even "token gifts" for official visits might generate liability, since offerings are generally made to establish goodwill and officials are generally in positions to aid the offeror. *Id*. at 406–07. And if "the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, *nothing but the Government's discretion*" would prevent such examples "from being prosecuted." *Id*. at 408 (emphasis added). The ultimate result would thus be a grave risk of "arbitrary enforcement." *Johnson*, 576 U.S. at 595.

The *McDonnell* Court similarly warned against "standardless" interpretations under which "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." 579 U.S. at 576 (cleaned up). Most pertinent among these cases, however, is once again *McCormick* itself. First Amendment

17

problems aside, any effort to convert a campaign contribution into criminal bribery absent an explicit quid pro quo—and thus to criminalize conduct that not only "has long been thought to be well within the law," but also that "in a very real sense is unavoidable" in politics—"would require statutory language more explicit than the Hobbs Act contains." *McCormick*, 500 U.S. at 272–73. In keeping with the rule of lenity, the Court declined to read any such language into the statute. Rather, the Court drew the line between normal politics and culpability where "men of common intelligence" would draw it: at a quid pro quo. *Lanier*, 520 U.S. at 266 (cleaned up). And to make sure the "forbidden zone" was defined "with sufficient clarity," the Court required that the quid pro quo be explicit. *McCormick*, 500 U.S. at 273.

This requirement would lose its fair-warning value if the Government could satisfy it with anything less than proof of a clear and unambiguous bribe. As the *McCormick* Court agreed, "[a] moment's reflection should enable one to distinguish, at least in the abstract," what constitutes a "prohibited exchange": "a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act." *Id*. (quoting *United States v. Dozier*, 672 F.2d 531, 537 (5th Cir. 1982)). If liability could attach to exchanges less clear than that, the line between a constitutionally protected interaction and a potential prison sentence will not be the matter of a moment's reflection, but of a highly fraught "guess." *Lanier*, 520 U.S. at 266 (cleaned up). And given that no court has previously defied the clear

18

import of *McCormick* and permitted a conviction to stand on anything less than proof of a clear and unambiguous bribe, doing so here would violate the third manifestation of the fair-warning rule. Courts may not take it upon themselves to retrofit statutes to cover "conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.*; *see also Benjamin*, 2022 WL 17417038, at *13.

### C. Federalism

Finally, every federal prosecution of a state or local official raises potential federalism concerns. State and local governments have their own "prerogative[s] to regulate the permissible scope of interactions" between officials and constituents. *McDonnell*, 579 U.S. at 576. The Supreme Court has, accordingly, often declined to construe federal statutes "in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." *Id.* at 577 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)) (internal quotation marks omitted). But the risk of federal prosecution becoming a tool of good-government oversight has long been recognized, *see* Ruff, *supra*, at 1172, 1228, and has only increased as the number of federal prosecutions of state and local officials has grown, *see, e.g.*, *Evans*, 504 U.S. at 290 (Thomas, J., dissenting) (observing that "the Hobbs Act has served as the engine for a stunning

19

expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws—acts of public corruption by state and local officials").

Properly applied, the *McCormick* requirement provides the clarity necessary to ensure that federal anti-corruption law does not "affect the federal balance" more than Congress "in fact . . . intended." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543–44 (2002) (cleaned up). A quid pro quo that is clear and unambiguous is unmistakably within the zone of conduct that Congress sought to prohibit. A quid pro quo that can only be proven by implication is not. If proving a bribery charge requires squinting at snatches of a conversation between a contributor and candidate and choosing a corrupt interpretation over an innocent one, that is a telltale sign that a prosecution is enforcing not the letter of the Hobbs Act or another federal statute, but a federal concept of good government. Beyond clear violations of federal law, what constitutes good campaign practice within a state or locality is for state and local officials to decide and enforce.

*    *    *

In sum, several bedrock constitutional principles fortify the proper reading of *McCormick*: in the context of campaign contributions, an unlawful quid pro quo exists only where the evidence leaves it clear and unambiguous that the contribution was made specifically in exchange for an official favor. Allowing a conviction to stand on ambiguous evidence would chill First Amendment activity, violate due-

20

process fair-warning principles, and intrude on the states' traditional role in setting standards for state and local government.

## CONCLUSION

For the foregoing reasons, Sittenfeld's convictions rest on an incorrect application of *McCormick* and should be reversed.[2]

Dated: December 18, 2023

Respectfully submitted,

/s/ Joseph O. Masterman
Joseph O. Masterman
COOPER LAW PARTNERS
1717 Pennsylvania Ave. N.W., Suite 1025
Washington, D.C. 20006
Telephone: (202) 866-0171
joe@cooperlawpartners.com

*Counsel for Amicus Curiae*
*Institute for Free Speech*

---

[2] Although outside the focus of this brief, in the event the convictions are not reversed, Amicus also supports Sittenfeld's alternative arguments for a new trial.

21

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 4,943 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.


Dated: December 18, 2023    /s/ Joseph O. Masterman

             *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 18, 2023, I electronically filed the foregoing amicus brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit through the CM/ECF system. Service will be accomplished by the CM/ECF system.

/s/ Joseph O. Masterman

*Counsel for Amicus Curiae*