No. 23-3840

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES,

*Appellee*,

v.

ALEXANDER SITTENFELD,

a/k/a "P.G." Sittenfeld

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Ohio (Western Division) (Cole, J.)
District Court Case No. 1:20-cr-142

## BRIEF OF AMICI CURIAE BUSINESS AND CIVIC LEADERS IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

Joshua H. Runyan
Patrick F. Linehan
Nicholas P. Silverman
Jennie A. Askew
M. Vito Arethusa
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202 429 3000
jrunyan@steptoe.com
plinehan@steptoe.com
nsilverman@steptoe.com
jaskew@steptoe.com
varethusa@steptoe.com

*Counsel for amici curiae political business leaders*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... i

INTEREST OF AMICI CURIAE. ...........................................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ..........................................................................................5

I.  Rigorous Enforcement of *McCormick*'s Requirement of an Unambiguous *Quid Pro Quo* Is Vital to Safeguarding the Constitutionally Protected Speech of Those Who Contribute to Political Campaigns ...................................................5

    A.  It Is Well-Settled that Campaign Contributions Are a Form of Political Speech Protected by the First Amendment, and for Good Reason..................6

    B.  The *McCormick* Rule Provides a Buffer Zone that Protects Campaign Contributors' Engagement in Legitimate Political Discourse with Candidates ..................................................................................8

    C.  The *McCormick* Rule Protects Against the Chilling of Political Speech due to Arbitrary Prosecution..................................................................11

    D.  The *McCormick* Rule Also Protects Against Politically Motivated Prosecutions at the Federal Level .............................................................15

II. Post-*McCormick* Case Law Confirms that Mr. Sittenfeld's Conviction Falls Within *McCormick*'s Buffer Zone...................................................21

    A.  Post-*McCormick* Cases Have Recognized that Criminalizing Campaign Contributions Requires an Unambiguous *Quid Pro Quo* .............................22

    B.  The District Court's Denial of Appellant's Rule 29 Motion Violated This Settled Principle of Law by Permitting a Conviction Based on an Ambiguous Discussion ..................................................................................26

CONCLUSION......................................................................................28

CERTIFICATE OF COMPLIANCE.....................................................29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckley v. Valeo*,
424 U.S. 1 (1976)...............................................................................6, 7

*Citizens United v. Federal Election Commission*.
558 U.S. 310 (2010)...............................................................................7

*City of Lakewood v. Plain Dealer Publishing Co.*,
486 U.S. 750 (1998)...............................................................................19

*Evans v. United States*, 504 U.S. 255 (1992)........................................23

*First National Bank of Boston v. Bellotti*,
435 U.S. 765 (1978)...............................................................................6

*McCormick v. United States*,
500 U.S. 257 (1991).........................................................................*passim*

*McCutcheon v. Federal Election Commission*.
572 U.S. 185 (2014)...........................................................................7, 8, 21

*Siegelman v. United States of America*,
640 F.3d 1159 (11th Cir. 2011) ........................................................16, 18

*United States v. Abbey*,
560 F.3d 513 (6th Cir. 2009) .................................................................23

*United States v. Allen*,
10 F.3d 405 (7th Cir. 1993) ...................................................................24

*United States v. Antico*,
275 F.3d 245 ........................................................................................24

*United States v. Benjamin*,
No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5,
2022) .....................................................................................................26

*United States v. Blandford*,
   33 F.3d 685 (6th Cir. 1994) .........................................................................*passim*

*United States v. Carpenter*,
   961 F.2d 824 (9th Cir. 1992) ..................................................................25, 26

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007) ....................................................................25, 26

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993) ...........................................................................25

*United States v. Marchan*,
   32 F. Supp. 3d 753 (S.D. Tex. 2013) ...............................................................1

*United States v. Sittenfeld*,
   No. 1:20-CR-142 (S.D. Ohio May 27, 2022), ECF No. 114............14, 20, 27, 28

*United States v. Sun-Diamond Growers of California*,
   526 U.S. 398 (1999)...............................................................................15, 17

*United States v. Terry*,
   707 F.3d 607 (6th Cir. 2013) .....................................................................27, 28

*Virginia v. Hicks*,
   539 U.S. 113 (2003)..................................................................................15, 21

**Statutes**

18 U.S.C. § 371 ...............................................................................................1

18 U.S.C. § 666.............................................................................1, 5, 14, 15

18 U.S.C. § 1951 ........................................................................................1, 14

OR. REV. STAT. ANN. §§ 162.005, 162.015 ..........................................................23

TEX. PENAL CODE ANN. § 36.02 ...........................................................................23

**Other Authorities**

Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of
   Bribery Make Things Worse*, 84 FORDHAM L. REV. 463, 483 (2015) ..............8, 9

Albert W. Alschuler, *Limiting Political Contributions After McCutcheon, Citizens United, and Speechnow*, 67 FLA. L. REV. 389, 462 (2015) .................................................................18

Brian F. Jordan, *Disclosing Bribes in Disguise: Campaign Contributions as Implicit Bribery and Enforcing Violations Impartially*, 17 U. PA. J. CONST. L. 1435, 1446-47 ...........................12

Christopher Robertson, D. Alex Winkelman, Kelly Bergstrand, & Darren Modzewlewski, *The Appearance and the Reality of Quid Pro Quo Corruption: An Empirical Investigation*, 8 J. LEGAL ANALYSIS 375 (2016) ...................................13, 14, 20

Eric D. Weissman, *McCormick v. United States: The Quid Pro Quo Requirement in Hobbs Act Extortion under Color of Official Right*, 42 CATH. U. L. REV. 433, 460 (1993)..........................................................*passim*

