# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*,

*v.*

ALEXANDER SITTENFELD, AKA P.G. SITTENFELD

*Defendant-Appellant*,

On Appeal from the United States District Court
for the Southern District of Ohio, No. 1:20-cr-142
Before the Honorable Douglas R. Cole

## BRIEF OF FORMER FEDERAL OFFICIALS
## AS AMICI CURIAE IN SUPPORT OF
## DEFENDANT-APPELLANT P.G. SITTENFELD AND REVERSAL

CHARLES C. SPETH
DONNA M. FARAG
DAVID M. LEVINE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
charles.speth@wilmerhale.com

December 18, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF AMICI CURIAE ..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ...............................................................................5

I.    POLITICAL SPEECH AND CAMPAIGN FUNDRAISING ARE AN INDISPENSABLE PART OF OUR DEMOCRACY ......................................5

II.   A PUBLIC OFFICIAL'S PLEAS FOR SUPPORT AND STATEMENTS TOUTING HIS RECORD AND CONSENSUS BUILDING ARE ROUTINE IN CAMPAIGN POLITICS AND ARE PROTECTED BY THE FIRST AMENDMENT ...............................................................8

III.  POLITICAL STATEMENTS REMAIN PROTECTED BY THE FIRST AMENDMENT EVEN WHEN UTTERED TO SOLICIT CAMPAIGN DONATIONS ...............................................................18

IV.  THE FIRST AMENDMENT REQUIRES COURTS TO ERR ON THE SIDE OF PROTECTING POLITICAL SPEECH ......................................20

CONCLUSION ...............................................................26

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Brown v. Hartlage*, 456 U.S. 45 (1982).................................................................6

*Buckley v. Valeo*, 424 U.S. 1 (1976)..........................................................6, 8, 23

*California Democratic Party v. Lungren*, 860 F. Supp. 718 (N.D. Cal. 1994) ................................................................................................................19

*Citizens United v. FEC*, 558 U.S. 310 (2010).......................................................3

*City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991) .................22

*Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989)......................................................................................5, 19

*FEC v. Cruz*, 596 U.S. 289 (2022)......................................................................23

*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979).........................................................................................6

*In re Ford Motor Company Securities Litigation, Class Action*, 381 F.3d 563 (6th Cir. 2004) ............................................................................13

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) .......................................................18

*McCormick v. United States*, 500 U.S. 257 (1991) ..............................2, 3, 5, 19, 21

*McCutcheon v. FEC*, 572 U.S. 185 (2014).................................................12, 20, 26

*McDonnell v. United States*, 579 U.S. 550 (2016) ...........................13, 14, 22, 24

*New York Times Company v. Sullivan*, 376 U.S. 254 (1964) ...................................8

*Republic Bank & Trust Company v. Bear Stearns & Company*, 683 F.3d 239 (6th Cir. 2012) .........................................................................13

*Skilling v. United States*, 561 U.S. 358 (2010) .......................................................25

*Snyder v. Phelps*, 562 U.S. 443 (2011)................................................................22

*United States v. Benjamin*, 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ....................................................................................20, 21

*United States v. Birdsall*, 233 U.S. 223 (1914)......................................14

*United States v. Carpenter*, 961 F.2d 824 (9th Cir.1992)............................5, 20, 21

*United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011).......................14

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) .................................14

*United States v. Reese*, 92 U.S. 214 (1875) ............................................26

## OTHER AUTHORITIES

Ackley, Kate, *McCarthy's Money at Stake for House GOP in Speaker's Downfall*, Bloomberg Government (Oct. 4, 2023), https://tinyurl.com/ysbv5ny4 ........................................................17

Buchanan, Maggie Jo, *Trump's Politicization of the Justice System*, Center for American Progress (Feb. 20, 2020), https://tinyurl.com/2rznjj44 ..........................................................24

Carney, Jordain, *Inside the House GOP's plan to go after FBI and DOJ*, Politico (July 5, 2023), https://tinyurl.com/2fyusfw7..........................24

Collins, Eliza, et al., *Joe Manchin and Daughter Pitch $100 Million Project to Boost Centrist Policies*, Wall Street J. (Aug. 30, 2023), https://tinyurl.com/yhad445s ............................................19

*Congressional Scorecard*, Planned Parenthood Action Fund, https://tinyurl.com/3unakwvx (visited Dec. 13, 2023)...................9

*Congressional Scorecard and Legislative Leadership List*, U.S. Chamber of Commerce, https://tinyurl.com/3f59ch39 (visited Dec. 13, 2023) ....................................................................9

CNN Interview with Representative Pramila Jayapal (Sept. 20, 2021), http://tinyurl.com/mr278ur4. ........................................................15

@ConorLambPA (Sept. 30, 2021, 7:02 PM), https://tinyurl.com/2uzmw4re.......................................................15

*EMILYs LIST Endorses Vice President Kamala Harris for Reelection*,
EMILYs List (June 23, 2023), https://tinyurl.com/ky6bcmtd .........................9

Evers-Hillstrom, Karl, *Most expensive ever: 2020 election cost
$14.4 billion*, Open Secrets (Feb. 11, 2021),
https://tinyurl.com/49awm93j.......................................................................6, 7

Giorno, Taylor, *Democrats anticipate record-shattering
2024 presidential bid for Joe Biden*, Open Secrets
(Apr. 25, 2023), https://tinyurl.com/j84e4h99...............................................7

Hagstrom, Anders, *Steve Scalise confident in speaker bid as
Republicans deliberate: 'We have the votes to do it'*,
Fox News (Oct. 11, 2023), https://tinyurl.com/4amabcya ............................12

Ikonomova, Violet, *Blue Cross has given more cash to Whitmer than
any Michigan gov candidate in past decade*, Detroit Metro
Times (Aug. 2, 2018), http://tinyurl.com/49w85hnp ...................................10

