**Case No. 23-3840**

IN THE

# United States Court of Appeals

**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA

*Appellee*,

—v.—

ALEXANDER SITTENFELD, a/k/a "P.G." Sittenfeld,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO (WESTERN DIVISION) (COLE, J.)
DISTRICT COURT CASE NO. 1:20-CR-00142

**BRIEF OF *AMICI CURIAE*
FORMER FEDERAL PUBLIC CORRUPTION PROSECUTORS
IN SUPPORT OF DEFENDANT-APPELLANT
AND REVERSAL**

STEVEN GARRETT TEGRAR
BEATRICE A. WALTON
SCOTT J. WOODS
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
sgtegrar@debevoise.com
bawalton@debevoise.com

DAVID A. O'NEIL
JUSTIN M. SHINDO
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES ....................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................1

SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT ................................................................................................4

I.     *McCormick* and Its Progeny Reflect a Complex and Evolving
Area of Law in Which Restraint Is Essential ......................................4

      A.     The Distinction Between Lawful and Unlawful Influence
Is Deeply Rooted in Core Constitutional Values........................5

      B.     Criminalization of Legitimate Political Activity
Undermines the Constitutional Values Underlying
*McCormick*..................................................................................9

II.    Two Highly Anomalous Features of This Case Put It in Conflict
with the Principles *McCormick* Articulated.....................................11

      A.     This Case Lacks the Obvious Signs of Wrongdoing that
Characterize Corrupt Conduct ..................................................12

      B.     The Government Failed to Identify Unambiguously
Corrupt Conduct Even After a Two-Year Undercover
Sting Operation .........................................................................16

III.   *McCormick* Was Intended to Prevent Convictions in Cases Like
This ....................................................................................................19

CONCLUSION...........................................................................................20

CERTIFICATE OF COMPLIANCE..........................................................21

CERTIFICATE OF SERVICE ...................................................................22

APPENDIX.................................................................................................23

i

# TABLE OF AUTHORITIES

**CASES**

*Citizens United v. FEC*, 558 U.S. 310 (2010)..................................................8

*Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014)................10

*Evans v. United States*, 504 U.S. 255 (1992)..........................................13

*FEC v. Cruz*, 596 U.S. 289 (2022)..........................................3, 8

*Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018 (N.D. Ohio 2013).......................7

*McConnell v. FEC*, 540 U.S. 93 (2010).......................................8

*McCormick v. United States*, 500 U.S. 257 (1991) .......................................... *passim*

*McCutcheon v. FEC*, 572 U.S. 185 (2014)........................................ *passim*

*McDonnell v. United States*, 579 U.S. 550 (2016) ...............................................8, 10

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)........................................8

*United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) ...............................................10

*United States v. Beldini*, 443 F. App'x 709 (3d Cir. 2011) ....................................13

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)............................ 12, 13

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994).............................. 9, 12, 13

*United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992)........................................17

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022)................................................13

*United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021) .........................6

*United States v. Farley*, 2 F.3d 645 (6th Cir. 1993) ................................................13

*United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993)...................................... 17, 18

*United States v. Hedgepeth*, 418 F.3d 411 (4th Cir. 2005).......................................12

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) ........................................... 13, 15

*United States v. Loftus*, 992 F.2d 793 (8th Cir. 1993) ...............................................17

*United States v. Moreno*, 44 F. App'x 836 (9th Cir. 2002) .......................................12

*United States v. Pawlowski*, 27 F.4th 897 (3d Cir. 2022)........................... 12, 13, 18

*United States v. Pawlowski*, 351 F. Supp. 3d 840 (E.D. Pa. 2018) ...........................6

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ...............................................9

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) ............................... 6, 9, 15, 18

*United States v. Turner*, 684 F.3d 244 (1st Cir. 2012) ............................................12

**RULES**

Fed. R. App. P. 29 .........................................................................................................2

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are sixteen former federal prosecutors and officials in the Department of Justice with decades of experience supervising and prosecuting some of the country's most significant public corruption cases, including prosecutions of elected officials.  *Amici* have collectively served in every administration for the past twenty years.  They include six former United States Attorneys, including the former United States Attorney for the District in which this case was charged; two former chiefs of the Public Corruption Unit at the U.S. Attorney's Office for the Southern District of New York; the former chief of the Public Integrity Section at the U.S. Attorney's Office for the Eastern District of New York; and former leadership of the Public Integrity Section at Main Justice. *Amici* have led and overseen federal investigations and established policies for prosecuting serious charges of bribery, fraud, extortion, money laundering, campaign finance violations, and violations of anti-corruption laws, among other offenses, working closely with the relevant law enforcement agencies, including the Federal Bureau of Investigation.

