No. 23-3840

_____

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Appellee*,

v.

ALEXANDER SITTENFELD,
a/k/a "P.G." Sittenfeld,
*Defendant-Appellant.*

On Appeal from the United States District Court for the South District
of Ohio (Western Division) (Cole, J.)
District Court Case No. 1:20-cr-142

**BRIEF OF FORMER FEDERAL, STATE, AND LOCAL ELECTED
OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF APPELLANT
P.G. SITTENFELD**

John S. Moran
MCGUIREWOODS
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

*Counsel for Amici Former Federal, State, and Local Elected Officials*

# TABLE OF CONTENTS

INTEREST IN THE CASE ...................................................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ......................................................................................... 4

I.   The Solicitation and Making of Campaign Contributions Are Forms of Political Speech Essential to Our Democracy ............................ 5

II.  Federal Bribery and Extortion Prosecutions for Protected Political Speech Must Satisfy Strict Scrutiny ............................................... 10

   A.   Bribery and extortion statutes, as applied to campaign contributions, must be narrowly tailored ............................ 10

   B.   To avoid chilling political speech, courts must require an unambiguous quid pro quo to sustain a conviction .............. 13

   C.   Other courts have required that the covered speech be unambiguously criminal ....................................................... 17

III. Other Safeguards Prevent Corruption Without Infringing First Amendment Rights ........................................................................ 20

CONCLUSION ...................................................................................... 24

APPENDIX A ....................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
141 S. Ct. 2373 (2021) ...................................................................20

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973)........................................................................15

*Buckley v. Valeo,*
424 U.S. 1 (1976) .........................................................2, 6, 9, 11, 12

*Counterman v. Colorado,*
600 U.S. 66 (2023) .................................................................. 14, 15

*Fed. Elec. Comm'n v. Nat'l Conservative Pol. Action Comm.,*
470 U.S. 480 (1985).......................................................................13

*Fed. Elec. Comm'n v. Wis. Right to Life, Inc.,*
551 U.S. 449 (2007).......................................................... 3, 15, 18, 19

*Jenkins v. Georgia,*
418 U.S. 153 (1974).......................................................................17

*McConnell v. Fed. Elec. Comm'n,*
540 U.S. 93 (2003) .......................................................................18

*McCormick v. United States,*
500 U.S. 257 (1991).......................................................... 4, 8, 10, 12

*McCutcheon v. Fed. Elec. Comm'n,*
572 U.S. 185 (2014)............................................... 5, 6, 13, 14, 15, 17

*People v. Behlin,*
863 N.Y.S.2d 362 (N.Y. Crim. Ct. 2008) .........................................3, 17

*State v. Krijger,*
97 A.3d 946 (Conn. 2014) .............................................................17

*United States v. Barcley*,
452 F.2d 930 (8th Cir. 1971)..............................................................3, 18

*United States v. Hansen*,
599 U.S. 762 (2023)................................................................................15

*United States v. O'Brien*,
391 U.S. 367 (1968)................................................................................11

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015).........................................................................11, 13

**Statutes**

18 U.S.C. § 607 ........................................................................................22

52 U.S.C. § 30104(b)(3)(A)......................................................................21

52 U.S.C. § 30116(a)(1)(A)......................................................................20

52 U.S.C. § 30116(a)(1)(C)......................................................................21

52 U.S.C. § 30116(a)(8)............................................................................21

**Regulation**

11 C.F.R. § 110.6(c)(1) .............................................................................21

**Other Authorities**

Am. Nat'l Elec. Studies, *Guide to Public Opinion and Electoral
Behavior*, https://bit.ly/3upV12R3.........................................................7

Andrew Daniller & Hannah Gilberstadt, *Key Findings About Voter
Engagement in the 2020 Election*, Pew Research Ctr. (Dec. 14, 2020),
https://pewrsr.ch/49LPEvL......................................................................7

Andy Sullivan, *In Washington, Lawmakers' Routines Shaped by
Fundraising*, Reuters (June 12, 2013) ..................................................8

