No. 23-3840

# In the
# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

# ALEXANDER SITTENFELD

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:20-cr-142 (Cole, J.)

## BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES

For the Appellee:

KENNETH L. PARKER
United States Attorney

MATTHEW C. SINGER
ALEXIS J. ZOUHARY
EMILY N. GLATFELTER
MEGAN GAFFNEY PAINTER
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Statement Regarding Oral Argument ...................................... vi

Statement of Jurisdiction .......................................................... 1

Issues Presented ........................................................................ 2

Statement of the Case................................................................. 3

    A. Factual Background ........................................................ 3

        1. Sittenfeld's Fundraising Strategy ............................... 3

        2. Corruption Investigations ........................................... 4

        3. 435 Elm .......................................................................... 5

        4. Ndukwe's Relationship with Sittenfeld ................... 7

        5. Corrupt Solicitation and Agreement......................... 8

        6. Sittenfeld Receives $20,000 Bribe.......................... 19

        7. Sittenfeld Advances 435 Elm ................................... 21

        8. Sittenfeld Continues to Build Relationship with Corrupt
           Investors ................................................................. 23

    B. Indictment................................................................... 24

    C. Trial Proceedings ...................................................... 25

        1. Government's Case...................................................... 25

2. Defense Case ................................................................ 26

3. Closing Arguments and Verdict ............................................ 27

D. Post-Trial Proceedings ..................................................... 28

1. Motions for Acquittal and New Trial ..................................... 28

2. Motions for Release ...................................................... 29

Summary of the Argument ...................................................... 31

Argument ..................................................................... 34

I. The sufficiency challenge is foreclosed by precedent ................. 34

A. The jury was instructed in accordance with *McCormick*. .... 34

B. The jury rationally found an explicit quid pro quo .............. 37

C. Sittenfeld's contrary arguments ignore the sufficiency standard ................................................................ 42

D. Precluding the jury from deciding Sittenfeld's intent is contrary to controlling law, fundamental principles of criminal law, and common sense ......................................... 50

II. Sittenfeld's constructive amendment claim fails. ................... .58

Conclusion .................................................................... 71

Certificate of Compliance .................................................... 72

Designation of Relevant District Court Documents ............................ 73

Certificate of Service ....................................................... 75

# TABLE OF AUTHORITIES

Cases:

*Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485 (1984) .............. 49

*Brown v. Konteh*, 567 F.3d 191 (6th Cir. 2009) ............................ 37, 46

*Citizens United v. FEC*, 558 U.S. 310 (2010) ...................................... 34

*Evans v. United States*, 504 U.S. 255 (1992) ................................. 35, 41

*Jackson v. Virginia*, 443 U.S. 307 (1979) ........................................... 37

*McCormick v. United States*, 500 U.S. 257 (1991) ........................ passim

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ........................................... 34

*Robinson v. Harry*, 562 F. App'x 440 (6th Cir. 2014) .......................... 64

*Rosemond v. United States*, 572 U.S. 65 (2014) ................................... 56

*Self–Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549 (6th Cir. 2016) ..... 53

*Stirone v. United States*, 361 U.S. 212 (1960) ..................................... 66

*United States v. Agrawal*, 726 F.3d 235 (2d Cir. 2013) ....................... 64

*United States v. Akridge*, 62 F.4th 258 (6th Cir. 2023) ................. 60, 70

*United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) .................. 65, 67

*United States v. Belcher*, 21-1650, ---F.4th---- (6th Cir. Feb. 9, 2024) ..67

*United States v. Benjamin,* 2022 WL 17417038
     (S.D.N.Y. Dec. 5, 2022) ................................................................ 48

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000) ........................... 64

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)...... 48, 52, 53

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994)..............passim

*United States v. Bowens*, 938 F.3d 790 (6th Cir. 2019) ........................ 46

*United States v. Bradley*, 917 F.3d 493 (6th Cir. 2019)............ 62, 63, 64

*United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992) ................... 56

*United States v. Collins,* 799 F.3d 554 (6th Cir. 2015)........................ 54

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022) .................... 48, 53

*United States v. Cusmano*, 659 F.2d 714 (6th Cir. 1981) .................... 66

*United States v. Emmons*, 8 F.4th 454 (6th Cir. 2021)........................ 38

*United States v. Fisher*, No. 21-11879, 2022 WL 4138863
   (11th Cir. Sept. 13, 2022) ........................................................... 70

*United States v. Hunt*, 82 F.4th 129 (2d Cir. 2023)............................. 49

*United States v. Hynes*, 467 F.3d 951 (6th Cir. 2006) ................... 58, 64

*United States v. Inman*, 39 F.4th 357 (6th Cir. 2022) ................... 52, 53

*United States v. Johnson*, 440 F.3d 832 (6th Cir. 2006)...................... 49

*United States v. Jones*, 506 F. App'x 137 (3d Cir. 2012) ..................... 70

*United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021)................ 63, 65

*United States v. Kuehne*, 547 F.3d 667 (6th Cir. 2008) ....................... 58

i

*United States v. Lee*, 359 F.3d 412 (6th Cir. 2004) .............................. 38

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) ......................... 52–53

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018) ........... 48

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) ................... 41

*United States v. Moore*, 129 F.3d 873 (6th Cir. 1997) ......................... 63

*United States v. Olano*, 507 U.S. 725 (1993) ...................................... 67

*United States v. Pawlowski*, 27 F.4th 897 (3d Cir. 2022) .............. 34, 46

*United States v. Porter*, 886 F.3d 562 (6th Cir. 2018) ......................... 41

*United States v. Russell*, 595 F.3d 633 (6th Cir. 2010) ........................ 60

*United States v. Semrau*, 693 F.3d 510 (6th Cir. 2012) ....................... 59

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) ...................passim

*United States v. Wallace*, 51 F.4th 177 (6th Cir. 2022) ....................... 46

Other Authority:

Fed. R. Crim. P. 30 ................................................................. 59

Fed. R. Evid. 401 .................................................................. 70

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record. Oral argument is therefore unnecessary.

## STATEMENT OF JURISDICTION

The United States concurs in Appellant's jurisdictional statement.

## ISSUES PRESENTED

1. Whether, under the governing sufficiency standard, the jury rationally found an explicit quid pro quo.

2. Whether, under the plain-error standard, Sittenfeld has shown a constructive amendment, where the allegations in the indictment mirrored the trial evidence and jury instructions.

## STATEMENT OF THE CASE

### A. *Factual Background*

#### 1. Sittenfeld's Fundraising Strategy

In November 2017, Cincinnati Councilmember Alexander Sittenfeld won re-election and set his sights on higher office—Mayor of Cincinnati. (R.267, tr.,6436.)[1] To support his mayoral run, Sittenfeld and his political consultant, Jared Kamrass, created the Progress and Growth PAC. (*Id.*,6436–38.) To fundraise, Sittenfeld focused on individuals who had business interests before the city. (*Id.*,6441.) Sittenfeld instructed his fundraising staff to keep a list of those who had a city contract or had replied to city requests for proposals ("RFPs") so that he could solicit donations from them. (*Id.*,6442.) Sittenfeld described those on this list as "transactional donors"—"folks who were trying to get something out of the city." (*Id.*,6442–43.)

Sittenfeld's strategy involved conveying to potential donors the consequences of contributing to his opponent, Councilmember Christopher Smitherman. Sittenfeld told Kamrass that he wanted to

---

[1] Record citations reference the PAGEID#. Audio and video exhibits provided to this Court are referenced by exhibit number.

"stop the developers . . . from supporting both of us." (*Id.*,6445; R.312, USA41H,7696.) Sittenfeld kept a list tracking individuals who contributed to both him and Smitherman. (R.267, tr.,6444–45.) His plan was "to make clear to those individuals or entities that he didn't want them to support Mr. Smitherman, as well as supporting him. He wanted them to solely support him." (*Id.*,6447.) Sittenfeld told Kamrass that "he would look more favorably upon those who contributed to him and only him." (*Id.*,6448.)

Sittenfeld said the same to lobbyist Jay Kincaid. Sittenfeld instructed Kincaid that business leaders should "be one hundred percent supportive of his campaign and not support[ ] anyone else, any potential challengers." (R.266, tr.,6369.) Sittenfeld told Kincaid that he planned to threaten another lobbyist "that if he hedges on my campaign, I'm going to hedge on his clients as mayor." (*Id.*)

## 2. Corruption Investigations

During this same time period, the FBI used undercover agents posing as real estate investors to investigate corruption in southern

4

Ohio.[2] Real estate developer Chinedum Ndukwe worked with the agents. (R.266, tr.,6210.)

Ndukwe had evaded campaign finance limits by donating to local politicians in the names of friends and family to advance real estate deals. (*Id.*,6221.) After being approached by the FBI regarding these contributions, Ndukwe provided information about suspected corruption in Cincinnati and began voluntarily working at the FBI's direction. (*Id.*,6220–23.) Ndukwe agreed to use one of his actual real estate projects as a vehicle to further the investigation.

3. <u>435 Elm</u>

Before being approached by the FBI, Ndukwe had been pursuing a development agreement with the city for a downtown property at 435 Elm St. (*Id.*,6227.) The city owned the property, and "it was in fairly severe disrepair." (R.262, tr.,5571.) Ndukwe had raised money to purchase a leasehold mortgage note attached to the property for approximately $1.2 million, a "significant investment" for his company.

---

[2] The investigations led to multiple bribery-related convictions. *See United States v. Pastor, et al.*, 1:20-cr-00136 (S.D. Ohio); *United States v. Dennard*, 1:20-cr-00042, (S.D. Ohio); *United States v. Householder, et al.*, 1:20-cr-00077 (S.D. Ohio).

(R.266, tr.,6228–29,6232.) Although the note gave Ndukwe an interest in the property's air rights and the right to cure default on a lease, he did not have the right to develop the property. (*Id.*,6229; R.262, tr.,5571,5573,5584.) Others were also looking at developing the property. (R.266, tr.,6294.)

