No. 23-3840

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

UNITED STATES,

*Appellee*,

v.

ALEXANDER SITTENFELD,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Ohio (Western Division) (Cole, J.)
District Court Case No. 1:20-cr-00142

_____

REPLY BRIEF OF APPELLANT
ALEXANDER (P.G.) SITTENFELD

_____

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., NW
Suite 300
Washington, DC 20006
(602) 501-5469
james@kingstlegal.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(202) 326-3939
amaugeri@jonesday.com

Yaakov M. Roth
Harry S. Graver
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-7658
yroth@jonesday.com

Justin E. Herdman
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7113
jherdman@jonesday.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

I.    THE CONVICTIONS MUST BE REVERSED, BECAUSE THE GOVERNMENT FAILED TO PROVE AN EXPLICIT QUID PRO QUO. .................................................. 1

    A.    The Government Cannot Satisfy *McCormick's* Standard ........................... 3

    B.    The Government Cannot Evade *McCormick's* Standard. ........................ 13

II.   THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT. ............ 17

    A.    The Government Cannot Ignore the "To Wit" Clauses. ........................ 17

    B.    The Government Exceeded the "To Wit" Clauses. ............................... 19

CERTIFICATE OF COMPLIANCE ....................................................................... 25

CERTIFICATE OF SERVICE ................................................................................ 26

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................... 14

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984) ................................................................... 14

*Cartwright v. United States,*
  12 F.4th 572 (6th Cir. 2021) ..................................................... 19

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ..................................................................... 4

*Crawford-El v. Britton,*
  523 U.S. 574 (1998) ................................................................... 15

*McCormick v. United States,*
  500 U.S. 257 (1991) ..........................................................*passim*

*Scott v. Harris,*
  550 U.S. 372 (2007) ................................................................... 16

*Stirone v. United States,*
  361 U.S. 212 (1960) ............................................................. 18, 22

*United States v. Abbey,*
  560 F.3d 513 (6th Cir. 2009) ..................................................... 16

*United States v. Agrawal,*
  726 F.3d 235 (2d Cir. 2013) ...................................................... 19

*United States v. Akridge,*
  62 F.4th 258 (6th Cir. 2023) ..................................................... 20

*United States v. Belcher,*
  92 F.4th 643 (6th Cir. 2024) ..................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Benjamin*,
  2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ..................................................... 11, 12

*United States v. Blagojevich*,
  794 F.3d 729 (7th Cir. 2015) ..................................................................... 9, 10

*United States v. Boyd*,
  640 F.3d 657 (6th Cir. 2011) ......................................................................... 19

*United States v. Bradley*,
  917 F.3d 493 (6th Cir. 2019) ......................................................................... 18

*United States v. Carpenter*,
  961 F.2d 824 (9th Cir. 1992) ......................................................................... 15

*United States v. Cavazos*,
  950 F.3d 329 (6th Cir. 2020) ......................................................................... 23

*United States v. Colon-De Jesus*,
  85 F.4th 15 (1st Cir. 2023) ............................................................................. 3

*United States v. Correia*,
  55 F.4th 12 (1st Cir. 2022) .......................................................................... 9, 10

*United States v. Cusmano*,
  659 F.2d 714 (6th Cir. 1981) .................................................................. 18, 22, 23

*United States v. Dedman*,
  527 F.3d 577 (6th Cir. 2008) ......................................................................... 19

*United States v. Farr*,
  536 F.3d 1174 (10th Cir. 2008) ...................................................................... 18

*United States v. Ferguson*,
  65 F.4th 806 (6th Cir. 2023) ......................................................................... 13

*United States v. Hunt*,
  82 F.4th 129 (2d Cir. 2023) .......................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Inzunza,*
  638 F.3d 1006 (9th Cir. 2011) ..................................................... 10

*United States v. Khalupsky,*
  5 F.4th 279 (2d Cir. 2021) .......................................................... 18

*United States v. Menendez,*
  291 F. Supp. 3d 606 (D.N.J. 2015) ............................................. 11

*United States v. Miller,*
  891 F.3d 1220 (10th Cir. 2018) .................................................. 23

*United States v. Moore,*
  129 F.3d 873 (6th Cir. 1997) ...................................................... 19

*United States v. Stirone,*
  262 F. 2d 571 (3d Cir. 1958) ...................................................... 18

*United States v. Terry,*
  707 F.3d 607 (6th Cir. 2013) ................................................... 9, 10

*United States v. Wells,*
  519 U.S. 482 (1997) .................................................................. 20

*United States v. Woods,*
  14 F.4th 544 (6th Cir. 2021) ...................................................... 14

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) .................................................................. 10

## OTHER AUTHORITIES

Fed. R. Crim. P. 30 ......................................................................... 20

*The New Oxford American Dictionary* (2001) ............................... 17

I.     **THE CONVICTIONS MUST BE REVERSED, BECAUSE THE GOVERNMENT FAILED TO PROVE AN EXPLICIT** *QUID PRO QUO.*

Imagine a developer saying to a legislator: "I have this large sack of cash I'd love to give you, but first I'd like to hear your position on a pending bill that affects me." That scenario reeks of corruption. Now imagine the same characters, but a different pitch: "I'd love to make a PAC donation to support your campaign, but first I'd like to hear your position on a pending bill that affects me." Suddenly it feels utterly routine. Why? Because campaign donations are *always* based on what the official will do in office. Discussions with donors on those topics are therefore part of ordinary, lawful politics; they generate no inference of impropriety.