George D. Brown, *New Federalism's Unanswered Question: Who Should Prosecute State and Local Officials for Political Corruption?*, 60 WASH. & LEE L. REV. 417, 441 (2003)...................................21

Gregory Howard Williams, *Good Government by Prosecutorial Decree: The Use and Abuse of Mail Fraud*, 32 ARIZ. L. REV. 137, 144 (1990) ........................................................................19

John L. Diamond, *Reviving Lenity and Honest Belief at the Boundaries of Criminal Law*, 44 U. MICH. J. L. REFORM 1, 18 (2010) .................................................................................9

Joseph R. Weeks*, Bribes, Gratuities, and the Congress: The Institutionalized Corruption of the Political Process, the Impotence of Criminal Law to Reach it, and a Proposal for Change*, 13 NOTRE DAME J. OF LEGIS. 123 (1986) ..............................................9

Peter J. Henning, *Public Corruption: A Comparative Analysis of International Corruption Conventions and United States Law*, 18 ARIZ. J. INT'L & COMP. L. 793, 853 (2001) ..........................................9

Ralph E. Loomis, *Comment, Federal Prosecution of Elected State Officials for Mail Fraud: Creative Prosecution or an Affront to Federalism?*, 28 AM. U. L. REV. 63, 78-79 (1978)..............................19

Sara Sun Beale, *Comparing the Scope of the Federal Government's Authority to Prosecute Federal Corruption and State and Local Corruption: Some Surprising Conclusions and a Proposal*, 51 HASTINGS L.J. 699, 719 (2000)..........................................................19

Stephen E. Sachs, *Corruption, Clients, and Political Machines: A Response to Professor Issacharoff*, 124 HARV. L. REV. ....................................10

**INTEREST OF AMICI CURIAE[1]**

The following list of amici consists of individuals of diverse backgrounds and professional experiences who share the common experience of participation in the political process, at the local, state, and federal levels. That participation often includes both discussions with political candidates aimed at issue advocacy and the making of campaign contributions to support those candidates.

This group of amici shares a concern that under the district court's ruling, an *ambiguous* discussion of policy interests and fundraising could be viewed as the "explicit *quid pro quo*" required by 18 U.S.C. §§ 666, 1951[2] and the First Amendment. Such a broad interpretation of "explicit *quid pro quo*" risks criminalizing legitimate political engagement and will effectively chill, if not eviscerate, the protected political speech of amici and others like them, including the

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* counsel made a monetary contribution to the brief's preparation or submission. Counsel for all parties have consented to the filing of this brief. Additionally, amici curiae appear in their individual capacities; institutional affiliations are provided here for identification purposes only.

[2] Although 18 U.S.C. § 1951 would not be primarily applicable to contributors like amici, campaign contributors could unjustly face liability for aiding and abetting Hobbs Act Extortion under circumstances similar to those leading to Appellant's conviction, as well as conspiracy to impede the lawful functions of a government agency under 18 U.S.C. § 371. *See United States v. Marchan*, 32 F. Supp. 3d 753, 766 (S.D. Tex. 2013) (upholding that payment of funds supported defendant's conviction for aiding and abetting Hobbs Act extortion under color of official right).

making of financial contributions to the campaigns of candidates who support the contributors' policy positions. Individual amici are listed below.

**Tony Alexander**, Founder and Chief Executive Officer, Remote Vans.

**Christopher Altcheck**, Founder and Chief Executive Officer, Cadence.

**Robert A. Axelrod**, President, Stavins & Axelrod Properties, Inc.

**Jean-François Flechet**, Founder and Chief Executive Officer, Taste of Belgium.

**Dan Fleming**, Managing Partner, RC Capital.

**Alexander Heiman**, President, Standard Textile.

**David Hoguet**, retired Chief Financial Officer, Globe Business Resources.

**Dr. Jonathan Isaacsohn**, Founder and Chief Executive Office of CinRx.

**John LaMacchia**, retired Chief Executive Officer, Cincinnati Bell.

**Timothy Maloney**, retired Chief Executive Officer, Carol Ann and Ralph V. Haile, Jr. Foundation.

**Michael D. McCurry**, Former Assistant to the President and White House Press Secretary.

**Sharon Janosik Mitchell**, Senior Vice President, Procter & Gamble.

**Jay Morelock**, Chief Executive Officer, Harper Capital, LLC.

**Anne Morriss**, Founder, The Leadership Consortium.

**Jennie Rosenthal**, Chair, National Board of Directors, Planned Parenthood Action Fund (2019-2021).

**Jack Rouse**, Founder and retired Chief Executive Officer, Jack Rouse Associates (JRA).

**Jesse Safir**, President, ABG Print.

**Chris Sommers**, Founder and Chief Executive Officer, Attune Solutions.

**Jacob Warm**, Chief Executive Officer and Chairman, JDL Warm Construction LLC.

**Josh Woodward**, Vice President, Google.

## SUMMARY OF ARGUMENT

Under a democratic electoral system, one feature is fundamental: the relationship between constituent and candidate as a means by which constituents may communicate and advocate for certain issues, and hold candidates accountable for supporting those issues. The backbone of this political dialogue central to the democratic process—alongside who a constituent chooses to vote for—is, for better or worse, money. In a system in which private campaign financing is ubiquitous, candidates inevitably have money solicited on their behalf in expectation of favorable action. These practices are unquestionably political speech protected by the First Amendment. But when candidates solicit, and constituents pay, campaign contributions in exchange for political action, those donations are no longer

constitutionally-protected speech, but unlawful conduct.  Without a clear line, the resultant political environment is a minefield: candidates are forced to raise funds to maintain a relationship with constituents, but any donation or solicitation could fall on the wrong side of the law, and support a criminal conviction.