Jackson, Jon, *Kevin McCarthy Confident Jim Jordan Will Become
Speaker: 'He'll Get There'*, Newsweek (Oct. 13, 2023),
https://tinyurl.com/3wxfuwu9 .....................................................................12

*Joe Biden The former vice president wants to restore the
soul of America*, N.Y. Times (Jan. 4, 2020),
https://tinyurl.com/dfreychh .......................................................................15

Jones, Kipp, *Kevin McCarthy Comes Up Short on 14th Speaker
Vote, Prevails on 15th Ballot* (Jan. 6, 2023),
https://tinyurl.com/bdhahehu........................................................................12

*Landry Receives NRA Endorsement*, Jeff Landry for Governor
(visited Dec. 13, 2023), https://tinyurl.com/5n6uaenu ............................9, 10

*Legislative Scorecard*, AFL-CIO, https://tinyurl.com/3n8m7vd4
(visited Dec. 13, 2023) .................................................................................9

Lemann, Nicholas, *The Controller*, New Yorker (May 4, 2003),
https://tinyurl.com/y8mk8cwc.....................................................................16

Letter from Alexis McGill Johnson, Acting President, Planned
    Parenthood Action fund, to Congressman Anthony Brown
    (Nov. 20, 2019), https://tinyurl.com/4epsy4cc ..............................10

McGrory, Mary, *Signs of Democratic Life*, Wash. Post
    (Nov. 14, 2002), https://tinyurl.com/mryds34m ...........................11

Pace, Julie, *What $40,000 gets you in presidential fundraising*, MPR
    News (June 7, 2012), https://tinyurl.com/msyzd9w5 ....................24

Palmer, Ken, *East Lansing City Council races features eight
    candidates, numerous issues*, Lansing State Journal
    (Nov. 4, 2023), https://tinyurl.com/2jtenhbz ................................13

Press Release, Senator Joe Manchin, *Manchin to Oppose Every EPA
    Nominee* (May 10, 2023), https://tinyurl.com/5bd2j8j7 .................9

Ratliff, Amisa, *The Congressional Fundraising Treadmill:  Six
    Numbers to Know from New Campaign Finance Filings,
    July-September 2022*, Issue One (Oct. 20, 2022),
    https://tinyurl.com/mv36ex4u...................................................7

Roemer, Tim, *Why Do Congressmen Spend Only Half Their
    Time Serving Us?*, Newsweek (July 29, 2015),
    https://tinyurl.com/3am3xmdx ..............................................7, 18

Slattery, Gram & Andy Sullivan, *Republicans speak out against
    US debt-ceiling deal, in sign of rocky road ahead*, Reuters
    (May 29, 2023), https://tinyurl.com/5dwpzddt...........................11

Sonka, Joe, *Where campaign cash is coming from in race for Ky.
    governor—and how it's getting spent*, Louisville Public Media
    (Oct. 31, 2023), https://tinyurl.com/3edtcf7m................................7

*Voting Record*, Senator Elizabeth Warren,
    https://tinyurl.com/mw8edjr5 (visited Dec. 13, 2023) ...................9

Vu, Nancy, *Congress Minutes*, Politico (Oct. 19, 2022, 8:56 AM),
    https://tinyurl.com/mr2a784r.....................................................24

*Women Vote Announces Program To Go On Offense for VP Nominee Kamala Harris*, EMILYs List (Sept. 2, 2020), https://tinyurl.com/2srdpm3c ............................................................. 9

# INTEREST OF AMICI CURIAE[1]

This brief is submitted by the following:

- John Ashcroft, Attorney General (2001-2005), U.S. Senator (1995-2001)

- William P. Barr, Attorney General (2019-2020 & 1991-1993), Deputy Attorney General (1990-1991), Assistant Attorney General, Office of Legal Counsel (1989-1990)

- Gregory B. Craig, Counsel to the President (2009-2010), Assistant to the President and Special Counsel (1998-1999)

- Mark Filip, Deputy Attorney General (2008-2009), Judge of the U.S. District Court for the Northern District of Illinois (2004-2008)

- Emmet T. Flood, Counsel to the President (2018), Special Counsel to the President (2018-2019 & 2007-2008), Deputy Counsel to the President (2008-2009)

- Donald F. McGahn II, Counsel to the President (2017-2018), Chair of the Federal Election Commission (2008), Member of the Federal Election Commission (2008-2013)

- Michael B. Mukasey, Attorney General (2007-2009), Chief Judge of the U.S. District Court for the Southern District of New York (2000-2006), Judge of the Southern District of New York (1988-2006)

Amici are seven former federal officials with unique insight into the types of interactions that occur between government officials and campaign donors as well as members of the public at large. Amici's collective experience includes service as Attorney General of the United States and Counsel to the President. In their

---

[1] All parties consent to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no entity or person other than amici and their counsel contributed money intended to fund the preparation or submission of this brief.

roles as the senior-most lawyers in the Executive Branch, they worked at the

intersection of law and politics and frequently counseled elected officials on their

legal obligations and ethical duties.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Our democracy depends on elections.  So long as campaigns for public

office depend on private funding, "money will constantly be solicited on behalf of

candidates."  *McCormick v. United States*, 500 U.S. 257, 272 (1991) (cleaned up).

Given this enduring reality, the Supreme Court has made clear that federal

prosecutions for bribery based on campaign contributions—as opposed to personal

gifts or cash—can lie only if there is an "explicit" *quid pro quo* between the

official and the contributor.  Officials (including candidates for public office) break

the law "only if the payments are made in return for an explicit promise or

undertaking by the official to perform or not to perform an official act."  *Id.* at 273.