*Amici* have a strong interest in the constitutional and policy issues at the center of this case.  Having devoted much of their careers to efforts to root out corruption from public office, they are deeply committed to law enforcement's critically important mission of maintaining integrity in the political process.  But

1

they are also acutely aware of the need to safeguard constitutional values and the public interest when pursuing such cases, including by a careful evaluation of whether a criminal charge would intrude on constitutional values, disrupt legitimate and democratically important activity, and sow doubt in the fair enforcement of public integrity laws. *Amici* accordingly submit this brief in support of the appeal filed by Defendant-Appellant Alexander "P.G." Sittenfeld ("Sittenfeld") to offer their perspective—based on years of public service handling cases in this field—on why this conviction was not consistent with Supreme Court precedent.[1]

## SUMMARY OF ARGUMENT

Campaign-contribution bribery is perhaps the most fraught area of public integrity law. Our system of democratic government—elected of the people, by the people, and for the people—is also *financed* by the people. Since the founding, public officials have run on platforms and made campaign promises not only to obtain votes, but also to obtain money from voters to fund their campaigns. *See McCormick v. United States*, 500 U.S. 257, 272 (1991). Indeed, this is a central

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, the parties have consented to the filing of this *amicus* brief. Also pursuant to Rule 29, undersigned counsel for *amici curiae* certify that: (1) no counsel for a party authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (3) no person or entity—other than *amici curiae,* its members, and its counsel—contributed money intended to fund the preparation or submission of this brief.

2

feature of our political system.  The Supreme Court has accordingly set an appropriately high threshold for prosecutions of bribery, extortion, and related crimes in the political arena, recognizing the important role played by public officials in reflecting and responding to the interests of constituents, as well as in soliciting campaign contributions.  *Id.*  The Court has also recognized the basic "expressive and associational rights" that citizens exercise when providing campaign contributions, a key way that they make known their opinions and interests and help steer the political system in their preferred direction. *McCutcheon v. FEC*, 572 U.S. 185, 204–05 (2014); *see also FEC v. Cruz*, 596 U.S. 289, 303 (2022) (restriction on the ability to loan money to campaign "burden[ed] core speech").

While the courts continue to work out where exactly the line falls between legitimate political fundraising and improper exchanges amounting to campaign-contribution bribery, federal prosecutors can, do, and must tread lightly in this area.  Only the clearest cases involving obvious indicia of criminal wrongdoing warrant the grave step of a felony charge for the payment or solicitation of a campaign contribution to a public official or candidate.

This case has two highly unusual features that render it an extreme outlier among campaign-finance bribery prosecutions.  First, Mr. Sittenfeld's conduct did not involve the typical signs of wrongdoing that prosecutors expect to see when a

3

public official is engaged in a corrupt enterprise.  Indeed, the Government's entire case reduced to the single accusation that Mr. Sittenfeld agreed to advance a project that he had already supported before the investigation began.  Second, the case resulted from a two-year investigation that involved a sting operation specifically *intended* to uncover evidence of misconduct.  The use of undercover agents is an appropriate and important tool of law enforcement.  But it must be used carefully in campaign-contribution cases, and here, even after surreptitiously recording Mr. Sittenfeld and suggesting other kinds of wrongdoing to him, undercover government agents were unable to develop the kind of unambiguous and obvious evidence of corrupt intent that has been the hallmark of similar prosecutions.

The result was a conviction for conduct that was not criminal.  Crossing the standard established in *McCormick* has significant and problematic collateral consequences: chilling essential public servant-constituent interactions, undermining the ability of citizens to financially contribute to campaigns, and eroding faith in the legitimacy of righteous public corruption cases.