Code of Ethics for Government Service (1958) .....................................24

Comm. on Ethics, House Ethics Manual (2022).........................22, 23, 24

iv

Fed. Elec. Comm'n, *Median Activity of Senate and House Candidates* (Aug. 17, 2022), https://bit.ly/3sL3XzY ..................................................9

Follow The Money, *Contributions to Gubernatorial or Other Statewide Candidates*, https://bit.ly/3G9AXVI ....................................................7

Follow the Money, *Contributions to Local Candidates and Committees*, https://bit.ly/40RR0kx....................................................................7

Follow the Money, *Contributions to State House/Assembly or State Senate Candidates*, https://bit.ly/46mk5pu...........................................7

Laurent Bouton *et al.*, *Small Campaign Donors* (Nat'l Bureau of Econ. Research, Working Paper No. 30,050, 2021) ........................................7

Nat'l Conf. of State Legis., *Contribution Disclosure Requirements* (July 22, 2022), https://bit.ly/3uwE1c0........................................................21

Nat'l Conf. of State Legis., *Public Financing of Campaigns: Overview* (Feb. 6, 2023), https://bit.ly/3sKCnTw ................................................8

Nat'l Conf. of State Legis., *State Limits on Contributions to Candidates 2023-2024 Election Cycle* (May 2023), https://bit.ly/3SXtcdg..............21

Nat'l Democratic Inst., *Constituent Relations Manual* (2008)...............10

Paul Freedman *et al.*, *Campaign Advertising and Democratic Citizenship*, 48 Am. J. Pol. Sci. 723 (2004) ...........................................9

Senate Code of Official Conduct (2021) ..............................................23

## INTEREST IN THE CASE[1]

*Amici curiae* are a bipartisan group of former elected officials. *See* Appendix A. These former officials are familiar with soliciting and accepting lawful campaign contributions while running for public office. *Amici* know well that campaign contributions from private parties play a critical role in funding American campaigns and that the criminalization of campaign solicitations can have a serious chilling effect on protected First Amendment activity. *Amici* thus have a strong interest in the proper application of federal bribery and extortion laws to campaign contributions.

---

[1] Counsel of record for all parties consented in writing to the *amici curiae*'s filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity other than *amici*'s counsel made a monetary contribution that was intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

The soliciting and making of political campaign contributions represent core exercise of the rights to free speech and free association under the First Amendment. The Supreme Court has recognized that our Nation's system of campaign finance—which relies heavily on private contributions, typically from interested parties—is both an inescapable and salutary feature of American politics.

A criminal prosecution like this one must be subject to strict scrutiny. It necessarily turns not just on the fact of a campaign contribution but on the speech attendant to that contribution. Thus, while the prosecution would be infirm even under the "exacting scrutiny" standard of *Buckley v. Valeo,* 424 U.S. 1 (1976), the Court should apply strict scrutiny.

Under this framework, the government cannot prosecute a defendant for the solicitation or making of a campaign contribution unless the evidence ***unambiguously*** establishes a quid pro quo. The district court here held that the evidence was ambiguous but that the jury could decide whether to infer a quid pro quo. That erroneous legal

2

standard creates an intolerable chilling effect on constitutionally protected speech.

This requirement of an unambiguous quid pro quo is consistent with how U.S. courts have approached similar First Amendment issues. In the context of "true threats," for example, courts have held that ambiguous statements cannot support a conviction; the threat must be "clear, unambiguous, and immediate." *People v. Behlin*, 863 N.Y.S.2d 362, 365 (N.Y. Crim. Ct. 2008); *see also United States v. Barcley*, 452 F.2d 930, 933 (8th Cir. 1971). Similarly, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), the plurality opinion by Chief Justice Roberts explained that a radio advertisement could not be considered prohibited electioneering communication under the Bipartisan Campaign Reform Act of 2002 unless the advertisement was "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70. (And the concurring Justices would have gone further to strike down BCRA altogether.) A similarly protective approach is necessary here.