To develop the property, Ndukwe needed a development agreement with the city. (*Id.*,6231.) A development agreement is a contract that is typically "reserved for a more complex transaction" and states the incentives the city will provide to the developer and what the developer will provide to the city. (R.262, tr.,5565.) Moving a development agreement through city bureaucracy "can be a fairly lengthy path" (*id.*), requiring presentation to the Economic Development Department, the Law Department, and the City Manager (*id.*,5546). This process requires "a fair bit of negotiation" and "information gathering [] between the staff person and a developer or a business." (*Id.*,5566.) The goal is to determine whether the agreement is "a good decision for the public." (*Id.*,5569.)

If these departments approve the agreement, the mayor may put it on Council's agenda. (*Id.*,5546.) If a majority of the nine-member Council

approves, the development agreement goes to the mayor, who may veto it. (*Id.*,5547.) Six members of Council can override the mayor's veto. (*Id.*)

In 2017 and 2018, Ndukwe's negotiations with the Economic Development Department for a development agreement to advance the 435 Elm project were not progressing. (*Id.*,6232.) Ndukwe suspected that Mayor John Cranley was holding up the project. (*Id.*,6219–20.)

4. Ndukwe's Relationship with Sittenfeld

Ndukwe was a "friendly acquaintance" with Sittenfeld. (*Id.*,6234.) Ndukwe had previously donated to Sittenfeld's campaign and had discussed his 435 Elm project with Sittenfeld. (*Id.*,6235.)

In the summer of 2018, Sittenfeld had multiple discussions with Ndukwe about fundraising for his mayoral campaign. (*Id.*,6241.) Sittenfeld told Ndukwe that he expected "every single developer [ ] to donate at least $10,000." (*Id.*) They also discussed a law change relating to contributions from LLC entities. (*Id.*)

Smitherman, Sittenfeld's mayoral opponent, also sought contributions from Ndukwe. (*Id.*,6245.) When Ndukwe consulted Kincaid about to whom to contribute, the lobbyist warned Ndukwe that Sittenfeld

"doesn't want people hedging" by contributing to both Sittenfeld and Smitherman. (*Id.*,6370.)

On September 21, Sittenfeld called Ndukwe and again solicited $10,000, reiterating that other developers were donating. (*Id.*,6242–43.) Ndukwe's choice was stark: if he supported Smitherman over Sittenfeld, or "hedged" by contributing to both, Ndukwe risked losing Sittenfeld's support for his project. Sittenfeld's $10,000 solicitation made Ndukwe feel a "responsibility to contribute in order to make developments happen . . . ." (*Id.*,6244.)

### 5. Corrupt Solicitation and Agreement

In October 2018, Ndukwe began recording calls with Sittenfeld at the FBI's direction. (R.263, tr.,5674–75.) In the second recorded call, Sittenfeld threatened to withhold support for 435 Elm unless Ndukwe contributed. Days later, Sittenfeld promised to "deliver the votes" in return for $20,000.

**October 26, 2018.** The first recorded call between Ndukwe and Sittenfeld lasted less than five minutes. (USA12A; R.312, USA12B,7546.) This was their first discussion since September 21, when Sittenfeld solicited $10,000. After exchanging pleasantries, Ndukwe informed

Sittenfeld that "435 Elm is starting to heat up," and referenced "Rob and Brian"—two undercover agents posing as investors in the project. Sittenfeld was familiar with the investors but did not have a relationship with them. (R.312, USA12B, 7548.) Ndukwe told Sittenfeld that Rob and Brian had "a ton of different LLCs." (*Id*.) Ndukwe and Sittenfeld discussed arranging an in-person meeting with the investors before a November 2018 local ordinance would limit the LLC contributions a campaign could receive from a single donor. (*Id*.,7548–49; R.267, tr.,6452.)

**October 30, 2018.** Ndukwe recorded another call with Sittenfeld where they discussed Ndukwe's problems advancing 435 Elm and Ndukwe's contributions to Sittenfeld. (USA13A; R.312, USA13B,7550.) Ndukwe told Sittenfeld that Rob could meet with Sittenfeld on November 7. (R.312, USA13B,7551.) The timing presented a "challenge" to Sittenfeld because it was after the "deadline"—when the law would change. (*Id*.)

Referencing his struggles with 435 Elm, Ndukwe complained that "[Mayor] Cranley is trying to fuck me left and [ ] right, because I supported [his opponent]." Sittenfeld responded, "I know a pretty good

amount about it"—a reference to Sittenfeld's knowledge that 435 Elm was stalled in the city. (*Id.*) Returning to Sittenfeld's prior solicitation, Ndukwe explained that Smitherman was also soliciting money from him. As a result, Ndukwe was trying to "keep [his] name off [ ] of shit for the most part." Sittenfeld replied:

> Sittenfeld: Just so, just so you know like, look I have, you know I, I love what you do as someone revitalizing our city creating jobs. I am fond of you as a friend. I also have like you know obligations to do the things I need to do to be a successful candidate so.
>
> Ndukwe: Absolutely.
>
> Sittenfeld: So, but what that means is I don't really get like, if if you say look I don't want to support you in the name of Chinedum Ndukwe, but some guy I've never met from Columbus is going to use a coup, you know, you know you're[sic] network are going to a, round up a bunch of LLC checks. Like that's great. I actually don't care. But I mean the one thing I will say is like, you know I mean, ***you don't want me to like be like "hey Chin like love you but can't"*** you know like, you know, I mean like, you know like. I, I, I want people to support me, that's like…
>
> Ndukwe: Absolutely.
>
> Sittenfeld: …if a candidate doesn't want people to support them, they're a shitty dumb candidate…
>
> Ndukwe: Yeah, right, yeah, right.

> Sittenfeld: …and you know I've been (UI) a lot of people have come through in a really big way that's been awesome so far and I would love, I would love for you to be one of those people too.

(*Id.*,7551–52)

Sittenfeld then highlighted the amounts of money he had received from other developers—ranging between $8,000 and $12,000. (*Id.*,7552.) After agreeing to meet with Rob on November 7, Sittenfeld instructed, "and then you're gonna deliver the goods before [the law change]." (*Id.*,7553.)

Ndukwe understood the "love you but can't" exchange as follows: "if I donated, he was going to support and be supportive in my efforts, and if I didn't, he wasn't going to be supportive." (R.266, tr.,6247.) Based on that solicitation, FBI Special Agent Nathan Holbrook instructed Ndukwe to record a third call and "make a very clear and obvious offer of money in exchange for votes by Mr. Sittenfeld on 435 Elm." (R.263, tr.,5700.) Special Agent Holbrook "wanted it to be clear that Rob, who [was] playing the role of an investor . . . willing to bribe public officials," had made a "bribe offer [that was] not ambiguous." (*Id.*,5709.)

**November 2, 2018.** On the next recorded call, Ndukwe made an express quid pro quo offer of money for votes.

Ndukwe told Sittenfeld that he could not arrange contributions before the LLC law change the following week but that he would "probably be able to get you close to twenty thousand over the next couple." (USA14A; R.312, USA14B,7556.) Ndukwe explained that "these guys that are doing that deal on 435 Elm . . . they don't really fuck around. They're very specific." (*Id.*) He went on:

> for this meeting with Rob next week, I'm pretty sure he can get you ten this week. You know the biggest thing is, you know, if we do the ten, I mean, they're gonna want to know that when it comes time to vote on 435 Elm, like whenever that, I don't know if it's next year, two years, three years, that it's gonna be a yes vote, you know, without, without a doubt.

(*Id.*)

Sittenfeld recognized the offer as an "express quid pro quo." (R.269, tr., 6780, 6784.) He responded to the corrupt offer as follows:

> Sittenfeld: I mean, obv-, as you know, obviously nothing can be illegal like…illegally nothing can be a quid, quid quo pro. And I know that's not what you're saying either. But what I…
>
> Ndukwe: Yeah.
>
> Sittenfeld: …can say is that I'm always super pro-development and revitalization of especially our urban core.

12

(R.312, USA14B,7557.) Sittenfeld continued, "we can discuss that more in person." (*Id*.)

Sittenfeld then emphasized that "in seven years, I have voted in favor of every single development deal that's ever been put in front of me." (*Id*.) Ndukwe and Sittenfeld discussed where and when to meet with Rob—whom Sittenfeld now knew to be a corrupt investor. Sittenfeld signaled that he would agree to give Rob precisely what he wanted: "Look, these, these, these guys want to know, I mean, look people want to invest in a winning endeavor, right? And I want, I want to give them the confidence and the comfort that that's what they're doing." (*Id*.)

**November 7, 2018**. Sittenfeld agreed to the express quid pro quo presented on the November 2 call during an in-person meeting on November 7.

To this point, 435 Elm had gained no traction in the city. (R.266, tr.,6249.) Economic development professionals believed that "Ndukwe had not demonstrated sufficient capacity, finances, or other plans necessary to present a development project to city council." (R.262, tr.,5585.) They determined "that the development agreement pursued by Mr. Ndukwe was not in the public interest." (*Id*.,5591.)

13

And to this point, Sittenfeld had not been involved in advancing the development agreement for 435 Elm. (R.266, tr.,6252.) Nor had he reviewed any documents regarding the agreement. (R.269, tr.,6789.)

Yet, minutes into his lunch with Ndukwe and Rob, Sittenfeld stated that he would support the development agreement before Council. (USA15A; R.312, USA15C,7559.) After introductions, Sittenfeld asked, "What's the latest on 435," and Ndukwe responded by explaining the status and what he wanted from the city, namely, "we wanna get this for a dollar or some long-term lease of some sort for a minimal amount . . . ." (R.312, USA15C,7564.)

Six minutes and twenty seconds later, after Ndukwe outlined general plans for the development—without discussing in any depth the issues economic development professionals consider when determining whether an agreement is in the public interest—Sittenfeld promised to "shepherd the votes" for the agreement. (*Id.*,7567.) In doing so, Sittenfeld promised the same quo referenced expressly on the November 2 call, the same quo Sittenfeld knew Rob wanted in exchange for payment.