Nonetheless, it is all too easy to imagine how a prosecutor can elide this crucial contextual distinction. Continue the story: The legislator declares his support for the bill; the developer makes the contribution; and the legislator later votes consistent with his stated position. You can hear the prosecutor's closing now: "Come on, do you really think those PAC donations were not in return for *anything*?"

The *McCormick* Court understood this—and feared it. If this is all it takes for an indictment and conviction, there is no elected official in this country whose fate could not be thrown to a jury. So the Supreme Court required more. The Government must prove an "explicit" *quid pro quo* in this context. *McCormick v. United States*, 500 U.S. 257, 272-73 (1991). It must marshal proof of an *unambiguous* corrupt deal—a *clear exchange* for official action. That heightened burden is *McCormick*'s essence.

1

The Government here acknowledges *McCormick*, but does not understand it—or at least has no interest in actually satisfying it. The Government mainly tries to avoid it, by arguing that the jury was told to find an "explicit" *quid pro quo*. But instructions are one thing; proof is another. If a jury's sense of corrupt intent satisfied *McCormick*, its bottom would fall out. The Government must *prove* an explicit bribe.

It failed to prove one here. After a two-year scripted-and-recorded charade, the best the Government can do is stitch together ambiguous comments spanning 20 days and urge the most sinister, unrealistic reading. But the whole point of an "explicit" *quid pro quo* is that it does not need a Rosetta Stone: If the deal is unmistakable, it stands on its own. And here, none of the Government's evidence can do so—as this Court can listen, watch, and see for itself. If this record suffices, *McCormick* is a paper barrier.

No need to take Sittenfeld's word for it. This case has attracted an extraordinary array of *amici* sounding the alarm. Sixteen former federal public corruption prosecutors have taken the rare step of criticizing their colleagues for pursuing this "extreme outlier" case. Former.Prosecutors.3-4. A bipartisan set of former Attorneys General, White House Counsel, and federal judges have warned the Government is trying to practically raze *McCormick*, and "criminalize" the politically "commonplace." Federal.Officials.5. And many others, from scholars to business leaders, have agreed.

The *amici* are right: This unprecedented prosecution stretches *McCormick* beyond its breaking point. And the Government's brief only confirms as much. This Court should therefore reverse the convictions and order acquittal.

2

### A.    The Government Cannot Satisfy *McCormick*'s Standard.

Measured against the ordinary bribery standard, the case against Sittenfeld was unusually weak. But measured against *McCormick*, it fell chasms short. Even the district court acknowledged that Sittenfeld's account was "plausible" on this record. R.283.PageID.7148. But the opposite of explicit is ambiguous, and the very definition of "ambiguous" is something with multiple "plausible interpretations." *United States v. Colon-De Jesus*, 85 F.4th 15, 24 (1st Cir. 2023).

Indeed, looking at the record afresh, a bipartisan group of former U.S. Attorneys and public corruption chiefs have stepped up to say that "*McCormick* was intended to prevent convictions in cases like this." Former.Prosecutors.19. As they detail, this case lacks **_all_** the indicia of corruption that prosecutors ordinarily look for: No campaign-finance violation, no money-laundering, no cover-up, no pattern of suspect solicitations. *Id.* at 12-15. In fact, rather than "obvious wrongdoing," the record reveals "behavior affirmatively *inconsistent*" with corruption. *Id.* at 18. Even worse, this "weak evidence" was the product of a *sting*, and one that targeted a project Sittenfeld *had already agreed* to "support." *Id.* at 14-16. *Amici* are aware of "no" case like this one. *Id.* at 15. This Court should ensure it does not become the first of many like it.

**The Evidence.** The Government does its best to cobble together an "explicit" bribe. The most effective rejoinder is for this Court to listen to the tapes and watch the videos for itself. But even limited to the cold page, the Government's account confirms the deficiencies in its case.

3

**1.** The Government begins with Sittenfeld's fundraising practices: He solicited developers who had business before the city, and once told a lobbyist he would "hedge" on them if they hedged in supporting him. Govt.3-4, 38-39. The Government is shocked—shocked!—that a local politician would target local business leaders for fundraising, and preferred that they not push money to his opponent too.

Far from suspect, this is routine. Politicians spend significant portions of their time fundraising. Former.Electeds.8-9. And those solicitations turn on "what they intend to do" in office, to the benefit of the person on the other end of the phone. *McCormick*, 500 U.S. at 272. So of course Sittenfeld is not calling up farmers in Iowa or bankers in New York; people donate to politicians who will have a discernible effect on their lives—and politicians, in turn, solicit from those people. *See Citizens United v. FEC*, 558 U.S. 310, 359 (2010). This may be "transactional" (Govt.3), but is not corrupt.

It likewise blinks reality to say Sittenfeld's "hedging" remarks imply criminality. As affirmed by the former Attorneys General, White House Counsel, and federal judges—who understand both the federal corruption laws and the realities of lawmaking—"public officials not only have the right to discourage funding of their political opposition, it is natural to do so." Federal.Officials.16.