The Supreme Court, in *McCormick v. United States*, 500 U.S. 257 (1991), recognized this paradox and established that the government must demonstrate a clear, unambiguous connection between the contribution and official political act to sustain a federal bribery conviction.  *Id*. at 273.  In short, *McCormick* held that prosecutors must prove an ***explicit*** *quid pro quo* arrangement to distinguish commonplace interactions between public official and constituent from illicit activity.  Otherwise, a lower standard would open every public official at risk of facing prosecution.

That is precisely what the district court did when it upheld that the ambiguous evidence presented at trial was sufficient to satisfy the express *quid pro quo* requirement to sustain a conviction under the federal programs bribery statute and the Hobbs Act.  An ambiguous evidence standard such as that applied below shirks the First Amendment freedoms underscoring the Supreme Court's reasoning in *McCormick*, fails to define with sufficient particularity the zone of formidable conduct under the federal bribery statutes, and fundamentally disrupts the role of the constituent as the proper regulatory authority for public official action by placing

that power in the hands of zealous federal prosecutors. Under this Court's precedent, we believe that the decision of the lower court should be reversed.

## ARGUMENT

I. **Rigorous Enforcement of *McCormick*'s Requirement of an Unambiguous *Quid Pro Quo* Is Vital to Safeguarding the Constitutionally Protected Speech of Those Who Contribute to Political Campaigns**

The Supreme Court in *McCormick* recognized the twin interests of safeguarding campaign contributions as protected First Amendment Speech and regulating corruption within the political system. To preserve both of these ends, the Court established an "**explicit**" *quid pro quo* standard to distinguish lawful political speech unique to the democratic process from criminal conduct. This settled standard reflects an essential principle of this Nation's electoral system: political contributions fund the means of communication necessary to promote the free-flowing exchange of ideas between constituent and candidate, and these contributions should not be chilled by the threat of criminal prosecution.

The district court's allowance of a jury conviction based on patently ambiguous evidence of a *quid pro quo* disregards this principle, and impermissibly expands the scope of campaign activity that may constitute federal programs bribery under 18 U.S.C. § 666 and the Hobbs Act. An ambiguous standard opens the door to excessive prosecution, and political speech, as this Nation has come to understand it, will cease to thrive as it did.

5

**A.** **It Is Well-Settled that Campaign Contributions Are a Form of Political Speech Protected by the First Amendment, and for Good Reason**

The understanding that campaign contributions "operate in an area of the most fundamental First Amendment activities" has been well-established since the Supreme Court's ruling in *Buckley v. Valeo* half a century ago. 424 U.S. 1, 14 (1976). That watershed decision determined that campaign contributions constitute a form of political expression afforded the highest First Amendment protection necessary to "'assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Id.* (quoting *Roth v. United States*, 354 U.S. 476 (1957)).

At the heart of *Buckley* is the recognition that the democratic principle of open communication between constituents and candidates is inextricably linked with "the giving and spending of money." *Buckley*, 424 U.S. at 16, 19 ("[V]irtually every means of communicating ideas in today's mass society requires the expenditure of money."); *see also First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978) (holding that contributions to campaigns are "the type of speech indispensable to decisionmaking in democracy[.]"). The "dependence of a communication on the expenditure of money" does not operate to "reduce the exacting scrutiny required by the First Amendment." *Buckley*, 424 U.S. at 16. This is because "[a] restriction on the amount of money a person or group can spend on

political communication during a campaign necessarily reduce[s] the *quantity of expression* by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id*. at 19 (emphasis added).

*Buckley* recognized a political reality: protection of the free-flowing dialogue between candidate and constituent requires protection of the means by which that dialogue is exchanged. Restrictions on contributions necessary to fund that democratic relationship may unconstitutionally restrict the "resources necessary for effective advocacy." *Id*. at 21.

The Supreme Court extended this reasoning in *Citizens United v. Federal Election Commission*. 558 U.S. 310 (2010). Underscoring its holding was the principle that political speech is central to democracy, which is "'no less true because the speech comes from a corporation rather than an individual.'" *Id*. at 349 (quoting *Bellotti*, 435 U.S. at 777). The *Buckley* reasoning was further confirmed in *McCutcheon v. Federal Election Commission*. 572 U.S. 185 (2014). There, the Court held that even though the political reality of campaign financing may seem unpalatable in the public opinion, "the First Amendment … surely protects political campaign speech ***despite popular opposition***." *Id*. at 191 (emphasis added). It found the campaign contribution context particularly deserving of protection, noting that "the First Amendment 'has its fullest and most urgent application precisely to the

conduct of campaigns for political office.'" *Id.* at 191–92 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

**B.     The *McCormick* Rule Provides a Buffer Zone that Protects Campaign Contributors' Engagement in Legitimate Political Discourse with Candidates**

The line between First Amendment-protected speech and illegitimate bribery or extortion is blurry due to the U.S. campaign finance system.  In federal elections and the vast majority of state elections, candidates primarily raise funds to support their campaigns from private sources.  Often, these campaign contributions come from those who stand to benefit most from legislation the candidate is likely to endorse.  Such contributions may even be designed to influence the candidate to vote in favor of the contributors' policy preferences.