This stringent requirement recognizes that campaign contributions are the

most sensitive area the bribery laws police.  Politicians have no professional need

(or First Amendment right) to accept personal gifts, whereas all but the wealthiest

politicians must raise private funding to pursue elected office.  "[C]ampaigns must

be run and financed," and the officials raising campaign funds must "[s]erv[e]

constituents and support[] legislation that will benefit the district and

individuals … therein."  *Id.* at 272.  Those who contribute to campaigns, too, will

naturally support those politicians whom they believe will support their policy goals.  "'It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors.'"  *Citizens United v. FEC*, 558 U.S. 310, 359 (2010).

Given these bedrock features of our political system, it is inevitable—indeed desirable—that officials' pleas for campaign funding will involve conversations about shared objectives and policy goals.  Such solicitations are commonplace.  And they violate the law only when the public "official asserts that his official conduct will be controlled by the terms of the promise or undertaking."  *McCormick*, 500 U.S. at 273.

By imposing a uniquely demanding "explicitness" requirement in this sensitive sphere, *McCormick* established that when the payment or benefit in a bribery or extortion case is a campaign contribution, the alleged link between the campaign contribution ("the *quid*") and the official act ("the *quo*")—the "*pro*"—cannot rest on statements sounding in everyday politics that are otherwise protected by the First Amendment.  In this context, the link or "*pro*" must be shown by something more than mere implication—there must be an explicit promise or undertaking.  Yet mere implication is *precisely* what the district court upheld here as a sufficient basis for conviction.

P.G. Sittenfeld, a Cincinnati city councilmember, was convicted of bribery and attempted extortion under color of official right after an FBI sting captured him soliciting campaign funds while suggesting that he would support a development project sponsored by his campaign donors. Sittenfeld, who had an established record of supporting projects that revitalize his city, disputes there was any agreement between him and his donors. There were no allegations that Sittenfeld asked for or accepted personal benefits; in fact, he rebuffed offers of lavish vacations made by the undercover FBI agents. *See* R.265, PageID.5992-5993. Nor were there allegations that the donations violated campaign or political finance laws. Rather, Sittenfeld had rejected efforts by undercover agents purporting to be campaign donors to give him unlawful contributions in the form of cash, R.3, PageID.32-33; R.265, PageID.5971-5972, cashier's checks or money orders, R.265, PageID.5974-5975, and non-compliant corporate checks, R.3, PageID.34. Indeed, Sittenfeld explained to his donors the lawful limits of campaign finance laws. *See* R.3, PageID.33.

Boiled down, the government's theory of prosecution linked lawful campaign contributions to Sittenfeld's future, official acts not by an express promise or mutual understanding that the two were conditioned on each other, but by a series of statements by Sittenfeld promoting his record and ability to win over his fellow councilmembers, along with his general pleas for support. These are the

type of statements that politicians routinely make, and they are in the heartland of political speech protected by the First Amendment.

Allowing the government to rely on essential and otherwise protected political speech, as here, would open the door to prosecutions for campaign contributions that are simply in "anticipation of" a future action—contributions that are squarely within the bounds of the law—rather than contributions made in explicit exchange for the *promise* of official action, which are not. *McCormick*, 500 U.S. at 276 (Scalia, J., concurring); *see also United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir.1992) (differentiating between legal "contributions … given or received with the 'anticipation' of official action" and illegal contributions "given or received in exchange for a 'promise' of official action"). This Court should therefore reject these bribery convictions predicated on a *quid pro quo* where the "*pro*" is protected speech that is routine and fundamental to our elections. To hold otherwise would give the government license to rely on lawful campaign contributions to criminalize commonplace election activities.

## ARGUMENT

I. **POLITICAL SPEECH AND CAMPAIGN FUNDRAISING ARE AN INDISPENSABLE PART OF OUR DEMOCRACY**

Political speech sits at the core of the protections enshrined by the First Amendment. "Indeed, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. S.F.*

*Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). This is because an election campaign is not only a path to "attaining political office," but a critical "means of disseminating ideas" to constituents, donors, and the public at large. *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979). Time and again, the Supreme Court has affirmed the importance of candidates "hav[ing] the unfettered opportunity to make their views known" as part of our "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Buckley v. Valeo*, 424 U.S. 1, 14, 52-53 (1976) (per curiam); *see also Brown v. Hartlage*, 456 U.S. 45, 53 (1982) (citing cases). Not only do public officials have the right to freely express their positions, but the public has a right to be informed of those positions. The laws prohibiting bribery and extortion cannot be construed, therefore, in a way that strikes at the heart of fundamental First Amendment interests and protections.

At the same time, fundraising has become an integral aspect of the election campaigns that actualize our democracy, and, for better or worse, it continues to dominate elections. The total cost of the 2020 election was $14.4 billion, more than twice the cost of the 2016 presidential cycle.[2] Indeed, "[n]ine of the 10 most expensive Senate races ever" and "[f]ive of the 10 most expensive House races"

---

[2] Evers-Hillstrom, *Most expensive ever: 2020 election cost $14.4 billion*, Open Secrets (Feb. 11, 2021), https://tinyurl.com/49awm93j.

were in 2020.[3]  "In 2012, House incumbents raised an average of $2,400 per day in the two-year cycle.  Senate incumbents raised an average of more than $4,700 per day over six years."[4]  More recently, "[t]he typical senator up for reelection in 2022 raised $16,200 per day."[5]

Political advisors now project that the President's reelection campaign will raise $2 billion.[6]  And the rapid increase in campaign spending is not limited to national races.  In Kentucky's recent gubernatorial race, for instance, "[s]pending by candidates and political groups … doubled the pace from the state's 2019 general election for the office."[7]  The need to raise sufficient funds to sustain a viable campaign has demanded officials' time and energy even as they simultaneously seek to govern and enact their policy agendas.

Against this backdrop, the government prosecuted P.G. Sittenfeld for bribery and extortion in connection with his efforts to solicit funds for his campaign.  But the government's theory of the case criminalizes relatively common campaign

---

[3] *Id.*

[4] *See* Roemer, *Why Do Congressmen Spend Only Half Their Time Serving Us?*, Newsweek (July 29, 2015), https://tinyurl.com/3am3xmdx.