## ARGUMENT

**I.**    ***McCormick* and Its Progeny Reflect a Complex and Evolving Area of Law in Which Restraint Is Essential**

The Supreme Court has made clear in *McCormick* and related cases that there is a difference between lawful influence and access by campaign

contributors, on the one hand, and corrupt agreements and exchanges between those contributors and public officials, on the other.  In the context of a political campaign, it is perfectly lawful—indeed beneficial—for public officials and candidates to make certain promises to their constituents and for those constituents, in turn, to contribute funds to help those officials get elected.  The difference lies in *quid pro quo* arrangements.  Important constitutional and democratic values define that difference and set the standard by which to assess it.  However difficult it may be to describe exactly where to draw the line, the criminal process must steer far wide of it in order to avoid penalizing defendants for conduct that, at bottom, amounts to lawful participation in American politics.

### A.    The Distinction Between Lawful and Unlawful Influence Is Deeply Rooted in Core Constitutional Values

In *McCormick*, the defendant state legislator was, like Mr. Sittenfeld, convicted of Hobbs Act extortion.  The Supreme Court reversed, holding that the receipt of campaign contributions violates the Hobbs Act "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *McCormick*, 500 U.S. at 273.

In explaining the logic behind this standard, the Supreme Court reasoned that public officials can be *expected* to solicit campaign donations and that courts cannot lightly assume Congress has criminalized that conduct:

5

> Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right."

*Id.* at 272. To violate the Hobbs Act or other federal corruption laws,[2] a public official's solicitation or receipt of campaign contributions must cross a clear line of impropriety. The reason is simple: A lower standard "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id.*

The Supreme Court therefore marked the critical line between improper and proper campaign contributions at not merely *quid pro quo* arrangements, but "explicit" *quid pro quo* arrangements. *Id.* at 273–74. Where such an "explicit"

---

[2] In addition to the Hobbs Act, courts have applied the "explicit" *quid pro quo* requirement of *McCormick* to prosecutions of campaign-contribution corruption under other statutes. *See, e.g.*, *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (bribery); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849–50 (E.D. Pa. 2018) (honest services fraud); *United States v. Donagher*, 520 F. Supp. 3d 1034, 1043–45 (N.D. Ill. 2021) (federal programs bribery).

6

arrangement exists, and the official "asserts that his official conduct will be controlled by the terms of the promise or undertaking," otherwise-lawful influence and access cross the boundary to bribery. *Id.* at 273.

The Supreme Court rested that standard on both pragmatic considerations and core constitutional values. The reality is "that campaigns must be run and financed [and that] [m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *Id.* at 272. As a result, even closely timed exchanges may not reveal an improper or criminal exchange. *Id.* (cautioning against reliance on "whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor" or "had supported legislation before the time of payment"); *see also Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1035 (N.D. Ohio 2013) (same).

Equally important, campaign contributions play a critical role in our democracy because constituents voice their interests and support their preferred candidates in part through their pocketbook. The fact that public officials are responsive to the views of those constituents, including those making campaign contributions, is therefore hardly unusual. *See McCormick*, 500 U.S. at 272 ("Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator."). Indeed,

7

as the Supreme Court put it in *McCutcheon*, a "central feature of democracy" is the interaction by which "constituents support candidates who share their beliefs and interests, and candidates who are elected . . . respon[d] to those concerns." 572 U.S. at 192; *see also Citizens United v. FEC*, 558 U.S. 310, 359 (2010) ("It is well understood that a substantial and legitimate reason . . . to make a contribution to[] one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors." (quoting *McConnell v. FEC*, 540 U.S. 93, 297 (2010)).[3]

The First Amendment also protects the right of citizens to make campaign contributions.  *See Cruz*, 596 U.S. at 307 ("The First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office." (internal citation and quotations omitted)); *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002) ("[D]ebate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms[.]" (internal

---

[3] As the Supreme Court explained in *McDonnell*, the "basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm." *McDonnell v. United States*, 579 U.S. 550, 575 (2016); *see also id.* (explaining that such interactions can take numerous forms, including "arrang[ing] meetings for constituents" and "contact[ing] other officials on their behalf" and "includ[ing] them in events"); *Citizens United*, 558 U.S. at 360 ("Ingratiation and access . . . are not corruption.").

citation and quotations omitted)).  Providing campaign contributions is "expressive and associational" activity—the exercise of the right to participate in public discussion and policy debate intricately tied up in the First Amendment. *McCutcheon*, 572 U.S. at 204; *see also id.* at 204–05 (referring to campaign contributions as the most "realistic" form of participation in our current political system).  Improper limitations to or chilling of the right of elected officials to state their position on issues that matter to voters, or the right of voters to promote those positions through campaign contributions, intrudes on the core function of the First Amendment.