Finally, requiring an unambiguous quid pro quo to send a defendant to prison over a campaign contribution does not leave the

3

government without other tools to combat political corruption. There are other rules and prophylaxis available (and already in place) which help to achieve that laudatory goal. And these other tools only further confirm that the prosecution below and other prosecutions like it do not reflect the least restrictive means to further the government's compelling interest in combatting quid pro quo corruption.

## ARGUMENT

Campaign contributions are an inescapable feature of American politics. For better or for worse, the parties most motivated to make campaign contributions are those who stand to gain from the election of their preferred candidate. The Supreme Court has recognized the potential clash between federal bribery prosecutions based on campaign contributions and the robust First Amendment protection of political speech. It has thus held that, to sustain such a conviction, the prosecution must prove the candidate and donor had an "explicit" quid pro quo. *McCormick v. United States*, 500 U.S. 257, 273 (1991).

In sustaining the conviction of Defendant P.G. Sittenfeld, the district court paid lip service to *McCormick*'s limitation on campaign-contribution bribery prosecutions but effectively supplanted it. At trial,

4

the prosecution's evidence of a quid pro quo was "ambiguous." Order on Motion for Judgment of Acquittal, R. 283, PageId 7142. Still, the district court sustained the conviction because the jury **could have inferred** that "an explicit quid pro quo existed here"—even though "a rational jury could have come out the other way." *Id.* at 7142–43.

The First Amendment does not countenance the chilling effect of leaving the criminality of accepting campaign contributions up to the *post hoc* judgments of juries construing an "ambiguous" record. Campaign contributions are protected political speech, and any law criminalizing such contributions must be narrowly tailored to not infringe on protected speech. This means that, for bribery, the government must show that the quid pro quo is **unambiguous**—in other words, the quid pro quo must be so clear that it cannot be reasonably understood as sounding in ordinary politics. This standard is demanding, and for good reason: anything lower chills political speech essential to our democracy.

## I.    THE SOLICITATION AND MAKING OF CAMPAIGN CONTRIBUTIONS ARE FORMS OF POLITICAL SPEECH ESSENTIAL TO OUR DEMOCRACY

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. Fed. Elec.*

*Comm'n*, 572 U.S. 185, 191 (2014) (plurality). A fundamental way to exercise that right is to contribute to a campaign.

Voters rely on robust "[d]iscussion of public issues and debate on the qualifications of candidates" to identify those most likely to "brin[g] about [the] political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (internal quotation marks omitted). The First Amendment promotes this public debate by guarding a voter's right to express her political views and her right to associate with others that hold those views.

A voter exercises both rights by donating to a campaign. *McCutcheon*, 572 U.S. at 203. Campaign contributions express "support for the candidate and his views"—putting a donor's money where her mouth is. *Id.* (internal quotation marks omitted). Campaign contributions also help disseminate a donor's views and policy preferences, as candidates funded by those contributions share those views more widely and more effectively than the donor could herself. And campaign contributions "affiliate a person with a candidate," signaling to others that the donor agrees with the candidate's policy proposals and that they should too. *Id.* (internal quotation marks omitted).

Tens of millions of Americans donate to local, state, and federal campaigns each year. Roughly 30 million individuals made at least 340 million separate contributions to campaigns between 2005 and 2020. *See* Laurent Bouton *et al.*, *Small Campaign Donors* 5–6, 11 (Nat'l Bureau of Econ. Research, Working Paper No. 30,050, 2021). In about that time, nearly 23 million contributions were made to candidates for state-wide office, *see* Follow The Money, *Contributions to Gubernatorial or Other Statewide Candidates*, https://bit.ly/3G9AXVI, 30 million to candidates for state legislatures, *see* Follow the Money, *Contributions to State House/Assembly or State Senate Candidates*, https://bit.ly/46mk5pu, and at least 1.5 million to candidates for local office, *see* Follow the Money, *Contributions to Local Candidates and Committees*, https://bit.ly/40RR0kx. In 2020 alone, an estimated 25% of voters donated to a campaign. *See* Andrew Daniller & Hannah Gilberstadt, *Key Findings About Voter Engagement in the 2020 Election*, Pew Research Ctr. (Dec. 14, 2020), https://pewrsr.ch/49LPEvL; *see also* Am. Nat'l Elec. Studies, *Guide to Public Opinion and Electoral Behavior*, https://bit.ly/3upV12R3 (estimating that a record-high 18.9% of all Americans donated to a campaign in 2020).