Sittenfeld then transitioned to the "political stuff." (*Id.*,7578.) Sittenfeld explained that contributing to him made sense because "you

like making good bets and good investments," and he presented a slide deck with polling indicating that he was likely to be elected the next mayor. (*Id*.) They then discussed the votes needed to ensure that the current mayor could not veto the development agreement, to which Sittenfeld confirmed, "I can move more votes than any single other person[,] [i]ncluding the Mayor . . . ." (*Id*.,7581.) Sittenfeld concluded his pitch by stating, "I just wanted to make [ ]my case"; and Rob responded by offering to "walk across the street" to his condominium "to talk for a second" without Ndukwe. (*Id*.,7582.)

Following lunch, Sittenfeld and Rob walked to a private condo to continue their discussion. The meeting was audio and video recorded. (USA15B.) Upon entering the condo, the conversation began as follows:

Rob:        Yeah so uh you know Chin uh the stuff with Cranley what concerns me…

Sittenfeld: Yeah.

Rob        …obviously like you got Chin kinda sideways with him was obviously he backed…

Sittenfeld: Yeah yeah.

Rob:        …you know the the wrong horse or whatever.

Sittenfeld: Sure.

Rob: So he doesn't want his name on anything.

Sittenfeld: Right.

Rob: And and um and we typically don't either.

Sittenfeld: Right.

Rob: Um you know we usually try to figure out a creative way to to do something.

Sittenfeld: Right, understood.

Rob: ***Um, but at the same time, like we want to help, we want to make sure, we want to really get this thing, Cranley, I would feel comfortable tellin' my guys like hey we're we're in...***

Sittenfeld: Right.

Rob: ***...this deal with Chin if I know we're Cranley-proof.***

Sittenfeld: Yeah.

Rob: ***Um and so with that like Chin told me like hey you know I want to try to get uh P.G. 20,000...***

Sittenfeld: Right.

Rob: ***...and I'm like, hey man I I'm I'm if if if we can get this deal done, like fuckin' let's do it.***

Sittenfeld: Yeah.

Rob: You know and so.

Sittenfeld: Do you guys...

Rob: **What is the best way, what's the best way for us to get that to you, to get that deal?** You know what I mean, like…

Sittenfeld: Yeah yeah yeah. I'm just, do you guys know that he's gonna try and veto it?

Rob: No, we don't know that. I'm just saying like I want it, I just want to be comfortable that…

Sittenfeld: Yeah no I get it I get what you're…

Rob: I mean obviously like I think, I don't think he will. Like we've had a lot of just meetings with him you know. We've we've done some things to kind of massage, we just wanna you know, he's been pretty good like, he he straight up told us, we had a meeting with him in his office and he's like, look, like it'll get, I'm fine with it I just don't want Chin to be the face of it. I just don't want Chin to be the one walking in and we're like cool we're fine with that.

Sittenfeld: **Honestly I can I can deliv-… I can sit here and say I can deliver the votes.**

Rob: Okay okay.

Sittenfeld: I do think if knowing that and I'll, if you don't mind I'll talk to John [Cranley] about it directly um.

(R.312, USA15C,7587–88.) During this exchange, Sittenfeld accepted the express quid pro quo that he was offered during the November 2 call— money for votes supporting the 435 Elm project.

Seconds after the above exchange, Sittenfeld reaffirmed his agreement to deliver the votes: "I can get it done." (*Id.*,7588.) In response, Rob asked Sittenfeld the best way to pay the $20,000 and told Sittenfeld he brought $10,000 cash, to which Sittenfeld asked: "Well whose name can stuff be in?" (*Id.*,7586–89.)

They then discussed the different ways Rob could pay Sittenfeld $20,000 in contributions while keeping Rob's name off any campaign filing, including cash, LLC checks, PAC checks, cashier's checks, and money orders. (*Id.*,7589–92.) Sittenfeld offered his PAC as an option because "no one's like snooping around in who's giving [ ] there" and "frankly a lot of people don't even know that I have it." (*Id.*,7589.) Rob told Sittenfeld that, regardless of whose name the payments were in, "It's gonna be the same $10,000 or $20,000." (*Id.*,7591.)

Ultimately, they agreed that Rob would pay $10,000 in money orders to Sittenfeld's campaign during November and another $10,000 in December. (*Id.*,7591,7595.) When Rob referenced the development agreement, Sittenfeld responded, "we're gonna make it happen." (*Id.*,7595–96.)

6. <u>Sittenfeld Receives $20,000 Bribe</u>

Following the November 7 meeting, Sittenfeld and Rob continued to discuss the best way for Sittenfeld to receive the $20,000.

During a recorded call on November 21, Sittenfeld told Rob that he could not accept money orders because of the cap on the amount of cash a campaign could receive, but that Rob could pay four $5,000 checks to Sittenfeld's PAC. (USA18C; R.312, USA18D,7598.) Sittenfeld explained that if Rob contributed to the PAC, "nothing about it in any way will [ ] ever be connected to me and no one will um, you know, no one is going to be poking around [and] find your names on it." (*Id.*)

Rob and Sittenfeld agreed to meet on November 28 to exchange the PAC checks. During the condo meeting, Sittenfeld immediately asked, "anything new on the uh 435 front [ ]?" (USA20C; R.312, USA20D,7602.) Sittenfeld also reaffirmed, "I'm ready to shepherd the votes as soon as it gets to us at Council," and offered to help if the "Law Department is ever being sluggish drafting up ordinances or anything . . . ." (*Id.*) Rob then gave Sittenfeld two $5,000 checks made out to his PAC, the first half of the $20,000 agreement. (*Id.*,7603.) After receiving the checks, Sittenfeld stated, "this PAC, my name is not, I mean this will, can certainly support

and benefit me but my name is not connected to it in any way." (*Id.*) Sittenfeld continued, "No one will ever know this." (*Id.*)

Sittenfeld called to inform Rob that his PAC could not deposit the checks because they were written from corporations rather than LLCs. PACs cannot accept contributions from corporations under campaign finance law. (R.265, tr., 5977.) They agreed to meet again in December to "get it straightened out." (USA21C; R.312, USA21D,7608–09.)

Sittenfeld, Rob, and Brian met at the same condo on December 17, 2018. (USA21F; R.312, USA21G,7610.) Rob gave Sittenfeld $20,000 for his PAC—two $5,000 LLC checks to replace those from November 28; and two new $5,000 LLC checks—consistent with their November 7 agreement. Sittenfeld responded, "all a big help." (R.312, USA21G,7612.) Transitioning to 435 Elm, Sittenfeld assured that the project was going to happen: "I can always get a vote to my left or a vote to my right." (*Id.*,7613.)

The night he received the checks, Sittenfeld left a voicemail for Ndukwe: "I just wanted to let you know how much I have really enjoyed getting to know Rob and Brian. No uh, no surprise that you attract great dudes and talented investors and partners. But uh, looking forward to [ ]

doing what I can to help get 435 across the finish line." (R.312, USA21K,7616.)

Sittenfeld gave the checks to Kamrass, who deposited them in the PAC account. (R.267, tr.,6455–58.) Sittenfeld told Kamrass that he received the checks from Rob and Brian but that they "had indicated that they did not want their names on any public report." (*Id.*,6459.) The January 2019 Federal Election Commission filing for the PAC did not attribute the checks to Rob and Brian. (*Id.*,6459–61.) Later, after receiving additional PAC checks from Rob, Sittenfeld asked, "where do you guys find these LLCs? Do I want to know?" After Brian responded, "you probably don't," Sittenfeld stated, "as long as it passes muster [with] like a person with a name." (R.312, USA33B,7686.)

7. Sittenfeld Advances 435 Elm

After receiving payment, Sittenfeld began to pursue Rob and Ndukwe's interests in conversations with the mayor. (R.312, USA22E,7618.) Sittenfeld also attempted to dissuade the Director of the Economic Development Department from opening the project up to an RFP, which would allow the city "to see what other developers [were] interested in it" and potentially allow "[an]other person [to] swoop[] in."

(R.312, USA23C, tr.,7623, 7626–27.) Sittenfeld described this process to Rob and Brian as "the worst-case scenario." (*Id.*,7626–27.)

After learning that the Economic Development Department did not want to sell 435 Elm to Ndukwe for a dollar (R.312, USA24B, tr.,7631), Sittenfeld offered to push the proposal directly "through council first," a move Sittenfeld described as "the council route." (R.312, USA25B, tr.,7639; USA26D, tr.,7645.) Ultimately, the Port of Greater Cincinnati Development Authority ("the Port")—a quasi-public economic development agency—offered to purchase 435 Elm from the city. (R.262, tr., 5560, 5577.) Ndukwe supported the transfer, which required a Council vote. (R.266, tr.,6249–50.) Sittenfeld also supported the transfer but only after talking to Ndukwe and Rob to make sure they were in favor of the sale. (R.312, USA26B,7642–43; R.265, tr.,6142).

Ndukwe sought the same development agreement with the Port as from the city. (R.266, tr.,6234.) A development agreement with the Port seeking city action needed Council's approval. (R. 262, tr.,5582–83.)

Sittenfeld continued to advance Rob and Ndukwe's interests. (R.312, USA28B,7649.) This included reaching out to Port President and

CEO Laura Brunner and attempting, as Sittenfeld described it, to "basically like force[] her to move forward." (R.312, USA35D,7695.)

Sittenfeld pressured Brunner to enter an agreement with Ndukwe for "as close to one dollar as possible." (*Id.*,6524.) Brunner found Sittenfeld's communications about 435 Elm "aggressive" and "completely out of context with the rest of [her] communication with him." (R.267, tr.,6526,6557.) Brunner described her conversations with Sittenfeld about 435 Elm as lacking substance. (*Id.*,6539.) Sittenfeld "wanted [her] to enter into an agreement with Mr. Ndukwe, regardless of whether [she] thought it was a good idea or not." (*Id.*,6533.) The Port determined that Ndukwe's development plans "were never satisfactory and complete" and declined to enter a development agreement, despite Sittenfeld's efforts. (*Id.*,6519–23.)