**2.** The Government moves to the October 30 call, and Sittenfeld's "love you but can't" remark to Ndukwe. Govt.38-39. This comment factored prominently in the prosecution's case-in-chief. Br.48-49. And the district court labeled it as perhaps the Government's "best" evidence. R.283.PageID.7140-41.

But now, the Government spends little time on it.  What was before a smoking gun is now "just the beginning."  Govt.39.  That pivot makes sense: However Ndukwe supposedly "understood" Sittenfeld's comment (*id.*), it was equally (if not more readily) understood as Sittenfeld observing that he would not be able to help his friend *if not elected Mayor*—his campaign had to be a "winning endeavor" (Govt.13).  That is why the FBI told Ndukwe to go back and make a "very clear and obvious offer" that was "not ambiguous."  Govt.11.  The October 30 call admittedly did not fit the *McCormick* bill.

**3.**     Turning to November 2, the Government says Ndukwe followed the FBI directive and made an "unambiguous offer of money for votes" on the recorded line.  Govt.39.  But the Government sidesteps that Sittenfeld *flatly rejected it*.  He told his friend and prior donor (Govt.7) that he could *not* promise a vote in exchange for anything, and assumed Ndukwe had misspoken—that was "not what you're saying."  App.46-47.

On the Government's telling, this "no" did not *really* mean "no," because "in the next breath" Sittenfeld "touted his record" on projects like 435 Elm.  Govt.39.  Yet that is exactly what an official is supposed to do—Sittenfeld's statements are "illustrative" of what officeholders do "everyday."  Former.Officials.10.  Officials fundraise almost exclusively based on "how they have voted or intend to vote."  *Id.* at 9.  Sometimes donors are ham-fisted; they want to know whether you will vote for a given tax cut, rather than whether you have pledged to always cut taxes.  *See* Former.Electeds.15-17.  But in those situations, the proper (and routine) course is to reiterate the line, and return to its lawful side—as Sittenfeld did.  Treating this as inculpatory is preposterous.

5

**4.**    If the October 30 call is the "beginning" of an ostensibly "explicit" bribe, the November 7 meetings are its culmination. The Government claims that by meeting Ndukwe and Rob, and later agreeing to accept Rob's PAC donation, Sittenfeld in effect "accepted" the *quid pro quo* he earlier rejected. Govt.17, 40.

Here too, the Government seeks to transform common politics into corruption. It highlights how Sittenfeld promised at lunch he could "shepherd the votes," and did so without "any serious exploration" of 435 Elm. Govt.40. But these are "the types of comments public officials make day in and day out." Federal.Officials.11. Fundraising entails talking about what officials "intend to do or have done." *McCormick*, 500 U.S. at 272. When a politician boasts about his ability to "shepherd the votes," he is saying he is able to advance donors' priorities and is therefore worthy of support—not that his actions are for sale. This is not the coded language of a criminal.

Nor is there any inference to be drawn from how quickly Sittenfeld declared his support at lunch. The Government ignores that he already knew the merits of 435 Elm and had committed to back it (along with *every other* development project to come across his desk). Br.5; *infra* at 8. And while Sittenfeld reiterated he could "shepherd the votes" only "minutes into the meeting," those first minutes were full of FBI actors *lying* about how amazing 435 Elm was doing. App.54-56. The more telling temporal observation is that all this transpired before any discussion of fundraising—when Sittenfeld broke out his PowerPoint slides to try to sell Rob on his political pitch. Nobody would bother to do that if an "unambiguous" corrupt deal had just been sealed.

6

Regardless, even the Government does not say that an "explicit" *quid pro quo* was complete at lunch. Its theory now is that Sittenfeld "accepted" the corrupt offer in the condo with Rob afterwards. Govt.17, 40. But *even Rob* does not believe this. Sittenfeld missed the pitch: When Rob asked him how to get his illicit "deal" done, Sittenfeld asked if the Mayor would "veto" it. Govt.16-17. As Rob thus conceded at trial, and as the video confirms, the two were talking past (and over) each other: Sittenfeld never understood Rob to be offering a *quid pro quo*, and never accepted one. He just reassured Rob about 435 Elm's prospects. R.265.PageID.6157; R.269.PageID.6751-52.[1]

In its best light, the Government's theory is Sittenfeld knew what "Rob wanted" from him (Govt.14); Rob tried to use his contributions to lock in that support; and Sittenfeld still took his donation. But *McCormick* demands more than this 30,000 foot account—precisely because of its first-blush appeal. Every politician knows what his donors want him to do; indeed, interest groups often have "scorecards" making it plain. Federal.Officials.9. Soliciting funds with an eye to such "favorable future action" is not corruption. *McCormick*, 500 U.S. at 276 (Scalia, J., concurring). A contribution is only a bribe if made "in exchange for an explicit promise of favorable future action." *Id.* And Sittenfeld's actual words and conduct here offer simply zero proof of *that*.

---

[1] Contrary to the Government's nonsensical suggestion in a footnote (Govt.44 n.6), Sittenfeld did not testify to taking a bribe. Quite the opposite. He explained that he understood Rob to be lamenting about how 435 Elm might stall before the city, and that Rob wanted to get the *development* "deal done" over Mayor Cranley's opposition— he never heard Rob to be offering an *exchange* of any kind. R.269.PageID.6751-52.