Given the breadth of contributions, even the most uncorrupted public official will inevitably confer a benefit to someone who financially supported their campaign; through no fault of their own, ordinary political business will appear corrupt.  *See* Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 FORDHAM L. REV. 463, 483 (2015).  Indeed, under overbroad definitions, such impartial conduct may even be prosecuted.  *Id.* at 484. If the official simply rejects all campaign contributions, he/she would be unable to finance an election campaign and be replaced by a candidate willing to accept contributions.  *See* Joseph R. Weeks*, Bribes, Gratuities, and the Congress: The*

*Institutionalized Corruption of the Political Process, the Impotence of Criminal Law to Reach it, and a Proposal for Change*, 13 NOTRE DAME J. OF LEGIS. 123, 143 (1986) ("If a congressman will not accept the PAC and other special interest contributions and support their agendas in return, they will find someone else who will, and this person might well be the congressman's next opponent.").

Political contributions are designed either to reward public officials for acts the contributor favors or to influence candidates to so act. *See, e.g.,* Peter J. Henning, *Public Corruption: A Comparative Analysis of International Corruption Conventions and United States Law*, 18 ARIZ. J. INT'L & COMP. L. 793, 853 (2001) ("[C]ampaign contributions are, by their nature, given to influence or reward the candidate."); *see also* John L. Diamond, *Reviving Lenity and Honest Belief at the Boundaries of Criminal Law*, 44 U. MICH. J. L. REFORM 1, 18 (2010) ("[U]nder our political system, campaign contributions are routinely used to reward public officials who cast legislative votes or make executive decisions favored by the contributor.").

So long as contributions remain an unavoidable and necessary part of the campaign finance system, the acts of politicians once elected to office will continue to incidentally benefit contributors, including those whom public officials know had contributed money in hope of inducing such acts. Nor would it be easy to separate bad faith contributors seeking undue influence from "good actors" on a case-by-case basis, given that contributions are often intended to influence or reward. *See* Stephen

E. Sachs, *Corruption, Clients, and Political Machines: A Response to Professor Issacharoff*, 124 HARV. L. REV. F. 62, 63 (2010) ("[T]he law is too blunt an instrument to divide bad contributors from good ones[.]").  Only a bright-line rule can separate illegitimate bribes from legitimate contributions without subsequently chilling all political speech.

The Supreme Court provided that bright line in *McCormick*.  West Virginia Delegate Robert L. McCormick was a leading advocate for an annual legislative program supported by foreign-trained doctors.  *McCormick*, 500 U.S. at 259. Delegate McCormick had an ambiguous conversation with those doctors' lobbyist; he highlighted his past support for the program and said that, despite his support, he had received no donations from the lobbyist's doctor clients, *possibly* threatening to withhold legislative support in the future.  *Id.* at 260.  The doctors thereafter donated to Mr. McCormick in cash, and the donations were not reported as campaign contributions.  *Id.*  Mr. McCormick then sponsored new legislation that would permanently enact the doctor-supported program, which successfully passed.  *Id.* Two weeks after the legislation was enacted, the doctors made another contribution to him.  *Id.*

The district court instructed the jury that a conviction required only that the payment was made "with the expectation that such payment would influence Mr. McCormick's official conduct, and with knowledge on the part of Mr. McCormick

that they were paid to him with that expectation by virtue of the office he held." *Id.* at 265. The Supreme Court, however, reversed the consequent conviction, holding that it was not enough that donors expected their payment to influence Mr. McCormick's conduct and for him to understand that expectation. Instead, it held that campaign contributions may qualify as a "receipt of money by an elected official under color of official right" in violation of the Hobbs Act "*only* if the payments are made *in return for an explicit promise or undertaking* by the official to perform or not to perform an official act." *Id.* at 273 (emphases added).

The Supreme Court in *McCormick* thus created a "forbidden zone of conduct" which does not encapsulate "a legitimate solicitation," but only "the exaction of a fee for a benefit conferred or an injury withheld … described familiarly as a … *quid pro quo*." *Id.* (quoting *United States v. Dozier*, 672 F.2d 531, 537 (1982)). This creates a clear and practical division: illegal contributions are made pursuant to an explicit *quid pro quo*, while contributions not so made, even in expectation of future benefit, are legitimate. "[O]therwise," the Supreme Court warned, "any campaign contribution might constitute a violation." *Id.*

## C. The *McCormick* Rule Protects Against the Chilling of Political Speech due to Arbitrary Prosecution

The Supreme Court's concern is not unfounded: these fears are shared by respected legal academics. Professor John L. Diamond, for example, cautioned that "there should be a clearer rule to give prosecutors better guidance before they level

expensive, politically career-destroying allegations, given that '[n]o politician who knows the identity and business interests of his campaign contributors is ever devoid of knowledge as to the inspiration behind the donation.'"  Diamond, *supra*, at 25–26 (quoting *United States v. Brewster*, 506 F.2d 62, 81 (D.C. Cir. 1984)).  Professor Brian F. Jordan similarly warned that, given the important role of private campaign contributions in campaign finance, "any reform in this area needs to be carefully executed to avoid chilling constitutionally protected political speech or stifling campaign contributions."  Brian F. Jordan, *Disclosing Bribes in Disguise: Campaign Contributions as Implicit Bribery and Enforcing Violations Impartially*, 17 U. PA. J. CONST. L. 1435, 1446–47; *see also* Eric D. Weissman, *McCormick v. United States: The Quid Pro Quo Requirement in Hobbs Act Extortion under Color of Official Right*, 42 CATH. U. L. REV. 433, 460 (1993) ("The quid pro quo requirement adopted in *McCormick* is valuable because it preserves the legitimacy of political fundraising. Absent such a requirement, the process of financing private political campaigns, a tradition in this country since its inception, would become chaotic.").