[5] Ratliff, *The Congressional Fundraising Treadmill:  Six Numbers to Know from New Campaign Finance Filings, July-September 2022*, Issue One (Oct. 20, 2022), https://tinyurl.com/mv36ex4u.

[6] Giorno, *Democrats anticipate record-shattering 2024 presidential bid for Joe Biden,* Open Secrets (Apr. 25, 2023), https://tinyurl.com/j84e4h99.

[7] Sonka, *Where campaign cash is coming from in race for Ky. Governor—and how it's getting spent,* Louisville Public Media (Oct. 31, 2023), https://tinyurl.com/3edtcf7m.

conduct and subjects candidates for public office to an impossible standard that is divorced from the realities of political fundraising and First Amendment protections.

## II.   A PUBLIC OFFICIAL'S PLEAS FOR SUPPORT AND STATEMENTS TOUTING HIS RECORD AND CONSENSUS BUILDING ARE ROUTINE IN CAMPAIGN POLITICS AND ARE PROTECTED BY THE FIRST AMENDMENT

Prosecutions like this one directly compromise the free speech interests that are the bedrock of political campaigns.  The government's case rests on proving a corrupt agreement through a mosaic of statements that primarily fall into three categories:  (1) statements in which Sittenfeld touts his pro-development record; (2) puffery and opinions about Sittenfeld's ability to build consensus and pass initiatives of interest; and (3) pleas for financial support to his campaign.  These statements typify the everyday discourse between politicians and their supporters. They are at the heart of the political debate that is protected by the First Amendment and that must remain "'uninhibited.'"  *Buckley*, 424 U.S. at 14 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

*First*, the government relied on statements of fact in which Sittenfeld touted his pro-development record and policy goals.  For example, the government targeted Sittenfeld's assertion that "[i]n seven years, [he] voted in favor of every single development deal that's ever been put in front of [him]" and his commitment to being "super pro-development and revitalization of especially our

urban core." R.251, PageID.5006-5007. But descriptions of a candidate's policy stance and record on issues of interest are emblematic of crucial political discourse. Public officials routinely publicize how they have voted or intend to vote.[8] Interest groups across the political spectrum score officials for their votes and actions on issues of interest—often with the assistance of the officials themselves—and publish their scorecards.[9] Not only do they rate officials, but interest groups and political action committees also provide financial support to public officials. Such financial support follows public officials who have established "lengthy and proven record[s]"[10] and who have "vocal[ly] advocate[d]" for the policy positions that are central to an interest group's objectives.[11] And those interest groups

---

[8] *See, e.g.*, *Voting Record*, Senator Elizabeth Warren, https://tinyurl.com/mw8edjr5; Press Release, Senator Joe Manchin, *Manchin to Oppose Every EPA Nominee* (May 10, 2023), https://tinyurl.com/5bd2j8j7.

[9] *See, e.g.*, *Congressional Scorecard and Legislative Leadership List*, U.S. Chamber of Commerce, https://tinyurl.com/3f59ch39; *Congressional Scorecard*, Planned Parenthood Action Fund, https://tinyurl.com/3unakwvx; *Legislative Scorecard*, AFL-CIO, https://tinyurl.com/3n8m7vd4.

[10] *Landry Receives NRA Endorsement*, Jeff Landry for Governor, https://tinyurl.com/5n6uaenu.

[11] *EMILYs LIST Endorses Vice President Kamala Harris for Reelection*, EMILYs List (June 23, 2023) (EMILYs List, NARAL Pro-Choice America and Planned Parenthood Action Fund, endorsed Harris for being a "steadfast fighter" for abortion rights), https://tinyurl.com/ky6bcmtd; *see also Women Vote Announces Program To Go On Offense for VP Nominee Kamala Harris*, EMILYs List (Sept. 2, 2020) ("EMILYs List … today announced a seven-figure independent expenditure program to push back against racist and sexist attacks against [then-]Sen. Harris."), https://tinyurl.com/2srdpm3c.

expect that the public officials they support will continue to advance their mutual policy objectives[12] or reject initiatives that are adverse to such objectives.[13]

Public officials' statements about their past record on issues, as well as commitments to continue to advance similar policies, are crucial communications with potential supporters who are deciding if they will back a candidate, whether through endorsements or fundraising. Sittenfeld's statements are illustrative of that everyday reality. Public officials must be able to have unfettered discussions about their records to promote, clarify, or defend their votes and political ideologies.[14]

*Second*, the government relied on Sittenfeld's forward-looking statements reflecting his opinions and aspirational projections about his ability to build consensus and be an effective advocate. Specifically, the government identified Sittenfeld's statements that he "can deliver the votes," R.251, PageID.5011, "'[is]

---

[12] *Landry Receives NRA Endorsement*, *supra* note 10 ("Clearly, if elected the next governor of Louisiana, you will continue to stand against those who seek to diminish our freedoms by ultimately destroying the Second Amendment and our Right to Keep and Bear Arms."); Letter from Alexis McGill Johnson, Acting President, Planned Parenthood Action Fund, to Congressman Anthony Brown (Nov. 20, 2019) ("You have demonstrated strong support for sexual and reproductive health and rights, and we feel confident you will be a dedicated advocate for Planned Parenthood health centers and the people they serve when you are elected to the House in 2020."), https://tinyurl.com/4epsy4cc.

[13] Ikonomova, *Blue Cross has given more cash to Whitmer than any Michigan gov candidate in past decade*, Detroit Metro Times (Aug. 2, 2018), http://tinyurl.com/2h8t3uuj.