### B.     Criminalization of Legitimate Political Activity Undermines the Constitutional Values Underlying *McCormick*

While *McCormick* and related Supreme Court cases make clear the values at stake in regulating interactions between public officials and constituents, applying the "explicit" *quid pro quo* standard has proven more difficult in practice.  *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) ("[C]ourts have struggled to pin down the definition of an explicit quid pro quo in various contexts."); *United States v. Blandford*, 33 F.3d 685, 695 (6th Cir. 1994) (noting that how to apply *McCormick* in practice is "not altogether clear"); *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (same).

Virtually all courts nonetheless agree that guarding the *McCormick* line is critical to the functioning of our political system.  *See McCutcheon*, 572 U.S. at

9

209 ("The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights."); *United States v. Abbey*, 560 F.3d 513, 517 (6th Cir. 2009) ("[T]he *quid pro quo* requirement exists to ensure that an otherwise permissible activity is not unfairly criminalized[.]"); *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 731 (7th Cir. 2014) ("To hold illegal [conduct] furthering the interests of some constituents shortly before or after campaign contributions are solicited and received 'would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable[.]'" (quoting *McCormick*, 500 U.S. at 272)).

Courts also agree that prosecutions failing to give sufficient room for legitimate public official-constituent interactions deeply damage normal democratic operations, including by chilling routine and healthy discussion. *See McDonnell*, 579 U.S. at 575 (explaining that the government's decision to prosecute in that case risked casting "a pall of potential prosecution" over relationships between constituents and public officials). With the threat of prosecutions hanging over their heads, officials might, for example, "wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *McDonnell*, 579 U.S. at 575. Qualified and involved citizens whom

10

the country needs as public servants might also decide not to participate in the political process for fear that an overzealous prosecutor will mischaracterize their words and actions, putting their very liberty at risk.

For all these reasons, prosecutions that threaten criminal punishment for lawful solicitation or receipt of campaign contributions threaten grave harm to core constitutional values and the democratic system. Just as courts "err on the side of protecting political speech rather than suppressing it," *see McCutcheon*, 572 U.S. at 209, prosecutors must be cautious not to bring charges when there is serious reason to question whether conduct being investigated might fall on the lawful side of the *McCormick* line.

## II. Two Highly Anomalous Features of This Case Put It in Conflict with the Principles *McCormick* Articulated

Since *McCormick*, political corruption prosecutions have generally respected the threshold set out by the Supreme Court by focusing on cases presenting obvious signs of wrongdoing—that is, conduct falling unambiguously on the unlawful side of the line. This case did not involve such conduct. To the contrary, the case is striking for the confluence of two fundamental features that render it an outlier among campaign-contribution prosecutions and that implicate all of the concerns that *McCormick* was intended to address.

11

A.     **This Case Lacks the Obvious Signs of Wrongdoing that Characterize Corrupt Conduct**

As a practical matter, corrupt officials tend not to limit their wrongdoing to a single discrete offense. Wary of the government's watchful eye, they often attempt to hide illicit proceeds by failing to disclose them, or they trip themselves up by lying to the government in a subsequent investigation. A campaign-contribution bribery act is usually just one in a series of crimes that a corrupt official commits in the course of an investigation. Thus, a typical criminal corruption scheme will involve not merely an isolated Hobbs Act charge but also an array of associated charges for the related conduct—such as money laundering, obstruction of justice, or making false statements.[4]

Despite that reality and the typical pattern of corrupt behavior, in this case the Government did not charge Mr. Sittenfeld with any other criminal acts other than the alleged campaign-contribution bribery. There is no allegation that Mr. Sittenfeld was using the campaign contributions he received—either to his political action committee or to his own campaign fund—improperly or for

---

[4] For examples of campaign contribution prosecutions involving lying to the government, see *United States v. Blagojevich*, 794 F.3d 729, 733–34 (7th Cir. 2015); *Blandford*, 33 F.3d at 704–06; *United States v. Turner*, 684 F.3d 244, 246, 251–52 (1st Cir. 2012); *United States v. Pawlowski*, 27 F.4th 897, 909–10 (3d Cir. 2022); *United States v. Hedgepeth*, 418 F.3d 411, 413–14 (4th Cir. 2005); *United States v. Moreno*, 44 F. App'x 836, 838 (9th Cir. 2002).