7

Candidates, in turn, depend on these private campaign contributions. "[C]ampaigns must be run and financed." *McCormick*, 500 U.S. at 272. Few states offer public financing for candidates. *See* Nat'l Conf. of State Legis., *Public Financing of Campaigns: Overview* (Feb. 6, 2023), https://bit.ly/3sKCnTw. The limited financing available is often designated for specific positions, like governor, and any candidate accepting public funding must in turn "promise to limit … how much the candidate spends on the election." *Id.* So most candidates turn to private individuals for campaign contributions, spending hours each day headlining rallies, calling potential donors, and attending fundraising dinners. *See* Andy Sullivan, *In Washington, Lawmakers' Routines Shaped by Fundraising*, Reuters (June 12, 2013).

Though fundraising may be a headache for many politicians, this system of private campaign contributions benefits the democratic process. For one, private contributions increase the pool of potential candidates for public office. Campaigns are expensive; the median cost of a campaign for an incumbent member of the Senate, for example, is between about $5 and $11 million, while an incumbent's campaign for the House of Representatives runs about $1.4 million. *See* Fed. Elec.

Comm'n, *Median Activity of Senate and House Candidates* (Aug. 17, 2022), https://bit.ly/3sL3XzY. Even local elections can cost tens of thousands of dollars. Because there are no limits on how much of a candidate's money can be spent on her own campaign, wealthy candidates have a head start that other candidates often cannot overcome. But by crowdsourcing contributions from individual donors, candidates "lacking immense personal or family wealth" can still run a successful campaign. *Buckley*, 424 U.S. at 26.

More importantly, private campaign contributions keep candidates accountable to their electorate. Those voters happy with an incumbent's performance might donate to encourage him to continue his recent activities. Others, discontent with the incumbent's actions, might take their money to a challenger. This competition between candidates draws public attention to races and promotes more vigorous debate on policy issues. *See* Paul Freedman *et al.*, *Campaign Advertising and Democratic Citizenship*, 48 Am. J. Pol. Sci. 723, 734 (2004) (showing that widespread political advertising "can inform and mobilize the citizenry").

Campaign contributions also ensure that politicians remain responsive to requests from their constituents to "solve their problems

and help [them] navigate the complex government bureaucracy." Nat'l Democratic Inst., *Constituent Relations Manual* 5 (2008). Indeed, "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator." *McCormick*, 500 U.S. at 272.

This system is not new; "election campaigns [have been] financed by private contributions or expenditures … from the beginning of the Nation." *Id*. In short, our democratic system is built upon campaign contributions from interested parties.

## II. FEDERAL BRIBERY AND EXTORTION PROSECUTIONS FOR PROTECTED POLITICAL SPEECH MUST SATISFY STRICT SCRUTINY

Because campaign contributions are protected political speech, any limits that discourage this speech must be viewed with strict scrutiny— even criminal statutes prohibiting bribery and extortion.

### A. Bribery and extortion statutes, as applied to campaign contributions, must be narrowly tailored

Statutes criminalizing speech generally must satisfy the demanding standard of strict scrutiny, and so too here. There are limited circumstances, where a statute's purpose is "unrelated to the suppression of free expression," in which the government must make a somewhat

10

lighter showing: that the statute "furthers an important or substantial governmental interest" and that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But where the law restricts expression, it must survive strict scrutiny—that is, the statute must be "narrowly tailored to serve a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 442 (2015). Laws that infringe on an individual's right to associate also must survive exacting scrutiny, meaning that the government must "demonstrate[] a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25.