8. <u>Sittenfeld Continues to Build Relationship with Corrupt Investors</u>

Although he praised Rob and Brian as "great dudes and talented investors and partners" to Ndukwe (R.312, USA21K,7616), Sittenfeld privately told Kamrass that Rob and Brian were "sleazy." (R.267, tr., 6471.) Sittenfeld also worried that "the FBI was prioritizing public corruption" and, as a result, in February 2019, he transitioned his

communications with Kamrass to an encrypted app that automatically deleted messages. (*Id.*,6471–72.)

Sittenfeld privately told Kincaid that the investors' conduct was "so over the top" that he questioned whether they were FBI agents. (R.266, tr.,6366.) Kincaid repeatedly advised Sittenfeld not to take any contributions from Rob and Brian. (*Id.*,6367.) Kincaid saw "a huge flashing red stop sign that said there was just something not right going on with these guys." (*Id.*) Sittenfeld nevertheless continued to meet with Rob and Brian, accept their money, and attempt to further their project.

In September 2019, Sittenfeld met with Rob, Brian, and a third undercover named Vinny, accepting two more $5,000 PAC checks while discussing actions he could take through Council to advance a sports book at 435 Elm. (R.312, USA30B,7673–81.) The next month, Sittenfeld received two more $5,000 PAC checks from Rob while discussing action to advance the sports book. (R.312, USA33B,7685–89.)

B. Indictment

A grand jury returned a six-count indictment against Sittenfeld. (R.3, indictment,26.) Counts 1 and 2 charged honest services wire fraud, *see* 18 U.S.C. §§ 1343, 1346; Counts 3 and 5 charged federal funds bribery,

*see* 18 U.S.C. § 666; and Counts 4 and 6 charged attempted extortion, *see* 18 U.S.C. § 1951.

## C. Trial Proceedings

Trial lasted eleven days. The jury heard testimony from fourteen witnesses and received over 160 admitted exhibits, including hours of recorded calls and meetings.

### 1. Government's Case

The government called ten witnesses. Former Councilmember Kevin Flynn testified about city development agreements, and former Director of Economic Development Phil Denning described his negative assessment of Ndukwe's proposal. Special Agent Nathan Holbrook introduced hours of recorded communications, and undercover Special Agents Rob Miller, Brian Bennett, and Vinny[3] testified about their roles in the investigation. Kincaid and Kamrass relayed their conversations with Sittenfeld. Ndukwe described 435 Elm and his interactions with Sittenfeld. Finally, Port President and CEO Laura Brunner explained the Port's negative assessment of Ndkuwe's proposal and recounted

---

[3] The undercover agents testified under their undercover names.

Sittenfeld's aggressive attempts to persuade her to enter into an agreement with Ndukwe.

2. <u>Defense Case</u>

Sittenfeld called four witnesses. City Manager John Curp and former Deputy Solicitor Luke Blocher testified about city development agreements, and former Councilmember Chris Seelbach testified about the role money plays in campaigns.

Sittenfeld testified in his own defense, offering his interpretation of the recordings admitted into evidence. Regarding the October 30 call, Sittenfeld testified that his "love you but can't" comment meant that he could only help Ndukwe with 435 Elm if he became the next mayor. (*Id.*,6745–46.) Regarding the November 2 call, Sittenfeld admitted that he recognized Ndukwe's offer as an express quid pro quo—money for "yes votes" on 435 Elm—but insisted that he believed Ndukwe was misrepresenting Rob's intent. (*Id.*,6747–49)

Regarding the November 7 meeting, Sittenfeld testified that he understood Rob's offer of $20,000 to make 435 Elm "Cranley proof" to mean "a veto-proof number of votes for 435" (*Id.*,6804); and that he understood Rob's offer of $20,000 to "get that deal" to mean "the

26

development proposal" for 435 Elm (*id.*,6751–52). Despite this, Sittenfeld testified that he did not understand the $20,000 and the votes "to be conflated." (*Id.*,6707–08)

Sittenfeld concluded: "I did never, and I would never, under any circumstance, sell my vote or trade my vote for a campaign donation." (*Id.*,6761,6784.)

3. <u>Closing Arguments and Verdict</u>

In closing, the government explained that the charges turned on the jury's assessment of what Sittenfeld knew and intended. (R.251, tr., 4997,5037.) The government argued that Sittenfeld committed bribery when he entered an explicit quid pro quo of $20,000 for votes on 435 Elm. (*Id.*,5000,5010–12,5034–37.)

The defense highlighted the importance of fundraising in political campaigns, citing a separate "campaign contributions" jury instruction. (*Id.*,5040–42, 5067.) The defense also focused on Sittenfeld's intent, telling the jury: "Everything in this case comes down to intent. Everything comes down to what P.G. intended. . . . And it comes down to whether or not he intended to be corrupt." (*Id.*,5040.) The defense continued this drumbeat throughout closing. (*Id.*,5066,5069.) Consistent

with Sittenfeld's testimony, the defense argued: "He did not intend to accept any bribes. He would never have sold his vote for anything." (*Id.*, 5047.)

The jury disagreed and found Sittenfeld guilty of Counts 3 and 4. The district court sentenced Sittenfeld to concurrent 16-month sentences of imprisonment.

## D. Post-Trial Proceedings

### 1. Motions for Acquittal and New Trial

Sittenfeld moved for acquittal, arguing the evidence was insufficient to prove an explicit quid pro quo. Sittenfeld contended that so long as a politician's statements and conduct are "susceptible to an innocuous explanation," they cannot provide the basis for criminal liability. (R.270, motion,6875–90.) The district court disagreed. "To start, Sittenfeld use[d] the wrong standard." (R.283, order,7141.) The question was not whether a "plausible alternative explanation" existed but whether a rational jury could have found "that the evidence presented by the government showed Sittenfeld's guilt beyond a reasonable doubt." (*Id.*) Relying on this Court's precedent, the district court held that it was the jury's task to "decid[e] the intent with which words are spoken or

actions taken" and "the reasonable construction given to them." (*Id.*,7140) Citing the "hours of recordings and testimony," the court held that "a rational jury could have found that an explicit quid pro quo existed." (*Id.*,7140–43.)

Sittenfeld also filed a Rule 33 motion in which he argued that the government unconstitutionally deviated from the indictment by charging him with soliciting a bribe from Rob but arguing in closing that the statement to Ndukwe—"You don't want me to be like love you, but can't"—amounted to corrupt solicitation. (R.271, motion,6902.) The district court found that this argument "fail[ed] both on the law and the facts." (R.283, order,7151.)

2. <u>Motions for Release</u>

Sittenfeld moved the district court for release pending appeal, raising these same arguments. The court denied the motion at the sentencing hearing, relying on the reasons in its order denying post-trial relief. (R.302, tr.,7505–07.)

Sittenfeld then moved this Court for release, renewing the same arguments. This Court found that neither raised a substantial question of law or fact, reasoning that Sittenfeld's sufficiency challenge

"misunderst[ood] the judicial role" and the constructive amendment challenge—even if successful—would only impact Count 3. (Doc.21,4.)

This appeal followed.

## SUMMARY OF THE ARGUMENT

The jury convicted Sittenfeld of federal funds bribery and attempted extortion. Consistent with *McCormick v. United States*, 500 U.S. 257 (1991), the instructions required the jury to find that Sittenfeld entered an explicit quid pro quo: that he agreed to exchange specific action for campaign contributions. After considering the evidence, including Sittenfeld's recorded statements and his trial testimony, the jury found that he did. Sittenfeld argues on appeal, as he did below, that the jury verdict should be overturned because he presented an innocent explanation for his conduct. In other words, Sittenfeld asks this Court to do what the sufficiency standard forbids: reweigh evidence, reevaluate credibility, and redraw inferences—all in *the defendant's* favor. But there is not a public-corruption exception for sufficiency challenges. This Court applies the same standard it applies in all criminal cases. And under that well-established standard, Sittenfeld's sufficiency challenge fails.

Sittenfeld never mentions the deferential standard of review this Court applies to jury verdicts. Instead, he seeks to skirt the standard by removing intent—the most quintessential of juror questions—from the purview of the jury. Sittenfeld argues that evidence of an explicit quid

pro quo is legally insufficient if the defendant's conduct can arguably be explained as ordinary politics. But that turns the sufficiency standard on its head. When deciding a sufficiency challenge, this Court does not consider whether an alternative explanation for the evidence exists or whether the jury reasonably could have acquitted, but whether the jury's actual determination was a rational result. As the district court concluded, it was.

Sittenfeld further distracts from the proper sufficiency inquiry by fixating on the explicit quid pro quo standard that applies when a campaign donation is alleged to be a bribe. But this is the exact standard the jury applied in convicting him. Applying the court's instructions— which came straight from *McCormick* and which Sittenfeld does not challenge—the jury assessed Sittenfeld's words, conduct, and all the surrounding circumstances and found that the government proved an explicit quid pro quo. That "twelve average jurors" rejected Sittenfeld's explanation does not mean that jurors cannot be trusted to decide matters of intent in bribery cases. Sittenfeld's sufficiency claim cannot succeed under this Court's precedent, and the Court should reject it.

Sittenfeld's constructive amendment claim—which he did not raise at trial—also fails. He argues the government constructively amended Counts 3 and 4 by urging the jury to convict based on his corrupt solicitation of Ndukwe during the October 30 call, rather than his corrupt solicitation of Rob. But the allegations in the indictment, the evidence at trial, and the jury instructions all aligned. The indictment alleged that Sittenfeld's corrupt solicitation of Ndukwe during the October 30 call led directly to Sittenfeld's receipt of PAC payments from Rob, and that is the exact same evidence the jury heard at trial. The indictment placed Sittenfeld on notice that his corrupt solicitation of Ndukwe was part of his offense in Count 3, and the evidence and jury instructions tracked the indictment. As to Count 4, the instructions made clear that solicitation did not suffice for this charge, so the jury could not have convicted Sittenfeld of attempted extortion for the corrupt solicitation of Ndukwe alone.