**5.** Lacking evidence of an explicit deal, the Government tries to back-fill with acts Sittenfeld took *after* the supposed agreement was reached—while ignoring his many actions that would be insane for someone taking bribes. *See* Federal.Prosecutors.18-19. Specifically, the Government claims that Sittenfeld carried out his end of the bargain by exhibiting "eagerness" to support 435 Elm after meeting with Rob, even as he faced opposition within the bureaucracy. Govt.42. This is grasping at straws. It is not usually a bad thing for an official to do what he said he would do, so long as the initial promise was not corruptly traded. And the evidence here does not make a corrupt trade any more likely than good-faith follow-through on Sittenfeld's long-held policy priorities.

To start, the Government is wrong that Sittenfeld only began backing 435 Elm after meeting with Rob; he had pledged his support before even knowing Rob existed. R.269.PageID.6730-35. Sure, he did not take concrete steps to "advance" the project then; that is the so-called "conflicting testimony." Govt.44. But there was no evidence he *even could have*; it was only once 435 Elm got before council that he could (and did) try to advance it, *like every other similar project*. R.269.PageID.6724-28 (describing past work with Port CEO Brunner); R.240.PageID.4668-78 (Brunner discussing same).

Nor can the Government reframe Sittenfeld's zeal as guilt. It never engages with how the FBI plied Sittenfeld with false information to gas him up about the project. So of course Sittenfeld disagreed with others in the government; he was operating from radically different "facts," and could not see why others disagreed. R.269.PageID.6738-41 (Sittenfeld discussing "fiction" and resulting "disconnect" it caused with Brunner).

**6.**    Finally, the Government brands as suspect how Sittenfeld helped Rob donate anonymously.  Govt.18-21, 41.  This is worst of all.  Contributing anonymously was the *FBI*'s idea; and the rationale (political blowback) is precisely why the practice is constitutionally protected.  Br.33.  Sittenfeld helped Rob navigate this process, and did so wholly within the bounds of the law—even as the agents tried to skirt it.  Nothing about this is *criminal*, even if laypeople may find it *distasteful*.  But it is a perfect example of the Government's continued attempt to blur the two.[2]

**The Caselaw.**  No court has ever affirmed a federal bribery conviction on a record like this.  Former.Prosecutors.15.  The Government's examples do not compare, and it offers almost nothing in response to the cases supporting Sittenfeld.

The Government primarily relies on *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013); *United States v. Correia*, 55 F.4th 12 (1st Cir. 2022); and *United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015).  For the most part, however, it invokes them only for undisputed points: that an "explicit" *quid pro quo* need not be "express," and can be established through inferential evidence.  Govt.48.  Other than that, the Government barely discusses their facts, or compares them to the facts here.  Strategically so.

---

[2] In its background section, the Government notes that Sittenfeld later told his political consultant that Rob (and others) were "sleazy" and perhaps undercover agents. Govt.23-24.  But it does not return to these points in its argument section, for good reason: Nothing in these asides betrays any suggestion that Sittenfeld believed he was acting corruptly.  Just the opposite: He told the consultant he had nothing to worry about because he "didn't do anything wrong."  R.267.PageID.6506.  Indeed he did not.

To begin, both *Correia* and *Blagojevich* involved *express* exchanges—which, while not required, certainly make it easier to satisfy *McCormick*'s standard. *See, e.g.*, *Correia*, 55 F.4th at 21-24 (mayor had aide tell people he was "looking to get a donation or a bribe" and that his actions came with a "cost"); *Blagojevich*, 794 F.3d at 734 (governor said "bill would not be signed until the money arrived"). This case involves nothing like that.

As for *Terry*, it is a good example of how an "explicit" *quid pro quo* need not be express or include "magic words" (Govt.52)—but stands in stark contrast to this case. There, the nature of the *quid pro quo* was inescapably corrupt: The Government proved the judge was deciding cases at the donor's direction, without even reading the files. Unlike support for a development project, there is no innocent political explanation for that conduct. Sure, the judge tried to offer "legitimate" reasons, 707 F.3d at 615—but, unlike here, none was "plausible," R.283.PageID.7140. Judges are sometimes elected, but their role means they are not analogous to legislators when it comes to fundraising. *Cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (upholding ban on personal solicitation of donations by judicial candidate). *Terry* is a good illustration of that principle.

On the other hand, Sittenfeld cited a series of cases that found similar records insufficient. The Government's cursory efforts to distinguish them fail. Govt.48-49.

To start, the Government essentially cuts bait with the Ninth Circuit. It ignores *United States v. Inzunza*, which affirmed vacatur of a bribery conviction under *McCormick* because (as here) the defendant's conduct could be fairly seen as an "innocent political act." 638 F.3d 1006, 1025 (9th Cir. 2011).

10

Likewise, the Government accepts that its position cannot be reconciled with *United States v. Benjamin*, 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022), but blames that on a difference in circuit law.  Govt.48.  Not so.  While *Benjamin* did note that some circuits require an "express" *quid pro quo*, 2022 WL 17417038 at *8 n.6, it did not rest on that ground, *id.* at *11 (agreeing that "explicit" *quid pro quo* can be "shown by *conduct*" so long as it is "clear and unambiguous").  Instead, it dismissed the indictment because "temporal proximity, winks and nods, and vague phrases" are not sufficient to satisfy *McCormick*'s "heightened legal standard." *Id.* at *10.  And, contrary to the Government, the fact that *Benjamin* involved dismissal of an indictment only makes this case *a fortiori*: An indictment is sufficient so long as the Government *alleges* a complete offense; that is an even more forgiving standard than the one here.