As noted above, even a hypothetical "uncorrupted public official" who supports legislation he/she has *always* supported might be found guilty of an "implicit *quid pro quo*."  Professor Albert W. Alschuler provides an illustrative hypothetical: "[w]hen an official has supported widget subsidies after accepting large contributions from widget manufacturers, for example, prosecutors and jurors

may infer that there must have been an implicit understanding," even without an explicit agreement. *Alschuler*, supra, at 483.

Under such a standard, prosecutors may arbitrarily charge, and jurors may convict, *anyone* who accepts campaign contributions for campaign finance violations. Indeed, there is some empirical evidence to support this claim. In a 2016 study led by Professor Christopher Robertson, mock grand jurors were presented with a hypothetical scenario describing political conduct which, lacking an explicit *quid pro quo* agreement, could not have legally amounted to bribery. Christopher Robertson, D. Alex Winkelman, Kelly Bergstrand, & Darren Modzewlewski, *The Appearance and the Reality of Quid Pro Quo Corruption: An Empirical Investigation*, 8 J. LEGAL ANALYSIS 375, 395–96 (2016). The scenario was "designed to mimic ubiquitous behavior that virtually any of the 535 Members of Congress engage in every day." *Id.* at 380. This study found that "the vast majority of … [mock] grand jurors were willing to indict such everyday behavior under the federal bribery statute." Based on these findings, it is no exaggeration to say that prosecutors may be able to indict and convict public officials for bribery on the basis of ordinary political activity, and further underscore the wisdom and importance of *McCormick*'s explicit *quid pro quo* requirement.[3]

---

[3] Indeed, the prosecution team below played into these very juror biases during the course of trial by demonizing aspects of the campaign finance process that are completely legal. That team highlighted Mr. Sittenfeld's personal receipt of checks

13

The statutes on which Appellant was convicted below—18 U.S.C. § 1951 (Hobbs Act extortion) and § 666 (federal programs bribery)—carry serious prison sentences. The Hobbs Act carries a maximum prison sentence of twenty years, and federal programs bribery ten years. *See* 18 U.S.C. §§ 1951(a), 666(a). The chilling effect of these potential sentences cannot be ignored. The overwhelming likelihood that a candidate will face prosecution for crimes that carry decades long sentences on the basis of implicit, everyday political discussions acts as an axe on campaign finance conduct, as opposed to a scalpel. *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 412 (1999). Where the law has restricted First Amendment speech, "[m]any persons, rather than undertake the considerable burden (*and sometimes risk*) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (emphasis added).

The risk, therefore, that First Amendment speech will be gutted under this standard is substantial. A mere indictment, which the *Robertson* study shows is easily secured, may end a political hopeful's career, and remove important—and Constitutional—speech from political discourse. To avoid the burden or risk of

_____

from the cooperator directly and his statement that donations to his PAC were more likely to remain anonymous. United States' Trial Brief at 4, *United States v. Sittenfeld*, No. 1:20-CR-142 (S.D. Ohio May 27, 2022), ECF No. 114. Both of these acts were perfectly legal, but nonetheless played into juror biases regarding the realities of the campaign contribution process.

litigation under an implicit standard, many—both politicians and contributors alike—may forgo protected speech entirely. The only way to safeguard First Amendment political speech is to rigorously enforce the *McCormick* explicit *quid pro quo* requirement. The district court's failure to do so below warrants reversal.

### D. The *McCormick* Rule Also Protects Against Politically Motivated Prosecutions at the Federal Level

There is another insulating effect of the explicit *quid pro quo* requirement: it prevents selective enforcement by federal prosecutors. *McCormick*, 500 U.S. at 272; *see* Brief *Amicus Curiae* of Former Attorneys General in Support of Petitioner at 4, *Siegelman v. United States of America*, 640 F.3d 1159 (11th Cir. 2011) (No. 11-955) (arguing the same in amicus brief addressing the explicit *quid pro quo* requirement under 18 U.S.C. § 666(a)(1)(B)). The district court's ambiguous *quid pro quo* standard would eviscerate the distinction between ubiquitous protected political exchanges and illicit bribery and opens that conduct to prosecution. Brief of Former Attorneys General at 4 ("Every President of the United States who nominates a contributor to an Ambassadorship could be subject to prosecution. Any United States Senator who publicly endorses a cause advocated by a contributor is at risk."). Broadening the facts and circumstances that may be encompassed by the federal bribery statutes in this manner gives prosecutors unbridled discretion to allege that *any* contributory conduct, even if historically understood to have been lawful and protected, constitutes criminal activity. *McCormick*, 500 U.S. at 272 ("To hold

otherwise would ***open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable*** so long as election campaigns are financed by private contributions or expenditure.") (emphasis added).

Authorizing prosecutors to argue to a jury that they may infer bribery from any public official action that benefits a contributor where that contributor desired that act to take place is to imprudently empower politically-motivated or overly ambitious prosecutors to wield a hatchet on First Amendment conduct before juries that (as the Robertson study demonstrated) are already holding a biased perception that the Constitutionally protected solicitation of campaign contributions is inherently corrupt. *See Sun-Diamond*, 526 U.S. at 412 ("[A] statute [regulating bribery of public officials] that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."); Sachs, *supra*, at 63 ("[T]he law is too blunt an instrument to divide bad contributors from good ones: some people spend money to buy a candidate's loyalty, while others use their money to advocate for candidates with whom they share a vision of good policy."). Allowing prosecutors to argue to a jury that "legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents" constitutes an improper

delegation, and disregards Congress's intent under the statute. *McCormick*, 500 U.S. at 272.