[14] *See Landry Receives NRA Endorsement*, *supra* note 10 (Governor-elect Landry stating in response to NRA endorsement: "Our Second Amendment must be protected and as Governor, I look forward to continuing that fight").

ready to shepherd the votes,'" *id.* at PageID.5012, and "'can move more votes than any single other person,'" *id.* at PageID.5010. Again, these are the types of comments public officials make day in and day out. Members of legislative bodies are constantly vowing that they have the votes to accomplish their objectives or that a certain measure will "absolutely pass."[15] And at all levels of elected office, members attempt to distinguish themselves by arguing that they, unlike their political opponents, have the necessary experience to "deliver" on an agenda or to "lead [their colleagues] into a consensus on issues."[16] Such aspirational statements signal to constituents the public official's priorities and those issues on which he or she is willing to spend political capital.

The broader context here is revealing. According to the prosecution, "[Ndukwe]'s project [had been] stalling" "because the mayor was supposedly holding up the project." R.262, PageID.5456-5457. Ndukwe approached Sittenfeld, with whom he had had a preexisting relationship, for help. *Id.* at PageID.5457. Sittenfeld, long supportive of development, touted his ability to advocate and win over his colleagues. Based on this, the court below determined

---

[15] Slattery & Sullivan, *Republicans speak out against US debt-ceiling deal, in sign of rocky road ahead*, Reuters (May 29, 2023) ("'[The debt ceiling deal] will absolutely pass. There's no question about that,' said Republican Representative Dusty Johnson, who said he had talked to dozens of fellow lawmakers."), https://tinyurl.com/5dwpzddt.

[16] McGrory, *Signs of Democratic Life*, Wash. Post (Nov. 14, 2002) (describing Nancy Pelosi as "the velvet hammer" and quoting her as saying, "I have perfect confidence in my ability to do this job…. I know I can lead the Democrats into a consensus"), https://tinyurl.com/mryds34m.

that Sittenfeld's projection that he could "'deliver the votes'" was "the most damning" and that "[n]o subtle winks and nods were needed." R.53, PageID.524 (alteration in original). But this effectively converts any exchange with a donor that discusses potential policy action—even without an explicit promise or undertaking—into an illegal *quid pro quo*. Such an approach ignores that "a central feature of democracy" protected by the First Amendment is that "constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality op.).

There is yet another reason why this Court should be reluctant to construe commonplace statements by officials touting their political abilities—like "deliver the votes"—as the "*pro*" in a *quid pro quo*: such statements are typically the sort of puffery endemic in politics. These comments are meant to project confidence—like a candidate for Speaker of the House asserting that he expects to prevail[17] or a candidate for city council claiming his experience and expertise are

---

[17] *See* Jones, *Kevin McCarthy Comes Up Short on 14th Speaker Vote, Prevails on 15th Ballot* (Jan. 6, 2023) ("Raju asked, 'Mr. McCarthy, do you think you have the votes to be elected Speaker tonight?' 'Yes,' McCarthy responded."), https://tinyurl.com/bdhahehu; Hagstrom, *Steve Scalise confident in speaker bid as Republicans deliberate: 'We have the votes to do it'*, Fox News (Oct. 11, 2023) ("Our momentum has been growing. I feel like we have the votes to do it—and not only do it today, but to go up on the House floor and get 218 votes...."), https://tinyurl.com/4amabcya; Jackson, *Kevin McCarthy Confident Jim Jordan Will Become Speaker: 'He'll Get There'*, Newsweek (Oct. 13, 2023) ("Yeah, but he'll get [to 217 votes]. I don't see a problem with him not getting there[.]"), https://tinyurl.com/3wxfuwu9.

- 12 -

unparalleled[18]—rather than to reflect an actual promise or undertaking of official action.

Outside the political speech context, statements of opinion and puffery are largely not actionable. *See, e.g.*, *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 248 (6th Cir. 2012) (citing Kentucky fraud law for proposition that "[a] mere statement of opinion or prediction may not be the basis of an action. This means that forward-looking opinions about investment prospects or future sales performance ... generally cannot be the basis for a fraud claim." (cleaned up)); *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (opining in securities fraud context that "statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information").

What is more, there were no allegations or evidence of a hierarchical structure that positioned Sittenfeld to actually pressure his colleagues to vote a certain way or to give advice that would necessarily be relied upon. *See McDonnell v. United States*, 579 U.S. 550, 572 (2016).[19] There is no evidence, for

---

[18] Palmer, *East Lansing City Council races features eight candidates, numerous issues*, Lansing State Journal (Nov. 4, 2023) ("It can be fairly said that no other member of the council has my experience in economic development, zoning, urbanism, my depth of knowledge on those."), https://tinyurl.com/2jtenhbz.

[19] In *McDonnell*, a case involving corruption charges against a state's highest executive, the Court explained that an official act can involve exerting pressure on another to perform an

instance, that Sittenfeld was the chair of a committee or subcommittee with the authority or influence to exert pressure on other councilmembers. Nor is there any indication that he was involved in a conspiracy with his fellow city councilmembers. *Cf. United States v. Inzunza*, 638 F.3d 1006, 1010 (9th Cir. 2011) (councilmember told briber that a law could be repealed only with the help of a particular candidate and arranged payment for that candidate, asserting, "We get him in, you support him, we'll get it off."). Although using one's official position to "exert pressure on *another* official to perform an 'official act'" or "provide advice … knowing or intending that such advice will form the basis for an 'official act'" may in certain circumstances constitute an official act under *McDonnell*, 579 U.S. at 572, Sittenfeld's political self-advocacy should be construed in light of his capabilities as a city councilman engaging with his co-equal elected officials. *Cf. United States v. Lee*, 919 F.3d 340, 360 (6th Cir. 2019) (Nalbandian, J., concurring) (questioning whether efforts to influence another public official constitute an official act "regardless of the relationship between the two officials" but recognizing that "the Supreme Court has not recognized a leverage requirement"). Whether a public official is in fact capable of

---

official act or advising another official to take a particular official act. That advising an official may constitute an "official action" was drawn from its earlier opinion in *United States v. Birdsall*, 233 U.S. 223, 234 (1914), which found an "official action on the part of subordinates where their *superiors would necessarily rely largely upon the reports and advice of subordinates* who were more directly acquainted with the facts and circumstances of particular cases," *McDonnell*, 579 U.S. at 572 (emphasis added) (cleaned up).