personal gain. *Cf. Blagojevich*, 794 F.3d at 733–34 (defendant governor, who had decided not to run for reelection, disguised requests for personal payment as "campaign contributions"). There is no allegation that Mr. Sittenfeld improperly accepted any cash, personal payments, or harder-to-trace kickbacks. *Cf. Evans v. United States*, 504 U.S. 255, 257 (1992); *Blandford*, 33 F.3d at 698 (defendant state legislator accepted cash payments from a lobbyist without "any legitimate claim" to them); *United States v. Correia*, 55 F.4th 12, 21–25 (1st Cir. 2022) (defendant mayor accepted cash payments for licenses to sell marijuana); *United States v. Farley*, 2 F.3d 645, 648–49 (6th Cir. 1993) (defendant sheriff sold deputy sheriff commissions for personal payments); *Pawlowski*, 27 F.4th at 904–05 (defendant mayor, among other acts, accepted a steak dinner and football tickets in exchange for directing a revenue contract toward a contractor); *United States v. Lee*, 919 F.3d 340, 347 (6th Cir. 2019) (defendant city council member accepted cash in exchange for helping get a criminal case dismissed). And there is no allegation that Mr. Sittenfeld failed to properly report any campaign contributions. *Cf. United States v. Beldini*, 443 F. App'x 709, 711–12 (3d Cir. 2011) (official reported a $10,000 cash contribution as several smaller contributions from straw donors).

Indeed, Mr. Sittenfeld's prosecution relates entirely to his support for a development project that he had already supported before the Government's

13

investigation began.  That project aimed to address a dilapidated structure that had for years blighted the Cincinnati downtown district.  Trial Tr. (Day 10), R. 269, Page ID ## 6730–31.  It was exactly the kind of development proposal that Mr. Sittenfeld had repeatedly supported as a local city councilman.  *See* App., ECF No. 23, at 49.

While it is possible in theory to find a *quid pro quo* exchange where an official has previously expressed support or intent to carry out certain actions that are later the subject of an alleged bribe, it is the rare case where the facts will bear out such an exchange.  Charging a case based solely on the continuation of such pre-existing support poses a very high risk of bringing within the criminal process conduct falling on the clearly lawful side of the *McCormick* line, where a public servant simply follows through on public positions for which he is known and has been selected.

In any event, Mr. Sittenfeld's prosecution presents an even more problematic variant of the pre-existing support scenario:  Not only had Mr. Sittenfeld previously expressed broad support for the economic development projects that came his way in general, he had also expressed support for resolving the issue of the blighted 435 Elm Street parcel at root of this case in particular.  In fact, he had been invited to participate in a discussion about 435 Elm Street with an interested stakeholder and the Government's own cooperating witness long before

14

the Government began its sting operation.  App. at 115.  By the time the undercover agents entered the scene, they were pitching Mr. Sittenfeld on a project that he was already behind.

Mr. Sittenfeld's existing support for the project makes this case highly anomalous.  In its papers before the district court and so far in this appeal,[5] the Government cites no cases in which a prior public corruption prosecution has rested *solely* on an official's agreement to take action to advance a project that he already supported.  Rather, the Government's citations are replete with officials going considerably out of their way to take corrupt action.  For example, in a recent case in this Circuit, the defendant local official inserted herself into a criminal prosecution in which she otherwise had no interest, pressuring a prosecutor to drop charges against the briber's relative.  *See Lee*, 919 F.3d at 357.  And in another recent Circuit case, a state judge accepted a bribe in exchange for denying two motions, even though he had not read the motions, and even though they were pending before a magistrate judge.  *See Terry*, 707 F.3d at 610.

---

[5] United States' Response in Opposition to Defendant's Motion for Release Pending Appeal, *United States v. Sittenfeld*, No. 23-3840 (6th Cir. Nov. 1, 2023), ECF No. 16.

## B.     The Government Failed to Identify Unambiguously Corrupt Conduct Even After a Two-Year Undercover Sting Operation

The fact that the Government identified no obvious pattern of wrongdoing is unusual among campaign-finance prosecutions.  But another feature of this case makes that fact all the more striking:  The Government spent two years on a sting operation that was *designed* to identify such a pattern.  The combined result of weak evidence *and* government instigation highlights why this conviction should not stand under *McCormick*.