The federal prohibitions on bribery and extortion must survive strict scrutiny (and, if not, still must survive at least exacting scrutiny). Campaign contributions represent core political speech, not conduct that only incidentally burdens speech. *Id.* at 16–17. By criminalizing the solicitation or making of certain types or amounts of campaign contributions, the government seeks to suppress this speech. The government's interest in criminalizing the act "of giving or spending

11

money" to a candidate arises "because the communication allegedly integral to the conduct itself is thought to be harmful." *Id.* at 17 (internal quotation marks omitted). The government also seeks to limit a person's political association by prohibiting them from making certain campaign contributions to candidates. *See id.* at 22.

*Buckley* applied exacting scrutiny, not strict scrutiny, in assessing federal limits on the ***amount*** of money that an individual could contribute to a particular candidate each year. But the statute at issue prohibited only the act of donating a particular amount of money. *See id.* at 7. In comparison, the federal bribery statute criminalizes a quid pro quo, or a payment "made in return for an ***explicit promise or undertaking*** by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at 273 (emphasis added). To prove this agreement, the government necessarily relies on speech of both the donor and the candidate. This case is illustrative.  In sustaining Sittenfeld's conviction, the district court scrutinized and emphasized the content of statements by Sittenfeld and the donor to explain why the conduct was criminal rather than innocent. *See* Order on Motion for Judgment of Acquittal, R. 283, PageId 7141–42. In other words, criminal liability necessarily turns

12

on the donor and candidate's speech, not just on the campaign contribution itself.

Strict scrutiny is thus the appropriate standard. *See Williams-Yulee*, 575 U.S. at 442–44 (applying strict scrutiny, rather than *Buckley*'s closely-drawn test, to state law banning judicial candidates from personally soliciting campaign funds).

## B. To avoid chilling political speech, courts must require an unambiguous quid pro quo to sustain a conviction

Congress has a recognized compelling interest in preventing "'*quid pro quo*' corruption" that would "control the exercise of an officeholder's official duties." *McCutcheon*, 572 U.S. at 207–08. Because a quid pro quo makes a politician accountable to one person rather than his constituents at large, it "is a subversion of the political process" sufficient to warrant restrictions on a donor and candidate's speech. *Fed. Elec. Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985).

The government does not, however, have a compelling interest in prohibiting political contributions from interested parties. *See McCutcheon*, 572 U.S. at 207–08. Inherent in a campaign contribution is the donor's expectation that, in exchange for her support, the public official will listen to her and potentially help with her problems. A

13

politician may feel "general gratitude … toward those who support him or his allies" and as a result may grant "political access" to those donors. *Id.* at 192. This "[i]ngratiation and access ... [is] not corruption." *Id.* (internal quotation marks omitted). Instead, it "embod[ies] a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id.*

Any prohibition on bribery thus must be narrowly tailored not only to ***target*** quid pro quo corruption but also to ***avoid*** sweeping in the solicitation and making of campaign contributions by interested parties. "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). "A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system," especially where his speech may lead to a jail sentence. *Id.* (citation omitted). Facing this uncertainty, the speaker chooses not to speak. This self-censorship harms the "silenced" speaker and deprives "society" of the speaker's

14

"contributions to the marketplace of ideas." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (internal quotation marks omitted). To avoid such chilling, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *McCutcheon*, 572 U.S. at 209 (quoting *Fed. Elec. Comm'n v. Wis. Right to Life*, 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)). In other words, protected speech must be given "breathing room." *Hansen*, 599 U.S. at 769. This breathing room "comes at a cost," for it necessarily "shield[s] some otherwise proscribable … speech." *Counterman*, 600 U.S. at 75. But "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

In prosecutions for bribery or extortion, the necessary breathing room demands that any quid pro quo be unambiguous. In other words, the government must prove that no reasonable person could see the campaign contribution as anything but an exchange in promise for the performance of a specific official act. Otherwise, politicians will hesitate to accept needed campaign funds and individuals will hesitate to donate for fear that campaign contributions that come close to the line but do

15

not cross it will be punished all the same. Wholly honest candidates will worry that their good intentions could be construed as "ambiguous" and that their fate would then be left to the *post hoc* judgment of a criminal jury. Better to steer clear.