# ARGUMENT

## I. The sufficiency challenge is foreclosed by precedent.

### A. The jury was instructed in accordance with *McCormick*.

The explicit quid pro quo requirement comes from *McCormick*. There, the Supreme Court confronted the issue that arises when a bribery prosecution is premised on a campaign contribution. On one hand, political fundraising implicates First Amendment protections for both candidates and donors. *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014). Solicitations and donations naturally relate to policy positions and outcomes. *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). On the other hand, the First Amendment does not protect quid pro quo corruption. *Id*. at 345. "[T]he public [ ] has an interest in ensuring its representatives are held accountable for abusing the public trust, even when that abuse occurs in the campaign-finance context." *United States v. Pawlowski*, 27 F.4th 897, 902 (3d Cir. 2022).

As Sittenfeld acknowledges, "[t]he Supreme Court identified—and solved—this problem in *McCormick*." (Br.,28.) *McCormick* held that a public official may be convicted for taking bribes in the form of campaign contributions only if the government establishes an explicit quid pro

quo—"if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." 500 U.S. at 272–73. This standard, the Court found, "define[d] the forbidden zone of conduct with sufficient clarity." *Id.* at 273. One year later, in *Evans v. United States*, the Supreme Court found the *McCormick* standard satisfied where a public official "accepts money in exchange for a specific requested exercise of his or her official power." 504 U.S. 255, 258 (1992).

The jury instructions here required the government to meet *McCormick*'s heightened "explicit quid pro quo" standard. The district court instructed that the government needed to prove a "specific" quo, consistent with *Evans*. (R.202, instructions,3222, 3227.) And, for both counts, the court instructed that the quid pro quo must be "explicit": that "the contours of the proposed exchange were clearly understood by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms." (*Id.*,3224,3231.)

The district court then went beyond what governing law requires to ensure that constitutionally protected conduct would not be criminalized.

Through an additional instruction, the court cautioned the jury that "[c]ampaign contributions to public officials or to PACs with which the public official is associated are generally protected by the First Amendment, unless they qualify as bribe payments," which, again, required an "explicit promise or understanding by the public official." (R.202, instructions,3233.) The court then designated the following conduct as lawful activity: accepting a campaign contribution, where the contributor has business pending before the official; accepting a campaign contribution while the official discusses his positions with the contributor; and soliciting contributions from individuals or entities who have business pending before a political body on which a candidate serves or may serve. (*Id*.,3233–35.) This instruction concluded with the court reiterating that criminal liability arises only where "a candidate has entered an explicit quid pro quo agreement in exchange for a contribution." (*Id*.,3235.)

To the extent Sittenfeld raises First Amendment concerns as part of his sufficiency challenge, the jury instructions addressed those

concerns.[4] And Sittenfeld does not challenge the instructions in this appeal. The First Amendment does not protect bribery, and that is what the unchallenged jury instructions criminalized.

## B. The jury rationally found an explicit quid pro quo.

Sittenfeld argues that the evidence was insufficient to prove an explicit quid pro quo. In doing so, he ignores the proper standard of review for jury verdicts. This Court must uphold the verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The sufficiency standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. This Court will "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). And the evidence

---

[4] All six amici stress the importance of the *McCormick* standard but ignore that the jury was instructed according to this standard and received additional instructions highlighting First Amendment protections.

need not "remove every reasonable hypothesis except that of guilt." *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021).

Sittenfeld does not grapple with this standard because he cannot meet it. As the district court held: "The evidence—including hours of recordings and testimony—told a consistent, credible story that a jury could reasonably find constituted a tale of corruption." (R.283, order,7148.)

Sittenfeld's recorded conversations, the witness testimony, and the corroborating evidence support this conclusion. To further his mayoral campaign, Sittenfeld solicited $10,000 from Ndukwe on multiple occasions, knowing Ndukwe was seeking a development agreement for 435 Elm, a project that had stagnated in city council. During the October 30 call, Sittenfeld and Ndukwe discussed Ndukwe's difficulties garnering support for 435 Elm. Because of these difficulties, Ndukwe expressed concerns about contributing to Sittenfeld in his name. In response, Sittenfeld explained that he did not care how Ndukwe contributed but

warned that failing to contribute would have consequences. As Sittenfeld put it: "[Y]ou don't want me to be like, . . . love you but can't."

Ndukwe understood Sittenfeld's statement as conditioning support for the project on Ndkuwe donating to his campaign. Ndukwe's interpretation was supported by Sittenfeld's prior threats that he would "hedge" on the city business of potential donors who did not contribute solely to his campaign and "look more favorably" on those who did. After hearing the recording in context, and in conjunction with the other evidence, the district court concluded that "a reasonable jury could have reached the same conclusion" as Ndukwe. (R.283, order,7141.)

That initial solicitation was just the beginning. At the FBI's direction, Ndukwe then made an unambiguous offer of money for votes: Rob would pay $20,000, including $10,000 the following week, in exchange for a "yes vote . . . , without a doubt" on 435 Elm. Sittenfeld immediately recognized the offer as an illegal quid pro quo. He responded, "nothing can be a [ ] quid pro quo"; but in the next breath, Sittenfeld touted his record supporting urban development projects and stated he wanted to "discuss this more in person" to give the potential

bribe payors "the confidence and the comfort" that they were "invest[ing] in a winning endeavor."

Less than one week later, Sittenfeld met with Rob and Ndukwe in person, knowing Rob wanted a "yes vote" from Council on 435 Elm in exchange for money. Minutes into the meeting, and without any serious exploration of the issues surrounding the development agreement, Sittenfeld promised to deliver the quo—"to shepherd the votes"—and later agreed to walk to the investor's condo to discuss the contributions.

At the condo, Rob reiterated the same express quid pro quo that was made on the November 2 call—$20,000 in return for votes for 435 Elm. And Sittenfeld promised to "deliver the votes." Immediately following this promise, Sittenfeld pivoted to how Rob could pay the $20,000 in a way that would keep Rob's name off public filings. Sittenfeld then reaffirmed the quo two more times: "I'm gonna get this done" and "we're gonna make [the development agreement] happen."

The jury had the opportunity to assess Sittenfeld's sudden eagerness to support 435 Elm in context. Sittenfeld had known about the project, but he showed no interest in supporting it or advancing it until he was presented with the corrupt offer. And Sittenfeld's immediate

support conflicted with the considered views of economic department professionals, who did not believe the agreement was in the public's interest.

In light of all of this evidence, the jury rationally concluded that Sittenfeld entered an explicit quid pro quo: he agreed to accept payment "knowing that the payment was made in return for official acts"—votes for 435 Elm—satisfying the elements of Count 4. *Evans*, 504 U.S. at 268; *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994); (*see* R.202, instructions,3226–27). This same evidence established the elements of Count 3—Sittenfeld corruptly solicited and accepted payment in connection with 435 Elm. *United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018); (*see* R.202, instructions,3221–22.) What happened after the agreement reinforces this conclusion.

When Sittenfeld received the initial checks from the bribe payors, he again promised to "shepherd the votes" and ensure that the agreement passed through council. He also agreed to arrange payment at their request in a way that would keep the bribe payors' names off public filings. After receiving the checks, he assured: "No one will ever know this." *Cf. United States v. McNair*, 605 F.3d 1152, 1197 (11th Cir. 2010)

("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent.").

Sittenfeld then attempted to fulfill his end of the corrupt bargain. He discouraged an RFP that would have opened the project to other developers, and he encouraged Rob to take the agreement "through council first" to circumvent the Economic Development Department's opposition. Sittenfeld also "aggressively" pressured the Port president to enter an agreement with Ndukwe, "regardless of whether [she] thought it was a good idea or not." Sittenfeld applied this pressure only after entering the corrupt bargain and did so while checking in with the bribe payors to make sure he was furthering their interests. *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013) ("[W]hen a public official acts as a donor's marionette[,] . . . a jury can reject legitimate explanations for a contribution and infer that it flowed from a bribery agreement.").

The jury weighed all the evidence and rationally found an explicit quid pro quo.

### C. Sittenfeld's contrary arguments ignore the sufficiency standard.

Sittenfeld's arguments to the contrary ignore the governing sufficiency standard. Sittenfeld argues here, as he testified and argued

below, that he did not enter an explicit quid pro quo. But the jury found otherwise. As the instructions made clear, Counts 3 and 4 required the jury to find an "explicit quid pro quo" such that "the contours of the proposed exchange were *clearly understood* by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms." (R.202, instructions,3231,3224 (emphasis added)); *see Blandford*, 33 F.3d at 696 n.13 (relying on definition of "explicit" as "[n]ot obscure or ambiguous. . . . *Clear in understanding*," while explaining, "by 'explicit' *McCormick* did not mean 'express'").[5] The jury necessarily found a "clearly understood" explicit quid pro quo agreement here.

Sittenfeld nevertheless asks this Court to overturn the jury verdict because he offered a "legitimate alternative explanation" for his statements and conduct. (Br.,31.) To support his claim that the evidence "sound[ed] in ordinary politics" (Br.,34), Sittenfeld cites the evidence in the light most favorable to *him*: his interpretation of the October 30 "love you but can't" call (*id*.,15, 35–36); his testimony that he had "already

---

[5] Sittenfeld himself proposed this language in the jury instructions to define "explicit." (R.97, def. instructions,1002,1015 (citing *Blandford*).)

agreed to support" 435 Elm (*id.*,5, 9, 35), despite conflicting testimony (R.266, tr.,6252); his interpretations of the November 2 call and the November 7 promise to "deliver the votes"[6] (Br.36–39); and his spin on the circumstantial evidence presented at trial—assessing each piece of evidence in isolation. (*Id.*,40–42.)