As for *United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2015), it is true there was no evidence "that the defendants were aware of the terms of the alleged quid pro quo." Govt.48.  But the court held that only *after* it rejected the exact gap-filling moves the Government is trying (again) here.  The court reasoned that: (i) an official escalating support for a project following a donation is not indicative of wrongdoing; (ii) "strong advocacy" for a project is not either, especially when "consistent with a position" the official had adopted "earlier"; and (iii) using anonymous donations as evidence of criminal activity would "raise[] significant First Amendment concerns." 291 F. Supp. 3d. at 627-32.  Offered little more, the court held the case fell short of *McCormick*'s "heightened" evidentiary bar.  *Id.* at 631.  So too here.

11

At minimum, the evidence here falls short of what fell short in *McCormick* itself. The Government does not dispute this, but instead contends that *McCormick* was only about jury instructions (not sufficiency). Not so. The Court stated plainly that the facts failed to show a bribe had been "made out." 500 U.S. at 272; *see also id.* at 281-82 (Stevens, J., dissenting) (reading majority as holding that "facts" did not reveal "explicit" *quid pro quo*). Courts have thus used the facts of *McCormick* as a shorthand: "Whatever an 'explicit' quid pro quo might entail, it must be more explicit than the exchange in *McCormick*—in which the Court reversed the conviction for lack of a sufficiently 'explicit' quid pro quo." *Benjamin*, 2022 WL 17417038, at *10.

The Government emphasizes (Govt.51) *McCormick*'s observation that "matters of intent are for the jury to consider." 500 U.S. at 270. It overreads that quote, which comes from the first part of the decision, chiding the Fourth Circuit for affirming based on jury instructions never submitted to the jury. *Id.* at 269-70. But the *McCormick* Court held that the Fourth had erred in "two respects." *Id.* at 269. The second error was the lower court's failure to appreciate what was required for campaign-contribution bribery. And for *that* inquiry, the Court underscored that while "the intention of the parties is a relevant consideration," it is not the entire analysis. *Id.* at 271. There must be, once more, unmistakable evidence of a corrupt bargain—an "explicit" *quid pro quo*. Instead, the Government has offered only attenuated inferences from a set of vague stitched-together comments across multiple distinct conversations over the course of weeks. That does not suffice.

12

### B.    The Government Cannot Evade *McCormick*'s Standard.

Perhaps unsurprisingly, the Government comes to sidestep *McCormick*, not to satisfy it.  Its main argument is that the jury was instructed to find an "explicit" *quid pro quo*—an illicit deal, clear in understanding—so it was ultimately their call whether one happened.  Govt.33-37, 50-57.  But even with adequate instructions, the Government must put forward sufficient evidence of the specific offense charged under its particular standard.  *See, e.g.*, *United States v. Ferguson*, 65 F.4th 806, 814-17 (6th Cir. 2023) (vacating conviction absent any instructional error).

*Especially* here.  The premise of *McCormick*—the reason campaign-contribution bribery needs its own rule—is that lay juries cannot reliably parse money-in-politics from criminal corruption.  And that animating intuition turns out to be empirically true.  Studies show that a super-majority of people—even after receiving proper jury instructions—are willing to brand an unambiguously *lawful* campaign donation as an illicit bribe.  Law.Profs.17-19.  After all, why else are these guys donating so much?  The federal courts thus must play a robust role in ensuring that the Government actually carries its *McCormick* burden.  Absent a meaningful judicial check, too much of the "everyday business of a legislator" will become fodder for conviction based on a jury's sense of "ethical considerations and appearances."  500 U.S. at 272.  And rather than risk it at trial, Americans will stop contributing; elected leaders will stop acting on behalf of their constituents; and a "chill" over "speech … essential to our democracy" will follow.  Former.Electeds.4-5.

To be clear, Sittenfeld is not asking the Court to determine his culpability anew, or to "displace" the sufficiency standard. Govt.49. He is simply asking this Court to do what it must do in every criminal case: Analyze *de novo* whether the evidence is sufficient to convict under the applicable legal standard. *United States v. Woods*, 14 F.4th 544, 552 (6th Cir. 2021). The only difference is that the applicable legal standard here—which, yes, Sittenfeld "fixat[es] on" (Govt.32)—is heightened to protect constitutional interests. This Court's review is in turn more exacting, commensurate with that heightened burden. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986) ("a higher burden of proof should have a corresponding effect on the judge"). In other words, because *McCormick* accounts for fundamental First Amendment considerations by raising the sufficiency standard for the Government, this Court must ensure that the evidence is sufficient to satisfy *that* standard—and in so doing, take care to "make sure" the judgment "does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).[3]

So even accounting for a jury's leeway, this Court must verify that the evidence reasonably proved a *clear and unambiguous* exchange. As shown above, it did not.