The disastrous effects of such a standard would be unavoidable. An ambiguous *quid pro quo* standard provides prosecutors with boundless opportunity to selectively target political figures for *commonplace* political conduct. *See* Brief of Law Professors as Amici Curiae in Support of Petitioner at 3, *Siegelman v. United States of America*, 640 F.3d 1159 (11th Cir. 2011) (No. 11-955) (arguing that an implicit *quid pro quo* standard under the federal bribery and "honest services" statutes would afford prosecutors "dangerously spacious latitude" to target "politicians and contributors whom they desire to silence."). The very real consequence of the district court's ruling is that "[a]mbitious prosecutors and cynical jurors . . . can easily infer a corrupt agreement from the common pattern [of campaign financing,]" and prosecutors can even take advantage of juror bias against a politician's party affiliation. Albert W. Alschuler, *Limiting Political Contributions After McCutcheon, Citizens United, and Speechnow*, 67 FLA. L. REV. 389, 462 (2015); *see, e.g.,* Robertson, *supra*, at 408 ("[A] mismatch between the respondent's political affiliation and the official's political affiliation … increased the rate of conviction by about 8 percent … the effect of mentioning the politician's party twice in the middle of the vignette was larger than the effect of giving instructions about

the relevant law immediately prior to asking for a verdict."); *see also* Robertson,

*supra*, at 412 ("At least in the eyes of the general public, bribery is ubiquitous.").

More generally, the Supreme Court has underscored the danger in granting

broad discretion to prosecutors under statutes that implicate the First Amendment:

> [I]n the area of free expression . . . ***placing unbridled discretion in the***
> ***hands of a government official*** . . . intimidates parties into censoring
> their own speech . . . Standards provide the guideposts that check the
> [official] and allow courts quickly and easily to determine whether the
> [official] is discriminating against disfavored speech. Without these
> guideposts, ***post hoc rationalizations by the . . . official and the use of***
> ***shifting or illegitimate criteria are far too easy***, making it difficult for
> courts to determine in any particular case whether the [official] is
> permitting favorable, and suppressing unfavorable, expression.

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757-58 (1998)

(emphases added).

The prosecutorial consequences of adopting an amorphous *quid pro quo*

standard have also been realized with respect to other federal statutes in the

campaign contribution context.[4] As a direct result of selective enforcement, the

---

[4] *See Sorich v. United States*, 129 S. Ct. 1308, 1309 (2009) (Scalia, J., dissenting)
(noting that the "honest services" standard under 18 U.S.C. § 1346 "has been
invoked to impose criminal penalties upon a staggeringly broad swath of behavior"
and a literal interpretation of that phrase  "renders criminal a state legislator's
decision to vote for a bill because he expects it will curry favor with a small minority
essential to his reelection"); Sara Sun Beale, *Comparing the Scope of the Federal
Government's Authority to Prosecute Federal Corruption and State and Local
Corruption: Some Surprising Conclusions and a Proposal*, 51 HASTINGS L.J. 699,
719 (2000) ("The amorphous content of the phrase 'honest services' [under 18
U.S.C. § 1346] gives prosecutors enormous leeway in selecting targets . . .
Prosecutors may succumb to the desire to chalk up a victory over prominent political

jurisprudence of the federal bribery statutes will suffer the same fate: those statutes will be arbitrarily applied and massaged to capture any and all behavior deemed illicit by law enforcement. *See* Gregory Howard Williams, *Good Government by Prosecutorial Decree: The Use and Abuse of Mail Fraud*, 32 ARIZ. L. REV. 137, 144 (1990) ("The selective enforcement aspect of mail fraud becomes even more pronounced when it is realized that federal law enforcement officials are . . . constantly defining and redefining the meaning of fraud as they choose offenders.").

The effect of an ambiguous *quid pro quo* standard is also uniquely chilling in the bribery context because the Supreme Court has struck down all prophylactic reforms for regulating money in politics, "leav[ing] bribery as the only regulatory tool." Robertson, *supra*, at 380. Where bribery, as the sole tool for regulating political corruption, "gives ultimate discretion to politically-appointed prosecutors to decide who does, and does not, get indicted," protected First Amendment political speech is at risk. *Id*. (summarizing results of study where mock jurors found that most exchanges between politicians and benefactors constituted *quid pro quo* corruption under the federal bribery statutes).

_____

figures, even when the evidence shows only relatively unimportant misconduct.");
Ralph E. Loomis, *Comment, Federal Prosecution of Elected State Officials for Mail Fraud: Creative Prosecution or an Affront to Federalism?*, 28 AM. U. L. REV. 63, 78-79 (1978) ("The dangers of this activist approach are twofold: it legitimizes the United States Attorney as a political actor and advocates a broad unchecked use of discretion.").

Indeed, the district court acknowledged this undesirable outcome: "no politician can accept money from anybody who is going to have business coming before them [without] leaving it up to twelve of their peers to decide whether . . . an inference could be drawn that there was some illicit deal." R.281.PageID.7105. As a result, individuals are more likely to forgo First-Amendment protected speech entirely than risk defending these rights through litigation. *Hicks*, 539 U.S. at 119 (emphasis added).

Sanctioning prosecutors with broad discretion to enforce the federal bribery statutes based on mere inferential evidence ignores the principle underscoring the Supreme Court's reasoning in *McCormick*. The clear, unambiguous *quid pro quo* standard in *McCormick* flowed directly from the relationship between constituent and candidate in the United States. *McCutcheon*, 572 U.S. at 192 ("[C]onstituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns."). This exchange "embod[ies] a central feature of democracy." *Id*.