"deliver[ing] the votes" must inform whether such a statement is a true promise to do so or mere bluster. The latter belies any "explicit" agreement.

At bottom, a public official's assertion that he "can move more votes than any single other person" is part and parcel of political discourse today. An official's political relationships,[20] the clout he has developed, and the ability to move votes or deliver on an agenda[21] are critical to how he promotes himself—that is, whether he is a "'winning endeavor.'"[22] R.251, PageID.5007. Regardless of whether such statements are earnest expressions of political objectives or are self-aggrandizing, courts should tread carefully before endorsing a rule that threatens to convert ordinary political puffery into promises subject to prosecution.

*Third*, the government relies on a number of Sittenfeld's statements urging donors to support him and attempting to dissuade them from supporting his political rivals. The government invoked Sittenfeld's insistence that "[w]e need to stop the developers from supporting both of us," R.251, PageID.5004, and the

---

[20] *See e.g.*, *Joe Biden The former vice president wants to restore the soul of America*, N.Y. Times (Jan. 4, 2020) (Biden campaign speech claims Biden has "met personally every major world leader in the last 40 years."), https://tinyurl.com/dfreychh.

[21] CNN Interview with Rep. Pramila Jayapal (Sept. 20, 2021, 4:25-4:33) ("Regardless of how people feel about the infrastructure bill, we would deliver our votes for the infrastructure bill. We would deliver the entirety of the president's agenda to him for his signature."), http://tinyurl.com/mr278ur4.

[22] *See, e.g.*, @ConorLambPA (Sept. 30, 2021, 7:02 PM) ("Trump promised & never delivered. We can deliver. Vote yes."), https://tinyurl.com/2uzmw4re.

following remarks made to a cooperating witness: "[T]he one thing I will say is, like, you know, I mean, you don't want me … to be like, 'hey [Chin], like love you but can't.' .… I want people to support me … if a candidate doesn't want people to support them, they're a shitty, dumb candidate." R.3, PageID.30. Although these statements do not capture Sittenfeld's political positions or record, they nonetheless embody the types of remarks that public officials make when urging donors to support them.

Although the government makes much of Sittenfeld's suggestion that his donors should not hedge because it was not in "[their] interest," *e.g.*, R.251, PageID.5002, public officials not only have the right to discourage funding of their political opposition, it is natural to do so. After all, successful fundraising is key to both winning an election and wielding political cachet once in office. Former Texas State Senator Robert Duncan recounted a pivotal fundraising point for his campaign, where he met with Karl Rove and then-Governor Bush, who were concerned about his fundraising efforts. Recognizing the urgency of his situation, he went to his next meeting with a group of lobbyists and pleaded, "Are you with me or against me?" He wanted to know, "Would they support me, would they raise the money necessary from their clients?"[23] Leaders from both political

---

[23] Lemann, *The Controller*, New Yorker (May 4, 2003), https://tinyurl.com/y8mk8cwc.

parties have long been perceived as using their fundraising prowess to prop up allies and punish enemies. Former Speaker of the House Kevin McCarthy said Democrats failed to support his speakership "because he could raise the money to oust them in 2024," quoting Democrats who reportedly told him, "Why would we help the person that becomes our executioner?"[24] That Sittenfeld urged donors to invest their resources in him and refrain from empowering his opponents is hardly notable. It is instead another example of commonplace, protected political speech that would be chilled by the rule the government presses here.

Given the stakes associated with campaign fundraising, public officials are bound to make exaggerated or aggressive pleas for support. Even so, inartful statements should not sustain a conviction for bribery or extortion. Indeed, a rule that allows prosecutions to rest on inartful statements not only sweeps up the types of statements that reverberate in fundraising pleas across the country (and that are not elicited as part of a sting operation), but it also supplants the government's requirement to prove an explicit agreement. Ratifying prosecutions that rely on these commonplace statements would not only chill speech, but may perversely target new politicians and donors who lack the polish and experience required to navigate discussions that demand nuance.

---

[24] Ackley, *McCarthy's Money at Stake for House GOP in Speaker's Downfall*, Bloomberg Government (Oct. 4, 2023), https://tinyurl.com/ysbv5ny4.

### III. POLITICAL STATEMENTS REMAIN PROTECTED BY THE FIRST AMENDMENT EVEN WHEN UTTERED TO SOLICIT CAMPAIGN DONATIONS

That Sittenfeld's statements were made while soliciting funds for his campaign does not diminish the free speech interests at stake. To the contrary, it would be anomalous to functionally bar such statements in the fundraising context—a natural result of the government's prosecution—when a public official's statements about his record or policy stances are critical to donors' decisions to contribute funds.

To begin with, every speech, statement, and vote has the potential to be a fundraising opportunity.[25] One member of Congress described the link between legislative work and fundraising, explaining: "As a member rises in seniority to committee chair or ranking member, their fundraising responsibilities multiply significantly. So just as they assume more jurisdiction, clout and a heavier legislative workload, they are simultaneously saddled with spending even more time raising even more money."[26]

More to the point, the First Amendment contemplates and indeed endorses the need for frank discussions between candidates and donors. Generally speaking, "the Constitution protects the right to receive information and ideas." *Kleindienst*

---

[25] Of course, public officials cannot use government time and resources to fundraise, but their government conduct can form the basis of their reelection efforts.

[26] Roemer, *Why Do Congressmen Spend Only Half Their Time Serving Us?*, *supra* note 4.