As a general matter, sting operations can be an important investigative tool and are often an appropriate way to identify wrongdoing.  They must be used cautiously in the specific context of campaign-contribution bribery because they have the potential to complicate the important mental ("*pro*") element in the *McCormick* "*quid pro quo*."  Sting operations sit astride the realms of fact and fiction, blending real-world relationships with choreographed interactions.  The government sets the stage, rehearses its lines, and blocks the movements.  At the same time, there are elements of the story that predate the operation.  As difficult as questions of intent and the existence of a *quid pro quo* agreement are to assess on facts that arise in the real world, they are even more difficult to assess on facts that do not.

Previous successful corruption prosecutions that stem from sting operations have involved unambiguous evidence of corruption.  In *United States v. Carpenter*,

16

961 F.2d 824, 827 (9th Cir. 1992), a large sting operation resulted in an undercover agent specifically asking how much it would cost to get the state legislator to change a state law, to which the defendant responded with a dollar-number figure. In *United States v. Freeman*, 6 F.3d 586, 588 (9th Cir. 1993), a related case involving the prosecution of two legislative staffers, an undercover agent paid the defendants to push through special-interest legislation that would have exclusive benefits for his company. One defendant reportedly "required a contribution of $5,000 to [the] campaign committee," as well as "a $500 cash payment" and a "consultant fee" that could be paid "straight cash under the table." *Id*. at 589. The defendant ultimately received the campaign checks undated to "conceal the timing" and "avoid the appearance of bribery." *Id.*

In some examples, defendants have also acted corruptly before a sting operation has begun. For example, in *United States v. Loftus*, 992 F.2d 793, 795 (8th Cir. 1993), the FBI planned a sting operation after receiving a credible tip that the defendant local official had openly suggested his amenability to a *quid pro quo*. The investigation in turn yielded recordings of Loftus saying he would support the project "if he made some cash" and suggesting that he would not have supported the project without the payoff. *Loftus*, 992 F.2d at 795. The operation culminated in a video recording of Loftus taking a $5,000 bribe. *Id.* Likewise, in *Freeman*, the FBI began investigating after one defendant indicated to an FBI informant "that

special interest legislation could be purchased . . . and that he expected to be paid for his efforts[.]" *Freeman*, 6 F.3d at 588.

In contrast with those precedents, the Government did not allege that it identified a pre-existing or ongoing pattern of corrupt criminal activity. That is true despite the fact that the undercover agents directly tested Mr. Sittenfeld on exactly the type of things that would have indicated obvious wrongdoing, such as solicitation of cash payments or acceptance of free trips. By comparison, the only cases the Government cites *without* such behavior involved misconduct that was unquestionably corrupt on its face. *See, e.g.*, *Terry*, 707 F.3d at 614–15 ("No subtle winks and nods were needed. Russo straight up asked Terry to deny the bank's motions . . . . And he did, within hours of the conversation."); *Pawlowski*, 27 F.4th at 903–08 (upholding convictions on 36 counts for a sprawling corruption conspiracy involving seven donors and a conspiracy to fire an official who refused to cooperate).

Indeed, not only did the undercover agents in this case fail to uncover a pattern of obvious wrongdoing, what they encountered was behavior affirmatively *inconsistent* with the inference that Mr. Sittenfeld was engaged in criminal activity. According to one undercover agent's testimony, Mr. Sittenfeld refused a donation check for breaking a rule that even the undercover agent himself apparently had not realized violated the law. Trial Tr. (Day 5), R. 265, Page ID ## 5976–77. And

18

perhaps most glaring, during the investigation Mr. Sittenfeld invited the undercovers—his alleged criminal co-conspirators—to have dinner at his home with the then-sitting United States Attorney.

## III.     *McCormick* Was Intended to Prevent Convictions in Cases Like This

Even though it resulted from a two-year investigation involving undercover government agents and efforts to identify obvious corruption, this case did not involve the typical wrongdoing that characterizes campaign-finance corruption cases.  To the contrary, Mr. Sittenfeld's conduct was consistent with the kind of legitimate official-constituent interactions that *McCormick* was intended to protect. The risk of criminalizing such conduct is particularly sensitive in this context because juries asked to decide the question of intent often enter the process with a strong distaste for elected officials and the business of politics.  There is a real risk that, without clear indicia of corrupt intent and bad faith, the jury will permit those predispositions to influence its verdict.  That is why *McCormick* requires unambiguous evidence of a corrupt bargain.  Failure to heed that requirement chills lawful activity:  It dissuades qualified people from seeking office, elected officials from stating their positions on issues that voters care about, and constituents from expressing their views by making political donations.  Based on many years of experience considering the interplay between these values and the criminal

19

process, *Amici* submit that the conviction of Mr. Sittenfeld was not consistent with *McCormick*.