Federal bribery and extortion law does not draw clear rules for candidates to know in advance which statements and expectations might later turn a lawful campaign contribution into criminal bribery. The line between an interested (and legal) campaign contribution made with the hope that a candidate will help the donor and an illegal campaign contribution made in exchange for the performance of an official act can be thin. Few campaign contributions are offered and accepted in a formal process, reviewed by counsel trained to detect whether a contribution has crossed the line. Instead, many campaign contributions are arranged informally, at rallies, dinners, or meetings, offered by donors and accepted by candidates using imprecise language. Given the rough and tumble nature of politics, there is a high risk that legal campaign contributions are misconstrued as illegal quid pro quos.

This risk is amplified where it is the jury that decides whether an ambiguous exchange amounted to an explicit quid pro quo. "Money in

politics may at times seem repugnant to some." *McCutcheon*, 572 U.S. at 191. Jurors, already skeptical of politicians and unversed in the realities of campaign financing, may not understand or give sufficient weight to the constitutional value of interested campaign contributions. That threat alone may be enough to chill campaign contributions, absent clear instructions to the jury that any quid pro quo must be unequivocal. *See Jenkins v. Georgia*, 418 U.S. 153, 160 (1974) (though obscenity turns on "questions of fact," juries do not have "unbridled discretion in determining what is 'patently offensive'") (internal quotation marks omitted).

**C.** **Other courts have required that the covered speech be unambiguously criminal**

Courts have imposed similarly high standards in other First Amendment contexts. In prosecutions of true threats, for instance, courts have demanded that the government prove that no reasonable person could consider the defendant's speech to be protected. That is, the statement must be a "clear, unambiguous, and immediate" threat to harm another. *People v. Behlin*, 863 N.Y.S.2d 362, 365 (N.Y. Crim. Ct. 2008); *accord State v. Krijger*, 97 A.3d 946, 962 (Conn. 2014). If the "communication contains language which is equally susceptible of two

17

interpretations, one threatening, and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity." *United States v. Barcley*, 452 F.2d 930, 933 (8th Cir. 1971).

Several Justices of the Supreme Court arrived at a similar test for a prohibition on a different category of campaign speech. *See Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449 (2007). The Bipartisan Campaign Reform Act of 2002 had "ma[de] it a federal crime for any corporation to broadcast, shortly before an election, any communication that names a federal candidate for elected office and is targeted to the electorate." *Id.* at 455–56. Several years prior, in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), the Court had held that the Act could constitutionally punish both express campaign advocacy and its "functional equivalent" but may run afoul of the First Amendment to the extent it punished issue advocacy. *Id.* at 456–57. A non-profit advocacy organization sought to air radio advertisements criticizing a group of senators for filibustering judicial nominees shortly before a state primary. *Id.* at 458–60. Facing criminal

18

penalties, the organization sought a declaratory judgment that BCRA was unconstitutional as applied to the organization's radio ads.

Chief Justice Roberts, joined by Justice Alito, found that the advertisement at issue was not the functional equivalent of express campaign speech. "[A] court should find that an ad is the functional equivalent of express advocacy," the Chief Justice reasoned, "only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70. Such a high standard was necessary, he explained, to "give the benefit of any doubt to protecting rather than stifling speech." *Id.* at 469. The organization's radio ads did not meet that standard because they could "reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate." *Id.* at 476. These ads were thus not the functional equivalent of express advocacy, and they fell outside the scope of *McConnell*'s constitutional holding. Three other Justices, concurring in the judgment, thought that even that high bar was insufficient to protect political speech and would instead have overruled *McConnell* and held BCRA facially unconstitutional. *Id.* at 492–93, 500 (opinion of Scalia, J., joined by Kennedy and Thomas, JJ.).