Ultimately, Sittenfeld's "alternate explanation" is that he was a "pro-development politician" who was tricked into believing the development project was good for the city and did not intend to enter a quid pro quo when he promised to "deliver the votes" in response to Rob's offer. But these are the same arguments that he presented at trial—through his own testimony and through counsel in closing—and the jury rejected them.

---

[6] Sittenfeld's own interpretation of his November 7 exchange with Rob is itself corrupt. Consistent with his argument on appeal, he testified that he interpreted Rob's offer of $20,000 to "get that deal" to mean "the development proposal." (R.269, tr.,6752.) Defense counsel argued similarly in closing. (R.251, tr.,5055.) So the jury could have reasonably interpreted Sittenfeld's testimony to be that he understood that the "deal" Rob offered was $20,000 for votes supporting the 435 Elm development proposal ("to get the deal done"), to which Sittenfeld stated he would "deliver the votes"—an explicit quid pro quo, the same quid pro quo offered on November 2.

It is easy to see how a rational jury saw things differently. For example, while Sittenfeld claims that he had "already agreed to support 435 Elm" (Br.,34), the evidence showed that Sittenfeld took no action to support the project while it languished in the city, but then aggressively furthered the project after receiving the bribe. Sittenfeld insists that "he disagreed with others about 435 Elm" because he "was operating from different facts—because the undercover agents had lied to him." (Br.,41.) But a jury could have reasonably concluded that the real reason such a "pro-development" politician did not look into the details of the development deal, including when confronted with negative assessments from others who believed it was not in the public interest, was because he had already agreed to take official action supporting it. Indeed, Sittenfeld tried to go around the Economic Development Department; he tried to prevent other developers from pursuing the project; and he pressured the Port president to enter an agreement with Ndukwe for "as close to one dollar as possible," "regardless of whether [she] thought it was a good idea or not."

In any case, Sittenfeld's alternative explanation of the evidence gets him nowhere given the nature of the sufficiency inquiry.[7] *United States v. Wallace*, 51 F.4th 177, 182–83 (6th Cir. 2022) ("It is the rare trial defendant who does not offer innocent explanations for their conduct. Where the jury rejects the explanations, we generally let the jury make the call when the point is contested with admissible evidence."); *United States v. Bowens*, 938 F.3d 790, 794 (6th Cir. 2019) ("The defendants' arguments fail because they are at bottom jury arguments—that the evidence is circumstantial and open to multiple interpretations."). This Court, like the district court, should decline Sittenfeld's invitation to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown*, 567 F.3d at 205; *Pawlowski*, 27 F.4th at 902 ("Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is

---

[7] To the extent the amici discuss the evidence, they adopt Sittenfeld's interpretation of it. By ignoring much of the government's evidence and the standard of review, amici do not assist the Court in resolving this sufficiency challenge.

inconsistent with the proper inquiry for review of sufficiency of the evidence challenges.").

This Court has faithfully applied the sufficiency standard in this context before, as it did in *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013). There, the defendant-judge received $1,200 in campaign benefits. One year later, the judge took official action by granting summary judgment at the payor's request, with no direct evidence that the official action was contemplated at the time of payment. *Id.* at 610. The defendant there—like Sittenfeld here—took the stand and "disclaimed . . . any agreement" to exchange campaign contributions for official acts. *Id.* at 615. But the jury there, like the one here, disagreed and found the defendant guilty. The defendant then argued on appeal, as Sittenfeld does, that the evidence did not sufficiently establish an explicit agreement to exchange campaign contributions for specific official acts. *Id.* at 613.

In denying the sufficiency challenge, this Court held that "a jury can reject legitimate explanations for a contribution and infer that it

flowed from a bribery agreement."[8] *Id.* at 615; *see United States v. Correia*, 55 F.4th 12, 24–25, 30–31 (1st Cir. 2022) (rejecting sufficiency challenge to campaign-contribution bribery conviction based on quid pro quo formed without express statement and shown by inferences); *United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015) (rejecting sufficiency challenge because, "[t]o the extent there are factual disputes, the jury was entitled to credit the prosecution's evidence"). The jury was entitled to reject Sittenfeld's explanation here too.

The cases Sittenfeld cites as "finding insufficient evidence" do not help him either. (Br.,32–33, 43.) His prime example, *United States v. Benjamin*, is not a sufficiency case at all but involved dismissal of an indictment. And the dismissal was driven by an interpretation of Second Circuit law that directly conflicts with this Court's precedent. 2022 WL 17417038, at *8 n.6 (S.D.N.Y. Dec. 5, 2022) (citing *Blandford* among the courts that view the law differently). The second case, *United States v. Menendez*, lacked any evidence that the defendants "were aware of the terms of the alleged quid pro quo." 291 F. Supp. 3d 606, 626–28 (D.N.J.

---

[8] Sittenfeld tries to escape this holding by mischaracterizing *Terry*. According to Sittenfeld, the "objective facts allowed no 'legitimate alternative explanation.'" (Br.,31.) But that is not what this Court said.

48

2018). The evidence here, in contrast, included "hours of recordings and testimony" through which "a rational jury could have found an explicit quid pro quo existed." (R.283, order,7140–43.)

Finally, to the extent Sittenfeld means to suggest—in a single paragraph and with a single citation (Br.,46)—that the constitutional-fact doctrine should displace the sufficiency standard, his argument should be deemed waived for lack of development. *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). The doctrine has never been applied in this context—not by the Supreme Court, this Court, or any other. And Sittenfeld provides no reason why this Court should apply the doctrine now. Indeed, there are very good reasons why the doctrine does not apply here, including the nature of the law at issue and the nature of the jury's factual determination, which hinged on the defendant's intent and credibility. *See, e.g., United States v. Hunt*, 82 F.4th 129, 134–137 (2d Cir. 2023) (discussing *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485 (1984), and declining to apply doctrine in threats prosecution).

## D. Precluding the jury from deciding Sittenfeld's intent is contrary to controlling law, fundamental principles of criminal law, and common sense.

As explained above, the standard of review forecloses Sittenfeld's sufficiency challenge because the jury's finding was rational. Sittenfeld attempts to skirt that standard, arguing that the district court erred by allowing the jury to determine his intent at all. This argument is astonishing: it conflicts with controlling precedent; it departs from basic principles of criminal law; and it defies common sense.

According to Sittenfeld, in cases involving campaign contributions, the evidence is insufficient as a matter of law if "ambiguous interactions" underlie the exchange. (Br.,25, 44.) Elsewhere, he frames it differently, saying that the jury may determine a defendant's intent only if the government presents so-called objective evidence that the district court concludes is not "susceptible to" a "legitimate explanation." (*Id.*,25.) Still elsewhere, he says that "unmistakable, objective evidence" is what is needed. (*Id.*,30.) Sittenfeld cannot identify a legal basis for these shifting standards or show how the jury's role would be preserved.

To start, Sittenfeld creates this new evidentiary requirement out of whole cloth. It does not come from *McCormick*. That case said the

opposite: "matters of intent are for the jury to consider." *McCormick*, 500 U.S. at 270. Sittenfeld's attempt to cast the "whole point" of *McCormick* as "shielding" the process from "jaundiced juries" (Br.,34) is thus entirely without basis. And while Sittenfeld tries to portray the facts of *McCormick* as establishing a floor for sufficiency,[9] *McCormick* concerned a challenge to the jury instructions. The Supreme Court never considered whether the facts demonstrated a sufficiently explicit quid pro quo. It held that the instructions failed to require any quid pro quo at all— explicit or otherwise. *Id*. at 274; *see also Blandford*, 33 F.3d at 693–94 (recognizing that *McCormick* agreed with the defendant's argument that "the trial court's jury instructions were flawed"). Nothing in *McCormick* suggests that properly instructed juries cannot find an exchange of a particular quid for a particular quo sufficiently explicit although the interpretation of the evidence is contested. Nor does *McCormick* suggest,

---

[9] Sittenfeld quotes *McCormick* as having "held" "that a violation of the Hobbs Act" had not been "made out." (Br.,30.) But the quoted passage stated only that, "[e]ven assuming" that the result of the "seven inquiries" by the court below "was unfavorable to *McCormick*," the Court could not agree "that a violation of the Hobbs Act would be made out." *Id*. at 272. This was a conclusion about the Court of Appeals' inquiry, not the evidence. The "seven inquiries" fell short because they did not require a quid pro quo. *See id*. at 265–66, 273–74.

as Sittenfeld claims without citation, that "unmistakable, objective evidence of a corrupt bargain" is required. (Br., 30.)[10]

What *McCormick* demands is a clearly understood corrupt bargain—precisely what the jury found here. It does not countenance usurping the jury's role in determining the parties' intent and understanding when statements and conduct must be interpreted. Otherwise, officials would have a veritable blueprint for how to commit bribery and get away with it. So long as an official could bake plausible deniability into his corrupt bargain, he would be immune from liability.

The reality is that bribery "does not have a magic-words requirement: [f]ew politicians say, on or off the record, 'I will exchange official act X for payment Y.'" *Blagojevich*, 794 F.3d at 738; *see United States v. Inman*, 39 F.4th 357, 365 (6th Cir. 2022) (quoting *Terry*, 707 F.3d at 613) ("To determine whether an agreement crossed the line into illegality, 'motives and consequences, not formalities' govern."). A savvy official cannot "avoid the *McCormick* standard" through "winks and nudges." *Blagojevich*, 794 F.3d at 738; *United States v. Lee*, 919 F.3d 340,

---

[10] The absence of citation is for good reason—*McCormick* never uses the words "unmistakable" or "objective" in any context.