---

[3] In *United States v. Hunt*, 82 F.4th 129 (2d Cir. 2023), the Second Circuit declined to apply more exacting review in the context of true threats, because that doctrine "relies on the sensibilities of ordinary people," and as such, "the court is no better equipped than the jury—and is arguably less equipped—to answer whether a statement is a true threat." *Id.* at 136. But the precise *opposite* is true here, where *McCormick* assigns an integral "role to the judge" to supervise "otherwise elusive constitutional standards" distinguishing the usual give-and-take of politics from an unlawful *quid pro quo. Id.*

The Government resists the premise that *McCormick* heightens its evidentiary burden of proof. It insists that proof of a "clear and unambiguous" exchange, *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992), does not require "clear and unambiguous evidence." Govt.56 n.12. The mind rebels: How can *ambiguous* evidence prove an *unambiguous* bribe? Abstractions aside, the reality is that *McCormick* creates a legal rule for the sort of record from which a jury can discern corruption in this context: There must be unmistakable evidence of an exchange. If the record can reasonably be seen as ordinary politics, it is legally insufficient. And if a jury finds a bribe on such a record, it has not applied *McCormick*—it has watered it down.

The Government tries its own watering down, suggesting *McCormick* demands clarity only as to the *terms* of the alleged bargain, as opposed to its *existence*. Govt.52-53. The *McCormick* Court recognized *quids* and *quos* are (by design) ubiquitous in a country with a First Amendment and representative government. So if *McCormick*'s standard only required a clearly *defined* bribe, it would mean nothing; a prosecutor will always be able to link a donation to a possible or actual act. Every campaign-contribution bribe case thus ultimately comes down to the *pro* (the exchange)—and that element too must be "explicit" (*i.e.*, clear and unambiguous), no less than the *quid* and *quo*. Otherwise we are right back to what the Supreme Court found constitutionally intolerable.

Finally, for similar reasons, it is not enough that the jury found "intent." Govt.50. Intent is "easy to allege and hard to disprove." *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998). That is why, under *McCormick*, a jury cannot condemn a campaign donation as

a bribe based merely on its perception of subjective guilt. That regime would "open to prosecution" too much conduct both "unavoidable" and "well within the law," creating the very chill *McCormick* sought to thaw. 500 U.S. at 272. So while "intent" is always "relevant"—and indeed *necessary*—it cannot be *sufficient*. *Id.* at 270-72. Along with proof of a defendant's *mens rea*, the Government must marshal objective proof of an "explicit" exchange—*i.e.*, an unambiguous corrupt bargain. *Id.* at 272. That is what divides an "explicit" *quid pro quo* from a *quid pro quo simpliciter*. *United States v. Abbey*, 560 F.3d 513, 517 (6th Cir. 2009) ("But not all quid pro quos are made of the same stuff.").

Contrary to the Government's caricatures, none of this sidelines juries. If a politician takes the stand to insist he was joking when he accepted an express *quid pro quo* on a recorded line, it is the jury's prerogative to discredit him. In a he-said-she-said, the jury determines who is telling the truth. But once those *factual* findings are made, courts must ensure such evidence is *legally* sufficient—after all, "there is not a public-corruption exception for sufficiency challenges." Govt.31.

Here, that task is streamlined. This prosecution was manufactured, so there is no dispute about *what* happened; the only issue is whether *the undisputed record* is sufficient. *Cf. Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Does it reveal an unmistakable corrupt bargain, or permit a plausible explanation that sounds in ordinary politics? This Court must make that legal determination, and the result is clear: *McCormick* demands more than proof that a pro-development official agreed to support a donor's development and then followed through. Sittenfeld's convictions must be reversed.

16

## II. THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT.

At minimum, a new trial is required, because the Government improperly (and, it seems, *successfully*) urged the jury to convict for conduct distinct from the indictment's charges. As the Government admits, the Indictment's "to wit" clauses specified that its counts were based on bribes in the form of "PAC" donations "from Rob." Govt.61; R.3, ¶¶ 42, 44. But the Government never disputes that, at trial, prosecutors told the jury to convict based solely on Sittenfeld's "love you but can't" comment, supposedly a corrupt solicitation of *direct contributions* (not PAC donations) from *Ndukwe* (not Rob). Br.42; Govt.62. That is a classic constructive amendment. The Government cannot wriggle out of the indictment's specificity, nor escape the consequences of its jury pitch.

### A. The Government Cannot Ignore the "To Wit" Clauses.

Below, the Government argued—and the court agreed—that "to wit" clauses are merely illustrative, and therefore do not hem in the prosecution. Softening that position, it now contends that a "to wit" clause does not "narrow[] the indictment" so long as the allegations providing the alternative ground to convict are "incorporated into the charge," such as through a boilerplate cross-reference. Govt.63-64. That is still wrong, as a matter of plain meaning, purpose, and precedent alike.

The whole point of a "to wit" clause is to *narrow*—to make "more specific"—the generic offense. *To Wit*, *The New Oxford American Dictionary* (2001). Such a clause serves a purpose *precisely when* an indictment contains multiple allegations that could arguably give rise to the offense. Whether the other allegations are "incorporated" into the count

17

makes no difference, since the "to wit" clause then specifies *which* of those allegations constitute the offense charged. Where a grand jury has chosen to be precise about the particulars, that is not just "inartful[] word[ing]" (Govt.64), and the Government may not then seek conviction based on other allegations, wherever found in the indictment. *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008) (Gorsuch, J.).