The authority to determine whether an elected official or candidate has complied with his duty owed to the state and citizens is the unique authority of his *constituents*, not that of a federal prosecutor. The ambiguous evidence standard disrupts this relationship by misplacing the power to evaluate elected representatives in the hands of the federal government. *See* Loomis, *supra*, at 73-74

("Indiscriminate intervention by the federal government may dampen not only internal state efforts at reform, but also the special rapport necessary between an elected representative and his constituency."); George D. Brown, *New Federalism's Unanswered Question: Who Should Prosecute State and Local Officials for Political Corruption?*, 60 WASH. & LEE L. REV. 417, 441 (2003) (emphasizing that corruption cases in Chicago during the 1970s demonstrate the "dramatically expanded and highly visible role of the federal prosecutor").

The district court's ruling, which was based on only ambiguous evidence of a *quid pro quo*, must be reversed to prevent the inevitable chill on political speech. An ambiguous evidence standard would force constituents and public officials to forgo their First Amendment right to engage in political speech via campaign contributions. To engage in political speech in this manner would be at one's own peril, as a prosecutor may wield the weapon of an amorphous *quid pro quo* standard at his whim.

## II. Post-*McCormick* Case Law Confirms that Mr. Sittenfeld's Conviction Falls Within *McCormick*'s Buffer Zone

An agreement must be unambiguous in order to qualify as the "explicit *quid pro quo*" required by *McCormick*. *McCormick* recognized that the contextual realities of electoral politics in this United States creates the need for a clear, bright-line rule to distinguish everyday exchanges between candidates and donors from illicit bribery. The district court's holding that ambiguous evidence is sufficient

would erase this distinction, and expand the scope of federal public corruption law so much so that candidates and donors would need to forgo constitutionally protected speech to remain safe from prosecution. A standard such as that applied in Appellant's trial below, which would surely result in such chilling effects on First Amendment conduct, should be rejected.

### A. Post-*McCormick* Cases Have Recognized that Criminalizing Campaign Contributions Requires an Unambiguous *Quid Pro Quo*

For over three decades since its inception, courts applying *McCormick* have been guided by its rationale that a bright-line rule is necessary to prevent the potential criminalization of legitimate, and possibly most, campaign contributions.[5] This is true even in cases that distinguished *McCormick*. In *United States v. Abbey*, for example, the Sixth Circuit held that a post-*McCormick* Supreme Court decision, *Evans v. United States*, "modified the standard in non-campaign contribution cases by requiring that the government show only that the official obtain[ed] a payment to which he was not entitled, knowing that the payment was made in return for official acts." 560 F.3d 513, 518–519 (6th Cir. 2009) (quotations omitted) (noting "almost

---

[5] In the legislative context, several states have chosen to go even beyond the *McCormick* standard, and to enact statutes offering additional safeguarding of legitimate campaign contributions. *See, e.g.*, OR. REV. STAT. ANN. §§ 162.005, 162.015 (West) (noting that lawfully reported contributions are not a "pecuniary benefit" necessary for a bribery prosecution); *see also* TEX. PENAL CODE ANN. § 36.02 (West) (requiring "direct evidence of [an] express agreement" "*notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence*") (emphasis added).

all lawful contributions are given to influence future legislative or executive actions"); *see Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring) (noting that "knowing winks and nods" were sufficient).

This is consistent with the understanding of electoral participants: mere knowledge that a payment was in exchange for official acts is sufficient in a *non-*campaign contribution context, where the *McCormick* rationale is inapplicable and a lesser standard is sufficient; but within the original campaign contribution context, where the concern for criminalization of protected speech is most warranted, an explicit *quid pro quo* remains necessary and *Evans* is simply not enough of a safeguard. *See United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("[A]bsent some fairly explicit language otherwise, accepting a *campaign contribution* does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act.") (emphasis added); *see also United States v. Antico*, 275 F.3d 245 (holding that *Evans* applies outside of the campaign contribution context, but *McCormick* applies to the campaign contribution context).

The Sixth Circuit examined the definition of an "explicit *quid pro quo*" in *United States v. Blandford*, instructing that that while "explicit" does not mean "express," an "explicit" agreement is one that is nevertheless "not obscure or ambiguous, having no disguised meaning or reservation," and is "[c]lear in understanding." 33 F.3d 685, 696 n.13 (6th Cir. 1994). The Court concluded that

under *McCormick*, "[c]ampaign contributions … enjoy what might be labeled a presumption of legitimacy." *Id.* at 697. Legitimate campaign contributions are "given with the hope, and perhaps expectation, that the payment will make the official more likely to support the payor's interest"; but they remain lawful because the United States prefers private campaign contributions to the alternative of public funding. *Id.* at 697. To prevent the criminalization of legitimate campaign contributions, which are protected speech under the First Amendment and both necessary to and unavoidable in our campaign finance system, *McCormick* continues to require an explicit *quid pro quo* before receipt of a campaign contribution can be considered a Hobbs Act violation.

Outside of the Sixth Circuit, the law is the same. The Ninth Circuit, following a similar reasoning as that in *Blandford*, held in *United States v. Carpenter* that *McCormick* requires "that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain." 961 F.2d 824, 827 (9th Cir. 1992). Here, the evidence *was* sufficient to find an explicit *quid pro quo*: State Senator Paul Carpenter made a promise to an FBI agent posing as a contributor to "intervene with his colleagues" to pass a bill "in exchange for a campaign contribution of $20,000." *Id*. at 828. Nevertheless, his conviction was reversed and remanded because the jury instruction failed to require that the government establish an explicit *quid pro quo*. *Id*. at 826. And to clarify this requirement, the court wrote that "the explicitness

24

requirement is satisfied so long as the terms of the quid pro quo are *clear and unambiguous.*" *Id*. at 827 (emphasis added).