*v. Mandel*, 408 U.S. 753, 762 (1972). This principle applies with even more force when constituents and donors seek information about a politician's stances and record before exercising their speech rights and donating to campaigns. *See Eu*, 489 U.S. at 223 (striking down ban on primary endorsements because it would "hamstring[] voters seeking to inform themselves about the candidates and the campaign issues"); *California Democratic Party v. Lungren*, 860 F. Supp. 718, 724 (N.D. Cal. 1994) ("[A] ban on partisan endorsements in nonpartisan elections" would "infringe the right to receive information that is guaranteed by the First Amendment" (cleaned up)).

That a donor would demand a candidate go beyond platitudes and express concrete positions is far from conjectural. While some donors may simply want to curry favor with the public officials in power (or with those likely to acquire power in the future), most insist on ensuring that their funds support a candidate whose ideals align with theirs.[27] The Supreme Court acknowledged this reality, underscoring that "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *McCormick*, 500 U.S. at 272.

---

[27] For instance, when Senator Joe Manchin and his daughter developed a project intended to boost centrist policies, "[s]ome donors who have been part of the Manchin conversations or heard about them said they would need more details, including on how the money would be deployed, before deciding whether to get involved." Collins et al., *Joe Manchin and Daughter Pitch $100 Million Project to Boost Centrist Policies*, Wall Street J. (Aug. 30, 2023), https://tinyurl.com/yhad445s.

- 19 -

Sittenfeld's statements convey his views and intention to revitalize the city, making those statements distinct from other statements that have explicitly conditioned a vote on a donation or that had nothing to do with a public official's political positions. *Cf. United States v. Carpenter*, 961 F.2d 824, 828 (9th Cir. 1992) ("Brennan met with Carpenter's aide John Shahabian several times … to discuss AB 3773. Brennan asked 'what it's going to cost' and Shahabian responded with a figure of $20,000."). Where, as here, the statements relied on to prove an explicit agreement consist of political speech that the First Amendment places great value on, a prosecution based on statements that are at-worst ambiguous about the official's intent to enter an illicit agreement must fail.

## IV.    THE FIRST AMENDMENT REQUIRES COURTS TO ERR ON THE SIDE OF PROTECTING POLITICAL SPEECH

In cases like this, where free speech principles are central to the validity of a prosecution, "the First Amendment requires [the Court] to err on the side of protecting political speech rather than suppressing it." *McCutcheon*, 572 U.S. at 209 (plurality op.); *United States v. Benjamin*, 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022), *appeal pending*, No. 22-3091 (2d Cir.) (citing cases). The alternative not only chills speech of public officials, but opens the door to prosecutions and convictions premised on donors contributing funds merely in anticipation of specific government action. Such conduct is far outside the reach of our criminal bribery and extortion laws.

It is well established that the "receipt of [campaign] contributions" can form the basis of a prosecution for bribery or related crimes "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at 273. As Justice Scalia opined, this requirement should not be construed "to cover campaign contributions with anticipation of favorable future action, as opposed to campaign contributions in exchange for an explicit promise of favorable future action." *Id.* at 276 (Scalia, J., concurring). Circuit and district courts across the country have underscored this distinction. *See, e.g.*, *Carpenter*, 961 F.2d at 827; *Benjamin*, 2022 WL 17417038, at *12 ("[T]he link between the official act and the payment or benefit—the *pro*— must be shown by something more than mere implication, and … there must be a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are conditioned upon each other.").

As this case illustrates, the prosecution's reliance on a mosaic of statements otherwise protected by the First Amendment abrogates the distinction between contributions made in exchange for an explicit promise and those made in anticipation of favorable future action. Here, donations made in anticipation of Sittenfeld's pro-development vote formed the basis of a bribery prosecution simply because Sittenfeld discussed his pro-development record in the same conversations as his fundraising requests.

To the court below, "Sittenfeld exceeded the bounds of ordinary political speech" and the jury was entitled to conclude that his statements were made with corrupt intent.  R.283, PageID.7145.  But Sittenfeld's statements are squarely within the bounds of ordinary political speech.  The court's reasoning that "Sittenfeld points to no authority indicating that *his* conduct in *this* case should be protected by the First Amendment," *id.*, is cold comfort to elected officials in the throes of campaign fundraising.  That reasoning also misses the point.  Rather than treating Sittenfeld's speech as presumptively protected, the district court flipped the burden, effectively converting protected speech in the context of campaign solicitations into "winks and nods" for a *quid pro quo*.  This approach not only flouts the Supreme Court's directive that everyday "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Snyder v. Phelps*, 562 U.S. 443, 452 (2011), but it threatens to sweep up a host of statements that would subject public officials to prosecution "for the most prosaic interactions," *McDonnell*, 579 U.S. at 576.

Equally troubling is the prosecution and lower court's failure to account for the context of Sittenfeld's statements.  Sittenfeld's intention to support the development project regardless of the purported bribe may not be a defense to outright bribery, *see City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 378 (1991), but it is relevant to whether there was an explicit *quid pro quo* or merely an

expression of shared objectives.  Sittenfeld's responses to statements intended to elicit agreement to a bribe were recitations of his pro-development record and aspirations, *i.e.*, statements intended to convey that he would represent his donors' interests.  But this prosecution subjects public officials to an untenable choice when they are ideologically aligned with prospective donors who make inarticulate statements in fundraising meetings:  walk away from the offer of needed campaign funds—no matter how strongly the official and donor are aligned and no matter how much the official disclaims a *quid pro quo*—or risk prosecution.  The former contravenes the fundamental principle that "[i]nfluence and access 'embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.'" *FEC v. Cruz*, 596 U.S. 289, 308 (2022).  The latter threatens speech that the Supreme Court has repeatedly affirmed must remain "unfettered" and "robust." *Buckley*, 424 U.S. at 14, 52-53.