## CONCLUSION

For the foregoing reasons, *Amici curiae* join Defendant-Appellant in urging the Court to reverse the district court's decision.

Dated:      December 18, 2023
            Washington, D.C.

                                    Respectfully submitted,

STEVEN GARRETT TEGRAR          DAVID A. O'NEIL
BEATRICE A. WALTON             JUSTIN M. SHINDO
SCOTT J. WOODS                 DEBEVOISE & PLIMPTON LLP
DEBEVOISE & PLIMPTON LLP       801 Pennsylvania Avenue N.W.
66 Hudson Boulevard            Washington, D.C. 20004
New York, New York 10001       (202) 383-8000
(212) 909-6000                 daoneil@debevoise.com
sgtegrar@debevoise.com
beatriceawalton@debevoise.com

                                    *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because this brief contains 5,007 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font size and Times New Roman type style.

Dated:  December 18, 2023

/s/ Steven Garrett Tegrar
STEVEN GARRETT TEGRAR

*Counsel for* Amici Curiae

21

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2023, I electronically filed the foregoing Brief of *Amici Curiae* Former Federal Public Corruption Prosecutors in Support of Defendant-Appellant and Reversal with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:        December 18, 2023

 /s/ Steven Garrett Tegrar
STEVEN GARRETT TEGRAR

*Counsel for* Amici Curiae

## APPENDIX

### List of *Amici Curiae*

**Russell Capone** served as an Assistant U.S. Attorney for the Southern District of New York from 2011 to 2021, including as Chief of the Public Corruption Unit from 2017 to 2020.

**Steven G. Glickman** served as a U.S. Department of Justice Trial Attorney for the Criminal Division and Special Assistant U.S. Attorney for the District of Columbia from 2005 to 2007.

**Mark A. Godsey** served as an Assistant U.S. Attorney for the Southern District of New York from 1995 to 2001.

**Andrew Goldstein** served as an Assistant U.S. Attorney for the Southern District of New York from 2010 to 2017, including as Chief of the Public Corruption Unit.

**Jonathan Kravis** served as an Assistant U.S. Attorney for the District of Columbia from 2010 to 2015, including as Deputy Chief of the Fraud and Public Corruption Section from 2018 to 2020, and as a trial attorney in the Public Integrity Section at the U.S. Department of Justice from 2015 to 2018.

**Jessie K. Liu** served as U.S. Attorney for the District of Columbia from 2017 to 2020.

**William M. McSwain** served as U.S. Attorney for the Eastern District of Pennsylvania from 2018 to 2021.

**Ryan Patrick** served as U.S. Attorney for the Southern District of Texas from 2018 to 2021.

**Nathan Reilly** served as an Assistant U.S. Attorney for the Eastern District of New York from 2011 to 2021, including as Chief of the Public Integrity Section.

**Jeannie S. Rhee** served as Deputy Assistant Attorney General for the Office of Legal Counsel from 2009 to 2011 and as an Assistant U.S. Attorney for the District of Columbia from 2000 to 2006.

**Daniel A. Schwager** served as a trial attorney in the Public Integrity Section at the U.S. Department of Justice from 2003 to 2009.

23

**Michael R. Sherwin** served as Acting U.S. Attorney for the District of Columbia from 2020 until 2021. He served as an Assistant U.S. Attorney for the Southern District of Florida from 2008 to 2020, including as Chief of the Health Care Fraud Section from 2016 to 2019.

**R. Trent Shores** served as U.S. Attorney for the Northern District of Oklahoma from 2017 to 2021.

**Justin Shur** served in the U.S. Department of Justice from 2008 to 2012, including as Deputy Chief of the Public Integrity Section from 2010 to 2012.

**Carter M. Stewart** served as U.S. Attorney for the Southern District of Ohio from 2009 to 2016.

**Douglas S. Zolkind** served as an Assistant U.S. Attorney for the Southern District of New York from 2014 to 2021, including as a senior member of the Public Corruption Unit.