19

## III. OTHER SAFEGUARDS PREVENT CORRUPTION WITHOUT INFRINGING FIRST AMENDMENT RIGHTS

Criminal prosecution for bribery or extortion is a blunt instrument, and it is not the only tool available for the government to combat political corruption.

Other safeguards ensure that, even with a heightened test for bribery and extortion that gives due weight to the First Amendment's protections, the government can still identify and prevent corruption. Strict scrutiny demands that a law use "the least restrictive means of achieving a compelling [government] interest." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (internal quotation marks omitted). And "[w]hile exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.*

For one, campaign finance laws target quid pro quo corruption. Donors typically may contribute only a certain amount to a candidate, limiting a donor's influence over a candidate. In federal elections, donors are limited to $2,000 per candidate each year. *See* 52 U.S.C. § 30116(a)(1)(A). Many states set similar limits. *See* Nat'l Conf. of State

20

Legis., *State Limits on Contributions to Candidates 2023-2024 Election Cycle* (May 2023), https://bit.ly/3SXtcdg. Legislatures have implemented measures to avoid circumvention of these limits. For example, individuals may only contribute $5,000 to a political action committee affiliated with a candidate. *See* 52 U.S.C. § 30116(a)(1)(C). And any contributions to a political action committee that are "in any way earmarked" for a particular candidate "shall be treated as contributions" to that candidate. *Id.* § 30116(a)(8).

Disclosure rules also keep donors and electors accountable to the public and regulators. Federal law demands disclosure of all campaign contributions over $200. *Id.* § 30104(b)(3)(A). Some states set similar dollar limits, while other states require that all contributions be disclosed. *See* Nat'l Conf. of State Legis., *Contribution Disclosure Requirements* (July 22, 2022), https://bit.ly/3uwE1c0. And political action committees must disclose any contributions "earmarked" for particular candidates. 11 C.F.R. § 110.6(c)(1).

Ethics rules hold officials to an even higher standard, going far beyond any conduct covered by the bribery and extortion statutes. For example, the Ethics Manual for the House of Representatives prohibits

21

Members from using "official resources," including office supplies and "staff time," to raise campaign funds. Comm. on Ethics, House Ethics Manual 133, 156 (2022). So Members may not solicit contributions from visitors to their offices nor accept any campaign contributions offered by visitors. *See id.* at 154, 158–59. Nor may they host fundraisers in the Capitol or even make fundraising calls in the hallways. *See id.* at 137, 154; *see also* 18 U.S.C. § 607 (making it unlawful "to solicit or receive a donation … in connection with a[n] … election from a person who is located in a room or building occupied in the discharge of official duties by an office or employee of the United States").

These ethics rules help ensure that donors are not misled that their campaign contributions are in exchange for "any official action that [the Member] has taken or is being asked to take." Ethics Manual 156. To that end, the Rules caution Members that though they may ethically "request contributions from those for whom the legislator had done appreciable favors," Members should never present such a contribution "as a payment for the services rendered" and should wait "a decent interval of time" before asking for a contribution "so that neither party will feel that there is a close connection between the two acts." *Id.* And if a donor ever offers

22

a campaign contribution that is "linked"—even indirectly—to an official act, the Member must reject the contribution. *See id.* at 159–60 (if a Member receives a letter requesting help and a campaign contribution in the same envelope, the Member must return the contribution, even if "the letter makes no reference to" it). In short, Members must "avoid *even the appearance*" of a potential quid pro quo. *Id.* at 156 (emphasis added).