357 (6th Cir. 2019) (although defendant stated, "'I'm not trying to influence you . . . I'm trying to make you think,' . . . a juror could easily have heard those words and concluded that they meant the exact opposite"). Recognizing this reality, courts have held that the jury must determine whether the terms of the quid pro quo were clear based on all the evidence and reasonable inferences. *Terry*, 707 F.3d at 612–13; *Inman*, 39 F.4th at 365; *Correia*, 55 F.4th at 24–25, 30–31; *Blagojevich*, 794 F.3d at 738.[11]

*Terry* again illustrates the point. There, this Court held that the nature of bribery agreements will often require the jury to decide whether a defendant intended to exchange official acts for contributions. *Terry* emphasized that "[a]n agreement . . . is the dividing line between permissible and impermissible payments." 707 F.3d at 613–14. Because "most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all

---

[11] Sittenfeld does not challenge this Court's precedent that "explicit" does not mean "express." *Blandford*, 33 F.3d at 696. To the extent an amicus attempts to make this argument for him (Amicus Brief of Law Professors), it cannot do so. *Self–Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 560 (6th Cir. 2016) (alteration omitted) ("While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties.").

matters that juries are fully equipped to assess." *Id*. at 613. *Terry* affirmed that it is the jury's job to "decid[e] the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor." *Id*. at 614. Further, evidence of intent should not be assessed in isolation but rather based on "all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them." *Id*.

Rather than try to reckon with *Terry*, Sittenfeld contends that "[f]iguring out what happened [here] does not involve credibility determinations, or factual findings." (Br.,48.) But that flies in the face of this Circuit's law: it is the jury's task to decide whether a defendant had the requisite intent to exchange official acts for contributions, and the jury must do so based on all of the surrounding circumstances and inferences. *Terry*, 707 F.3d at 613–14. The jury here had to assess Sittenfeld's explanations for his recorded conduct and statements in light of the other evidence, including the testimony of other witnesses, in determining whether his story was credible. The jury found that it was not. *See United States v. Collins,* 799 F.3d 554, 589 (6th Cir. 2015)

(credibility determinations "must be resolved in favor of the jury's verdict").

To the extent Sittenfeld suggests that the district court erred by denying his motion for acquittal, despite finding the evidence "ambiguous," he is again misguided. (Br.,24, 44, 46.) What the district court actually said was that "many of the statements [were] ambiguous, especially considered in isolation." (R.283, order,7141.) Relying on *Terry*, the district court then reasoned that, when "faced with ambiguity, it is the jury's job to construe the language and conduct." (*Id.*,7140.) Through a proper sufficiency lens, the district court's characterization of certain statements as "ambiguous" is not inconsistent with its denial of a sufficiency challenge. After all, the factfinder's role is to resolve disputes about what the evidence means; and, as explained above, the sufficiency standard demands only that a rational factfinder, when viewing the evidence in the light most favorable to the government, could find the defendant guilty beyond a reasonable doubt—not that every rational factfinder would necessarily do so.

Sittenfeld cites no authority that the government must present unambiguous *evidence* of a defendant's intention to enter a criminal

agreement for the issue to go to the jury—not in a bribery case or any other.[12] Rather, it is *the jury's* job to determine, based on all the evidence, whether an exchange is "clearly understood" by the official and the payor. (R.202, instructions,3224,3231.) *See Terry*, 707 F.3d at 614. Sittenfeld's proposed requirement runs contrary to the well-established principle that it is the factfinder's job to "draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission." *Rosemond v. United States*, 572 U.S. 65, 78 n.9 (2014).

The jury here was "quite capable" of deciding Sittenfeld's intent. *See Terry*, 707 F.3d at 614. Sittenfeld threatened a developer by warning he would not support a project unless the developer contributed; he quickly agreed to meet the developer's investor following an express quid pro quo of $20,000 for votes supporting the project; he met with the

---

[12] While Sittenfeld asserts that "every other court to address the question" has determined that *McCormick* requires "'clear and unambiguous' *evidence* of a corrupt bargain" (Br.,44) (emphasis added), the case he cites for that proposition does not support it. Instead, the case says that "what *McCormick* requires is that the *quid pro quo* be clear and unambiguous." *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (emphasis added). But *Carpenter* itself made clear that the quid pro quo "need not be verbally explicit" and that "[t]he jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds on a quid pro quo." *Id.* That is just what the jury did here.

investor and agreed to "deliver the votes" for the project in exchange for $20,000; he accepted $20,000 from the corrupt investor while promising to "shepherd votes" for the project and stating "nobody will know about this"; and he attempted to fulfill his end of the corrupt bargain by acting at the corrupt investor's behest at every turn. The jury rationally found that this was not evidence of "ordinary politics" but evidence of an explicit quid pro quo. That decision was for the jury to make.

## II. Sittenfeld's constructive amendment claim fails.

An indictment protects a defendant's Sixth Amendment right to fair notice of the charges against him and his Fifth Amendment right to avoid double jeopardy. *United States v. Hynes*, 467 F.3d 951, 961 (6th Cir. 2006). "A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). In examining whether such an alteration has occurred, this Court "review[s] the language of the indictment, the evidence presented at trial, the jury instructions and the verdict forms utilized by the jury." *Id.* at 683–84.

Sittenfeld argues on appeal, as he did in post-trial motions, that the government constructively amended Counts 3 and 4 by urging the jury to convict because "Sittenfeld had corruptly solicited Ndukwe" rather than Rob. (Br.,49.) Sittenfeld did not argue at trial, however, that the evidence or argument led to a constructive amendment. He did not object when the government introduced his solicitation of Ndukwe into

evidence. (R.263, tr.,5698–99.) Nor did he object to the statement in closing that he now claims urged the jury to convict based on the solicitation of Ndukwe. (*See* Br.,49 (citing R.251, tr.,5035).)

Sittenfeld did not preserve an objection to the instructions either. Sittenfeld claims that, "over objection, the instructions did not expressly link Counts 3 or 4 to 'Rob.'" (Br.,49.) But Sittenfeld did not object to the jury instructions he cites as supposedly amending the indictment during the charge conference or at trial. (R.272, tr.,6936–37; R.251, tr.,4974–4978); *see United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012) (noting necessity of such an objection). Even his earlier written objection to the proposed Count 3 instruction referring generally to a "person" (after he initially proposed the same language) was not based on a constructive amendment; it raised only a First Amendment vagueness concern. (R.107, objections,1181; R.97, def. instructions,1009.) *See* Fed. R. Crim. P. 30(d) (requiring a party who objects to an instruction to "inform the court of the specific objection and the grounds for the objection"). As to the Count 4 instruction, Sittenfeld not only failed to object at any time to the "another person" language (R.107, objections,1183–84), he proposed that very language himself. (R.97, def.

instructions,997.) As such, review as to Count 3 is, at best, only for plain error. *United States v. Russell*, 595 F.3d 633, 643 (6th Cir. 2010). And, as to Count 4, any error was invited. *United States v. Akridge*, 62 F.4th 258, 263 (6th Cir. 2023). In any event, there was no error, much less plain error, on either count.

**Count 3.** Count 3 charged Sittenfeld with federal funds bribery occurring from September 21, 2018 to December 17, 2018. The count expressly incorporated paragraphs 1 through 23 of the indictment, which charged the criminal conduct underlying Counts 3 and 4.

Under the subheading "2018 Solicitations," the paragraphs charged the October 26 call where Ndukwe introduced Rob and Brian as investors "who could support Sittenfeld"; the transcription of Sittenfeld's "love you, but can't" threat on October 30 and his agreement to meet Rob on November 7; and the November 2 call where Ndukwe explained that Rob would pay $20,000, including $10,000 at the November 7 meeting, in return for a "yes vote" on 435 Elm. (*Id.*,28–31.) The indictment then detailed the November 7 meeting where Sittenfeld agreed to "deliver the votes" for $20,000, along with the subsequent communications leading up

to Sittenfeld's receipt of $20,000 from Rob and Sittenfeld's follow-up call to Ndukwe. (*Id.*,31–35.)

After expressly incorporating these paragraphs, Count 3 alleged that Sittenfeld "corruptly solicited and demanded for his own benefit, and accepted and agreed to accept a thing of value from a person," intending to be influenced and rewarded in connection with city business. (*Id.*,41–42.) Count 3 continued, "to wit: the defendant, . . . while a member of Cincinnati City Council, corruptly solicited and demanded, and accepted and agreed to accept, payments to [his] PAC for his benefit from [Rob], who was posing as a businessman supporting [435 Elm] . . . ." (*Id.*,42.)

The evidence mirrored these allegations. It included recordings of Ndukwe's October 26 introduction of Rob as an investor with LLCs who could support Sittenfeld on Ndukwe's behalf, Sittenfeld's October 30 "love you but can't" threat and agreement to meet Rob, and the express quid pro quo agreement that led to Rob paying Sittenfeld $20,000 in bribes through LLC checks to his PAC.

The jury instructions for Count 3 also mirrored the indictment. The instructions required the jury to find that "Sittenfeld solicited, demanded, accepted, or agreed to accept a thing of value from another

person." (R.202, instructions,3221.) The indictment contained the same language. (R.3, indictment,42.) "Where the jury instructions do not differ from the crime charged in the indictment, there is no constructive amendment." *United States v. Bradley*, 917 F.3d 493, 503 (6th Cir. 2019).

Sittenfeld's argument to the contrary has no merit. He asserts that "the Government urged the jury to convict Sittenfeld based on a *direct* contribution from *Ndukwe*." (Br.,49, 51 (emphasis in original).) Not so. Never did the government suggest that Ndukwe *directly* paid Sittenfeld a bribe. Sittenfeld does not cite a single instance in which the government suggested a "direct contribution from Ndukwe" to Sittenfeld satisfied an element—because it does not exist.

By referencing "direct contribution from Ndukwe," it appears Sittenfeld means his October 30 "solicitation" of Ndukwe, which is how he argued his constructive amendment claim post-trial. Sittenfeld reads the "to wit" clause in paragraph 42 as limiting the scope of Count 3 to "soliciting a bribe from Rob" and argues "the Government changed course" by improperly presenting evidence of the October 30 "love you but can't" call—despite the indictment's description of the call and quotation of the solicitation. (Br.,49.) He also argues that the government should

not have argued in closing that the jury could consider "the solicitation 'love you but can't'" in deciding whether Sittenfeld "solicited, demanded, accepted or agreed to accept a thing of value from another person." (*Id.* (citing R.251, tr.,5035).)