Indeed, the Supreme Court rejected this very gambit in *Stirone*. Contrary to the Government's claim here (Govt.66), the Government there argued that the indictment included allegations about steel, not only about sand. *See* U.S. Br., *Stirone v. United States*, 361 U.S. 212 (1960) (No. 35), 1959 WL 101621, at *35; *see also United States v. Stirone*, 262 F. 2d 571, 574 (3d Cir. 1958) (describing indictment's allegation that shipments were used to construct steel mill). But the Court held that because the indictment had specified interference with "sand" *in the charging section*, it could not "fairly be read as charging interference with movements of steel." 361 U.S. at 217. So too here.[4]

None of the Government's cited cases supports its position that incorporation of other allegations defeats the narrowing function of a "to wit" clause. Three of its four cases involved indictments that did not have a "to wit" clause at all (or anything similar). *See United States v. Khalupsky*, 5 F.4th 279, 293-94 (2d Cir. 2021); *United States v.*

---

[4] Similarly, it makes no difference that the indictment did not specifically allege "threats of physical violence" (Govt.66) in *United States v. Cusmano*, 659 F.2d 714 (6th Cir. 1981). It did allege "extortion." *Id.* at 715. But for the narrowing "to wit" clause, that would have *encompassed* the threats of physical violence proved at trial.

*Bradley*, 917 F.3d 493, 503 (6th Cir. 2019); *United States v. Moore*, 129 F.3d 873, 878 (6th Cir. 1997). Only *United States v. Agrawal* involved such a clause, and it applied the Second Circuit's idiosyncratic view—contrary to the law of this Circuit, and no longer advanced by the Government on appeal—that "to wit" clauses are always "illustrative rather than definitional." 726 F.3d 235, 261 (2d Cir. 2013).

In addition, the Government's approach here would render the indictment unlawfully duplicitous. A corrupt agreement with Ndukwe and a corrupt agreement with Rob would be two distinct offenses that must be charged as distinct counts. *United States v. Boyd*, 640 F.3d 657, 665-66 (6th Cir. 2011); *United States v. Dedman*, 527 F.3d 577, 599 n.10 (6th Cir. 2008). Yet the Government reads each of Count 3 and 4 as charging Sittenfeld with both. Only when the "to wit" clauses are given effect do these counts each lawfully charge a single offense, relating to Rob.

## B.    The Government Exceeded the "To Wit" Clauses.

The Government thus needed to stick to the terms of its "to wit" clauses—*i.e.*, it needed to convict Sittenfeld for entering a corrupt agreement involving *PAC donations* from *Rob*. The Government failed to adhere to this limit, for both counts.

At the outset, the Government cannot evade review by claiming that Sittenfeld waived or even invited this error in connection with the jury instructions. Govt.58-60. The district court considered and adjudicated the constructive amendment claim on the merits. R.283.PageID.7149-53. As this Court has explained, "there can be no forfeiture where the district court nevertheless addressed the merits of the issue." *Cartwright v.*

*United States*, 12 F.4th 572, 580 n.6 (6th Cir. 2021). And the same principle applies to claims of invited error. *United States v. Wells*, 519 U.S. 482, 487-88 (1997); *McCormick*, 500 U.S. at 271 n.9. This Court's review is therefore *de novo*.[5] And, regardless of the standard of review, the error here compels a new trial.

**Count 3.** The Government does not dispute that prosecutors argued to the jury that Sittenfeld's "love you but can't" comment to Ndukwe was a "corrupt solicitation," which alone sufficed to convict on Count 3. Br.42; Govt.62-64. Echoing the district court, the Government tries to square that argument with the "to wit" clause by arguing that Ndukwe and Rob were effectively "indistinguishable." Govt.65. But its heart is not in the argument. As Sittenfeld detailed, this theory was fatally flawed at least three times over. The Government barely attempts to respond.

---

[5] In all events, Sittenfeld *did* properly object to the relevant jury instructions. He objected that the instructions were "too vague" because they failed to identify the "specific individual" who was the bribe payor. R.107.PageID1181. That objection was timely, because it was made "before the jury retire[d] to deliberate." Fed. R. Crim. P. 30(d). And it was fairly understood to apply to Counts 3 and 4 alike, because the Government's proposed instructions used the identical phrase "another person" to identify the bribe payor in Count 4. R.98.PageID.1048.

The charge of invited error is even weaker. The Government says that Sittenfeld proposed an instruction identifying the bribe payor for Count 4 as "another person," rather than Rob. But he did so *before trial*. R.97.PageID.997. There was no indication, at that time, the Government was going to seek to convict based on an agreement with Ndukwe. Had the Government stuck to the to-wit clauses, the instructions would have posed no problem. Thus, it was the Government, not Sittenfeld, that "provoke[d] the court" to err. *United States v. Akridge*, 62 F.4th 258, 263 (6th Cir. 2023).