The Second Circuit goes a step further. In *United States v. Ganim*, the court affirmed its previous ruling in *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993), distinguishing the *Evans* standard, which applies to *non*-campaign contribution contexts, from the *McCormick* standard. 510 F.3d 134, 143 (2d Cir. 2007). Going further than the *Blandford* "clear and unambiguous" standard, the Second Circuit held that "an *express* promise is necessary when the payments are made in the form of *campaign contributions*." *Id.* at 142 (emphases added).

Applying this precedent, the Southern District of New York, in *United States v. Benjamin*, held that the only standard that would adequately satisfy the *McCormick* rationale was one where "(1) the link between the official act and the payment or benefit—the pro—must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that a specific quid and a specific quo are conditioned upon each other." No. 21-CR-706 (JPO), 2022 WL 17417038, at *12 (S.D.N.Y. Dec. 5, 2022). Where there is a clear *quid* (contributions to a political campaign) and a clear *quo* (sponsoring legislation favorable to the donor), "the *pro* itself must be clear and unambiguous — and characterized by more than temporal proximity, winks and nods, and vague phrases like 'let me see what I can do.'" *Id.* at *10.

The common thread in *Blandford*, *Carpenter*, *Ganim*, and *Benjamin* is that *McCormick* requires an explicit *quid pro quo* in the campaign contributions context to be clear and unambiguous. An ambiguous standard would instead give federal prosecutors near free rein to interpret ordinary political conduct as illicit. Such a regime would undoubtedly chill campaign speech, which is why *McCormick* and subsequent case law below has rejected an ambiguous evidence standard.

**B.     The District Court's Denial of Appellant's Rule 29 Motion Violated This Settled Principle of Law by Permitting a Conviction Based on an Ambiguous Discussion**

The court's decision in *United States v. Sittenfeld*, however, defies *McCormick*. Despite the language in *Blandford*, the court in *Sittenfeld* held that a *quid pro quo* need not be unambiguous to satisfy *McCormick*, requiring only that the facts "could reasonably be interpreted to give rise to a finding of intent to enter an explicit deal." No. 1:20-CR-142, 2023 WL 2964661, at *2 (S.D. Ohio Apr. 17, 2023). In doing so, it cited *United States v. Terry* for the proposition that, "faced with ambiguity, it is the jury's job to construe the language and conduct." *Id.* at *2. But while *Terry* held that the jury was capable of determining intent, the contexts in *Terry* and *Sittenfeld* are different. The facts of *Terry* were unambiguous and met the standard articulated in *Blandford*: a donor asked a judge to deny two motions for summary judgment, who was recorded confirming to the donor that he would do so. *United States v. Terry*, 707 F.3d 607, 614–15 (6th Cir. 2013). There was clear and

unambiguous proof of a *quid pro quo*, and *nowhere* were the words "ambiguous" written in that opinion; in fact, the court found that "[n]o subtle winks and nods were needed." *Id.* at 615. *Terry* simply stood for the proposition that intent, decided by a jury, rather than formality is key to finding an explicit *quid pro quo*. *Id.* at 613. Under *Blandford*, that finding of intent may only be founded on unambiguous evidence, and *Terry* did not overturn that precedent.

Here, Mr. Sittenfeld was asked by a donor to support an initiative which he had already long supported, and even the district court below agreed that the communications between Mr. Sittenfeld and the undercover contributor were ambiguous. *Sittenfeld*, No. 1:20-CR-142, 2023 WL 2964661 at *3. Mr. Sittenfeld received a contribution in expectation of an official action, which as established above is ordinary and innocent, and the only evidence that there was a *quid pro quo* fails to meet the *Blandford* "unambiguous" standard. This is precisely the kind of conduct which *McCormick* sought to prevent from being criminalized. By holding the facts of *Sittenfeld* sufficient to find an explicit *quid pro quo*, the district court goes against Sixth Circuit precedent and the rationale expressed in *McCormick*. The ambiguous standard which the district court applied would impermissibly chill protected speech and cannot square with the settled law of the Sixth Circuit.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the lower

court.

Dated: December 18, 2023                          Respectfully submitted,

                                                  s/ Joshua H. Runyan
                                                  Joshua H. Runyan
                                                  Patrick F. Linehan
                                                  Nicholas P. Silverman
                                                  Jennie A. Askew
                                                  M. Vito Arethusa
                                                  STEPTOE LLP
                                                  1330 Connecticut Avenue, N.W.
                                                  Washington, DC 20036
                                                  Telephone: 202 429 3000
                                                  jrunyan@steptoe.com
                                                  plinehan@steptoe.com
                                                  nsilverman@steptoe.com
                                                  jaskew@steptoe.com
                                                  varethusa@steptoe.com

                                                  *Counsel for Amici*

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(G)(1)

1.      This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,456 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style-style requirements of Fed. R. App. P. 32(a)(6) because it this document has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.


December 18, 2023                  /s/ Joshua H. Runyan
                                           Joshua H. Runyan

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(c)(2)(A), I, Joshua H. Runyan, hereby certify that on December 18, 2023, I caused a true and correct copy of a copy of the foregoing document to be served on all parties of record via the CM/ECF system.

/s/ Joshua H. Runyan
Joshua H. Runyan