Permitting political speech that does not unambiguously embark on a corrupt bargain to be the "*pro*" in a bribery prosecution not only renders the requirement of an explicit "*quid pro quo*" illusory, distorting Supreme Court precedent, but it offers no meaningful constraints on government prosecutions.  Given the ubiquity of fundraising efforts, the government's theory criminalizes ordinary interactions between politicians and donors.  In a world where—as President Bill Clinton

explained—"high-dollar donations bought supporters a 'respectful hearing if they have some concern about the issues,'"[28] the most common political interactions will make the participants vulnerable to prosecution.

Such unrestrained prosecutorial power is particularly problematic as both major political parties (rightly or wrongly) decry the politicization of the Department of Justice.[29]  If an explicit *quid pro quo* can so easily be proved by political statements in the form of routine political speech, there is far greater risk of "'arbitrary and discriminatory enforcement.'"  *McDonnell*, 579 U.S. at 576. Under the prosecution's theory, endorsed by the district court, it is of no matter if a public official were to turn down a bribe or offer of a *quid pro quo* so long as a patchwork of political advocacy can be stitched together to paint an implicit agreement.  *See* R.251, PageID.5005-5006; R.283, PageID.7142.

---

[28] Pace, *What $40,000 gets you in presidential fundraising*, MPR News (June 7, 2012), https://tinyurl.com/msyzd9w5.

[29] *See, e.g.*, Buchanan, *Trump's Politicization of the Justice System*, Center for American Progress (Feb. 20, 2020) (opining that "[t]hroughout his presidency, Trump and his attorneys general have worked to turn the DOJ and the federal judiciary into political puppets"), https://tinyurl.com/2rznjj44; Carney, *Inside the House GOP's plan to go after FBI and DOJ*, Politico (July 5, 2023) ("[T]he House GOP is ready for a confrontation after a spate of recent decisions it sees as either anti-Trump or pro-Biden."), https://tinyurl.com/2fyusfw7; Vu, *Congress Minutes*, Politico (Oct. 19, 2022, 8:56 AM) (citing Morning Consult/POLITICO poll finding that 59% of respondents—including 53% of Democrats, 56% of independents, and 68% of Republicans—"believe outside politics influence the DOJ's decision to prosecute federal crimes"), https://tinyurl.com/mr2a784r.

Permitting prosecutions based on commonplace political statements also suffers from a fundamental due process problem: it deprives public officials of fair notice as to what constitutes illegal behavior when soliciting contributions, magnifying the risk of arbitrary and politicized prosecutions. *See Skilling v. United States*, 561 U.S. 358, 402 (2010). The lower court's endorsement of the prosecution's theory offers public officials little guidance as to how they can exercise their First Amendment rights to both solicit funds and communicate their policy positions without running afoul of the bribery and extortion statutes and risking serious criminal sanctions. In the absence of statements clearly indicating a promise to exchange benefits, the prosecution's reliance on otherwise protected speech leaves public officials subject to arbitrary prosecution. Indeed, the district court implicitly recognized this consequence, noting that "similar conduct [to Sittenfeld's] *could* lead to different outcomes depending on how the jury in a given case" interpreted his statements. R.283, PageID.7146. This leaves public officials practicing their profession without "sufficient definiteness" to understand whether their statements will be construed as part of a lawful discussion about policy priorities and contributions, or as the basis of a corrupt agreement. *Skilling*, 561 U.S. at 402.

A statute must not be interpreted in such a way that it casts a "net large enough to catch all possible offenders" and then "leave[s] it to the courts to step

inside and say who could be rightfully detained, and who should be set at large."
*United States v. Reese*, 92 U.S. 214, 221 (1875).  Requiring the government to prove an explicit *quid pro quo* without resorting to statements that sound in everyday political speech addresses that due process problem, cabins the risk of prosecutorial abuse, and protects the right to robust political speech.

*     *     *     *

Amici "do not doubt the compelling nature of the 'collective' interest in preventing corruption in the electoral process."  *McCutcheon*, 572 U.S. at 206 (plurality op.).  But as the Supreme Court has cautioned, "there are compelling reasons not to define the boundaries of the First Amendment by reference to such a generalized conception of the public good."  *Id.* at 205.  Congress may prohibit campaign activities only "so long as it does not unnecessarily infringe an individual's right to freedom of speech."  *Id.* at 206.  Perceived shortcomings in our elections or campaigns cannot be addressed through prosecutions that criminalize everyday fundraising or campaign activities.

## CONCLUSION

This Court should decline to endorse a rule that permits bribery prosecutions based on campaign contributions where the asserted illegal agreement rests on speech that sounds in ordinary politics.  Such a rule would criminalize large swaths of everyday campaign activities and would circumvent the Supreme Court's

explicit instruction that courts are to err on the side of protecting political speech in this context. This Court should vacate Sittenfeld's conviction.

Respectfully submitted,

/s/ Charles C. Speth

CHARLES C. SPETH
DONNA M. FARAG
DAVID M. LEVINE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
charles.speth@wilmerhale.com

December 18, 2023                    *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed R. App. P. 29(a)(5).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,484 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/  Charles C. Speth
CHARLES C. SPETH

December 18, 2023

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Date Filed | Page ID Range | Description |
|---|---|---|---|
| R.3 | 11/18/2020 | 26-45 | Indictment |
| R.53 | 3/1/2021 | 494-536 | Opinion and Order denying Sittenfeld's Amended Motion to Dismiss |
| R.251 | 8/25/2022 | 4941-5112 | Day 11 Trial Transcript (July 6, 2022) |
| R.262 | 9/30/2022 | 5419-5645 | Day 2 Trial Transcript (June 22, 2022) |
| R.265 | 9/30/2022 | 5928-6183 | Day 5 Trial Transcript (June 27, 2022) |
| R.283 | 4/17/2023 | 7137-7162 | Opinion and Order denying Defendant's Motion for Acquittal and Motion for New Trial |

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Charles C. Speth
CHARLES C. SPETH