The ethics rules go so far as to discourage members from favoring donors over other constituents. *See id.* at 160. "Members and staff are not to take or withhold any official action on the basis of the campaign contributions or support of the involved individuals," and they "are likewise prohibited from threatening punitive action on the basis of such considerations." *Id.* "[A]ll requests for casework assistance are to be handled according to their merits," with no "preferential treatment" given to "requests made by the Member's supporters or contributors." *Id.* (emphasis omitted); *see also* Senate Code of Official Conduct R. 43(3) (2021) ("The decision to provide assistance to petitioners may not be made on the basis of contributions or services, or promises of contributions or services, to the Member's political campaigns or to other organizations in which the Member has a political, personal, or financial

23

interest."); Code of Ethics for Government Service ¶ 5 (1958) ("Any person in Government service should … [n]ever discriminate unfairly by the dispensing of special favors or privileges to anyone, whether for remuneration or not … .").

Any House Member that violates these ethics rules "is subject to disciplinary action by the Standards Committee." Ethics Manual 134. The Committee may "issue letters of reproval" or "make recommendations to the House," which can in turn "punish a Member by censure, reprimand, condemnation, reduction of seniority, fine, or other sanction," or even "expel a Member." *Id.* at 3. Members "in doubt" about a particular contribution may contact the Committee for guidance. *See id.* at ii.

These campaign finance laws and ethics rules are both effective means to prevent *quid pro quos*. So the breathing room necessary to protect legal campaign contributions need not be improperly shrunk for the government to effectively police corruption.

## CONCLUSION

Campaign contributions are core political speech. To give that speech sufficient breathing room under the First Amendment, the

24

government must prove that any quid pro quo is unambiguous to sustain

a criminal conviction.

Dated: December 19, 2023

/s/ John S. Moran
John S. Moran
MCGUIREWOODS
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

## APPENDIX A

### List of Amici Curiae

**Chester G. Atkins**, Member of the United States House of Representatives, Massachusetts, 1985–1993; Member of the Massachusetts Senate, 1972–1984; Member of the Massachusetts House of Representatives, 1970–1971.

**Chris Bortz**, Member of the Cincinnati City Council, 2005–2011.

**Yvette McGee Brown**, Associate Justice of the Ohio Supreme Court, 2011–2012; Judge of the Court of Common Pleas of Franklin County, Ohio, 1993–2002.

**Dick Celeste**, Governor of Ohio, 1983–1991; Lieutenant Governor of Ohio, 1975–1979; Member of the Ohio House of Representatives, 1971–1974.

**Steve Driehaus**, Member of the United States House of Representatives, Ohio, 2009–2011; Member of the Ohio House of Representatives, 2001–2009.

**Lee Fisher**, Lieutenant Governor of Ohio, 2007–2011; Attorney General of Ohio, 1991–1995; Member of the Ohio Senate, 1983–1990; Member of the Ohio House of Representatives, 1981–1982.

**Willis D. Gradison, Jr.**, Member of the United States House of Representatives, Ohio, 1975–1993; Mayor of Cincinnati, 1971; Member of the Cincinnati City Council, 1961–1974.

**Greg Hartmann**, Hamilton County Commissioner, Ohio, 2009–2015.

**Mark Mallory**, Mayor of Cincinnati, 2005–2013; Member of the Ohio Senate, 1999–2005; Member of the Ohio House of Representatives, 1995–1998.

26

**Robert McDonnell**, Governor of Virginia, 2010–2014; Attorney General of Virginia, 2006–2009; Member of the Virginia House of Delegates, 1992–2006.

**Andrew Platt**, Member of Maryland House of Delegates, 2015–2019.

**Zack Space**, Member of the United States House of Representatives, Ohio, 2007–2011.

**Christopher Seelbach**, Member of the Cincinnati City Council, 2011–2022.

**Dwight Tillery**, Mayor of Cincinnati, 1991–1993; Member of the Cincinnati City Council, 1975, 1990–1991, 1993–1998.

28

## CERTIFICATE OF COMPLIANCE

This brief contains 4,884 words and was prepared using 14-point Century Schoolbook, a proportionally spaced font.

*/s/ John S. Moran*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2023, I electronically filed the foregoing document using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ John S. Moran*