As the district court found, "[t]his argument fails both on the law and the facts." (R.283, order,7151.) The "to wit" language cannot be read in isolation. This Court "consider[s] the full scope of the indictment in analyzing whether a . . . constructive amendment occurred, not only the sections that [the defendant] chooses to acknowledge." *Bradley*, 917 F.3d at 503. And it denies constructive amendment claims based on a narrow reading of the indictment where, as here, the relevant facts at trial were expressly incorporated into the charge. *Id.*; *United States v. Khalupsky*, 5 F.4th 279, 293–94 (2d Cir. 2021) (no constructive amendment where allegations were "incorporated by reference into all charged counts"); *United States v. Moore*, 129 F.3d 873, 878 (6th Cir. 1997) (no constructive amendment because "[a]nyone reading the mail fraud counts as a whole would understand the charges against the defendant, the defendant would know what charges he would face at trial, and the court would understand what was required for conviction"). Viewing the "to wit"

clause as narrowing the indictment, as Sittenfeld urges, simply cannot be squared with this Court's directive to view the indictment as a whole. *Bradley,* 917 F.3d at 504; *United States v. Agrawal,* 726 F.3d 235, 260–61 (2d Cir. 2013) ("When the indictment is thus considered as a whole, the 'to wit' clause is properly understood to be illustrative rather than definitional of the core of criminality charged by the grand jury.").

Assessing the full scope of the allegations aligns with the purposes of an indictment: to provide notice and protect from double jeopardy. *Hynes,* 467 F.3d at 961. Where the charging instrument details the defendant's crimes with sufficient specificity, these interests are met. *Bradley,* 917 F.3d at 504. Even inartfully worded indictments do not give rise to a constructive amendment where the indictment provides notice. *Robinson v. Harry,* 562 F. App'x 440, 445–47 (6th Cir. 2014); *United States v. Berger,* 224 F.3d 107, 117–18 (2d Cir. 2000).

Here, the indictment alleged that Sittenfeld's corrupt solicitation of Ndukwe on the October 30 call led directly to Sittenfeld's receipt of PAC payments from Rob, and that is the exact same evidence the jury heard at trial. The indictment placed Sittenfeld on notice that his corrupt

solicitation of Ndukwe was part of his offense in Count 3, and the evidence at trial and jury instructions tracked the indictment.[13]

Further, as the district court found, the allegations in the indictment and the evidence at trial showed that Rob and Ndukwe were "inextricably intertwined" such that "soliciting from Ndukwe was indistinguishable from soliciting from Rob." (R.283, order,7152.) Even Sittenfeld admitted that he viewed Rob as an "extension" of Ndukwe. (R.269, tr.,6802.) The October 2018 calls described in the indictment and played at trial made clear that Ndukwe's investors would be making payments to Sittenfeld. Because the bribe payments ultimately made to the PAC were first solicited and discussed in conversations between Sittenfeld and Ndukwe, those conversations were "within the charged core of criminality" and intrinsic to Count 3. *Khalupsky*, 5 F.4th at 293–94; *see United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) ("So long as the indictment identifies the 'essence of [the] crime' against which the defendant must defend himself, discrepancies in 'the particulars of

---

[13] The October 30 solicitation was the subject of multiple pretrial filings, further showing Sittenfeld was on notice it was part of the charged offense. (*See, e.g.,* R.53, order,521; R.104, br.,1126.)

how a defendant effected the crime' do not constructively amend the indictment.").

The authority cited by Sittenfeld is inapposite because none of the cases involve allegations expressly incorporated into the charged count as they are here. (Br.,52–53.) Take *United States v. Cusmano*, 659 F.2d 714 (6th Cir. 1981). In that case, the government charged only "extortion, to wit: by threats of economic loss"; but witnesses at the trial spoke of threats of physical violence, and the court's instruction encompassed extortion under both fear of economic loss and fear of violence. *Id.* at 715–17. As such, the jury was permitted to convict "on charges the grand jury never made." *Id.* at 719. *Stirone v. United States*, 361 U.S. 212 (1960), is similar. The indictment there, as in *Cusmano*, did not address an alternative theory introduced at trial at all, such that it could not be said "with certainty" that the jury convicted the defendant "solely on the charge made in the indictment." *Id.* at 217; *Cusmano*, 659 F.2d at 719. Here, in contrast, Sittenfeld's solicitation of Ndukwe on October 30 was expressly part of the charged conduct for Count 3, noted under the subheading "2018 Solicitations."

Ultimately, however, even if Sittenfeld could show error, he cannot satisfy the plain-error standard." *United States v. Olano*, 507 U.S. 725, 734–36 (1993). The indictment placed Sittenfeld on notice that his corrupt solicitation of Ndukwe was part of his offense, and both the evidence at trial and jury instructions aligned with the indictment. Under these circumstances, any discrepancy caused by Sittenfeld's post-trial construal of the "to wit" clause does not present a clear or obvious error, nor does it raise doubts about the fairness and integrity of the trial. *See Bastian*, 770 F.3d at 223 (rejecting constructive amendment challenge under second prong); *United States v. Belcher*, 21-1650, -- F.4th --, at 7–8 (6th Cir. Feb. 9, 2024) (same as to fourth prong because defendant was on notice based on pretrial proceedings).

**Count 4.** Count 4's attempted extortion charge expressly incorporated the same facts as Count 3, and the evidence at trial mirrored those allegations. Unlike Count 3, however, the jury instructions required the government to prove that Sittenfeld "obtained, accepted, agreed to accept, or received" property in exchange for specific official action—solicitation alone was not a basis for conviction. (R.202, instructions,3226–27; *compare id.*,3221.) The part of the government's

closing argument that Sittenfeld identifies as giving rise to the constructive amendment reflects that difference. The prosecutor's statement occurred in a portion of the argument relating solely to Count 3, and was phrased solely in terms of "solicitation." (R.251, tr.,5034–35 ("This also includes potentially the solicitation 'love you but can't' in October 30th, 2018. That element [element two of Count 3] is established."). Sittenfeld's attempt to extend his constructive amendment argument to Count 4 thus fails at the outset.[14]

Sittenfeld attempts to avoid this fatal flaw by recharacterizing the alleged constructive amendment. Sittenfeld now argues the government impermissibly focused "on a direct contribution" from Ndukwe—not a solicitation of Ndukwe, as he did in post-trial briefing. Sittenfeld suggests that the jury "could have easily found that Sittenfeld 'agreed to accept' the solicited bribe based on Ndukwe's reply that he would 'go to work on' collecting contributions." (Br.,50.) This argument is nonsensical—how could Sittenfeld agree to anything based on Ndukwe's reply? Under no

---

[14] Sittenfeld unsuccessfully relied on this statement from the government's closing to support his post-trial constructive amendment claim. In denying his motion for release, this Court correctly held that Sittenfeld's claim only applied to Count 3.

reasonable interpretation of the October 30 call could Sittenfeld have "agree[d] to accept" a direct contribution from Ndukwe through his "love you but can't" solicitation. Moreover, Sittenfeld points to no argument advanced by the government that Sittenfeld agreed to accept a bribe on that phone call.

The government, instead, cited Sittenfeld's recorded meeting with Rob as proof that Sittenfeld agreed to accept property in exchange for specific official action. (R. 251, tr.,5000,5011–12.) The October 30 call was part of the course of conduct that gave rise to Sittenfeld's agreement to accept and receive $20,000 to his PAC. That call was necessary to tell the full story of corruption—the November 2 call and November 7 meeting would make no sense without the preceding October 30 call— and it was direct evidence of Sittenfeld's corrupt intent. Fed. R. Evid. 401. But the government never claimed that the call itself established the "agreed to accept" element. And because Count 4 did not allow conviction based on solicitation, the instructions left no possible avenue for the jury to convict Sittenfeld for the corrupt solicitation of Ndukwe alone.

For these reasons, Sittenfeld can show no error, let alone plain error that gave rise to a "manifest injustice." *Akridge*, 62 F.4th at 263; *see*

*United States v. Fisher*, No. 21-11879, 2022 WL 4138863, at *19 (11th Cir. Sept. 13, 2022) (rejecting constructive amendment challenge for invited error because defendant agreed with jury instruction at issue); *United States v. Jones*, 506 F. App'x 137, 140 (3d Cir. 2012) (same where defendant proposed the instruction).

## CONCLUSION

This Court should affirm the district court judgment.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

/s/ Matthew C. Singer
MATTHEW C. SINGER
ALEXIS J. ZOUHARY
EMILY N. GLATFELTER
MEGAN GAFFNEY PAINTER
Assistant U.S. Attorneys
221 East Fourth Street
Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Matthew.singer@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 12,917 words of Century Schoolbook (14 pt) proportional type. Microsoft Word is the word-processing software that I used to prepare this brief.

/s/ Matthew C. Singer
MATTHEW C. SINGER
Assistant United States Attorney

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
| --- | --- | --- |
| 3 | indictment | 26–45 |
| 25 | motion | 134–159 |
| 53 | order | 494–536 |
| 97 | defendant jury instructions | 979–1023 |
| 104 | trial brief | 1118–1152 |
| 107 | response | 1170–1186 |
| 202 | jury instructions | 3190–3256 |
| 251 | transcript | 4941–5112 |
| 262 | transcript | 5419–5645 |
| 263 | transcript | 5646–5804 |
| 265 | transcript | 5928–6183 |
| 266 | transcript | 6184–6409 |
| 267 | transcript | 6410–6634 |
| 269 | transcript | 6637–6871 |
| 270 | motion | 6872–6894 |

| 271 | motion | 6895–6929 |
| 272 | transcript | 6930–6942 |
| 283 | order | 7137–7162 |
| 302 | transcript | 7391–7511 |
| 312 | notice | 7544–7697 |

**CERTIFICATE OF SERVICE**

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Sittenfeld by filing with the Court's CM/ECF system this 9th day of February, 2024.

/s/ Matthew C. Singer
MATTHEW C. SINGER
Assistant United States Attorney