*First*, the theory contradicts the indictment. Although the indictment makes clear that the contributions discussed in the October 30 call would come from "Ndukwe's investors" (Govt.65), it goes on to specify that those investors were "others" *besides Rob*, and they would be contributing *directly* to Sittenfeld's campaign (not a PAC). *See* R.3 ¶ 13; Br.47-48. *Second*, the trial evidence confirmed as much; the "others" from whom Ndukwe could gather contributions were "friends up in Columbus"—not Rob, down in North Carolina. App.41, 52; *see* Br.47-48.[6] *Finally*, the "conduit" theory was never put to the jury, even as the Government *did* tell the jury the October 30 call was a standalone offense. Br.48-49. On all three points, the Government is silent, implicitly admitting that a belated conflation of Ndukwe with Rob cannot cure the problem.

**Count 4.** The Government argues that even if it constructively amended Count 3, the jury instructions for Count 4 did not use the term "solicit" and so the jury could not have convicted on Count 4 based on the Ndukwe solicitation. Govt.67-69.

That is mistaken. As the Government concedes, the jury could convict on Count 4 if Sittenfeld "agreed to accept" a bribe. Govt.67. By claiming his "love you but can't" comment was a corrupt solicitation, the Government branded it as an *offer* to participate

---

[6] This point also gives the lie to Sittenfeld's supposed admission that Rob was an "extension" of Ndukwe. Govt.65. In the cited testimony, Sittenfeld explained that when Mayor Cranley retaliated against Ndukwe by obstructing 435 Elm, he in effect also retaliated against Rob, as an investor. R.269.PageID6801-02. Sittenfeld never said he saw any donation from Ndukwe as effectively from Rob, an idea flatly inconsistent with the October 30 call and with how Sittenfeld independently pitched Rob.

in a bribe. *See, e.g.*, R.266.PageID.6247. A jury accepting that premise could easily take Ndukwe's responses—"we'll make something happen," and he would "go to work on" collecting contributions (App.42)—as accepting the corrupt offer, thereby forming an *agreement* that Sittenfeld would accept a bribe from Ndukwe. The Government calls this "nonsensical" (Govt.68), but Judge Cole thought it was true. He wrote that "love you but can't" was "the best example" of a corrupt agreement *for both counts*. R.283.PageID.7140.

The Government resists, claiming it never told the jury to convict on Count 4 based on the October 30 call. Govt.69. In fact, prosecutors repeatedly identified that call as conclusive proof of Sittenfeld's corrupt intent—without any suggestion that its significance was cabined to Count 3. Br.48-49. In any event, a constructive amendment occurs where the "admission of evidence," combined with the jury instructions, enables the jury to convict "on a charge the grand jury never made." *Stirone*, 361 U.S. at 219; *see also Cusmano*, 659 F.2d at 719. Here, the Government played the entire recording of the October 30 call multiple times at trial; the instructions for Count 4 allowed the jury to convict based on an illicit deal with Ndukwe for direct contributions; and the Government emphasized the sufficiency of that exchange elsewhere in its closing. R.251.PageID.4978-79, 5002; R.263.PageID.3700; R.266.PageID.6246-48.

At the very least, a new trial is required because it "cannot be said with certainty" that the jury convicted Sittenfeld "solely" for a corrupt agreement with Rob, as opposed to one with Ndukwe. *Stirone*, 361 U.S. at 217.

Indeed, it appears the jury *did* convict by finding an agreement with Ndukwe. That is the only way to explain why the jury convicted on Counts 3 and 4 even as it acquitted on Count 1—which was based on the same underlying events, but where the instructions required a corrupt agreement *with Rob.* Br.43. The Government never even attempts to rebut this. The constructive amendment here is thus not merely some technicality—but quite likely the reason Sittenfeld was convicted.[7]

\*       \*       \*

The Government proved only ordinary politics and routine fundraising, not an explicit *quid pro quo.* And on top of that, it induced the jury to convict based on conduct beyond what the indictment actually charged. An innocent man now sits in prison as a consequence. This Court should reverse, or at minimum order a new trial.

---

[7] Even if plain-error review applied, it would warrant a new trial. The error was obvious because "binding case law"—*Cusmano*—requires the Government to adhere to the terms of a to-wit clause. *United States v. Cavazos*, 950 F.3d 329, 337 n.3 (6th Cir. 2020). Because "constructive amendments" are "*per se* prejudicial," they necessarily "satisf[y] the [affecting-substantial-rights] prong of the plain error standard." *United States v. Belcher*, 92 F.4th 643, 650 (6th Cir. 2024). And because the grand jury right is a "long-standing and fundamental foundation of a fair trial," a constructive amendment seriously affects "fairness, integrity, and the public reputation of judicial proceedings," *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018), at least where (as here) the Government fails to notify the defendant pre-trial that it intends to seek a conviction on an alternative basis.

February 29, 2024

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., NW
Suite 300
Washington, DC 20006
(602) 501-5469
james@kingstlegal.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(202) 326-3939
amaugeri@jonesday.com

Respectfully submitted,

*/s/ Yaakov M. Roth*
Yaakov M. Roth
Harry S. Graver
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-7658
yroth@jonesday.com

Justin E. Herdman
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7113
jherdman@jonesday.com

*Counsel for Appellant*

24

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,495 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Garamond style, 14 point font.

February 29, 2024                          */s/ Yaakov M. Roth*
                                           Yaakov M. Roth

**CERTIFICATE OF SERVICE**

I hereby certify that on February 29, 2024, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ *Yaakov M. Roth*
Yaakov M. Roth